

INTERNATIONAL | INTERNATIONAL | LEADING DISPUTE
COURT OF | CENTRE | RESOLUTION
ARBITRATION® | FOR ADR | WORLDWIDE

WE HEREBY CERTIFY THAT THIS IS
A TRUE COPY OF THE ORIGINAL

ADDLESHAW  GODDARD LLP

DATE .......1.711.17.6...............

ADDLESHAW GODDARD LLP

# AWARD

**INTERNATIONAL CHAMBER OF COMMERCE (ICC)**
**INTERNATIONAL COURT OF ARBITRATION**

33-43 avenue du Président Wilson, 75116 Paris, France
**T** +33 (0)1 49 53 29 05  **F** +33 (0)1 49 53 29 33
**E** arb@iccwbo.org   www.iccarbitration.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No 18806/ARP/MD/TO

KONOIKE CONSTRUCTION CO. LIMITED

(Japan)

**vs/**

**1.** THE MINISTRY OF WORKS

(Tanzania)

**2.** TANZANIA NATIONAL ROADS AGENCY

(Tanzania)

**3.** THE MINISTRY OF TRANSPORT

(Tanzania)

**4.** THE ATTORNEY GENERAL OF THE UNITED REPUBLIC OF TANZANIA

(Tanzania)

This document is an original of the Final Award rendered in conformity with the
Rules of Arbitration of the ICC International Court of Arbitration.

INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION
ICC Case No. 18806/ARP/MD/TO

BETWEEN:

## KONOIKE CONSTRUCTION CO., LTD (Japan)

**Claimant**

-v-

## (1) THE MINISTRY OF WORKS (Tanzania)
## (2) TANZANIAN NATIONAL ROADS AGENCY (Tanzania)
## (3) THE MINISTRY OF TRANSPORT (Tanzania)
## (4) THE ATTORNEY GENERAL OF THE UNITED REPUBLIC OF TANZANIA (Tanzania)

**Respondents**

**FINAL AWARD**

## TABLE OF CONTENTS

I.      INTRODUCTION………………………………………………………….3

II.     BACKGROUND TO THE DISPUTES…………………………………… 22

III.    THE ADDENDUM CLAIMS…………………………………………….. 42

IV.     THE SUSPENSIONS CLAIMS………………………………………….. 89

V.      OTHER DELAY AND DISRUPTION CLAIMS……………………….... 123

VI.     EXTENSIONS OF TIME AND LIQUIDATED DAMAGES………… 136

VII.    PROLONGATION AND DISRUPTION COSTS………………………141

VIII.   TERMINATION………………………………………………………..160

IX.     CLAIMS ARISING FROM TERMINATION…………………………..188

X.      THE FINAL ACCOUNT…………………………………………… 205

XI.     THE CLAIMANT'S DAMAGES CLAIMS……………………………. 217

XII.    THE CLAIMANT'S CLAIMS FOR VAT, FINANCING AND

        INTEREST………………………………………………………….... 235

XIII.   COUNTERCLAIMS………………………………………………….... 242

XIV.    COSTS………………………………………………………………...249

XV.     SUMMARY OF DECISIONS…………………………………………. 261

XVI.    FINAL AWARD……………………………………………………….. 275

## SECTION I: INTRODUCTION

1. In this Section, the following background issues are addressed:

   a. Definitions;

   b. Referencing;

   c. Parties and their legal representatives;

   d. Arbitral Tribunal;

   e. Arbitration Agreement, Applicable Law and Place of Arbitration;

   f. Procedural history of the Arbitration;

   g. Partial Award;

   h. Fact witnesses;

   i. Expert witnesses, their reports and joint statements;

   j. Tanzanian law;

   k. Parties' list of issues.

**Definitions**

2. In this Award, the following terms and expressions are used:

   **"Accepted Contract Amount"** means the amount claimed in Clause 1.1.14 of the Contract.

   **"Addendum"** means Addendum No. 1 (to the Contract) dated 15 March 2007.

   **"Arbitral Tribunal"** or **"Tribunal"** means the tribunal appointed by the Parties as set out in this section.

   **"CCS"** means the Claimant's written closing submissions.

   **"Claimant"** or **"Konoike"** means the Claimant in this arbitration as set out in paragraph 4 below.

3

**"Contract"** means the construction contract entered into between the Claimant and the Ministry of Works dated 21 March 2003.

**"Contract price"** has the meaning ascribed to it in the Contract.

**"Contractor"** has the meaning ascribed to it in the Contract.

**"DoS"** means the Deed of Settlement dated 15 March 2007.

**"Employer"** has the meaning ascribed to it in the Contract.

**"Engineer"** has the meaning ascribed to it in the Contract.   The original Engineer, Roughton International was replaced by Black & Veatch.

**"FIDIC"** means Federation Internationale Des Ingenieurs-Conseils.

**"GNT"** means the Government Negotiating Team formed for the purpose of negotiating a settlement with Konoike in late 2006.

**"GST"** means the Government Special Team appointed by the Government to review the Project in November 2006.

**"Government"** means the Government of the United Republic of Tanzania.

**"ICC"** means the International Chamber of Commerce.

**"ICC Court"** means the ICC International Court of Arbitration.

**"ICC Rules"** means the 1998 ICC Rules of Arbitration.

**"IPC"** means Interim Payment Certificate.

**"Japanese Yen"** or **"JYN"** means the currency of Japan.

**"Letter of Acceptance"** means the letter sent by the Employer to the Claimant dated 14 March 2009 informing the Claimant that its Tender had been accepted **[E2/228/230]**.

**"MoID"** means the Ministry of Infrastructure and Development of Tanzania.

**"MoU"** means the Memorandum of Understanding dated 30 January 2007.

**"Outstanding Amount"** means the sum of USD 10,602,746.36 which Konoike alleges was owed to it as Price Escalation on the Foreign Currency element of IPCs 7 – 16.

**"Pre-Bid Meeting Minutes"** means the minutes of the meeting held on 25 November 2002 in relation to the tender for the design and construction of the Dodoma-Manyoni and the Manyoni –Singida Roads **[G1/1/1]**.

**"Parties"** means the Claimant and the Respondents together unless the context requires otherwise, and **"Party"** means each individually as the context requires.

**"Price Escalation"** has the meaning ascribed to it in the Contract.

**"Project"** means the design and construction of the Road by the Contractor under the Contract.

**"RCS"** means the Respondents' written closing submissions.

**"Regulations"** means the Public Procurement (Goods, Works, non-Consultant Services and Disposal of Public Assets by Tender) Regulations 2005, GN No. 97.

**"Respondents"** means the Respondents in this arbitration as set out in paragraphs 6-9 below.

**"Road"** means the road from Dodoma to Manyoni.

**"Schedule"** means the Schedule of Costs and Percentages of Listed Elements in the Contract **[E1/6/108]**.

**"Section"** means a section of the Road.

**"Section 1"** means Km 0 (Dodoma) to Km 63 (Uhelela) of the Road.

**"Section 2"** means Km 63 (Uhelela) to Km 84 (Chikuyu) of the Road.

**"Section 3"** means Km 84 (Chikuyu) to Km 110 (Muhalala) of the Road.

**"Section 4"** means Km 110 (Muhalala) to Km 127 (Manyoni) of the Road.

"**Tanroads**" means the Second Respondent, Tanzania National Roads Agency.

"**Tanzanian Shillings**" or "**TZS**" means the currency of the United Republic of Tanzania.

"**Tanzania**" means the United Republic of Tanzania.

"**US Dollars**" or "**USD**" means the currency of the United States of America.

"**Works**" has the meaning ascribed to it in the Contract.

**Referencing**

3. The following referencing system is used:

    a. Transcript citations: the citation **[T1/1/1]** refers to the transcript of the hearing on day 1, page 1, line 1.

    b. Documents: identified by their electronic hearing bundle reference - **[A1/1.1/1]**.

    c. Expert reports: identified by the name of the expert, the number of the expert report and the paragraph number of the expert report.

    d. Witness statements: identified by the name of the witness, the number of the witness statement and the paragraph number of the witness statement.

**Parties and their legal representatives**

4. The Claimant is Konoike Construction Co. Limited, a limited liability company, incorporated under the laws of Japan, whose address and registered office is at 3-4-5, Umeda, Kita-ku, Osaka 530-8517, Japan.

5. The Claimant is represented in this arbitration by:

    Mr David Thomas QC

    Ms Jane Lemon QC

Keating Chambers

15 Essex Street

London WC2R 3AA

Tel:          +44 (0)20 7544 2600

Fax:          +44 (0)20 7544 2700

Email:        dthomas@keatingchambers.com

Email:        jlemon@keatingchambers.com


Mr Simon Delves

Mr Ben Mellors

Ms Claire Miller

Mr Nicholas Smith

Beale and Company Solicitors LLP

Capital House

85 King William Street

London EC4N 7BL

Tel:          +44 (0)20 7469 0400

Fax:          +44 (0)20 7469 0401

Email:        s.delves@beale-law.com

Email:        b.mellors@beale-law.com

Email:        c.miller@beale-law.com

Email:        n.smith@beale-law.com

6.  The First Respondent is the Ministry of Works (Tanzania) whose address is PO Box 9423, Dar es Salaam, Tanzania. The First Respondent is a Ministry of the Government of the United Republic of Tanzania.

7.  The Second Respondent is the Tanzanian National Roads Agency (**"Tanroads"**) whose office is at ZAIN House, Fl 3 and 4, Corner Ali Hassan Mwinyi Road / Kawawa Road, Kinondoni, Dar es Salaam, Tanzania. Tanroads is an Executive Agency of the Government of the United Republic of Tanzania established pursuant to section 3(1) of the Executive Agencies Act, and operational since July 2000.

8.  The Third Respondent is the Ministry of Transport whose address is PO Box 9144, Dar es Salaam, Tanzania. The Third Respondent is a Ministry of the Government of the United Republic of Tanzania.

9.  The Fourth Respondent is the Attorney General of the United Republic of Tanzania whose address is PO Box 9050, Dar es Salaam, Tanzania. The Attorney General is the chief legal adviser to the Government Departments and Ministries of the United Republic of Tanzania.

10. The Respondents are represented in this arbitration by:

Mr D Brian King

Mr Jonathan Gass

Mr Carlos Ramos-Mrosovsky

Mr Lee Rovinescu

Mr Francisco Franco Rodriguez

Ms Tessa Hayes

Mr Michael Xiao

Freshfields Bruckhaus Deringer US LLP

601 Lexington Avenue

31st Floor

New York, NY 10022

USA

Tel:    +1 212 277 4020

Fax:   +1 646 521 5620

Email: brian.king@freshfields.com

Email: jonathan.gass@freshfields.com

Email: carlos.ramos-mrosovsky@freshfields.com

Email: lee.rovinescu@freshfields.com

Email: francisco.francorodriguez@freshfields.com

Email: tessa.hayes@freshfields.com

Email: michael.xiao@freshfields.com


Ms Jane Davies Evans

Crown Office Chambers

2 Crown Office Row

London

EC4Y 7HJ

Tel:         +44 (0)20 7797 6221

Fax:        +44 (0)20 7797 8101

Email:      davies_evans@crownofficechambers.com

**Arbitral Tribunal**

11. The members of the Arbitral Tribunal are:

Mr John Bellhouse

13 Gray's Inn Square

London WC1R 5JR

United Kingdom

Tel:            +44 (0)20 7067 1900

Email:         john@jmhbellhouse.com

Mr Bellhouse's appointment as President, on the joint nomination of the Parties, was confirmed by the Secretary-General of the ICC International Court of Arbitration pursuant to Article 13(2) of the ICC Rules (2012) on 26 February 2013.

Professor Douglas Jones AO

Level 15, 1 Bligh Street

Sydney, NSW 2000

Australia

Tel:            +61 2 9353 4120

Fax:           +61 2 8220 6700

Email:         dougjones@dougjones.info

Professor Jones' appointment, on the nomination of the Claimant, was confirmed by the Secretary-General of the ICC Court, pursuant to Article 13(2) of the ICC Rules (2012) on 10 January 2013.

Mr Graeme Christie

Simpson Grierson

88 Shortland Street

Private Bag 92518

1141 Auckland

New Zealand

Tel:        +64 9 977 5088

Fax:        +64 9 977 5028

Email:      graeme.christie@simpsongrierson.com

Mr Christie's appointment, on the joint nomination of the Respondents, was confirmed by the Secretary-General of the ICC Court, pursuant to Article 13(2) of the ICC Rules (2012), on 10 January 2013.

**Arbitration Agreement, the Applicable Law and Place of Arbitration**

12. The agreement to arbitrate is set out in Sub-Clause 20.6 (Arbitration) of the General Conditions of the Contract dated 21 March 2003 signed by Konoike and the Ministry of Works which provides:

*"Unless settled amicably, any dispute in respect of which the DAB's decision (if any) has not become final and binding shall be finally settled by international arbitration. Unless otherwise agreed by both Parties:*

11

**12**

*The dispute shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce,*

*The dispute shall be settled by three arbitrators appointed in accordance with these Rules, and*

*The arbitration shall be conducted in the language for communications defined in Sub-Clause 1.4 [Law and Language].*

*The arbitrator(s) shall have full power to open up, review and revise any certificate, determination, instruction, opinion or valuation of the Engineer, and any decision of the DAB, relevant to the dispute. Nothing shall disqualify the Engineer from being called as a witness and giving evidence before the arbitrator(s) on any matter whatsoever relevant to the dispute.*

*Neither Party shall be limited in the proceedings before the arbitrator(s) to the evidence or arguments previously put before the DAB to obtain its decision, or to the reasons for dissatisfaction given in its notice of dissatisfaction. Any decision of the DAB shall be admissible in evidence in the arbitration.*

*Arbitration may be commenced prior to or after completion of the Works. The obligations of the Parties, the Engineer and the DAB shall not be altered by reason of any arbitration being conducted during the progress of the Works. "*

13. Sub-Clause 1.4 (Law and Language) of the General Conditions of the Contract provides that:

   *"The Contract shall be governed by the law of the country (or other jurisdictions) stated in the Appendix to Tender. "*

14. The Appendix to Tender provides that the *"Governing Law"* is the *"Law of the Republic of Tanzania."*

15. The Parties agreed, and at its session of 11 October 2012, the ICC Court fixed London, United Kingdom, as the place of arbitration.

**Procedural history of the arbitration**

16. On 3 April 2012, the Claimant notified the Respondents of its intention to commence this arbitration.

17. The Claimant submitted a Request for Arbitration dated 4 July 2012 (received by the ICC Secretariat on 5 July 2012).

18. At its session of 11 October 2012, the ICC Court decided that this arbitration shall proceed between the Claimant and the Respondents, pursuant to Article 6(4) of the ICC Rules (2012).

19. The Respondents submitted an Answer and Counterclaim dated 13 September 2012, and the Claimant submitted a Reply to the Answer and Counterclaim dated 24 October 2012.

20. On 2 November 2012, the Claimant acknowledged that the MoID had ceased to exist as of 24 November 2010 and should be removed as a Respondent to this arbitration.

21. The members of the Arbitral Tribunal were appointed on the dates set out in paragraph 11 above and the ICC Secretariat submitted the file in this arbitration to the Arbitral Tribunal on 26 February 2013.

22. On 18 April 2013, a procedural meeting was held in London and a provisional procedural timetable was largely agreed.

23. The Claimant submitted the Statement of Case and supporting evidence on 17 May 2013.

24. Further to a hearing on 6 and 7 June 2013 in London, the Arbitral Tribunal issued Procedural Order No. 1 and the Procedural Timetable pursuant to Article 24.2 of the ICC Rules (2012).

25. Further to the hearing on 6 and 7 June 2013, the Arbitral Tribunal issued Procedural Order No. 2 containing the Arbitral Tribunal's decisions in respect of the Second and Third Respondents' preliminary issues application dated 10 April 2013.

26. The Terms of Reference were executed by the Claimant, the Respondents and Arbitral Tribunal on 7 June 2013. The Terms of Reference were approved by the ICC Court on 11 July 2013.

27. An Addendum to the Terms of Reference was executed by the Arbitral Tribunal on 19 July 2013.

28. By email dated 6 December 2013, pursuant to Article 27 of the ICC Rules 2012, the Arbitral Tribunal declared the proceedings closed in relation to the Preliminary Issues 3, 6 and 8 to be decided in a Partial Award.

29. The Respondents submitted the Defence and Counterclaims and supporting evidence on 22 February 2014.

30. The Claimant submitted a Reply and Defence to Counterclaims on 13 June 2014.

31. The Respondents submitted a Rejoinder on 12 September 2014.

32. On 1 October 2014, the Tribunal directed the Parties to submit Powers of Attorney authorising their respective counsel to represent the Parties. The Claimant submitted a Power of Attorney in respect of Beale & Company LLP dated 10 April 2013; a Power of Attorney in respect of David Thomas QC and Jane Lemon QC dated 30 September 2014; and a Power of Attorney in respect of Ms Fatma Karume dated 30 October 2014. The Respondents submitted a Power of Attorney in respect of the Ministry of Transport granting a Power of Attorney to Freshfields Bruckhaus Deringer LLP and Freshfields Bruckhaus Deringer US LLP dated 11 April 2013; a Power of Attorney by Tanroads, the Ministry of Works and the Attorney General in favour of Freshfields Bruckhaus Deringer US LLP, Jane Davies Evans and Gabriel Pascale Malata dated 2 October 2014.

33. On 7 October 2015, both Parties agreed in principle to the appointment of a Tribunal Secretary. Ms Marie-Claire O'Kane was subsequently appointed.

34. The Tribunal issued a draft Procedural Order No. 3 on 21 October 2014 for review by the Parties. The Tribunal then issued a revised draft Procedural

Order No 3 on 29 October 2014 and an amended appendix 2 on 31 October 2014. Procedural Order No 3 was not formally issued, having been superseded by the hearing.

35. By emails dated 5, 11 and 12 January 2015 the President issued directions for the hearings held on 20 and 21 January 2015.

36. The Parties' submitted written Closing Submissions on 16 January 2015.

37. Evidential hearings were held from 24 November 2014 to 8 December 2014; 8 and 9 January 2015; and 20 and 21 January 2015.

38. The ICC Court extended the time for the issue of the Final Award on a number of occasions and finally on 26 October 2015 to 29 January 2016.

39. Pursuant to a Confidentiality Agreement dated 13 May 2015, between the Arbitral Tribunal and the Parties' quantum experts, Ms Joanne Prior for the Claimant and Mr David Kyte for the Respondents, the Parties agreed to the quantum experts assisting the Arbitral Tribunal with the calculation of the quantum arising from the Arbitral Tribunal's decisions.

40. The Chairman of the Arbitral Tribunal met twice and had one telephone conference with the quantum experts who calculated the quantum resulting from the Arbitral Tribunal's decisions.

41. The calculation of the quantum was finalised on 6 November 2015, following which the Arbitral Tribunal requested submission by the Parties of their respective costs submissions which had already been exchanged between the Parties.

42. By email dated1 February 2016, the Arbitral Tribunal, pursuant to Article 27 of the ICC Rules, declared the proceedings closed.

**Partial Award**

43. During the hearing on 6 and 7 June 2013, the Arbitral Tribunal heard submissions from the Parties on which, if any, further preliminary issues would be considered at the hearing on 18 and 19 July 2013. By a letter dated

3 June 2013, the Respondents had proposed that 11 issues be addressed on a preliminary basis.  At the conclusion of day 1 of the hearing, and having carefully considered the Parties' submissions, the Arbitral Tribunal indicated that it was not prepared to consider on a preliminary basis proposed issues 1, 2. 4, 7, 9, 10 or 11.  The Arbitral Tribunal decided that the proposed preliminary issues 4, 7, 9, 10 and 11 were not possible to consider in the absence of relevant factual and/or expert evidence and/or would not, if decided as preliminary issues, significantly reduce the cost of the arbitration. If necessary, those issues would be addressed in the Final Award.

44. The Arbitral Tribunal indicated that it would consider Preliminary Issue No. 3, Preliminary Issue No. 5, Preliminary Issue No. 6 and Preliminary Issue No. 8. The precise and agreed formulation of these preliminary issues was communicated by the Claimant following the hearing on 6 and 7 June 2013 and recorded in the directions contained in Procedural Order No. 1.

45. By email dated 4 July 2013, the Respondents' counsel confirmed the Parties' agreement that Preliminary Issue No. 5 no longer required determination. The Partial Award therefore only considered Preliminary Issue No. 3, Preliminary Issue No. 6 and Preliminary Issue No. 8.

46. Preliminary Issue No. 3 was: "*Are the MoU and the DoS stand alone contracts?  If not, are claims made under the terms of the MoU / DoS subject to the notice, particularisation and dispute resolution provisions of the Contract?*"

47. Preliminary Issue No. 6 was: "*Is compliance with the contract notification provisions of the Contract a pre-condition to the pursuit of a claim for an extension of time and/or additional payment under the Contract?*"

48. Preliminary Issue No. 8 was: "*What principles apply in relation to the use of currencies under the Contract?  Does the Contract c*

49. *onstrain the currency of payment for claims under the Contract or for claims for damages for breach of the Contract?*"

50. The Arbitral Tribunal decided that:

a.  In relation to Preliminary Issues No. 3:

- In respect of the items referred to in paragraphs 3.0, 4.0, 5.0, 6.0, 8.0 and 9.10 of the MoU, the MoU is not a "stand alone" document and any claims under the terms of the MoU in respect of the matters set out in such paragraphs are subject to the notice, particularisation and dispute resolution provisions of the Contract.

- Clause 2 of the MoU and paragraphs 1, 2 and 3 of the DoS are not "stand alone" agreements and any claims made pursuant to Clause 2 of the MoU and/or paragraphs 1, 2 and 3 of the DoS are subject to the notice, particularisation and disputes resolution provisions of the Contract.

b.  In relation to Preliminary Issue No. 6: compliance with the contractual notification provisions of Sub-Clause 20.1 of the Contract is a pre-condition to the pursuit of a claim for an extension of time or additional payment under the Contract.

c.  In relation to Preliminary Issue No. 8:

- Any sums due under the terms of the Contract are payable in either US Dollars or Tanzanian Shillings.

d.  The Arbitral Tribunal declined to decide as a Preliminary Issue whether the Contract constrains the currency of payment in respect of a claim for damages for breach of the Contract.

## The Fact Witnesses

51. The Claimant's witnesses of fact are:

a.  Tetsuo Sakamoto who was the Project Manager for the Dodoma-Manyoni Road Project at Konoike. Mr Sakamoto filed five witness statements dated 17 May 2013, 13 June 2014, 8 October 2014, 10 December 2014, 18 December 2014.

17

**18**

b. Takashi Yamashita who is the General Manager of the Kenya Office at Konoike. Mr Yamashita filed three witness statements dated 15 May 2013, 11 June 2014, and 26 November 2014.

c. Hajime Nagaishi who is the Operating Officer of the International Division at Konoike. Mr Nagaishi filed two witness statements dated 14 May 2013 and 13 June 2014.

d. Jeffrey McCormick who was a consultant for Konoike in relation to the Dodoma-Manyoni Road Project. Mr McCormick filed two witness statements dated 13 May 2013 and 10 June 2014.

e. Yasutaka Mizobata who was an Operations Officer of the Corporate Planning Department and the International Operation of Konoike. Mr Mizobata filed one witness statement dated 8 May 2013.

f. Akihiko Koizumi who is Section Manager of the Administration Department for the International Division of Konoike. Mr Koizumi filed one witness statement dated 8 May 2013.

g. Nobuo Okada who was a manager in the Business Department of the International Division of Konoike. Mr Okada filed one witness statement dated 12 June 2014.

52. The Respondents' witnesses of fact are:

a. Jotham Ntensibe who was Highway Engineer and subsequently Resident Engineer for the Dodoma-Manyoni Road Project. Mr Ntensibe filed three witness statements dated 2 December 2013, 12 September 2014 and 19 December 2014.

b. Sirilius Matupa who was Principal State Attorney in the Attorney General's Chambers. Mr Matupa filed one witness statement dated 5 December 2013.

**Expert witnesses, their reports and joint statements**

53. The Claimant's expert witnesses and reports are as follows:

   a. David Richards submitted:

- First report in relation to delay issues dated 1 May 2013 **[D1/1.1/1]**;

- Side report on delay issues dated 25 October 2014 **[D5/5.1/1]**;

- Second report in relation to prolongation and disruption issues dated 9 May 2013 **[D1/1.2/1]**;

- Side report on disruption issues dated 31 October 2014 **[D5/5.2/1]**;

- Side report on prolongation and disruption valuation dated 16 November 2014 **[D5/5.3/1]**;

- Revised side report on prolongation and disruption valuation dated 19 December 2014 **[D6/15/1]**;

- Third report concerning pre-Addendum disruption issues dated 17 April 2014 **[D1/1.3/1]**;

   b. Tim Tapper submitted a report on quantum dated 20 June 2013 **[D2/2.1/1]**.   Mr Tapper was replaced by Ms Joanne Prior as the Claimant's quantum expert.

   c. Joanne Prior submitted:

- First report on quantum dated 17 April 2014 **[D2/2.3/1]**;

- First side report on quantum dated 13 November 2014 **[D5/5.4/1]**;

- Third side report on quantum dated 24 December 2014 **[D6/2/1]**.

   d. Nigel Penfold submitted:

- Report on technical defects dated 12 June 2014 **[D4/4.1/1]**;
- Side report on technical defects dated 13 November 2014 **[D5/5.5/1]**.

54. The Respondents' expert witnesses and reports are as follows:

19

20

a. Wendy MacLaughlin submitted:

- Report on delay and disruption dated 28 February 2014 **[D2/2.2.1/1]**;
- Side report on delay dated 24 October 2014 **[D5/5.6/1]**;
- Side report on disruption dated 30 October 2014 **[D5/5.7/1]**.

b. David Kyte submitted:

- First side report on quantum dated 19 November 2014 **[D5/5.8/1]**;
- Second side report on quantum dated 22 December 2014 **[D6/14/1]**.

c. Christian Busch submitted:

- Report on technical defects dated 29 September 2014 **[D4A/1/1]**;
- Side report on technical defects dated 12 November 2014 **[D5/5.9/1]**.

55. The experts submitted the following joint reports:

a. Joint report on delay by David Richards and Wendy MacLaughlin dated 10 October 2014 **[D3/3.1/1]**;

b. Joint report on disruption by David Richards and Wendy MacLaughlin dated 11 October 2014 **[D3/3.2/1]**;

c. List of Agreed Issues on quantum by Joanne Prior and David Kyte dated 17 October 2014 **[D3/3.3/1]**;

d. Joint statement on quantum issues by Joanne Prior and David Kyte dated 17 December 2014 **[D6/1/1]**;

e. Schedule of Agreement and Disagreement concerning prolongation and disruption valuation issues by David Richards and David Kyte dated 7 November 2014 **[D3/3.4/1]**;

20

f. Further joint report concerning prolongation and disruption valuation issues by David Richards and David Kyte dated 22 December 2014 **[D6/16/1]**;

g. Joint report on technical defects by Nigel Penfold and Christian Busch dated 4 November 2014 **[D4/4.2/1]**.

## Tanzanian law

56. As set out above, the governing law of the Contract is the law of the Republic of Tanzania.

57. The key provisions of the law of Tanzania relied upon by the Parties include the following:

a. Law of Contract Act, sections 20(1), 21, 23, 59, 60, 73, 73(2);

b. Evidence Act, section 115;

c. Public Procurement Act 2004, section 87;

d. Judicature and Application of Laws Act, section 2(3);

e. Public Procurement (Goods, Works, Non-Consultant Services and Disposal of Public Assets by Tender) Regulations 2005, sections 2(1), 23(1), 44, 118(3), 123(3).

## Parties' List of Issues

58. The Respondents provided a list of issues to the Tribunal, upon which the Claimant has commented, stating whether the issue as framed is agreed or not agreed and providing an alternative issue where it is not agreed (**"the List of Issues"**).

59. The Tribunal has had regard to this List of Issues and the corresponding comments, in addition to the Claimant's list of issues provided at Appendix A to the CCS.

## SECTION II: THE BACKGROUND TO THE DISPUTES

### Introduction

1.  In considering the various heads of claim, it is important to put into context the history of dispute between the Parties regarding payment for the Contract Works.

2.  In this Section, the Tribunal summarises the key events and claims in relation to:

    a.  Tender;

    b.  Initial problems and commencement of First Suspension;

    c.  Negotiations;

    d.  Re-mobilisation;

    e.  Second Suspension;

    f.  Third Suspension;

    g.  Termination;

    h.  Events subsequent to termination.

3.  This Section is not intended to set out an exhaustive list of events.

### Tender

4.  On 15 November 2002, the Tanzanian Ministry of Works invited tenders for the design and construction of the upgrade of the Dodoma-Manyoni Road (**"the Road"**) **[E1/1/1]**. The Tender Documents were contained in two Volumes. Volume 1 comprised Sections I-V and Volume 2 comprised Sections VI and VII **[E1/2/11]**. Section V of Volume 1 contained amendments to the standard FIDIC yellow book form of contract **[E1/5/75]**. Section III of Volume 1 contained a Schedule of Cost and Percentage of Listed Elements which stated a sum of TZS 1.5 billion as the Provisional

22

Sum to cover Price Escalation **[E1/3/41]**. The Contractor was also to designate the currencies and proportions in which it wanted the Contract Amount to be paid **[E1/3/40]**.

5.   A mandatory pre-bid meeting took place in Dar es Salaam at the Ministry of Works on 25 November 2002 **[G1/1/1]**. The meeting dealt with both the Dodoma-Manyoni Road and the Manyoni-Singida project. By paragraph 18.4 of Section II of the Tender, *"any modification of the bidding documents...that may become necessary as a result of the pre-bid meeting shall be made by the Employer exclusively through the issue of an Addendum pursuant to Clause 11 and not through the minutes of the pre-bid meeting; however, such an Addendum may be prepared and transmitted together with the above Minutes. "* **[G1/2/19]**

6.   The Minutes of the Pre-Bid Meeting state at Q16:

*"Q Does sub-clause 13.8 of the Conditions of Particular Application mean that there will be no adjustment for change in Price in respect of the foreign currency element of the contract amount?*

*A That is correct"* **[G1/1/6]**

7.   On 15 January 2003, the Claimant sent its submission letter in respect of the Road, enclosing the relevant bid documents **[E2/4/248]** including Form of Tender **[E2/4/249]** and the Appendix to Tender including Schedule of Costs with Contingency amounts to cover Price Escalation **[E2/5/255]**. The Minutes of the Pre-Bid Meeting were attached to the Contractor's Proposals **[E1/11/220]**.

8.   On 7 February 2003, the Ministry of Works issued a Letter of Intent to the Claimant confirming that its tender had been successful subject to the Claimant answering certain queries **[E2/3/232]**. On 14 March 2003, the Employer sent its Letter of Acceptance to the Claimant **[E2/2/228]** which stated the contract sum of TZS 63,887,999,940.80 payable in TZS 15,599,521,051.20 and USD 48,883,365.00. The Form of Agreement was signed on 21 March 2003 **[E2/1/224]**.

9.    The Contract was an amended form of the FIDIC Yellow Book design and build contract **("the Contract")**. The Employer was the Ministry of Works and Roughton International was named as the Engineer **[E2/2/228]**.

10.   The Contract provided for the Lump Sum Contract Price of TZS 63,887,999,940.80 (inclusive of VAT) payable in the following proportions: 24.4% in TZS (15,899,521,051.20) and 75.6% in USD (48,883,365.00). **[E2/1/224]**. A breakdown of this figure was provided by the Claimant in the completed version of the Schedule of Cost and Percentage of Listed Elements **[E2/5/259]**. The Commencement Date for the Contract was 1 April 2003, and the Time for Completion was 29 September 2006. The rate of exchange was TZS 987.8305 to USD 1.00 **[E2/1/225]**. The Accepted Contract Amount was defined at Sub-Clause 1.1.4.1 as *"the amount accepted in the Letter of Acceptance for the execution and completion of the Works and the remedying of any defects."* **[E3/1/606]**. The Letter of Acceptance referred to a contract sum of TZS 63,887,999,940.80 payable in the local and foreign currency proportions set out above **[E2/2/228]**.

**Initial Problems and Commencement of First Suspension**

Variations

11.   In April 2003, the design work commenced in addition to some preliminary work on site. In 2003 and 2004, the Employer instructed a number of variations to the design of the Road, predominantly in relation to the vertical and horizontal alignment **[G1/25/119]**. The Claimant contends that the effect of these changes was to almost double the quantity of earthworks under the Contract. The Engineer also instructed changes to the design of the C1 and C2 sub-base in respect of the thickness of the layers and cement content

12.   The Claimant's detailed design was not completed and approved until December 2004, 15 months later than planned **[G1/16/55]** **[G1/18/57]** **[G1/19/58]**. Commencement and progress of bulk earthworks was accordingly delayed.

13. By December 2005, the Claimant had submitted claims for extensions of time and additional payment of TZS 13,157,710,069 and USD 16,568,911.98 arising from the variations **[G1/16/55] [G1/18/57]**. This was followed by a claim in March 2006 for additional payment of TZS 918,783,689 and USD 4,485,246.81 for Variations to C1/C2.

Price Escalation on foreign currency and delayed payment of IPC 15

14. By its application for payment of IPC 12 of 16 December 2005, the Claimant submitted an application for payment of Price Escalation due on IPCs 7 – 11 **[G1/26/159]**. By letter of 9 March 2006, the Engineer wrote to the Claimant calculating Price Escalation on the amount payable in local currency namely, TZS only **[G1/40/177]**. The Claimant responded on 9 March 2005 stating that it did not agree that Price Escalation was due only on the Tanzanian shilling element **[G1/41/179]**.

15. On 23 March 2006, the Claimant gave the Employer notice of its intention to refer the Price Escalation dispute to the DAB **[G1/42/180]**.

16. Throughout this period, the Claimant continued to apply for Price Escalation on amounts payable in both the local and foreign currency amounts in its applications for IPCs 14 and 15 on 10 April and 3 June 2006 respectively. The Engineer amended those applications to allow for Price Escalation on the amount payable in local currency only **[G1/45/185] [G1/47/190]**.

17. By its decision of 5 July 2006, the DAB decided that Price Escalation was payable only on the local currency element **[G1/52/207]**. On 10 July 2006, the Claimant gave the Employer notice of dissatisfaction and required an attempt at amicable settlement pursuant to Sub-Clause 20.5 **[G1/52/237]**.

18. The Claimant wrote to the Engineer on 14 July 2006 giving notice that it was funding the Project by means of credit supplied from Japan in the amount of TZS 33.8 billion **[G1/54/238]**. On 26 July 2006, the Claimant requested meetings with the MoID and Prime Minister to appeal for urgent, high-level intervention **[G1/56/241]**.

25

19. The Claimant wrote to the MoID on 3 August 2006 noting that IPC 15 should have been paid in full by 1 August 2009. As at the date of the Claimant's letter, USD 1,278,530.00 remained outstanding **[G1/60/309]**.

20. The Cabinet informed the Claimant on 7 August 2006 that the Government could not afford to pay Price Escalation as requested and refused to intervene **[G1/63/313]**.

21. On 14 August 2006 the Claimant served a Sub-Clause 16.1 notice of suspension following the non-payment of IPC 15 **[G1/66/318]**.

22. On 31 August 2006, Roughton wrote to the Claimant noting that the Claimant had threatened to suspend from 5 September 2006, but that it had observed on site that the Claimant's progress has substantially dropped prior to this date. Roughton stated that it was concerned that the Claimant's reduction in progress was not contractually justified.

23. On 5 September 2006, the Claimant wrote to the Employer recording its entitlement to suspend and giving notice under Sub-Clause 20.1 **[G1/72/375]**. The Claimant chose to slow down its works rather than suspend completely **("the First Suspension")**.

24. On 8 September 2006, the Claimant received a payment of USD 1,252,808.69 which cleared much of the underpaid amount on IPC 15, leaving a deficit of USD 25,721.98 **[G1/73/376]**.

25. The Minutes of the Site Progress Meeting No 39 on 14 September 2006 note that the Claimant confirmed that IPC 15 had been paid on 8 September 2006 **[G1/84/394]**.

26. IPC 16 was certified on 20 October 2006 in the sum of TZS 919,364,404.18 and USD 2,379,355.87 **[G1/86/412]**. Payments were received of TZS 919,364,408.20 on 8 November 2006, USD 1,458,399.75 on 10 November 2006 and USD 948,633.10 on 22 December 2008 **[H1/1.55/36]**. This amounted to an overpayment of IPC 16 by USD 27,721.98 **[G3/183/1165]**.

26

27. The Claimant and the Engineer allocated the totality of these payments to IPC 16 as recorded in the Claimant and the Engineer's respective Monthly Progress Reports to the Employer **[H1/1.55/36] [H2/1.48/20]**. Following payment of IPC 16, the deficit on IPC 15 was recorded as reduced to USD 18,922.50.

**Negotiations**

28. On 18 October 2006, the Claimant made a request for arbitration in respect of the Price Escalation dispute **[G1/85/396]**. On 27 October 2006, the Claimant gave the Employer notice of its intention to refer to a DAB the variations dispute resulting from the Engineer's instructions on the Contractor's proposed design given during the design review process **[G1/87/414]**.

29. On 2 November 2006, there was a meeting between Dr Konoike and the President of Tanzania **[G1/89/485]** followed by a meeting at ministerial level **[G1/90/486]**.

30. On 10 November 2006, the MoID informed Roughton that a team of seven officials **("the GST")** appointed by the Government to review the Project would visit on 12 November 2006 **[G1/92/494]**. Discussions were held during this visit **[G1/93/495]** in a meeting chaired by Mr Matupa.

31. This was followed by another meeting on 28 November 2006 **[G1/97/509]** in which the possibility of agreeing an amicable settlement was canvassed by the MoID. The Claimant was requested to suspend its arbitration in respect of Price Escalation but refused to do so **[G1/97/509]**.

32. On 11 December 2006, Mr Chambo (the Deputy Permanent Secretary of the MoID) informed the Claimant that a negotiating team ("GNT") had been set up for the purpose of reaching an amicable settlement **[G1/100/515]**. On 14 December 2006, the Claimant submitted its paper entitled "Minimum Position for Negotiations – Without Prejudice" **[G2/101/517]**. Mr Mrema was initially part of the Claimant's team prior to joining Tanroads at 11 June 2007. The Claimant's position paper summarised the problems that the

Claimant had encountered on the Project, including allegations concerning the Employer and the Engineer's alleged lack of understanding of the concepts of design and build and lump sum contracts, such that they mistakenly concluded that they could instruct any changes of additional works they liked without having to pay for them. The Claimant also complained that the Employer failed to recognise its entitlement to Price Escalation on the foreign currency element of the contract sum whilst paying some other contractors for such sums.

33. The paper also set out the Claimant's minimum position for a negotiated settlement which included:

   a. An extension of time of 36 months if the administration of the Contract on the Employer's side remained the same, or 24 months if it was changed together with time-related costs with a minimum total of TZS 9.9 billion.

   b. Payment of Price Escalation on the full contract amount.

   c. Variations to the work to be paid in full.

   d. Additional design costs of TZS 1,813,008,129.

   e. TZS 14.6 billion for disruption caused by loss of productivity. **[G2/102/525]**

34. Negotiations took place during a series of meetings in December 2006 and January 2007. The negotiating process and the resulting Minutes of Meeting, Memorandum of Understanding and Addendum are discussed in the next Section III but summarised below.

35. The First Meeting was held on 19 December 2006, and it was agreed that the first item to be discussed would be Price Escalation **[G2/102/645].**

36. This was dealt with at the Second Meeting on 20 December 2006 **[G2/104/667]**.

28

**29**

37. The Third Meeting took place on 21 and 27 December 2006 **[G2/105/677]**. During this meeting, the Parties went through in detail the 13 Variation claims put forward by the Claimant.

38. Meetings resumed with the Fourth Meeting on 3 January 2007 **[G2/107/724]**, during which it was agreed that the ICC arbitration on Price Escalation would be suspended pending the outcome of the negotiations.

39. The Fifth, Sixth and Seventh Meetings took place on 4, 5 and 8 January respectively. **[G2/107/726] [G2/107/728]**

40. The Eighth Meeting took place on 9 January 2007, during which:

    a. The Claimant offered to reduce its disruption claim to TZS 10 billion whereas the Employer put forward a figure of TZS 5 billion **[G2/107/730]**.

    b. The Claimant offered to accept a 24 month extension of time whereas the Employer offered 19 months with a possible further 5 months **[G2/107/730]**.

    c. It was agreed that the Claimant would put forward a proposal for sectional completion at paragraph 25.6 **[G2/107/729]**.

    d. The Employer agreed to expedite the payment of Price Escalation because it was a matter that could be dealt with as part of the existing Contract without the need to modify it by Addendum **[G2/107/729]**.

41. The Ninth and final meeting took place on 10 January 2007 **[G2/107/730]**. It was agreed at paragraph 27.4 that payment of Price Escalation would be made on IPCs 7-16 upon which Price Escalation on the local currency portion had already been certified and paid **[G2/107/731] ("the Outstanding Amount")**.

42. On 15 January 2007, the Claimant submitted its application for IPC 17 which included the Outstanding Amount **[G2/110/766]**. This was rejected by Roughton by a letter of the same date **[G2/111/770]** requesting that the IPC

be resubmitted without the "disputed escalation". The Claimant did so on 17 January 2007 **[G2/112/771]**.

43. The Memorandum of Understanding was signed on 30 January 2007 **[G2/118/811]**.

44. On 3 February 2007, there was a meeting between the MoID and the Claimant **[G2/122/855]**. The Claimant stated that, in order to remobilise works and equipment, it required the Employer to at least effect payment of Price Escalation while waiting for completion of arrangements for the payment of the remaining claims as agreed in the MoU. The Minister confirmed that an addendum would be prepared and ratified by the Attorney General's office, passed through Ministerial Tender Board and once agreed and signed by both Parties, the addendum would become effective.

45. The Claimant wrote to the Employer on 6 February 2007 **[G2/123/860]** and 19 February 2007 **[G2/124/861]** requesting payment of the Outstanding Amount.

46. On 5 March 2007, Roughton was informed about the agreement in relation to Price Escalation **[G2/126/909]**. On 19 March 2007, Roughton certified payment of the Outstanding Amount in IPC 18 **[G2/132/958]**.

47. The Addendum (incorporating the MoU and Minutes of Meeting) was signed on 14 March 2007 **[G2/130/915]**. The following day, the Parties executed a Deed of Settlement **[G2/131/955]** in order to conclude the arbitration that the Claimant had commenced in respect of Price Escalation.

## Re-mobilisation

48. On 18 and 19 March 2007, the Employer paid TZS 719,219,158.41 and USD 1,540,721.154 respectively in respect of IPC 17, leaving a deficit of USD 20,768.37 on 29 March 2007 **[G3/183/1165]**.

49. As a result of this payment, the Claimant resumed some work but did not fully remobilise.

50.   On 1 May 2007, the Claimant attended a meeting with Mr Chambo at which it was told that the MoID was not sure how much could be paid from the remaining budget but that it was planned to pay as much as possible against the certified amount. **[G2/139/973]** At this time, Black & Veatch replaced Roughton as Engineer under the Contract **[G2/155/1000]**.

51.   Actual earthworks resumed on 2 May 2007. The Outstanding Amount was then paid in four instalments between 25 May and 23 July 2007 **[G2/153/997] [G2/161/1081] [G2/168/1070] [G3/183/1200]**.

52.   On 14 September 2007 the Claimant submitted its claim for an extension of time and additional costs arising from the First Suspension (Claim 6) **[G3/200/1239]**. A draft Determination was issued on 8 November 2007 awarding the Claimant a 42 day extension of time for completion, 15 days extension for Section 3 and additional payment of TZS 520,543,451.04 **[G3/232/1336]**.

53.   Black & Veatch then wrote to the Employer on 27 February 2008 seeking approval of this determination **[G3/318/1510]** but by letter dated 10 March 2008, approval was refused by Tanroads on the basis that the determination was *"unwarranted and appears mischievous"* **[G3/324/1558]**. On 18 June 2008, Black & Veatch wrote to the Claimant advising that the Engineer determined that by virtue of clause 3.5 it was prohibited from implementing its determination **[G4/407/1772]**.

**Second Suspension**

IPC 19

54.   On 20 April 2007, the Claimant submitted its application for IPC 19, which included the payments in respect of Pre-Addendum Disruption, prolongation and Additional Design (totalling TZS 21,721,102,945) **[G2/135/967]** The Engineer stated on 11 May 2007 that he was unable to certify them because of a lack of understanding of the background to the Addendum **[G2/145/985]**. The Claimant served a Sub-Clause 16.1 notice in respect of the failure to certify IPC 19 on 21 May 2007 **[G2/150/992]**.

55.  IPC 19 was resubmitted on 16 June 2007 **[G2/156/1006]**. It was certified by Black & Veatch on 26 June 2007 **[G2/160/1016]** and due for payment on 21 August 2007. The Claimant gave a Sub-Clause 16.1 notice in respect of the resubmitted IPC 19 on 22 August 2007 **[G3/189/1217]** on the basis that a sum of USD 13.482 million remained outstanding at this point. A further payment was made on 6 September 2007 **[G3/193/1221],** leaving USD 2.4 million remaining outstanding.

56.  On 20 September 2007 the Engineer wrote to the Claimant asking for substantiation of the Pre-Addendum Disruption which formed part of IPC 19 **[G3/203/1247]**. The Claimant responded stating that, under the terms of the Addendum, the Parties had agreed that Pre-Addendum Disruption had been adequately substantiated **[G3/204/1248]**. By a letter dated 1 November 2007, the Engineer stated that substantiation was required, failing which provisional payment made in respect of Pre-Addendum Disruption would be deducted from future payments **[G3/227/1328]**.

57.  On 2 November 2007, the Claimant received USD 2.2 million towards IPC 19 together with payment of the outstanding sums due on IPCs 1 – 18 **[G3/231/1334]**.

58.  The remaining amount on IPC 19 of USD 182,000 was paid on 29 May 2008 **[G4/393/1715]**.

IPC 20

59.  The Claimant applied for IPC 20 on 28 April 2007, which included payment for the varied pre-Addendum works carried out between 2003 and 2006 subject to measurement under the Addendum **[G2/136/968]**. The application was returned by Black & Veatch on 4 July 2007 on the grounds that the re-measure would need to be carried out jointly **[G2/166/1026]**.

60.  The Engineer suggested to the Claimant at Technical Meeting 3 on 6 August 2007 that it should submit its application and claim an on-account payment for increased quantities based pro rata on the completed length of the road. A supplemental application for payment on a remeasurement basis could

32

then be submitted once that remeasurement had been undertaken **[G2/177/1089]**. The Claimant re-submitted IPC 20 on 16 August 2007 in accordance with this suggestion **[G3/182/1108]**.

61. The revised IPC 20 was certified on 7 September 2007 **[G3/196/1226]**. The Employer refused to pay this and returned it to the Engineer on 9 October 2007 **[G3/214/1277]**. On 17 October 2007, the Engineer wrote to the Claimant attaching the MoID's letter and asking for the application to be re-submitted based on actual work done and associated escalation costs only **[G3/218/1284]**.

62. The Claimant gave notice under Sub-Clause 16.1 in respect of IPC 20 by its letter of 6 November 2007 **[G3/230/1333]**.

63. Meanwhile:

    a. IPC 21 was certified on 15 December 2007 **[G3/266/1407]**. This was paid in full by two payments on 16 and 22 January 2008 **[H1/1.13/70]**.

    b. IPC 22 was certified on 15 January 2008 **[G3/285/1437]**. This IPC was cleared by three payments on 18, 20 and 26 February 2008 **[G3/312/1497]** **[G3/316/1507]** **[H2/1.56/57]**.

64. By January 2008, there was approximately USD 128,000 outstanding in respect of IPC 19 **[M1/1.13/70]** and TZS 6 billion and USD 19 million outstanding on IPC 20 **[H2/1.55/26]**.

65. The Claimant wrote to Tanroads on 23 January 2008 requesting a top-level meeting regarding its financial problems. It stated that construction work would be suspended unless payment was made immediately **[G3/291/1452]**.

IPC 20A, IPC 23

66. A meeting took place between Tanroads, the Engineer and the Claimant on 12 February 2008 **[G3/302/1475]**. It was agreed that the Claimant would re-submit IPC 20 as IPC 20A excluding the re-measured works. These works would then be submitted in later IPCs once the re-measurement process had been undertaken.

67. IPC 20A was re-submitted by the Claimant on 15 February 2008 **[G3/307/1489]** and certified by the Engineer on 19 February 2008 **[G3/310/1493]**.

68. IPC 23 was submitted on 23 February 2008.

69. The Claimant wrote to Tanroads on 26 March 2008 chasing payment of IPC 20A and reiterating that the Works would be suspended again if payment was not made. The Claimant also pointed out that the Sub-Clause 16.1 notice given on 6 November 2007 was still valid in respect of IPC 20 **[G3/330/1569]**.

70. On 15 April 2008, Dr Konoike wrote to the President of Tanzania explaining the position and seeking assistance **[G3/347/1594]**.

71. On 16 April 2008, the Claimant submitted a suspension notice for non-payment of IPC 20A without prejudice to its primary position that the notice previously given on 6 November 2007 in respect of IPC 20 applied **[G3/349/1597]**.

72. On 19 April 2008, the Claimant suspended the earthwork and pavement works for a second time **[G3/353/1609]** and structure and ancillary works on 29 April 2008 **[G3/357/1614]**.

73. A Sub-Clause 16.1 notice was submitted on 21 April 2008 in respect of IPC 23 **[G3/356/1613]**.

74. By the end of April 2008 a further payment of TZS 8 billion was received by cheque referenced to IPCs 20A and 23 **[G3/362/1623]**. The Claimant confirmed in its letter dated 1 May 2008 its understanding that this payment covered the local currency portions of IPC 20A, 23 and partially paid the foreign currency element of IPC 20A. Approximately USD 22.5 million remained outstanding on IPCs 19, 20A and 23. The Claimant requested that the Engineer inform it of any misunderstanding in this regard **[G3/362/1622]**.

75. By letter dated 1 May 2008, the Claimant gave notice pursuant to Sub-Clause 20.1 of its claim for an extension of time and costs pursuant to Sub-Clauses 8.4 and 20.1 resulting from delayed payment of IPC 20 **[G3/361/1621]**. A Sub-Clause 20.1 notice was issued in respect of IPC 23 on 24 May 2008.

76. On 5 May 2008, Tanroads wrote in response to the suspension of the Works stating that because of the above payments the Claimant was advised to proceed with the Works as planned **[G3/366/1628]**.

77. On 15 May 2008, the President of Tanzania's office wrote to the Claimant expressing concern regarding the financial difficulties it faced and expressed a commitment to pay a further USD 10 million in June 2008 with any remaining sums in July 2008. The Clamant was requested to proceed with the works as scheduled to enable timely completion of the Project **[G3/373/1638]**.

78. A high-level meeting took place on 23 May 2008 in Tokyo between the Permanent Secretary Chambo and Dr Konoike. The former agreed that a payment schedule would be prepared and submitted to Dr Konoike. It was acknowledged by Mr Chambo that it was no longer feasible to expect the Project to be completed by 29 September 2008 and the Parties would need to agree an extension of time **[G3/387/1702]**.

79. Mr Chambo sent the Claimant a payment schedule on 7 June 2008 showing the proposed dates for payment **[G4/397/1731]**. On 16 June 2008, Dr Konoike asked for confirmation that the Respondents would not fail to execute payments due after IPC 23, which were not included on the schedule **[G4/402/1750]**. The Deputy Permanent Secretary responded assuring Dr Konoike that the Government would pay IPC 24 in July 2008 **[G4/403/1751]**.

80. Payment of USD 9 million was made on 19 June 2008 in accordance with the agreed schedule **[G3/380/1694]**. The Claimant recommenced the Works on 21 June 2008 **[G4/404/1752]** with full remobilisation on 12 July 2008.

No further payment of USD 10.5 million was in fact made in July, contrary to the payment schedule provided by Mr Chambo on 7 June 2008. On 16 September 2008, IPC 20A was paid in full. IPC 23 was eventually paid in full on 22 September 2008.

**Third Suspension**

81. IPC 24 was certified on 16 May 2008. A Sub-Clause 16.1 notice was given in respect of IPC 24 on 5 August 2008 **[G4/430/1836]**.

82. The Claimant applied for IPC 25 on 17 July 2008 **[G4/424/1820]** which was certified by the Engineer on 18 August 2008. This certificate included sums due for re-measured works carried out between April and June 2008.

83. On 25 August 2008, the Claimant informed Tanroads that its financial position had become critical and it could not continue the Works further and would be suspending on 27 August 2008 **[G4/443/1859]**.

84. On 2 September 2008, the Respondents made payment of the local currency portion of IPC 24 **[G4/447/1865]**.

85. On 16 September 2008, the Respondents made a further payment of USD 10 million covering the outstanding foreign currency portion of IPC 20A and part of the foreign currency element of IPC 23.

86. On 19 September 2008, the Claimant submitted its application for IPC 26 in the sum of TZS 2,426,600,697.00 and USD 8,009,220.37 for work done during July and August together with Price Escalation **[G4/460/1917]**.

87. On 20 September 2008, the Claimant submitted a consolidated claim for an extension of time and additional payment by reason of the First Suspension (Claim 6), the cement shortage (Claim 7), the cholera outbreak (Claim 8) and the Second Suspension (Claim 13) **[G4/463/1927]**.

88. On 22 September 2008, the Claimant received a further payment of USD 4 million **[G4/464/1930]**. This was the final payment received on the Project.

89. The Claimant issued a notice under Sub-Clause 16.1 in respect of IPC 25 on 15 October 2008 **[G4/498/2005].**

90. On 25 October 2008, Mr Lear of Black & Veatch wrote to the Claimant informing it that the Employer had advised that it was not satisfied with the various explanations for the previous certifications and accordingly they required the reversal of these payments until such time as the latter had been resolved. Amounts would be deducted from IPC 26 which did not meet the minimum amount required for certification. **[G4/515/2052].** On the same day, Mr Ntensibe wrote to Mr Mrema stating that Black & Veatch did not agree with Tanroads' position on the issue **[H2/1.65/89]**.

91. On 1 November 2008, the Claimant gave notice of entitlement to suspend for the non-certification of IPC 26, stating that Sub-Clause 14.6 did not permit the Employer to instruct or require the Engineer to adjust or deduct on the ground of dissatisfaction with any payment of any amount certified **[G4/525/2072]**.

92. On 3 November 2008, the Claimant gave notice that it would be suspending works from 6 November 2008 by reason of the Employer's failure to pay IPCs 24 and 25 **[G4/527/2084]** which it confirmed by letter of 6 November 2008 **[G4/535/2097]**.

93. The Engineer wrote to the Claimant on 5 November 2008 confirming that he remained constrained by the Employer's instructions **[G4/531/2089].**

94. The minutes of the Site Progress Meeting on 13 November 2008 record that the Claimant stated that even if all certified amounts for IPC 24 and 25 were paid, it would not resume working **[A2/19/6].**

95. The Claimant gave notice of Claim 22 in respect of the Third Suspension on 14 and 17 November 2008 **[G4/546/2116] [G4/548/2121]**.

96. On 24 November 2008, the Claimant submitted its application for IPC 27 for works carried out in September and October 2008 together with Price Escalation **[G4/554/2131]**. This was never certified by the Engineer.

**Termination**

97. On 2 December 2008, the Claimant issued a notice of entitlement to terminate **[G4/559/2142]**. In response, Mr Chambo wrote to the Claimant on 4 December 2008 calling a meeting for the following day to discuss the situation **[G4/560/2145]**. This meeting took place on 5 December 2008 **[G4/561/2146]**. The Claimant was asked to confirm whether it would recommence the Works if IPCs 24 and 25 were paid but not IPC 26. The Claimant replied that the position would not change and the suspension would continue.

98. On 12 December 2008, the Claimant wrote to Mr Chambo stating that it was open to the possibility of participating in amicable settlement negotiations **[G4/567/2156]**. Mr Chambo responded on 15 December 2008 agreeing to convene a meeting to resolve the differences which had arisen including payment of IPCs 24, 25 and 26 on 22 December 2008 **[G4/570/2163]**.

99. On 15 December 2008, Tanroads convened an Emergency Meeting at which they approved the procurement of a contractor to complete the remaining works and recommended that the Claimant's subcontractor, Estim, carry out this work **[G4/579/2183]**.

100. In another letter of 15 December 2008, Tanroads outlined its position that the Claimant had given it no choice but to complete the works by other means and was required after the elapse of 14 days to proceed as per Sub-Clause 16.3 to cease further work, hand over plant and materials for which it had received payment and remove all their goods from site **[G4/571/2164]**.

101. Tanroads wrote to the Claimant on 16 December 2008 stating that the notice of termination would take effect from today's date in accordance with Sub-Clause 16.2 **[G4/577/2180]**.

102. The Claimant wrote on 16 December 2008 clarifying that the notice of 2 December 2008 did not mean that the Contract was automatically terminated at the end of the 14 day period **[G4/578/2182]**. Tanroads reiterated on the same date that the notice was a notice of termination **[G4/579/2183]**.

103. The Engineer wrote to the Claimant on 16 December 2008 giving notice that the 14 day notice of entitlement to terminate had ended that day and asking whether the Claimant now intended to terminate the Contract **[G4/580/2185]**. He also wrote to Mr Mrema of Tanroads stating that Tanroads' planned retendering of the Contract would be tantamount to repudiation of the Contract which would place Tanroads in a very vulnerable contractual position **[S3/1.1]**.

104. On 17 December 2008, the Claimant wrote in response to Tanroads' two letters of 16 December 2008 stating that the notice was a notice of entitlement to terminate and it considered that Tanroads taking final steps to appoint an alternative contractor amounted to a repudiation of the Contract. **[G4/583/2189]**

105. On 20 December 2008, Black & Veatch wrote to the Claimant setting out the sums that would have been due under IPC 27 and the deductions that had been made and confirming that, as a result, IPC 27 did not meet the minimum amount required for certification **[G4/591/2213]**.

106. Three days of meetings took place on 22, 23 and 24 December 2008 chaired by Mr Chambo **[G4/592/2215] [G4/593/2219] [G4/594/2226]**. It was agreed that there would be another meeting sometime in January 2009 **[G4/594/2229]**

107. On 5 January 2009, Tanroads wrote to the Claimant stating that it should be vacating the site so as to allow Tanroads to pave the way for the new contractor by the end of January **[G4/601/2246]**.

108. Dr Konoike visited Tanzania in late February 2009 and, at a number of meetings with Mr Chambo of MoID held on 19 and 21 February 2009, advised that the Claimant would resume work if outstanding payments for IPCs 24-27 were made **[G4/633/2298] [G4/634/2301]**.

109. By letter dated 5 March 2009, Tanroads wrote to the Claimant advising that it had entered into a replacement contract with Estim on 27 February 2009 and requesting the Claimant to leave the site immediately **[G5/640/2310]**.

110. The Claimant wrote to Tanroads on 11 March 2009 stating that Tanroads' actions amount to a repudiatory breach and the Claimant gave notice of its election to terminate the Contract under Sub-Clause 16.2 with immediate effect [G5/645/2325].

**Events subsequent to termination**

111. The Claimant transferred the majority of its demobilised plant and equipment to the Zuzu storage yard near Dodoma. Thereafter, during April, May and June 2009, the Claimant sold this plant and equipment, predominantly to Highlands Estates and Estim.

112. On 26 June 2009, the Claimant submitted its application/claim for final payment following termination [G5/669/2451].

113. On 10 February 2010, the Claimant received a response from Mr Ntensibe of Black and Veach assessing the amounts due under Bills 1-6 and Variations. He did not deal with the termination claims, on the basis that this issue was under dispute [G5/717/2607].

**Summary of Claims**

114. As a result of the above, the Claimant asserts that at the date of termination, it had completed 92% of the Works (approximately 110km of the Road) but had been paid only 71% of the agreed Adjusted Contract Price which took no account of its claims.

115. Consequently, in outline, the Claimant now seeks:

   a. The balance of payments due to it for work it has completed, including:

   - The sums agreed in the Addendum for pre-Addendum disruption, additional design costs and price escalation;

   - Various disputed bill items and variations.

   b. Delay and disruption claims arising from the First, Second and Third Suspensions as outlined above (in addition to further claims during this

period resulting from (i) national cement shortage; (ii) emergency repair works; (iii) a cholera outbreak; (iv) waterlogged ground; (v) exceptional rainfall).

c.  Claims arising from wrongful termination of the Contract, including:

- Costs of maintaining the Performance Security;

- Losses arising from currency devaluation;

- Loss of opportunity to undertake three further contracts as a consequence of financial difficulties suffered by the Claimant caused by the Respondents' breaches of contract;

- VAT;

- Financing charges and interest;

- Costs of DAB proceedings, amicable settlement and the arbitration itself.

116. The Respondents contend that the Claimant's claims should be dismissed in their entirety and seek:

a.  That the Tribunal open up, review and revise IPCs 15 to 25 to exclude sums that were not due to the Claimant pursuant to the Contract.

b.  Recovery of sums allegedly overpaid to the Claimant in relation to IPCs 15 to 25, together with pre- and post-award compound interest at an appropriate rate.

c.  A declaration that the Claimant failed to complete the Works by the time for Completion.

d.  A declaration that Tanroads terminated the Contract on or about 15 December 2008 and did so validly.

e.  Liquidated damages for delay in the sum of 10% of the Accepted Contract Amount.

41

    f.   Costs of repairing the allegedly defective works.

    g.   Costs of the DAB referrals and amicable settlement discussions.

117. Against this background the Arbitral Tribunal now considers the various claims arising between the Parties, commencing with the issues arising from the Addendum dated 14 March 2007.

## SECTION III: THE ADDENDUM CLAIMS

### Factual background

Context to negotiations

1. The context in which the negotiations between the Parties arose is set out in the Section II. Some of the events referred to in Section II are repeated in this Section but in greater detail.

2. On 14 July 2006, the Claimant wrote to the Engineer stating that its cash flow had reached critical level [G1/54/238]. The Claimant then wrote to the MoID on 26 July 2006 requesting co-operation in order to reach a practical solution [G1/56/241].

3. At a meeting on 7 August 2006 between the MoID and the Claimant, the latter was informed that the Government of Tanzania could not afford to pay Price Escalation as requested [G1/63/313].

4. On 14 August 2006, the Claimant served a suspension notice on the basis of the Employer's non-payment of IPC 15 [G1/72/375]. It contends that it was therefore entitled either to suspend or go slow from 5 September 2006 pursuant to Sub-Clause 16.1 of the Contract. At paragraph 44 of their closing submissions, the Respondents maintain that the Claimant had in fact already slowed down the Works two weeks before giving this notice [S4/1/23]. In any event, the receipt of USD 1,252,808.69 (99% of IPC 15) on 8 September 2006 should have put an end to the slowdown.

5. The Respondents contend that the continued slow-down of the Works, notwithstanding the receipt of substantial payments, was a tool to pressurise the Government to yield to the Claimant's demand for Price Escalation. At paragraph 2.29 of its closing submissions, the Claimant rejects this allegation and contends that at no stage during the course of the Works was it suggested to the Claimant by the Engineer or the Employer that its suspension was invalid [S3/1/21].

43

Initial discussions

6.   On 2 November 2006, Dr Konoike met with the President of Tanzania in Tokyo to discuss the Claimant's financial situation **[G1/89/485]**. This was followed by a meeting on 5 November 2006, between the Claimant and the Engineer, the Employer, the MoID and the Chairman of the Parliamentary Infrastructure Committee **[G1/90/486]**.

7.   On 10 November 2006, the Claimant was informed that a team of seven officials had been appointed by the Government to review the Project – the Government Special Team (**"GST"**). A meeting took place with the GST on 12 November 2006, chaired by Mr Matupa **[G1/93/495]**.

8.   On 13 November 2011, Mr Matupa sent the Claimant a list of questions **[G1/94/497]**. In response, the Claimant submitted a file of further information to Mr Matupa, including the DAB decision **[G1/95/502]** and a report on the problems it had encountered **[G1/96/503]**.

9.   A further meeting took place on 28 November 2006 **[G1/97/509]**, chaired by Mr Chambo (the Deputy Permanent Secretary of the MoID). It was recorded that the MoID had decided to look into agreeing an amicable settlement. The Claimant was requested to suspend its arbitration in respect of Price Escalation, but it refused to do so.

10.  On 11 December 2006, Mr Chambo informed the Claimant that a negotiating team had been set up for the purpose of reaching an amicable settlement – the Government Negotiating Team (**"GNT"**). The Claimant was invited to present all its claims to the GNT as a basis for negotiations within two days **[G1/100/515]**.

11.  In response, the Claimant prepared a report entitled *"The Contractor's Minimum Position for Negotiations – Without Prejudice"* **[G2/101/517]**.

GNT negotiations

12.  Negotiations took place at a series of meetings in December 2006 and January 2007. The meetings were attended by a number of representatives

from the Claimant, with Mr McCormick acting as a consultant. The GNT was composed of a range of professionals whose positions are confirmed by Mr McCormick **[C4/1/6]**:

a. Mr Chambo – Deputy Permanent Secretary of the MoID;

b. Mr Matupa – from legal department in the Attorney General's office;

c. Mr Feleshi – from legal department in the Attorney General's office;

d. Mr Kasuwi – engineer from the Ministry of Finance;

e. Mr Rubibira – Contract specialist from MoW;

f. Mr Macha – engineer with Cowi;

g. Mr Mndowla – from consultancy firm PWC.

13. The First Meeting took place on 19 December 2006 **[G2/102/645]**. Price Escalation was the first issue discussed. It was noted at paragraph 5.14 as an agreed fact that *"Procedure for including the minutes for pre-bid meeting was not properly followed."*

14. On the evening of 19 December 2006, Mr Feleshi sent an email to the GNT, copied to Mr Nyamubi of the Claimant, attaching a document setting out the GNT's position on the items in dispute. At paragraph 3.0, it noted that *"The Employer in principal agrees that the escalation clause applies to the whole contract amount."* **[G2/103/652]**

15. The Second Meeting took place on 20 December 2006, during which the issue of Price Escalation was agreed between the Parties. Paragraphs 4.1.1 and 4.1.2 of the Minutes record:

> *"4.1.1 ISSUES OF ESCALATION OF PRICE*
>
> *The following issue was agreed by the parties.*
>
> *Whether the pre-bid meetings were properly incorporated into the contract*

*Arguments for issue determination*

*The parties agreed that since the clear wording of clause 13.8 allows escalation of price on the whole contract sum and the pre bid meeting was not effectively incorporated in the contract, the price escalation clause should apply to the whole contract sum payable both in local and foreign currency.*

*The Employer in principal agrees that the escalation clause applies to the whole contract amount.*

*4.1.2 Price escalation*

*The parties agreed that price escalation clause should apply to the whole contract sum in accordance with article 13.8 of the Conditions of the particular application.*

*4.3 Disruption claims*

*The contractor undertook to provide a cost build-up for the claim of 14,635,397,232 relating to the descriptions causing loss of productivity.* " **[G2/104/671]**

16. The Claimant stated at paragraph 4.5.0 that *"work cannot recommence until some payment is received."* The Respondents contend that during the negotiations, on a daily basis, the Claimant told the GNT that it would not remobilize unless it received Price Escalation on foreign-currency payments or other substantial sums.

17. The Minutes for the First and Second Meetings were signed on 22 December 2006.

18. The Third Meeting took place on 21 and 27 December 2006, dealing with the 13 Variation claims **[G2/105/677]**.

19. The Fourth Meeting took place on 3 January 2007, during which the Parties agreed to suspend the ICC arbitration on Price Escalation pending the outcome of the negotiations **[G2/107/724]**.

46

47

20. The Fifth Meeting took place on 4 January 2007 and the Sixth Meeting on 5 January 2007, at which the Claimant confirmed that it would discontinue the arbitration upon *"The Employer's decision to pay for Adjustments for Changes in Costs in accordance with Clause 13.8 in both Contract currency components."* **[G2/107/727]**.

21. Negotiations continued at the Seventh Meeting on 8 January 2006 **[G2/107/728]**. The Eighth Meeting took place on 9 January 2007 **[G2/107/729]**. By this point:

   a. The Claimant had offered to reduce its disruption claim to TZS 10 billion.

   b. The Claimant offered to accept a 24 month extension of time. The Employer offered 19 months with a possible further 5 months.

   c. It was agreed that the Claimant would put forward a proposal for sectional completion.

   d. The Employer agreed to expedite the payment of Price Escalation because it was a matter that could be dealt with as part of the existing Contract, without the need to modify it by Addendum.

   e. The Employer undertook to make sure that the Resident Engineer would be changed and to supervise closely the next Engineer.

22. Further agreements were reached at the Ninth (and final) Meeting on 10 January 2007 **[G2/107/730]**. Paragraph 27.0 records the following:

   *"27.1 The Contractor maintained the claim of Tshs.76,228,583,586.00 in accordance with the submitted Bills of Quantities for the Final Approved Design (B2), being a revised Contract Lump Sum amount and Tshs.12 bln for disruption claims. However, he invited the Employer to give another offer for consideration.*

   *27.2 The Employer urged the Contractor to be consistent because already on 9th Jan 2006 [sic] the Contractor had agreed to reduce his disruption claim from Tshs 14.64 billion to Tshs. 10.0 billion.*

47

*27.3 Eventually it was agreed that the disruption costs be Tshs.10.0 billion and the Contractor was inclined to discount the balance of the claim. The final agreed Contract Lump Sum amount now will be Tshs. 86.2 bln. It was agreed that the disruption had been adequately substantiated.*

*27.4 The Contractor maintained the request for an extension to the Time for Completion of 24 months and early payments of Adjustments for Changes in Costs to enable them to continue with the work. In response the Employer informed the Contractor that a balance of Adjustments for Changes in Costs in foreign currency can be paid now on those certificates upon which Adjustments for Changes in Costs for local component has already been certified and paid.*

*27.5 The Contractor has 64 Km to complete after finishing 63 Km. It was agreed that the time needed is 24 months to finish the Works.*

*27.6 The Parties settled with the sum of Tshs. 86,228.583,586.00 as an adjusted Contract Price which excludes amounts for Adjustments for Changes in Costs VAT and all Provisional Sums and Contingencies. "*

Memorandum of Understanding / Addendum/Deed of Settlement

23. Following the Ninth Meeting, a Memorandum of Understanding dated 30 January 2007 **("the MoU")** was prepared **[G2/118/811]**. The MoU provided at paragraph 10.1.1 that those areas that required amendment of the Contract would be implemented in accordance with the mandatory procedure of the Public Procurement Act No 21 of 2004 and Regulations GN 97 of 2005. These areas are contained in paragraphs 3.0, 4.0, 5.0, 6.0, 8.0 and 9.0. Paragraph 10.1.2 stated that the areas which do not need amendment of the Contract will be implemented immediately by the Employer, by following administrative arrangements within the Government.

24. Pursuant to paragraph 11.0, the minutes of the nine meetings formed part of that agreement **("the MoU Minutes")**. The minutes of the Third Meeting and the consolidated minutes of the Fourth to Ninth meetings were dated

30 January 2007 but in fact signed the following day, 31 January 2007, according to the evidence of Mr McCormick **[C4/1/20]**. This is also apparent from the email chain between the Parties at the time **[G2/119/829]** referred to below.

25. Subsequently, a meeting took place at Dodoma on 3 February 2007 between the Claimant and the MoID. The Record of Discussions (prepared by the Claimant originally in Japanese) notes that during this meeting, the Minister of Infrastructure Development (A.J. Change) explained that an addendum would be prepared and ratified by the Attorney General's office, passed through the Ministerial Tender Board and once agreed and signed by both Parties, the Addendum would become effective **[G2/122/855]**.

26. On 14 March 2007, the Parties entered into the Addendum **("the Addendum")** **[E5/2/1308]** which provided for, amongst other things, an Adjusted Contract Price of TZS 86,228,583,586.99 excluding VAT and a Provisional Sum to cover for Price Escalation. The MoU and MoU Minutes were appended to the Addendum at Appendix 1.

27. On the following day, 15 March 2007, the Parties executed the deed of settlement **("the DoS")** **[G2/131/955]**.

**Claims Arising from the Addendum**

Outline of claims

28. The Claimant contends that the Respondents are in breach of their obligations under the Addendum by seeking to deduct sums which had previously been certified and paid to the Claimant in respect of (i) Price Escalation, (ii) pre-Addendum disruption costs and (iii) Additional Design costs:

a. In respect of Price Escalation, the Claimant was paid a total of TZS 7,545,094,949.00 (TZS 9,054,113,934 including VAT) and USD 23,060,819.64 (USD 27,672,983.57 including VAT) up to and including IPC 24. The Respondents are now seeking to reclaim all Price

Escalation paid to the Claimant on the foreign currency element and all Price Escalation in excess of TZS 1.5 billion paid on local currency.

b. Regarding pre-Addendum disruption costs, the Claimant received TZS 10 billion through IPC 19 on 29 May 2008, in addition to Price Escalation on that sum. The Respondents subsequently sought to reclaim this payment in September 2008, instructing the Engineer to deduct the sums certified from IPC 26 and IPC 27.

c. The Claimant also received TZS 1,813,008,129.00 for Additional Design costs in IPC 19, which the Respondents have sought to reclaim.

29. The Respondents allege that they are entitled to deduct such amounts as the Claimant in fact had no right to the sums paid. They say that adjustments should be made to the IPCs accordingly, as set out in the Respondents' Summary of Revised IPCs at Appendix C to the Defence and Counterclaims.

30. The Tribunal must therefore determine the extent of the Claimant's entitlement to payment for:

a. Price Escalation;

b. Pre-Addendum disruption costs;

c. Additional Design costs.

31. The Tribunal's analysis of whether the Addendum is a binding and enforceable agreement and of each of the three claims is set out below.

**Price Escalation**

The Parties' Principal Submissions

32. The summaries of the Parties' cases set out in this Section and elsewhere in the Award are not intended to be exhaustive.

33. The Claimant contends that the correct position in relation to its entitlement to Price Escalation is the following:

    a. Under the original Contract, Price Escalation was payable on the whole of the Accepted Contract Amount after expiry of the first 18 months of the Contract, payable in Tanzanian Shillings. A provisional sum of TZS 1.5 billion was allowed in respect of Price Escalation but there was no cap on the amount that might ultimately be payable.

    b. The effect of the Addendum was that Price Escalation on the US Dollar element of the Accepted Contract Amount was itself payable in US Dollars. The Respondents' arguments as to the invalidity of the Addendum cannot succeed.

34. The Respondents deny that this is the correct interpretation of the original Contract or the Addendum. They contend that:

    a. On the true construction of the original Contract, Price Escalation was due only on the local currency, capped at TZS 1.5 billion. This is evident from:

- The pre-bid meeting minutes;

- Schedule of Costs and Percentages of Listed Elements;

- Contractual provisions on Contingencies.

    b. The Addendum was not effective in modifying the provisions on Price Escalation, as such agreement was void or unenforceable. In any event, the TZS 1.5 billion cap was left intact.

    c. In the alternative, even if Price Escalation was due on the US Dollars position, it was not payable in US Dollars, but in Tanzanian Shillings.

35. The Parties' principal submissions are summarised below on the issues of:

    a. Entitlement to Price Escalation under the original Contract;

    b. The effect of the Addendum;

    c. Entitlement to payment of Price Escalation in dollars following the Addendum.

Entitlement to Price Escalation under the Original Contract

36. The Claimant avers that there are no words in Sub-Clause 13.8 or any of the other relevant provisions limiting Price Escalation to the local currency. Consequently, the Price Escalation formula in Sub-Clause 13.8 is applicable to the whole of the Accepted Contract Amount. The Claimant relies in particular on the provisions set out below:

   a. Sub-Clause 13.8:

   *"...the lump sum Accepted Contract Amount shall be adjusted for rises or falls in the cost of labour, goods and other inputs to the Works, by the addition or deduction of the amounts determined by the formulae prescribed in this Sub-Clause."* **[E2/6/273]**

   b. Clause 1.1.4 of the General Conditions:

   *"'Accepted Contract Amount' means the amount accepted in the Letter of Acceptance for the execution and completion of the Works and the remedying of any defects."* **[E3/1/605]**

   c. The Letter of Acceptance:

   *"The contract sum will be Tsh 63,887,999,940.80 (i.e. Sixty three billion eight hundred eighty seven million nine hundred ninety nine thousand nine hundred forty and cents eighty) only payable in the following proportions: Tshs 15,599,521,051.20 (i.e. fifteen billion five hundred ninety nine million five hundred twenty one thousand fifty one and cents twenty) and USD 48,883,365.00 (i.e. forty eight million eight hundred eighty three thousands three hundred sixty five) only, equivalent to Tsh 48,288,278,889.60 (i.e. forty eight billion two hundred eighty eight million four hundred seventy eight thousand eight hundred eighty nine and cents sixty) at the rate of exchange of 1 USD to Tshs 987.8305."* **[E2/2/228]**

   d. Sub-Clause 13.8(b):

52

**53**

*"...the sums payable by the Employer to the Contractor shall – in the event of change in the NCC index – be subjected to increase or decrease in accordance with application of the Formula."* **[E2/6/274]**

e. Sub-Clause 13.8(c):

*"The value of net work done, certified by the Engineer, in any monthly Interim or Final Certificate as payable by the Employer to the Contractor before deduction of any Retention Money shall be increased or decreased by an amount of 'F' Tanzanian Shillings where the value of 'F' shall be determined as follows:*

$$F = \frac{(lc - lo)}{lo} \times Pc$$

*Wherein:*

*(i) lc indicates the value of the NCC Index on the day, which falls thirty days before the date of Interim or Final Valuation*

*(ii) lo indicates the value of the NCC Index on the day, which falls thirty days before the Tender submission date.*

*(iii)Pc indicates the "effective value" of the work done under the certificate concerned (being the value of that part of the work which is subject to such increase or decrease) and is as defined hereinafter."*

f. Sub-Clause 13.8(d):

*"The effective value (Pc) or work done which is to be subjected to increase or decrease shall be the difference between:*

*(i) the amount which, in the opinion of the Engineer, is due to the Contractor under Section 14 [Contract Price and Payment] (before deduction of retention money and before deducting sums previously paid on account) less:*

*any amount for payment or repayment of any advance payment*

*any amount for materials on site*

*any amounts for nominated sub-contractors (if any)*

*any amounts for any other items based on actual cost or current prices*

*any sums for increases or decreases in the Accepted Contract Amount as paid under this Sub-Clause and*

*(ii) the amount calculated in accordance with Sub-Clause 13.8(c)(i) above and included in the last preceded Interim Certificate issued by the Engineer in accordance with Section 14 [Contract Price and Payment] hereof."* **[E2/6/275]**

g.  Sub-Clause 14.1(a)

*"The Contract Price shall be the lump sum Accepted Contract Amount and be subject to adjustments in accordance with the Contract."*

Relevance of Pre-Bid Meeting Minutes

37.  The Respondents dispute the Claimant's interpretation of the original Contract. They contend that the Pre-Bid Meeting Minutes demonstrate that Price Escalation would not be available on foreign currency amounts, as evidenced by Question 16:

> *"Q 16 Does sub-clause 13.8 of the Conditions of Particular Application mean that there will be no adjustment for change in Price in respect of the foreign currency element of the contract amount?*
>
> *A 16 That is correct."* **[G4/574/2175]**

38.  The Claimant consciously included the Pre-Bid Meeting Minutes in its Contractor's Proposal, which formed part of the Contract. It had no legitimate expectation of Price Escalation on foreign currency and has failed to produce any witnesses who were involved in the bidding process to say otherwise. Answer 16 simply confirmed that the bidding documents in their

54

current form meant that there would be no Price-Escalation on foreign currency. Consequently, an Addendum was not necessary as no modification was required.

39. The Claimant denies that the Pre-Bid Meeting Minutes negate an entitlement to Price Escalation on foreign currency:

    a. Paragraph 18.4 of the Instructions to Bidders stated that any modification to the Contract through the Pre-Bid Meeting must be made by the issue of an addendum. No such addendum was issued by the Respondents in respect of Sub-Clause 13.8.

    b. Alternatively, the Pre-Bid Meeting Minutes are inconsistent with Sub-Clauses 13.8 and 14.1 which take priority under Sub-Clause 1.5 of the Conditions of Contract **[E2/6/267]**.

    c. In any event, there can be no doubt of the entitlement to Price Escalation on amounts payable in foreign currency after the agreements of January to March 2007.

Schedule of Costs and Percentages of Listed Elements

40. The Respondents contend that the Schedule of Costs and Percentages of Listed Elements in the Contract **[E5/4/1327]** also demonstrates that Price Escalation was not payable on foreign currency. In the cell marked *"Provisional Sum to cover price escalation"*, the amount of TZS 1.5 billion was inserted in the Tanzanian Shilling column. The Claimant filled in *"0.00"* in the corresponding Foreign Currency column. The Instructions to Bidders stated that:

    > *"Elements against which no percentage/amount has been entered by the Tenderer shall not be the subject of any payment calculation but shall be deemed to be included elsewhere in the Lump Sum Amount."*
    > **[E1/2/15]**

41. Furthermore:

55

a. In contrast to the Tanzanian Shillings column, the foreign currency columns for Total Cost of Works and Total Lump Sum Bid Price were the same — at approximately USD 40.7 million — since no amount was included for Price Escalation.

b. The Total Foreign Currency Requirements for the Project stated a figure of USD 40.7 — the same as the Total Cost of Works without Price Escalation.

42. In response, the Claimant avers that it could not include any sums for Price Escalation in the foreign currency column because under the formula in Sub-Clause 13.8(c) any allowance for Price Escalation was at the time of the contract to be paid in Tanzanian Shillings. Therefore any allowance for Price Escalation in the Schedule could only be in Tanzanian Shillings and the Claimant was recording that no Price Escalation was payable in the foreign currency. That later changed with the agreements of January and March 2007.

Contingencies and Cap on Price Escalation

43. The Respondents submit that all Price Escalation under the Contract was to be paid from a contingency amount that the Contractor itself included in its bid, capped at TZS 1.5 billion, as evidenced by the Schedule of Costs and Percentages of Listed Elements. The Respondents aver that such a cap is reflected in the terms of the Contract, including the following:

a. Sub-Clause 13.5:

*"The Contingencies shall only be used, in whole or in part, in accordance with the Engineer's instruction and the Contract Price shall be adjusted accordingly. The total sum paid to the Contractor shall include only such amounts from the Contingencies element of the Price as the Engineer shall have instructed."* **[E2/6/273]**

b. Sub-Clause 13.8:

> *"The costs of complying with the requirements of this sub-clause shall be met from the Contingencies element of the Contract Price."* **[E2/6/275]**

c. Sub-Clause 14.4:

> *"The Contingencies element of the Schedule does not enter into this valuation of the Work and shall be used or not used entirely as the Employer may see fit, but primarily for meeting the costs of the implementation of sub-clause 13.8; Adjustments for Changes in cost."* **[E2/6/277]**

44. The Instructions to Bidders required tenderers to submit a Sub-Clause 14.4 Schedule as part of their bid; while warning that where no amount was entered, that element would *"be deemed to be included elsewhere in the Lump Sum amount."* **[E1/2/15]**

45. Therefore, even if the Claimant could succeed in its argument that Price Escalation is payable on foreign currency amounts in principle, in practice, it makes no difference. The TZS 1.5 billion contingency amount was exhausted by the Price Escalation paid to the Contractor on local currency amounts alone, as of IPC 15, issued on 6 June 2006.

46. The Claimant denies that the provisions relied upon by the Respondents support their position as alleged **[S3/1/74]**. The reality is that amendments have been introduced to the standard form of contract at Sub-Clauses 13.5, 13.8 and 14.4 which are neither internally consistent nor consistent with the absence of any Contingencies. However, they do not contain any words of limitation on the amount payable and should be read subject to the main purpose of Sub-Clause 13.8. Further, they should be construed strictly or alternatively contra proferentem.

47. In any event, the Claimant contends that a cap on Price Escalation does not make commercial sense. The Respondents could have instructed numerous Variations to the Contract, increasing the contract price and without any

*57*

corresponding obligation to pay the Claimant for Price Escalation in respect of the same.

48. The Respondents deny that the existence of a cap is commercially nonsensical. The uncertainty of the amount payable under a Price Escalation formula is precisely why a cap is appropriate for a developing country financing a major project.

The Effect of the Addendum

49. The Respondents deny that the Price Escalation provisions of the Addendum are effective. Four principal submissions are made:

   a. The Addendum was not submitted to a tender board for approval, contrary to Section 44 of the Tanzanian Public Procurement (Goods, Works, Non-Consultant Services and Disposal of Public Assets by Tender) Regulations 2005 **("the Regulations")**.

   b. The agreement on Price Escalation produced an unreasonable windfall for the Claimant, in breach of Section 23(1) of the Regulations.

   c. The agreement was void for mutual mistake of fact under section 20(1) of the Law of Contract Act.

   d. The original TZS 1.5 billion cap was left unamended by the Addendum in any event.

Tender Board approval

50. The Respondents rely on Section 44 of the Regulations:

   *"Any variations to the value of a procurement or disposal contract shall be reviewed and approved by the appropriate tender board."* **[F3/3.8/49]**:

51. The Respondents contend that in purporting to provide for Price Escalation on the foreign currency, the Addendum varied the Contract's value as:

   a. Price Escalation was not payable on the foreign currency under the original Contract;

b. Even if the original Contract had provided for Price Escalation on the foreign currency, on the Claimant's case, the Addendum still purportedly increased the value of the Contract by:

- Removing the TZS 1.5 billion cap on Price Escalation;

- Providing for payment of Price Escalation on US Dollars *in* US Dollars.

52. No review or approval of the Addendum was sought or obtained. The fact that members of the GNT had authority, even senior authority, in public contracting or public procurement in other contexts does not change the fact that none of them purported to act as a tender board, or had authority to do so. Even if the GNT or its process had the objective characteristics of a Tender Board within the meaning of the Regulations, this is irrelevant.

53. The requirement for Tender Board approval is not a mere technicality. The policy behind Section 44 is to prevent government officials from conveying valuable contractual entitlements outside the designated process. It cannot be circumvented by arguing that the Addendum was simply "interpreting" the original Contract – the question of whether or not the value of a contract has been varied is objective.

54. In response to the Respondents' Tender Board arguments, the Claimant contends that:

a. This is not a pleaded point, having been raised by the Respondents for the first time during opening submissions **[T14/30/10-13]**.

b. Approval is not needed in any event. Section 44 does not apply as Price Escalation was payable on foreign currency in the original Contract and consequently there was no change to the value of the Contract by the Addendum. Nor does the change in relation to Price Escalation being paid in dollars change the value of the Contract.

c. Even if Section 44 did apply, the best evidence is that approval was in fact given, even though the MoU itself indicates that it was not needed.

Reliance is placed on the record of discussions held in Dodoma on 3 February 2007 **[G2/122/856]** and the letter from Mr Chambo of 13 March 2007 **[G2/129/914]**.

d.  In the event that approval was not given by the Tender Board, the Respondents are estopped from denying that it was given. The Claimant states that it relied on what it was told about approval having been given and on the Addendum being a good and lawful agreement.

55.  The Respondents accepted that the onus is on them to show that the approval had not been granted **[T15/69/25 – T15/70/4]**. They contend that the documentary evidence relied on by the Claimant is unclear. The documents simply suggest what was intended to happen, not what actually happened **[T15/65/14-19]**. Furthermore, the mantra that runs through the actual documents – the Deed of Settlement and the Addendum – is that the modification to Price Escalation is not actually a change and did not need to go to the tender board **[T15/67/1-6]**.

56.  The Respondents submit that the Claimant cannot derive assistance from the doctrine of estoppel. Estoppel cannot breathe life into an otherwise unlawful public contract. Reliance is placed on the cases of *Maritime Electric Co v General Dairies Ltd* [1937] AC 610, 620, *Rhyl Urban District Council v Rhyl Amusements Ltd* [1959] 1 W.L.R. 465, *Southend-on-Sea Corporation v Hodgson (Wickford) Ltd* [1962] Q.B. 416, and *Churchill Fisheries Export Pty Lid v Director General of Conservation* [1990] VR 968.

57.  The Respondents acknowledge that Mr Matupa's evidence was that the GNT had intended the Contractor to be paid Price Escalation on the entire contract price, including the foreign currency element **[T5/170/21-24]**. It is denied that this is of any relevance, in light of the legal position. Regardless of the GNT's desire to agree to Price Escalation on the foreign currency, they could not do so without Tender Board approval.

58.  By letter dated 2 September 2015, the Respondents submitted recently discovered minutes of a Tender Board meeting on 21 February 2007, dated

13 April 2007. The Respondents submitted that the Minutes were consistent with the Respondents' closing submissions on 21 January 2015 [**T15/67/23 – T15/68/4**]. By letter dated 8 September 2015, the Claimant did not object to the submission of the minutes and submits that the Minutes make clear that Tender Board approval was given to the Addendum before it was signed by the Parties.

Unreasonable Windfall

59. The Respondents contend that even if the Claimant can overcome the arguments on procedural validity of the Addendum, the purported agreement in respect of Price Escalation is unlawful or contrary to public policy and consequently unenforceable under Tanzanian Law.

60. The Respondents rely upon Section 23(1) of the Regulations:

*"23 Price adjustment*

*In the event of inflation, a price adjustment formula shall apply in order to arrive at a reasonable price."*

61. Applying Price Escalation to the foreign currency element would create a windfall for the Claimant which could not be a "reasonable price" for the following reasons:

   a. Applying a TZS inflation index to US dollars could not be a reasonable adjustment. Inflation in Tanzania has consistently exceeded that in the United States. The fact that the Claimant was making dollar-denominated purchases in Tanzania is irrelevant.

   b. The available evidence suggests that during the relevant period, dollar prices in Tanzania remained relatively stable. In contrast, the NCC index on which the Price Escalation formula was based increased in 2007 at an annual rate of 31%.

   c. To the extent that the foreign currency amount relates to costs that the Contractor actually incurred in Japan, Price Escalation would be

61

inappropriate. The Japanese Yen was static or deflationary during the relevant period.

62. In response, the Claimant contends that:

    a. The Regulations do not apply. Reliance is placed on section 2(1):

> *"2(1) Subject to sub-regulation (2), these Regulations shall apply to all procurement of goods, works and non-consultant services undertaken by a procuring entity except where the context provide otherwise in which case the provisions of the Act shall prevail."* **[F3/3.8/7]**

    b. In this case the context is the Contract. Provided that it does not contravene the provisions of the Act referred to, the Public Procurement Act 2004, the Regulations will not apply.

    c. If the Regulations do apply, then on the proper construction of Regulation 23, the effect is to require the Parties to apply a price adjustment formula so as to arrive at a reasonable price. Thus if they apply a price adjustment formula then Regulation 23 deems the price arrived at by its application to be reasonable.

    d. Even if the Regulations required the result of the application of the formula to be reasonable, there was compliance because it was reasonable. The Price Escalation formula in fact takes account of only 50% of the increase in the prices of the basket of construction materials on which it is founded.

63. Even if contrary to the above there is a breach of the Regulations, this does not necessarily entail that the price adjustment formula is void. Reliance is placed on section 23(1) of the Law of Contracts Act (Tanzania):

> *"23(1) The consideration or object of an agreement if lawful, unless –*
>
> > *(a) it is forbidden by law;*
> >
> > *(b) is of such a nature that, if permitted, it would defeat the provisions of any law;*

62

> *(c) is fraudulent;*
>
> *(d) involves or implies injury to the person or property of another; or*
>
> *(e) the court regards it as immoral or opposed to public policy. "* **[F1/1.3/15]**

64. The burden lies on the Respondents to show that one of the above criteria is met and they have failed to do so. In particular, the Claimant contends that the Respondents have failed to show that the Price Escalation formula was forbidden by law. The Claimant relies on *Gherulal Parekh v Mahadeodas* (1959) Supl. 2S.C.R.406.

65. The Respondents submit in return that the context of the Contract cannot displace the Regulation pursuant to Regulation 2(1). Regulation 2(1) merely confirms the basic principle of administrative law that the regulations must yield if, in a particular instance, they are incompatible with the statute they implement – not the Contract they regulate.

66. The Respondents assert that the Claimant's contention that the Price Escalation formula compensated it for only 50% of actual cost increases is neither relevant nor factually accurate.

Mistake

67. The Respondents contend that the agreement on Price Escalation was premised on a mutual mistake of fact and is consequently void. The Law of Contract Act (Tanzania) provides that:

*"20(1) Where both the parties to an agreement are under a mistake as to a matter of fact essential to the agreement, the agreement is void.*

*(2) An erroneous opinion as to the value of the thing which forms the subject matter of the agreement is not deemed a mistake as to a matter of fact.*

*21) A contract is not voidable because it was caused by a mistake as to any law in force in Tanzania; but a mistake as to a law not in force in Tanzania has the same effect as a mistake of fact. "*

68. The Respondents aver that:

    a. The Minutes of the First Meeting on 19 December 2006 note as an agreed fact that "*Procedure for including the minutes for pre-bid meeting was not properly followed.* " **[G2/102/650]**.

    b. The Claimant and the GNT expressly premised the Price Escalation provision of the Addendum on this mistaken agreed fact: "*Since...the pre bid meeting was not effectively incorporated into the contract, the price escalation clause should apply to the whole contract sum payable both in local and foreign currency.* " **[G2/104/667]**.

69. Mr Matupa confirmed that this was the GNT's belief at the time as its members had not considered the legal points that had been taken in the DAB proceedings **[T5/163/8 – T5/168/21]**. Mr McCormick confirmed that the Claimant had also believed that the Pre-Bid Meeting Minutes had not been incorporated into the Contract **[T4/31/5-12]**.

70. The Respondents aver that a mistake about the terms of a contract is one of fact. Reliance is placed on Pollock & Mulla, Indian Contracts & Specific Relief Acts (13th ed) (Vol 1), p629 **[F4/4.18/4]** and *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349 **[F4/4.13/1]**. An agreement premised on a mutual mistake of fact is void under section 20(1) of the Tanzania Law of Contract Act 1961.

71. The Respondents contend that notwithstanding Mr Matupa's evidence that the GNT had decided to concede Price Escalation regardless of the fine contractual position, the agreed statement of facts is nonetheless demonstrative of reliance upon the mistake as to what was contained in the Contract in relation to Price Escalation **[T14/214/22 – T14/215/3]**.

72. The Claimant's position on mistake is that:

a. There was no mistake as:

- The minutes of the negotiation meetings were accurate. The procedure at paragraph 18.4 of the Instructions to Bidders was not followed.

- The award of the DAB was based on the fact that the minutes of the Pre-Bid Meeting were included in the Claimant's tender and in the Contract. The members of the GNT would have been aware of that.

b. Even if there was a mistake, it was a mistake of law not fact, pursuant to section 21 of the Law of Contract Act (Tanzania) read in conjunction with Section 2(3) of the Judicature and Application of Law Act.

c. The requirements of section 20(1) are not satisfied, as the purported mistake did not go to the very basis of the Contract or involve a fact essential to the agreement. Both Parties should have known the true state of affairs in any event. The Claimant relies on Pollock and Mulla *"The Indian Contract Act"* pages 455-475 **[F2/2.28/13]** and *Sheikh Brothers Ltd v Arnold Julius Ochsner and Another* [1957] AC 136 **[F2/2.3/1]**.

d. Any mistake was irrelevant as the Particular Conditions take precedence over the Contractor's Proposal under the order of priority provisions found in the Form of Agreement and at Sub-Clause 1.5 of the General Conditions.

e. In any event, Price Escalation was payable on foreign currency elements under the terms of the original Contract. If the Price Escalation agreement contained in the Addendum is void for mistake of law, this is ultimately irrelevant.

TZS 1.5 billion cap

73. The Respondents aver that the 1.5 billion cap in the original Contract was not amended by the Addendum. The cap had in fact already been exhausted by payments of Price Escalation on TZS amounts. The Addendum left all of

the Contract's original terms undisturbed unless specifically stated otherwise.

74. Additionally, eliminating the cap would have varied the value of the Contract by billions of Tanzanian Shillings and therefore would have required review and approval by a Tender Board.

75. The Claimant contends that even if the original Contract did contain a cap it is plain from the express terms of the subsequent agreements that there was none following agreement of the MoU, Addendum and Deed of Settlement.

76. Furthermore, the Claimant submits that:

    a. There is no reference to a cap in any of the Minutes;

    b. As at IPC No 16 on 20 October 2006, the Respondents had already paid TZS 1,629,788,350 for Price Escalation, in excess of the purported cap;

    c. Mr Matupa confirmed that the government was committed to pay Price Escalation without any cap [T5/171/24].

77. Alternatively, the Respondents have waived their right to rely upon any cap argument or are estopped from advancing the same. If there was a cap originally, the Respondents, by their conduct, assured the Claimant that they would not enforce it, and the Claimant acted on that to its detriment. Reliance is placed on the case of *Edwin Simon Mamuya v Adam Jonas Mbala* [1983] TLR 410.

Entitlement to payment of Price Escalation in Dollars following the Addendum

78. The Respondents contend in the alternative that even if Price Escalation is payable *on* dollars, it is not also payable *in* dollars. The Claimant must therefore reimburse the Respondents for the overpayments it received in this respect, amounting to TZS 8,370,108,867.

79. Payment in dollars would have been a clear change from the original Contract, and thus required approval from the Tender Board. Furthermore, if the negotiators had agreed to change the currency in which Price Escalation

66

was to be paid, they would have done so expressly and such would have been evident in the Minutes. Additionally, adding another uplift in the form of a non-market exchange rate on top of the application of a TZS index to US dollar amounts would make the Price Escalation formula even more unreasonable.

80. The Claimant relies on the following provisions in support of its entitlement to Price Escalation payable in dollars:

   a. Paragraph 2.2 of the MoU:

   *"The Parties have agreed to interpret the said Clause 13.8 in such a manner that allows the Contractor to be paid for the changes in cost on the full Accepted Contract Amount (or such other amount amended in accordance with the Contract) and in currencies both, Tanzanian as well as Foreign."*

   b. The Addendum provided at paragraph 1.0(i):

   *"Sub-Clause 13.8 of the Particular Application shall be correctly interpreted i.e. Price Escalation shall be paid on the whole of the works covered by the Adjusted Contract Price in both Tanzanian Shillings and US Dollars. Price Escalation in accordance with Sub-Clause 13.8, will be paid on all works carried out until the final Time for Completion."*

   c. The Deed of Settlement dated 15 March 2007:

   *"The Parties have agreed to interpret the said Clause 13.8 in such a manner that allows the Contractor to be paid for the changes in cost on the full Accepted Contract Amount or such other amount as may be arrived at after amendment of Contract and in currencies both, Tanzanian as well as Foreign."*

81. The Claimant asserts that there can be no doubt about the effect of these provisions – Price Escalation was to be paid on dollars and in dollars. The Claimant denies that the payment of Price Escalation in dollars as opposed to Tanzanian Shillings would have caused any extra windfall. Because the

67

**68**

contractual rate is used to get both from the initial dollars to Tanzanian Shillings in order to apply the formula, and then applied again to bring it back to dollars, there is no additional gain from the conversion. An additional gain would only arise if at the beginning of the process the dollars were converted into Tanzanian Shillings at the prevailing rate rather than the contractual rate. This is not what happened.

## Analysis and Conclusions of the Tribunal on Price Escalation

Was the Addendum Approved by the Tender Board?

82. The facts are that Mr Chambo (the Deputy Permanent Secretary of the MoID) for the Respondents proposed negotiations between the GNT and the Claimant and requested the Claimant to present all its claims as the basis for negotiations **[G1/100/515]**. The Claimant submitted a report entitled *"the Contractor's minimum position for negotiations-without-prejudice"* **[G2/101/517]** which served as the basis for the subsequent discussions.

83. The GNT included the persons who held the positions set out above.

84. It is clear from the positions of the members of the GNT that the GNT was composed of senior members of relevant government departments, some or all of whom would or should have been aware of the Respondents' procurement requirements. Mr Chambo as Deputy Secretary of MoID, in particular must have been aware of such requirements as can be seen from the Record of Discussions **[G2/122/855]** described in Section II.

85. The negotiating process involved a series of nine meetings in respect of which Minutes were signed by both Parties.  These Minutes were incorporated in the MoU which was dated 30 January 2007. Although the Minutes of the third meeting and the consolidated Minutes of the fourth to ninth meetings are dated 29 January 2007, Mr McCormick, a consultant at the time to the Claimant and who was involved in the negotiations gave

68

evidence that these Minutes were in fact signed on 31 January 2007 [C4/1/20]. The Tribunal accepts Mr McCormick's evidence on this point.

86. On 14 March 2007, the Parties entered into the Addendum. The MoU and the MoU Minutes were attached to the Addendum. On 15 March 2007, the Parties executed the Deed of Settlement.

87. The Respondents, acting in accordance with the terms of the Addendum, caused sums to be certified and paid to the Claimant in respect of Price Escalation, pre-Addendum disruption and Additional Design costs. The Respondents now seek to recover such sums.

88. The Respondents, having negotiated and executed the MoU, Addendum and Deed of Settlement and having made such payments pursuant to the Addendum, now adopt the relatively unattractive position that the Addendum was not submitted to a Tender Board for approval contrary to section 44 of the Tanzanian Public Procurement (Goods, Works, Non-Consultant Services and Disposal of Public Assets of Tender) Regulations 2005. The Claimant submits that this position is not pleaded, having first been raised by the Respondents during their opening submissions [T14/30/1013].

89. The Respondents contend that as the Addendum varied the value of the Contract (e.g. by way of Price Escalation) it should have been reviewed and approved by the appropriate Tender Board and it was not.

90. The Respondents accept that the burden is on the Respondents to demonstrate that the approval had not been granted [T15/69/25-T15/70/4]. In the Tribunal's view, the Respondents have failed to discharge this burden for the following reasons:

   a. A meeting took place between the Claimant and the MoID on 3 February 2007 – that is, after the signature of the MoU and prior to the execution of the Addendum. The Record of Discussions of this meeting (prepared by the Claimant) records that the Minister for the MoID explained that an Addendum would be prepared, ratified by the Attorney General's office

69

and passed through the ministerial Tender Board. Once agreed and signed by both Parties, the Addendum would become effective [G2/122/855]. The Addendum was signed on 14 March 2007. and the Respondents acted upon it.

b. It is now clear from the Minutes of the Tender Board meeting on 21 February 2007 (submitted by the Respondents by letter dated 2 September 2015) that the Tender Board did consider and approve the Addendum. The Arbitral Tribunal does not consider that the Respondents' submission that it is "*not clear whether the Board was presented with (or purported to approve) the second "Addendum No 1" dealing with price escalation...*" carries any weight. It is clear from paragraph 5.3 of the Minutes that the Tender Board discussed each of the "5 main categories" of claims including Price Escalation, and agreed them.

c. The MoU provided at paragraph 10.1.1 that those areas that require amendment of the Contract would be implemented in accordance with the mandatory procedure of the Public Procurement Act Number 21 of 2004 and Regulations GN 97 of 2005. Paragraph 10.1.2 of the MoU stated that the areas which did not need amendment of the Contract would be implemented immediately by the Employer. It is clear from the MoU that the Respondents and the GNT on its behalf were aware of and addressed the need for compliance with the Regulations.

d. In his letter of 13 March 2007 [G2/129/914], Mr Chambo stated that the settlement of certain of the claims was a change to the Contract and this required compliance with the procedure under the Procurement Act. Mr Chambo further stated: "*An Addendum for that purpose has already been cleared by the Attorney General and the other procurement machinery has been complied with. You may wish to sign the Agreement as finally approved*". The Addendum was signed the following day.

e. Mr Matupa, who was a member of the GNT, gave evidence in relation to Price Escalation that the GNT intended the Contractor to be paid price escalation on the entire contract price [T5/170/21-24].

70

71

    f.  The Respondents did not provide any documentary or witness evidence that demonstrated that approval had not been given to the Addendum by the relevant Tender Board to displace the evidence suggesting that the relevant approval had been given. On the contrary, the documentary evidence, in particular the letter of 13 March 2007 from Mr Chambo **[G2/129/914]**, confirms that the necessary approval was given. Mr Chambo was the Deputy Permanent Secretary of MoID and had been closely involved in the negotiations leading to the Addendum. The Claimant was entitled to rely upon Mr Chambo's letter.

91.    Accordingly, the Tribunal finds that the Respondents have failed to demonstrate that approval of the Addendum by a Tender Board was not granted. It follows, and the Tribunal so finds, that pursuant to paragraph 1.0(i) of the Addendum (and also stated in the Deed of Settlement) the Claimant is entitled to be paid Price Escalation in US Dollars on the foreign currency element of the Adjusted Contract Price from the date of the Addendum.

92.    The Tribunal will now consider the other issues in relation to Price Escalation. Before dealing with the issues relating to Price Escalation under the Addendum, the Tribunal addresses how Price Escalation is addressed under the original Contract.

Does the original Contract limit the application of Price Escalation to local currency only (prior to the Addendum)?

93.    In summary the Claimant's position is that Price Escalation was payable in Tanzanian Shillings on the whole of the Accepted Contract Amount after the first 18 months of the Contract, whereas the Respondents contend that Price Escalation was due only on the local currency portion of the Accepted Contract Amount and that in addition the amount of Price Escalation was capped at TZS 1.5 billion. The Claimant disputes the application of such a cap. The Tribunal addresses the issue of the cap below.

94.   Pursuant to Sub-Clause 14.1(a), the Contract Price is defined as the lump sum Accepted Contract Amount and is subject to adjustments in accordance with the Contract. The term *"Accepted Contract Amount"* is defined in Clause 1.1.14 as being the amount accepted in the Letter of Acceptance for the execution and completion of the Works and the remedying of any defects.

95.   The Letter of Acceptance defines the contract sum in Tanzanian shillings payable in specified proportions of Tanzanian shillings and US dollars. The relevant part of the Letter of Acceptance is set out above **[E2/6/274]**.

96.   The Contract provides at Clause 13.8 that the Accepted Contract Amount is to be adjusted for the rises and falls in certain costs and that price escalation shall be calculated in accordance with a specified formula. This formula provides that the *"sums payable by the Employer to the Contractor"* shall be *increased or decreased "by an amount of 'F' Tanzanian Shillings"* in accordance with the application of the formula in the event of change in the NCC Index (see Sub-Clauses 13.8(b) and (c)).

97.   In the Tribunal's view, it is clear from the foregoing that the original Contract provided for Price Escalation to apply (after the first 18 months of the Contract) to the whole of the Accepted Contract Amount including the proportion payable in US Dollars, but that the amount of Price Escalation on both currencies is payable in Tanzanian Shillings.

The Pre-Bid Meeting Minutes

98.   The Respondents contend that the Pre-Bid Meeting Minutes demonstrate that Price Escalation was not applicable to the foreign currency portion of the Accepted Contract Amount and that these minutes were included by the Claimant in their Tender. The Minutes set out question and answer 16 which interprets Sub-Clause 13.8 as meaning that there will be no adjustment for change in price in respect of the foreign currency element of the Accepted Contract Amount.

99.  The Claimant submits and the Tribunal agrees that in accordance with paragraph 18.4 of the Instructions to Bidders any modification to the Contract arising through the Pre-Bid Meeting is to be made by the issue of an addendum.  No such addendum was issued by the Respondent or the Engineer and the incorporation of the Pre-Bid Minutes in the Claimant's tender is insufficient to amend the Contract.  In any event the answer to question 16 in the Pre-Bid Minutes interprets Sub-Clause 13.8 as meaning that there will be no adjustment for change in price in respect of the foreign currency element of the Accepted Contract Amount and the Tribunal does not agree with this interpretation of Sub-Clause 13.8.

100.  Secondly the Pre-Bid Minutes if applicable are inconsistent with Sub-Clauses 13.8 and 14.1 of the Contract which take priority under Sub-Clause 1.5 of the Contract.

The effect of the Schedule of Costs and Percentages of Listed Elements in the Contract

101. The Schedule is as follows:

**COPY**

Volume 1 – Section III – Form of Tender

14.4 Schedule of Costs and Percentages of Listed Elements

| | Element Descriptions | Breakdown of Costs | | | |
|---|---|---|---|---|---|
| | | Tanzanian Shillings | | Foreign Currency | |
| | | Percent | Amount | Percent | Amount |
| 1A | Contractor's Establishment and Mobilisation | 44.2% | 6,200,544,484 | 25.4% | 10,330,789.38 |
| 1B | Initial Provision of Facilities for the Engineer | 1.4% | 166,141,510 | 1.1% | 470,402.69 |
| 1C | Balance of General Items, incl. Maintenance of Engineer's facilities | 3.0% | 492,290,000 | 2.2% | 915,690.61 |
| 2A | Pipe Culverts incl. Inlet & Outlet structures and channels | 12.0% | 1,411,099,210 | 1.0% | 421,858.79 |
| 2B | Other Drainage Works | 2.3% | 272,564,192 | 0.7% | 270,003.41 |
| 3A | Site Clearance | 0.3% | 30,690,990 | 1.1% | 446,388.93 |
| 3B | Removal of Existing Structures | 0.1% | 12,690,000 | 0.2% | 91,065.73 |
| 3C | Excavation in Rock | 0.0% | 2,919,520 | 0.1% | 27,553.49 |
| 3D | All Other Earthworks incl. Excavation and Embankment | 3.1% | 364,470,193 | 15.0% | 6,468,738.81 |
| 3E | Pavement Layers of Natural Gravel incl. Improved Subgrade | 1.4% | 158,514,550 | 3.3% | 1,348,580.34 |
| 3F | Pavement Layers of Stabilised Material | 5.4% | 630,342,655 | 24.9% | 10,113,801.18 |
| 3G | Pavement Layers of Crushed Rock | 3.0% | 347,840,920 | 6.7% | 2,745,659.66 |
| 3H | Bituminous Layers | 5.2% | 616,149,626 | 9.6% | 4,032,097.60 |
| 5A | Thermoplastic Road Markings | 3.2% | 377,650,000 | 0.0% | 0.00 |
| 5B | Topsoil and Grassing | 7.7% | 908,000,000 | 0.0% | 0.00 |
| 5C | Weighbridges incl. All civil, electrical and mechanical works | 0.0% | 0 | 1.5% | 600,000.00 |
| 5D | All other Ancillary Works incl Additional works at Railway Crossings | 0.4% | 42,820,904 | 0.8% | 330,373.08 |
| 6A | Bridges | 4.2% | 490,016,900 | 0.4% | 182,517.56 |
| 6B | Box Culverts | 2.4% | 288,729,278 | 0.3% | 111,538.47 |
| 6C | All Other Structural Works | 0.1% | 5,834,504 | 0.3% | 105,530.19 |
| 7 | Design of the Works | 0.0% | 0 | 4.5% | 1,835,345.34 |
| | **Total Cost of Works** | **100%** | **11,749,900,878** | **100%** | **40,736,137.57** |
| 8 | Provisional Sum to cover price escalation. | | 1,500,000,000 | | 0.00 |
| | **Total Lump Sum Bid Price** | | **13,249,900,878** | | **40,736,137.57** |

Note: Serial numbers 1 to 6 in the above table are intended to correspond with Sections 1 to 6 of the Standard Specification.
Tenderers may adjust the element descriptions in this table to suit proposed methods of construction. They should not replace or consolidate the number of elements
Element 6A Bridges, is provisional in nature and bidders must study subclause 11.6 of the Employer's requirements before completing this line.

14.16 Total Foreign Currency Requirements

| Currency | Amount Required |
|---|---|
| United States Dollar | 40,736,137.57 |

Dated_____15 January, 2003_____Firm or Joint Venture KONOIKE CONSTRUCTION CO., LTD.

3-11, 2-chome, Kandanungaidai,

At__Chiyoda-ku, Tokyo, Japan__ Signed by_____Yoshini MIYAZAWA_____

Name_____(Signature)_____Position Resident Representative of Dar es Salaam Office

IN THE PRESENCE OF                                    IN THE PRESENCE OF

Name:_____        Name:_____(Hiroha TAKASHIGE)

5-11, Honcho 5-chome,                                 3-11, 2-chome, Kandanungaidai,

Address__Naraku-ku, Tokyo, Japan_____        Address_Chiyoda-ku, Tokyo, Japan_____

3-6

105

102. The Respondents rely upon the Schedule for two contentions: first, that the sum of TZS 1.5 billion was inserted in the Tanzanian Shilling column with zero in the corresponding foreign currency column under the heading *"Provisional Sum to cover price escalation"*. Second, that the amount of TZS 1.5 billion was a contingency from which all price escalation under the Contract was to be paid and that it operated as a cap.

103. In relation to the first contention, the sum of TZS 1.5 billion was inserted by the Respondents and then incorporated by the Claimant in its Tender. Notwithstanding the Respondents' reliance on the Instructions to Bidders in relation to the lack of a percentage or amount being entered, the Tribunal

74

agrees with the Claimant's contention that at the time of the original Contract it could not include any sums for Price Escalation in the foreign currency column of the Schedule because under the formula in Sub-Clause 13.8(c) any price escalation on the foreign currency portion was at the time of the Contract to be paid in Tanzanian shillings.

104. The Claimant was simply recording that no Price Escalation was payable in foreign currency under the original Contract which is entirely consistent with the terms of the Contract as the Tribunal has found.

105. In relation to the second contention that the sum of TZS 1.5 billion operates as a cap on the amount of Price Escalation that can be paid under the Contract, the Respondents rely upon Sub-Clauses 13.5, 13.8 and 14.4.

106. In the Tribunal's view, the provisions upon which the Respondents rely primarily set out the basis on which the contingencies elements are to be utilised and do not limit in any way the amount that may be payable for Price Escalation on the Accepted Contract Amount. In any event, the column in which the sum of TZS 1.5 billion was inserted by the Respondents is entitled *"Provisional Sum to cover price escalation"*. A provisional sum is exactly that. It is a sum that may increase or decrease in accordance with the Contract and, in this case, as a consequence of the application of the formula set out in Sub-Clause 13.8. In circumstances where Price Escalation is to be calculated in accordance with a formula which in turn reflects an index based on future changes in various elements of cost, it is obvious that at the time of the Tender the amount of Price Escalation could only be provisionally estimated. Such a provisional sum cannot be and does not operate as a cap on the amount of Price Escalation which may or may not become due depending on the operation of the contract formula.

107. Accordingly the Tribunal finds that:

   a. Under the original Contract, after the expiry of the first 18 months of the contract period, the Claimant is entitled to payment of Price Escalation in

Tanzanian shillings on both the local currency and the foreign currency elements of the Accepted Contract Amount.

b. The Pre-Bid Minutes do not alter this finding.

c. The fact that the Claimant did not insert a figure in the foreign currency column of the Schedule does not alter this finding.

d. The figure of TZS 1.5 billion inserted in the Schedule is a provisional sum and does not operate as a cap on the amount of Price Escalation payable under the original Contract in Tanzanian shillings on both the local and foreign currency elements of the Accepted Contract Amount.

Does the Price Escalation agreement in the Addendum result in an Unreasonable Windfall?

108. The Respondents contend that even if their contention that the agreement in relation to Price Escalation in the Addendum was not approved by the Tender Board is rejected (as it has been by the Tribunal), this agreement is in breach of section 23(1) of the Regulations which provides in relation to price adjustment *"in the event of inflation a price adjustment formula shall apply in order to arrive at a reasonable price."*

109. The Parties' respective contentions are summarised above.

110. The Parties agreed a specific price adjustment formula in the Contract, which, as the Tribunal has found, applies to the local and foreign currency elements of the Accepted Contract Amount but with the price escalation on those elements payable in Tanzanian shillings. The Tribunal has found that under the Addendum Price Escalation on the foreign currency element of the Adjusted Contract Price is payable in US Dollars.

111. In the Tribunal's experience, it is not uncommon for a formula reflecting an index based on costs in one country to be applied to costs that might be incurred in another country. The organisation responsible for the index – the National Construction Council - confirmed that this was the practice in Tanzania [G1/55/240].

76

77

112. The original Contract was approved under the relevant procurement Regulations and the Tribunal has found that the Respondents have failed to demonstrate that the Addendum was not so approved. Section 23(1) of the Regulations simply provides that where there is inflation a price adjustment formula is to apply in order to arrive at a reasonable price. At the time of the original Contract, and also at the time of the Addendum, this issue would have been addressed by the relevant procurement authorities, and the Respondents have failed to demonstrate that at these respective times there was any suggestion that the application of the formula in this case would result in an unreasonable price. In the Tribunal's view, the purpose of section 23(1) is to ensure that where there is inflation there is the application of a price adjustment formula to achieve a reasonable price, since, if there was no such formula, the price would be unreasonable because of the lack of any adjustment.

113. In any event, having agreed a price adjustment formula with the relevant approvals under the Regulations, the Respondents are bound by that agreement and the result of the formula, when that result is the consequence of the application of an agreed Tanzanian index applicable to projects in Tanzania. In the Tribunal's view, this is the sensible commercial approach to be adopted.

114. In view of this conclusion, it is not necessary to address other issues raised by the Parties, including the Law of Contract Act and the contention that the price escalation formula compensates for only fifty percent of the actual cost increases.

115. Accordingly, the Tribunal finds that the agreement in respect of Price Escalation in the Addendum does not result in an unreasonable windfall to the Claimant.

Is the agreement in respect of Price Escalation in the Addendum void for Mistake?

116. The Parties' respective submissions on this issue are set out above in this Section III.

77

78

117. The Respondents rely upon the Minutes of the second negotiation meeting on 20 December 2006 **[G2/104/667]** to contend that the Price Escalation provision of the Addendum was premised on a mistaken agreed fact that the procedure for including the minutes of a pre-bid meeting was not properly followed. In fact, the Minute at paragraph 4.1.1 states:

> *"ISSUES OF ESCALATION OF PRICE*
>
> *The following issue was agreed by the parties*
>
> > o *Whether the pre-bid meetings were properly incorporated into the contract*
>
> ***Arguments for issue determination***
>
> (i) *The parties agreed that since the clear wording of clause 13.8 allows escalation of price on the whole contract sum and the pre bid meeting was not effectively incorporated in the contract, the price escalation clause should apply to the whole contract sum payable both in local and foreign currency.*
>
> (ii) *The Employer in principal agrees that the escalation clause applies to the whole contract amount. "*

118. It is clear from the Minutes that the primary reason for agreeing that price escalation in both currencies is payable was *"...the clear wording of clause 13.8 allows escalation of price on the whole contract sum...".*

119. The Minute states *"the Employer in principal [sic] agrees that the escalation clause applies to the whole contract amount."*

120. The Parties were correct in believing that the Pre-Bid Minutes were not correctly incorporated into the Contract. There was no addendum as required by paragraph 18.4 of the Instructions to Bidders, and in any event

Sub-Clauses 13.8 and 14.1 take priority pursuant to Sub-Clause 1.5 of the Contract.

121. It follows that the Respondents' submission that the Addendum was entered into based upon a mutual mistake of fact is misconceived. There was no mistake. The Pre-Bid Minutes were not properly incorporated into the Contract, and the Minutes of the second negotiation meeting reflect this.

122. Secondly, the Pre-Bid Minutes express a view as to the meaning of Sub-Clause 13.8 and whether Price Escalation is payable on the foreign currency element of the Accepted Contract Amount. The Minutes of the second negotiating meeting make clear that the Parties took the view that Sub-Clause 13.8 allowed price escalation on the whole contract sum and there was no mistake about the terms of the Contract.

123. As the Tribunal finds that the Addendum is not void on the basis of mutual mistake of fact the Tribunal concludes that it is not necessary to consider any of the other submissions of the Parties on the issue of mistake.

124. Accordingly, pursuant to the Addendum, the Claimant is entitled to the sum of TZS 3,825,541,246.28 and USD 9,167,298.07 for Price Escalation.

**Pre-Addendum Disruption Costs**

The Parties' Principal Submissions

125. The Respondents contend that they are entitled to claw back sums paid to the Claimant in respect of Pre-Addendum Disruption costs, due to the Claimant's failure to provide substantiation. The Claimant contends that a liquidated sum was agreed, and that substantiation was deemed to be adequately provided. Furthermore, Price Escalation is payable on the sums due.

126. The Claimant contends that the natural reading of the Addendum and attached MoU and Minutes is that TZS 10 billion was an agreed liquidated

sum of money that was to be paid. Substantiation was deemed to be adequately provided. The Claimant relies on the following:

a. The Parties agreed in the Addendum that the contract price would be revised to the "Adjusted Contract Price" of TZS 86,228,583,586 which was expressly recited to include *"Disruption and Loss of Productivity."* The figure of TZS 10 billion was included in the amended Schedule of Costs and Percentages of Listed Elements which applied following the Addendum at Appendix 2 **[G2/130/935]**.

b. The Minutes of the meetings demonstrate that the Parties reached an agreement on a compromise lump sum, in particular:

   • Paragraph 4.3 of the Minutes of the Second Meeting held on 20 December 2006 **[G2/104/667]**.

   • Paragraph 14 of the Minutes of the Sixth Meeting on 5 January 2007 **[G2/107/726]**.

   • Paragraph 26 of the Minutes of the Eighth Meeting on 9 January 2007.

   • Paragraph 27 of the Minutes of the Ninth meeting on 10 January 2007 **[G2/107/730]**.

c. Paragraph 27 of the Minutes of the Ninth Meeting on 10 January 2007 record that:

   *"Eventually it was agreed that the disruption costs be Tshs 10.0 billion and the Contractor was inclined to discount the balance of the claim. The final agreed Contract Lump Sum amount now will be Tshs 86.2 bln. It was agreed that the disruption had been adequately substantiated."*

d. Clause 1(iv) of the Addendum states that:

   *"The Addendum provides extra costs required to successfully complete the project...The extra costs are the result of the negotiations held*

> *between the Employer and the Contractor on pertinent contract terms*
> *and are agreed. The agreed negotiated items are, namely:*
>
> ...
>
> *(iv) Costs due to Disruption and Loss of Productivity amounting to*
> *Tshs 10,000,000,000.00."*

127. To the extent that there is any conflict between the MoU suggesting that substantiation was to be provided and the minutes of the Ninth Meeting suggesting that it had already been given, the latter prevail as they are later in time and in effect answer the MoU wording.

128. Alternatively, paragraph 27 of the Minutes of the Ninth meeting was expressly incorporated at paragraph 11 of the MoU and so when read together any requirement for substantiation was agreed as fulfilled.

129. Further, the B2 bills are attached to the MoU as well as the Addendum. The B2 bills show a total of TZS 76 billion plus TZS 10 billion added for disruption, making a total of 86 billion, which is the amount of the new adjusted contract sum **[T14/46/416]**.

130. The Claimant points out that Mr Richards has carried out an assessment of the approximate valuation of pre-Addendum disruption based on the methods and rates used for post-Addendum disruption.   As such, substantiation has in fact been provided. The delay in providing this is irrelevant. During the negotiations, it would have taken considerable time and cost to undertake such an exercise in circumstances where the Claimant was in severe financial difficulties as a result of the Respondents' failure to pay sums due to it.

131. The Claimant denies that the Minutes record that disruption was limited to Claims 1, 2, 8, 12 and 13. The Claimant claimed the additional payment in relation to all matters set out in its Minimum Position for Negotiations Paper **[G2/101/517]**.

132. The Claimant also contends that it was entitled to be paid Price Escalation on the pre-Addendum disruption costs:

   a. Under Clause 1.0(i) of the Addendum, Price Escalation was payable on the entirety of the Adjusted Contract Price. The Adjusted Contract Price was defined at page 1 of the Addendum and included the sum of TZS 10 billion for Disruption.

   b. This was clearly the intention of the Parties as evidenced by the fact that the Engineer in fact certified such sums in IPC 20A which was paid by the Respondents.

   c. Furthermore, pre-Addendum Disruption was in fact calculated by reference to a comparison between planned and actual productivity as can be seen from the Contractor's Minimum Position for Negotiation Paper dated 14 December 2006 prepared for the Addendum Negotiations **[G2/101/157-644]**. Consequently, there can be no objection to seeking Price Escalation on this sum.

133. The Respondents rely on:

   a. Paragraph 5 of the MoU:

      *"The parties have agreed that any disruption that has sustained the Contractor loss of productivity shall be compensated upon reasonable and fair substantiation of related costs."* **[G2/118/811]**

   b. The Minutes of the Second Negotiation Meeting:

      *"The Contractor undertook to provide a cost buildup for the claim...relating to the descriptions* [sic] *causing loss of productivity."* **[G2/104/671]**

   c. Mr McCormick's evidence, which is accepted by the Tribunal, is that the GNT had made the request for substantiation and the Claimant had given such an undertaking **[T3/149/3-8]**.

134. The Respondents reject the suggestion that the GNT included the substantiation requirement in the MoU simply to save face, or that the timing of the signing of the Minutes of the Fourth to Ninth negotiation meetings one day after the MoU has any relevance.

135. The Respondents also reject the purported subsequent substantiation of pre-Addendum disruption contained in Mr Richards' report on the basis that:

   a. It was provided seven years after the event, rather than at the correct time.

   b. Mr Richards has not investigated the cause of the discrepancy between the Claimant's actual productivity and the measured mile on the erroneous assumption that liability was accepted by the GNT during the Addendum negotiations. In fact, only Claims 1, 8, 12 and 13 were acknowledged to have caused disruption.

136. The Respondents further deny that Price Escalation is payable on any amount claimed for Pre-Addendum disruption:

   a. The Contract's Price Escalation formula at Sub-Clause 13.8 explicitly precludes Price Escalation on any amount that is quantified by reference to actual cost.

   b. The Claimant cannot be entitled to a Price Escalation adjustment on a liquidated sum, which it has presented as a negotiated bargain between the Parties for payment of a sum certain. The Respondents submit that the Claimant cannot have it both ways. The amount is either liquidated, as the Claimant alleges, or it is not. The amount cannot be liquidated only to the extent that it benefits the Claimant (i.e. no substantiation required) but not where it does not (i.e. Price Escalation still owed).

**Analysis and Conclusions of the Tribunal on Pre-Addendum disruption costs**

137. The Parties' respective submissions are set out above.

138. In support of the contention that the pre-Addendum disruption costs require substantiation by the Claimant, the Respondents rely upon paragraph 5 of

the MoU **[G2/118/811]**, the Minutes of the second negotiating meeting **[G2/104/621]** and Mr McCormick's evidence **[T3/149/3-8]**.

139. However it is necessary to construe these provisions (and evidence) in the context of the full terms of the Minutes, MoU and Addendum, and the timing of the execution of each document is also relevant.

140. The Minutes and MoU are annexed to the Addendum and form part of it.

141. The Minutes of the second meeting (held on 20 December 2002) were signed on 20 December 2006; the minutes of the sixth meeting on 5 January 2007; the minutes of the eighth meeting on 9 January 2007.

142. The MoU was signed on 30 January 2007.

143. The Minutes of the fourth to ninth meeting were dated 30 January 2007 but in fact signed on 31 January 2007 after the date of the MoU. Apart from Mr McCormick's evidence on this point **[C4/1/20]** in the Tribunal's view it is clear from the email chain between the Parties at the time **[G2/119/2013; G2/119/829]** that the minutes were not signed until 31 January 2007.

144. The Addendum was signed on 14 March 2007.

145. The negotiations on the Pre-Addendum Disruption Costs claim progressed as follows:

   a. At the second meeting, the Claimant agreed to provide a cost build up for the disruption claim (paragraph 4.3).

   b. At the sixth meeting, the Parties agreed to continue to scrutinise the claims including the disruption claims (paragraph 14).

   c. At the eighth meeting, the Claimant offered to reduce the disruption claim from TZS 14 billion to TZS 10 billion to result in a total claim of TZS 86.2 billion (paragraph 26).  The Respondents asked the Claimant to reconsider an offer of TZS 5 billion.

   d. The MoU provided at paragraph 5:

*"5.0 DISRUPTION CAUSING LOSS OF PRODUCTIVITY*

*5.1 The Parties have agreed that any disruption that has sustained the Contractor loss of productivity shall be compensated upon reasonable and fair substantiation of related costs."*

e. At the ninth meeting on 10 January 2007 [**G2/119/837**] the Parties agreed:

*"27.3 Eventually it was agreed that the disruption costs be Tshs 10.0 billion and the Contractor was inclined to discount the balance of the claim. The final agreed Contract Lump Sum amount now will be Tshs. 68.2 bln. It was agreed that the disruption had been adequately substantiated.*

*…*

*27.6 The Parties settled with the sum of Tshs. 86,228,585,586.00 as an adjusted Contract Price, which excludes amounts for Adjustments for Changes in Costs, VAT, and all Provisional Sums and Contingencies."*

f. Clause 1(iv) of the Addendum provides:

*"INTRODUCTION*

*The Addendum provides extra costs required to successfully complete the project for **THE DESIGN AND CONSTRUCTION OF THE DODOMA-MANYONI ROAD**. The extra costs are the result of the negotiations held between the Employer and the Contractor on pertinent contract items are agreed. The agreed negotiated items are, namely:*

*…*

*(iv) Costs due to Disruption and Loss of Productivity amounting to Tshs. 10,000,000,000.00…"*

146. In the Tribunal's view, it is clear from the documents referred to above that the negotiations regarding the pre-Addendum disruption started with a requirement for substantiation but that a settlement was reached at TZS 10

85

billion as recorded in the Addendum which was signed after the MoU. Clause 1(iv) of the Addendum, which was the final approved document concluding the negotiations, prevails over paragraph 5 of the MoU. This is supported by the fact that the Minutes of the ninth meeting were signed on 31 January 2007, after the date of the MoU.

147. The wording of Clause 1(iv) of the Addendum makes clear that this was an agreed liquidated figure of TZS 10 billion for costs due to Disruption and Loss of Productivity (see Section III (paragraph 14.5(f)).

148. This figure was included in the Adjusted Contract Price of TZS 86,228,583,586 in the Addendum and in the amended Schedule of Costs and Percentages of Listed Elements at Appendix 2 **[G2/130/935]**.

149. Accordingly, the Tribunal finds that the Parties agreed a liquidated sum of TZS 10 billion in respect of the Pre-Addendum Disruption costs and that no further substantiation is required. This was paid to the Claimant in IPC 19 and was not subsequently deducted.

150. The Tribunal also notes that the Respondents' Engineer (Mr Ntensibe) wrote on 25 October 2008 to Tanroads making clear that the Addendum as the record of the final agreement between the Parties made no mention of a requirement for substantiation and that the Employer's instruction to deduct the disruption costs may not be justified.

Is the Claimant entitled to Price Escalation on the amount of pre Addendum Disruption?

151. The first page of the Addendum at clause (i) defines the Adjusted Contract Price as including the additional costs payable to the Claimant for the settled claims including "Disruption and Loss of Productivity". Addendum No. 1 **[E5/2/1313]** to the Addendum (also headed "Addendum No 1") provides at Clause 1.oi) that Sub-Clause 13.8 *"shall be correctly interpreted i.e. Price Escalation shall be paid on the whole of the works covered by the Adjusted Contract Price in both Tanzanian Shillings and US Dollars."*

86

**87**

152. Accordingly, the Tribunal finds that pursuant to the Addendum the Claimant is entitled to be paid Price Escalation on the pre-Addendum disruption as it was included in the Adjusted Contract Price upon which the Claimant is entitled to be paid Price Escalation.

153. It is also noteworthy that the Engineer certified payment of price escalation on the pre-Addendum disruption costs in IPC 20A which was paid by the Respondents at the time.

154. Accordingly, the Claimant is entitled to TZS 593,370,920 and USD 5,630,448.83 for Price Escalation on Pre-Addendum disruption.

**Additional Design Costs**

The Parties' Principal Submissions

155. The Respondents contend that they are entitled to claw back sums paid for Additional Design Costs as the Claimant has failed to provide substantiation. The Claimant contends that a liquidated sum was agreed in the Addendum and the Respondents are simply seeking to renege on this agreement.

156. The Claimant contends that:

   a. The Parties agreed in the Addendum that the contract price would be revised to the Adjusted Contract Price of TZS 86,228,583,586.00. This was expressly stated to include Additional Designs.

   b. By the express wording of Clause 1 of the Addendum, "*costs due to Additional Designs amounting to Tshs 1,813,008,129.00*" were agreed.

   c. The amount due for variations at Clause 1(ii) of the Addendum was expressly described as an estimate whereas the figure for Additional Design was not.

   d. Appendix 2 to the Addendum shows Design of the Works as a line item in the breakdown of the Adjusted Contract Price.

157. The Claimant contends that although Mr McCormick's evidence was that the Claimant initially agreed to provide more detail in relation to the

87

Additional Design Costs, the position changed as with Pre-Addendum Disruption such that the Parties ultimately agreed to a liquidated sum **[C4/1/26-27]**. It is inconceivable that IPC 19 would have been certified and paid without substantiation having been provided if such had been agreed.

158. Whether the Additional Design took 18 or 21 months is irrelevant as the Claimant's proposal, which was accepted by the Respondents, was limited to doubling the original allowance for 6 months of design costs. This effectively compensated the Claimant for approximately 12 months' design costs which are still substantially less than 18 months. In any event, the design did take 21 months to complete.

159. Contrary to what the Respondents allege, the Claimant states that there is in fact a note on the record of the additional design figure, because it is included in the B2 bills, attached to the MoU and the Addendum **[T14/47/3-13]**.

160. As is the case with pre-Addendum Disruption, the Respondents contend that the effect of the Addendum was that the Parties agreed to provisionally set aside TZS 1,813,008,129.00 for payment to the Claimant, on the condition that the Claimant substantiate its claimed costs. The Engineer certified payment for the additional design costs on an interim basis, on the understanding that substantiation would be forthcoming.

161. It was agreed that the Claimant would be entitled to compensation for its purported design costs only if it could be shown that such costs were incurred as a result of the instructions given by the Employer or the Engineer. The express wording of Clause 4 of the MoU states that:

> *"The Parties agreed that the design work was part of the Contractor's obligations. Accordingly, if at all the Contractor has incurred any additional costs as a result of any extra designs, these costs shall be borne by the Contractor. However, if any extra design(s) is or was in any way due to the instruction(s) or additional requirement(s) of the Employer*

*and/or the Engineer, then the cost(s) of executing such designs shall be borne by the Employer."* **[E5/3/1323]**

162. The minutes of the Second Meeting record: "The Contractor undertook to prepare a realistic proposal explaining the increase in costs." **[G2/104/667]**

163. The Respondents contend that it is significant that the final draft of the MoU that was ultimately executed originated from the Claimant, not the Employer.

164. The formulation of the Claimant's proposed amount for Additional Designs – the "double up" method – is arbitrary and emphasises why it should not be considered to have been understood as a liquidated sum. Reliance is placed on Mr McCormick's evidence on Day 3 **[T3/199/21 – T4/200/4]**.

165. The Claimant does not claim Price Escalation on the Additional Design costs as recorded in the Claimant's comments at item 3 of the Respondents' list of issues. Mr Sakamoto also confirmed that he did not consider Price Escalation should be applied to the Additional Design costs **[C1/2/3]**.

**Analysis and Conclusions of the Tribunal on Additional Design Costs**

166. The position with regard to the Additional Design costs is similar to that relating to pre-Addendum disruption costs.

167. Pursuant to Clause i of the Addendum the Adjusted Contract Price of TZS 86,228,583,586.00 is expressly stated to include TZS 34,238,583,581.00 *"being the additional costs payable to the Contractor due to ...Additional Designs..."*

168. Clause 1.0 of Addendum No. 1 **[E5/2/1313]** to the Addendum provides:

*"The Addendum provides extra costs required to successfully complete the project for THE DESIGN AND CONSTRUCTION OF THE DODOMA – MANYONI ROAD. The extra costs are the result of negotiations held between the Employer and the Contractor on pertinent contract items and are agreed. The agreed negotiated items are, namely:*

89

90

...

    *(iii)   Costs due to Additional Designs amounting to Tsh 1,813,008,129.00;*

    *... "*

169. Item 13.01 of the Bills for the Final Approved Designs in Appendix 3 to the Addendum includes a lump sum of TZS 1,813,008,129 for "Additional Design Costs".

170. To the extent that there is any conflict between the MoU and the Minutes of Meetings, the Tribunal considers that the Addendum prevails and that its terms are clear.

171. Accordingly, the Tribunal finds that the Claimant is entitled to recover TZS 1,813,008,129.00 for Additional Design costs without further substantiation of this figure.   This sum was paid in IPC 19 and was not subsequently deducted.

172. The Claimant does not claim Price Escalation on the Additional Design costs.

Extension of Time and Sectional Completion

173. Although not an issue in dispute, this is a convenient place to record that in the Addendum **[G2/118/815-816]** the Parties agreed an extension of time of 24 months (231 days) from 30 September 2006 for completion of the work, and that Section 1 was completed by 30 November 2006 (Sub-Clause (viii) of the Addendum) **[E5/2/1300]**.

174. The Parties also agreed **[G2/130/917]** the following sectional completion dates:

    Section 2        31 December 2007

    Section 3        30 April 2008

    Section 4        29 September 2008

175. The completion date for Section 4 was also the date for completion of the contract works **[CCS/4.1]**.

176. Section 3 was taken over on 1 November 2008, 184 days late **[G4/529/2086; S3/1/114]**.

## SECTION IV: SUSPENSION CLAIMS

### Overview of Claims

1.  The Claimant contends that as a result of the Employer's failure to make payments, it was entitled to suspend the Works on three occasions:

    a.  September 2006 – mid 2007 **("the First Suspension")**;

    b.  April 2008 – June 2008 **("the Second Suspension")**;

    c.  November 2008 – March 2009 **("the Third Suspension")**.

2.  On the basis of the above, the Claimant submits that it is entitled to additional costs plus reasonable profit/damages and an extension of time. In the alternative, the Claimant seeks a declaration that time is at large and/or that the Employer is precluded from collecting liquidated damages.

3.  As an initial threshold issue, the Respondents submit that the Claimant is barred from bringing these claims due to its failure to comply with the notice and/or particularisation provisions contained in Sub-Clause 20.1.

4.  The Respondents further contend that in any event, the suspension claims fail on their substantive merits. Additionally, as the Claimant had no excuse for the critical delay to progress, the Employer is entitled to liquidated damages for late completion pursuant to Sub-Clause 8.7 **[E3/1/632-633]**.

5.  In the Partial Award, the Tribunal decided in relation to Preliminary Issue No. 6 that compliance with the notice provisions of the first paragraph of Sub-Clause 20.1 of the Contract is a pre-condition to the pursuit of a claim for an extension of time or additional payment under the Contract **[B2/2.1/29]**. The Tribunal did not make findings on (i) what the contractual provisions require for the purpose of compliance; (ii) when the Claimant became aware or should have become aware of the relevant event or circumstance; (iii) whether Sub-Clause 20.1 applies to claims for damages for breach of contract; (iv) the application of the prevention principle. The Tribunal did not, in the Partial Award, decide whether any Contract notice provisions had or had not been complied with in respect of any relevant

92

**93**

claim. This issue is addressed in this Section in relation to the Suspensions claims.

6.     In the following Sections, the Tribunal sets out the relevant contractual provisions, the factual background in relation to each suspension,     a summary of the Parties' principal submissions and its analysis and conclusions in relation to each Suspension.

**Relevant Contractual Provisions**

7.     The relevant contractual provisions are outlined below.

8.     Sub-Clause 16.1 – Contractor's Entitlement to Suspend Work:

*"Sub-Clause 16.1 – Contractor's Entitlement to Suspend Work*

*If the Engineer fails to certify in accordance with Sub-Clause 14.6 [Issue of Interim Payment Certificates] or the Employer fails to comply with Sub-Clause 2.4 [Employer's Financial Arrangements] or Sub-Clause 14.7 [Payment], the Contractor may, after giving not less than 21 days' notice to the Employer, suspend work (or reduce the rate of work) unless and until the Contractor has received the Payment Certificate, reasonable evidence or payment, as the case may be and as described in the notice.*

*The Contractor's action shall not prejudice his entitlements to financing charges under Sub-Clause 14.8 [Delayed Payment] and to termination under Sub-Clause 16.2 [Termination by Contractor].*

*If the Contractor subsequently receives such Payment Certificate, evidence or payment (as described in the relevant Sub-Clause and in the above notice) before giving a notice of termination, the Contractor shall resume normal working as soon as is reasonably practicable.*

*If the Contractor suffers delay and/or incurs Cost as a result of suspending work (or reducing the rate of work) in accordance with this Sub-Clause, the Contractor shall give notice to the Engineer and shall be entitled subject to Sub-Clause 20.1 [Contractor's Claims] to:*

93

*An extension of time for any such delay, if completion is or will be delayed, under Sub-Clause 8.4 [Extension of Time for Completion], and*

*Payment of any such Cost plus reasonable profit, which shall be included in the Contract Price."* **[E3/1/653]**

9.    Sub-Clause 20.1 - Contractor's Claims:

*"If the Contractor considers himself to be entitled to any extension of the Time for Completion and/or any additional payment, under any Clause of these Conditions or otherwise in connection with the Contract, the Contractor shall give notice to the Engineer, describing the event or circumstance giving rise to the claim. The notice shall be given as soon as practicable, and not later than 28 days after the Contractor became aware, or should have become aware, of the event or circumstance.*

*If the Contractor fails to give notice of a claim within such period of 28 days, the Time for Completion shall not be extended, the Contractor shall not be entitled to additional payment, and the Employer shall be discharged from all liability in connection with the claim...*

*Within 42 days after the Contractor became aware (or should have become aware) of the event or circumstance giving rise to the claim, or within such other period as may be proposed by the Contractor and approved by the Engineer, the Contractor shall send to the Engineer a fully detailed claim which includes full supporting particulars of the basis of the claim and of the extension of time and/or additional payment claimed...*

*Each payment certificate shall include such amounts for any claim as have been reasonably substantiated as due under the relevant provision of the Contract...*

*...If the Contractor fails to comply with this or another Sub-Clause in relation to any claim, any extension of time and/or additional payment shall take account of the extent (if any) to which the failure has prevented or*

94

95

*prejudiced proper investigation of the claim, unless the claim is excluded under the second paragraph of this Sub-Clause. "* **[E3/1/684]**

10.    Sub-Clause 1.3 – Communications:

*"Wherever these Conditions provide for the giving or issuing of approvals, certificates consents, determinations, notices and requests, these communications shall be:*

*in writing and delivered by hand (against receipt), sent by mail or courier, or transmitted using any of the agreed systems of electronic transmission as stated in the Appendix to Tender; and*

*delivered, sent or transmitted to the address for the recipient's communications as stated in the Appendix to Tender. However:*

*if the recipient gives notice of another address, communications shall thereafter be delivered accordingly; and*

*if the recipient has not stated otherwise when requesting an approval or consent, it may be sent to the address from which the request was issued.*

*Approvals, certificates, consents and determinations shall not be unreasonably withheld or delayed. When a certificate is issued to a Party, the certifier shall send a copy to the other Party. When a notice is issued to a Party, by the other Party or the Engineer, a copy shall be sent to the Engineer or the other Party, as the case may be. "*

11.    Paragraph 1230 of the Standard Specification:

*"1230 RECORDING OF INFORMATION RELATING TO CLAIMS FOR ADDITIONAL COMPENSATION OR EXTENSION OF TIME*

*Should any circumstances arise or order be given by the Engineer which the Contractor considers may fairly entitle him to additional compensation, or extension of time for completion of the Contract, then the Contractor shall at the earliest practicable opportunity inform the Engineer of these circumstances so that he may have the opportunity to investigate the*

95

*circumstances and take such action as he considers desirable in order to reduce possible costs to the Employer. The Contractor shall at the same time inform the Engineer of his intention either to claim additional compensation or extension of time, or to reserve his right to claim at a later stage. The Contractor shall also state on which clause or clauses of the Conditions of Contract, the Special Specifications or other parts of the Contract Documents his claim is based.*

*In order that the extent and validity of such claims may be properly assessed when they are submitted at a later date, all circumstances relating to claims must be investigated, recorded and agreed upon as far as possible between the Contractor and the Engineer as and when they occur. For this purpose the Contractor shall furnish the Engineer from day to day with records, in a form approved by the Engineer, of all the facts and circumstances that the Contractor considers relevant and may wish to rely upon in support of his claims. The Engineer may in turn record such other facts and circumstances as he considers relevant and the Contractor shall for this purpose, supply him with all the information that he may require in this respect.*

*The Engineer and the Contractor shall, at the time of recording, indicate in writing and by signature, their agreement or disagreement as to the correctness of the information recorded. Additional compensation shall for the purposes of this Clause be taken to mean compensation over and above the payments at unit rates and prices bid or agreed upon for work ordered by the Engineer."* **[E4/2/949]**

**Factual Background to the Suspensions**

96

12. The First Suspension concerns the slow down from 5 September 2006 until mid-2007[1] as a result of the alleged late payment of IPC 15. The Claimant also contends that a second ground for suspension arose in 2007, due to the late payment of the Outstanding Amount (the sum of USD 10,602.746.36 allegedly owed to the Claimant as Price Escalation on the foreign currency component of IPCs 7 -16).

13. The key events are set out in further detail in the table below.

| DATE | EVENT |
|---|---|
| 6 June 2006 | IPC 15 issued. |
| 27 June 2006 | TZS portion of IPC 15 paid in full. |
| 14 August 2006 | Sub-Clause 16.1 notice served in respect of IPC 15 **[G1/66/318]**. |
| 5 September 2006 | Claimant notified MoID that it was slowing down progress and gave notice under Sub-Clause 20.1 in respect of IPC 15 **[G1/72/375]**. The Claimant reduced the rate of working. |

[1] Mr Sakamoto's evidence is that the slowdown lasted until May 2007 **[C1/1/11]**. The Claimant's Closing Submission states that the reduced rate of working lasted until 12 July 2007 **[S3/1/115]**.

97

| | |
|---|---|
| 8 September 2006 | USD 1.252 million paid to Claimant – leaving USD 25,000 unpaid on IPC 15. |
| 10 November 2006 | USD 1,458,399.75 paid to Claimant and allocated to IPC 16. |
| 22 December 2006 | USD 900,000 paid to Claimant:<br>• USD 6,729 allocated to IPC 15, leaving USD 18,000 unpaid.<br>• USD 20,000 allocated to clear small balances on IPCs 13 and 14. |
| 10 January 2007 | Ninth Meeting between GNT and the Claimant. Minutes record that Outstanding Amount would be paid "*now*". |
| 15 January 2007 | IPC 17 submitted but not certified. |
| 17 January 2007 | IPC 17 re-submitted minus Outstanding Amount [**G2/112/771**]. |

| | |
|---|---|
| 30 January 2007 | MoU signed. |
| 6 February 2007 | Claimant letter to Respondents seeking payment of Outstanding Amount [G2/123/860]. |
| 19 February 2007 | Claimant letter to Respondents again seeking payment of Outstanding Amount [G2/124/861]. |
| 16 March 2007 | Deed of Settlement signed. |
| 19 March 2007 | Outstanding Amount certified in IPC 18 [G2/132/958]. |
| 10 April 2007 | Limited remobilization begins [C1/1/21]. |
| 12 July 2007 | Full payment of IPC 18 (Outstanding Amount) received and full remobilization. |
| 4 August 2007 | Sub-Clause 20.1 notice for Outstanding Amount. |

| | |
|---|---|
| 2 November 2007 | IPC 15 paid in full. |

14. The Second Suspension occurred during 19 April 2008 to 21 June 2008 due to the purported late payment of IPCs 19, 20, 20A and 23. The key events are set out in the table below:

| DATE | EVENT |
|---|---|
| 16 June 2007 | IPC 19 submitted. |
| 26 June 2007 | IPC 19 certified. |
| 16 August 2007 | IPC 20 submitted. |
| 22 August 2007 | Sub-Clause 16.1 notice given in relation to IPC 19 **[G3/189/1217]**. |
| **7** September 2007 | Revised IPC 20 certified. |
| 2 November 2007 | USD 182,000 still outstanding on IPC 19. |
| 6 November 2007 | Sub-Clause 16.1 notice served in |

| | |
|---|---|
| | respect of IPC 20 **[G3/230/1333]**. |
| 26 January 2008 | IPC 23 submitted. |
| 12 February 2008 | Meeting between Tanroads and Claimant – agreed to resubmit IPC 20 as IPC 20A **[G3/302/1475]**. |
| 15 February 2008 | IPC 20A submitted. |
| 19 February 2008 | IPC 20A certified. |
| 23 February 2008 | IPC 23 submitted. |
| 26 March 2008 | Claimant wrote to Tanroads stating that its Sub-Clause 16.1 notice in respect of IPC20 applied to IPC20A **[G3/330/1569]**. |
| 16 April 2008 | Sub-Clause 16.1 notice served in respect of IPC 20A **[G3/349/1597]**. |
| 18 April 2008 | Claimant informs Respondents of Second Suspension **[G3/353/1609]**. |

101

| | |
|---|---|
| 19 April 2008 | Claimant commenced Second Suspension. |
| 21 April 2008 | Sub-Clause 16.1 notice served in respect of IPC 23 **[G3/356/1613]**. |
| 25 April 2008 | Letter from Claimant to Tanroads stating that its financial situation has deteriorated and that it will be suspending the structure works and ancillary works from 29th April 2008 **[G3/357/1614]**. |
| 1 May 2008 | Letter from Claimant to Tanroads giving notice of claim for extension of time and associated costs in relation to IPC 20 **[G3/361/1621]**. |
| 8 May 2008 | Minutes of Progress Meeting 52 **[A2/13/5]**. |
| 9 May 2008 | Letter from Claimant to Tanroads notifying suspension from 10th May 2008 **[G3/367/1629]**. |
| 14 May 2008 | Letter from Claimant to Tanroads acknowledging payment of TZS 8 billion but stating that this amount is enough to pay sub-contractors and suppliers for services rendered in |

| | |
|---|---|
| | March and April 2008 only, and not for resuming works in full capacity. Notes that the amount of outstanding payments for the IPCs, after the aforementioned part payment, is in excess of USD 22 million [G3/371/1636]. |
| 23 May 2008 | High-level meeting at Konoike headquarters in Osaka, Japan [G3/387/1702]. |
| 24 May 2008 | Sub-Clause 20.1 notice provided in respect of IPC 23 [G4/390/1711]. |
| 29 May 2008 | IPC 19 paid in full [G4/393/1715]. |
| 21 June 2008 | Claimant resumed Works. |
| 12 July 2008 | Full remobilisation. |
| 16 September 2008 | IPC 20A paid. |
| 20 September 2008 | Particularisation provided [G4/463/1927]. |
| 22 September 2008 | IPC 23 paid. |

|  |  |
|  |  |

15.   The Third Suspension began on 6 November 2008 as a result of the alleged
      non-payment of IPCs 24 and 25 and continued up until termination (the date
      of which is disputed). The key events are set out below.

| DATE | EVENT |
| --- | --- |
| 16 May 2008 | IPC 24 certified. |
| 5 August 2008 | Sub-Clause 16.1 notice for IPC 24 [G4/430/1836]. |
| 18 August 2008 | IPC 25 certified. |
| 2 September 2008 | Local currency element of IPC 24 paid (TZS 2,182,176,813) [G4/447/1865]. |
| 17 September 2008 | Claimant letter to Tanroads stating entitlement to suspend works [G4/455/1906]. |
| 22 September 2008 | USD 4 million paid, of which USD 3.49 million was allocated to IPC 24 [G4/464/1929]. |

| | |
|---|---|
| 15 October 2008 | Claimant submitted a Sub-Clause 16.1 notice based on non-payment of IPC 25. In the same letter, the Claimant asserted that it would be entitled to terminate the Contract 120 days after IPC 24 was due, on 11 July 2008 **[G4/498/2005]**. |
| | The Employer responded that it was reviewing the prior payments made under the Addendum and asked the Claimant to withdraw its intention to suspend the works **[G4/523/2070]**. |
| 3 November 2008 | Claimant wrote to Tanroads stating that works would proceed at a reduced rate from that day forward, pursuant to the Sub-Clause 16.1 notice for IPC 24, and that suspension of the works for non-payment of IPC 25 would begin on 6 November 2008 **[G4/527/2084]**. |
| 6 November 2008 | Claimant confirmed the Third Suspension **[G4/534/2096]**. |
| 2 December 2008 | Claimant issued a "Notice of Entitlement to Terminate Pursuant to Sub-Clause 16.2" alleging various grounds including that payment for IPC 24 was 144 days late, the Engineer had not certified IPC 26 within the required time, as |

105

|  | well as that the Employer had refused to issue Taking Over Certificates and had interfered with the Engineer's determination of claims **[G4/559/2142]**. |
|---|---|
| 15 December 2008 | Tanroads informed the Claimant that the Contract was at an end and instructed the Claimant to vacate the Site. |
| 11 March 2009 | Claimant purportedly terminated the Contract **[G5/645/2325]**. |

## Parties' Principal Submissions

## First Suspension

Overview

16. As set out above, the Claimant submits that it was entitled to suspend and did so from 5 September 2006 on the basis of the delayed payment of IPC 15, which was not paid in full until 2 November 2007. It maintains that an additional ground for suspension arose in 2007 as a result of the non-payment of the Outstanding Amount.

17. It is accepted by the Parties that a Sub-Clause 16.1 notice was given on 14 August 2006 **[G1/66/318]**, and a Sub-Clause 20.1 notice on 5 September 2006 **[G1/72/375]**. It is also accepted that particularisation was provided on 14 September 2007. The Respondents however deny that the Claimant's claim can succeed as (i) the Claimant was not substantively entitled to suspend on the basis of IPC 15 when it purported to do so; and (ii) no Sub-Clause 16.1 notice was given in respect of the Outstanding Amount, which is a condition precedent.

Claimant's principal submissions

18.    The Claimant asserts that:

   a.  Sub-Clause 16.1 provides no restrictions on a Contractor's right to
       suspend for non-payments. The Claimant was entitled to suspend even if
       the amount outstanding could be described as *de minimis*.

   b.  There is no foundation in law or fact for the Respondents' argument that it
       should be treated as having allocated funds from the 10 November 2006
       and 22 December 2006 payments to IPC 15 with the result that the right to
       suspend work ended. The Claimant relies on section 60 of the Tanzanian
       Law of Contracts Act **[F2/2.29/22]**. Even if the Claimant had allocated the
       sums paid in respect of IPC 16 as against IPC 15, sums would then have
       been outstanding on IPC 16, which would have entitled the Claimant to
       suspend Works. The Claimant expressly clarified that it had not
       recognised that the whole of IPC 15 had been paid **[H2/1.40/82]**
       **[G1/90/486] [G2/104/671] [H1/1.55/1] [G2/113/772]**.

   c.  In any event, the claim relates to delayed remobilisation in April-August
       2007 due to lack of funds. The Respondents had additionally failed to pay
       the Outstanding Amount in the sum of USD 10.6 million until 12 July
       2007.

19.    The Claimant submits that even if is wrong on IPC 15, it was nevertheless
       entitled to continue the reduced rate of working by reason of the
       Employer's failure to pay the Outstanding Amount, which was due
       following the meeting on 10 January 2007, alternatively when the MoU was
       signed on 31 January 2007, alternatively at the date of the Deed of
       Settlement on 14 March 2007, alternatively 14 May 2007, the due date of
       IPC 18. The Claimant was not required to follow the contractual payment
       mechanism again in respect of this sum. To the extent that a further
       certificate was required, it was for the Employer to inform the Engineer
       immediately of the agreement reached so the Engineer could effect
       certification.

20.   As to the notice provided in respect of the Outstanding Amount:

   a. It was agreed as part of the Addendum by Minute 4.5.0 of the meeting on 20 December 2006 **[G2/104/671]** that work would not commence until some payment had been made. Given the contractual force of that agreement, further notices under Clauses 16 and 20 were not required.

   b. Failure to pay the Outstanding Amount was a *"delay, impediment or prevention"* on the part of the Employer, entitling the Claimant to an extension of time pursuant to Sub-Clause 8.4(e). Entitlement under this clause does not require the service of a Sub-Clause 16.1 notice.

   c. However if and insofar as necessary, notice was given under Sub-Clause 16.1 and 20.1 in respect of the non-payment of the Outstanding Amount by:

      • Minute 4.5.0 of the above meeting on 20 December 2006, which was restated and agreed by inclusion in the MoU and the Addendum;

      • Letter dated 6 February 2007 **[G2/123/860]**;

      • Letter dated 19 February 2007 **[G2/124/861]**.

   d. In the circumstances of Works already being subject to a reduced rate of working, notice that they would not be re-commenced until payment was made was sufficient description of the event or circumstances giving rise to an extension of time.

   e. Notice provisions such as Sub-Clauses 16.1 and 20.1 are to be construed broadly  – *Obrascon Huarte Lain SA v Her Majesty's Attorney General for Gibraltar* [2014] EWHC 1028 (TCC).

   f. The Respondents have waived their right and/or are estopped from relying upon any failure by the Claimant to comply with the notice provisions.

21.   If the Claimant was entitled to suspend or reduce the rate of working, it was entitled to do no work at all and consequently cannot be criticized for

remobilizing slowly when it was not obliged to start remobilising at all until 12 July 2007. In any event, the Employer is estopped from withholding payments which have been approved (certified) by the Engineer acting as its agent. Regulation 123(3) creates no additional powers to those contained in the Contract.

Respondents' Principal Submissions

22.    In respect of IPC 15, the Respondents contend that the Claimant:

   a.   Suspended prematurely before it had any entitlement to do so; and

   b.   Maintained its slowdown after it had received payment of all, or alternatively, all but a *de minimis* part of IPC 15.

23.    It was only on 14 August 2006 that the Claimant gave notice of its alleged entitlement to slow down the Works. However, the slowdown in fact began on or before 1 August 2006 and in any event prior to the expiration of the 21 day notice period on 7 September 2006. Reliance is placed on the Engineer's letter of 31 August 2006 **[G1/69/324]** and Mr Sakamoto's evidence **[T5/19/13] [T5/23/20-24]**. Therefore even if the Claimant is correct that it was entitled to suspend on the basis of IPC 15, which is denied, the suspension was still in breach of contract, as the Claimant had already started slowing down the work before it had any arguable entitlement to do so **[T14/128/24 – T14/129/4]**.

24.    In any event, the Claimant could not start nor continue a suspension after the Employer paid IPC 15 in full on 8 September 2006. The Claimant admitted this at the time **[G1/84/394]** and subsequently **[G5/678/2478]**. At this point, a *de minimis* amount remained outstanding. Thereafter, the Claimant held unallocated funds received from the Employer without crediting them against outstanding certified sums, contrary to section 59 of the Tanzanian Law of Contracts Act **[F2/2.29/22]**.

25.    Nor was the Claimant entitled to suspend on the basis of the Outstanding Amount. The Claimant applied for payment of this in IPC 18, which was

not due until 14 May 2007. The Claimant was required to follow the contractual payment mechanisms. The Contract does not allow for payments to be made by the *ad hoc* mechanism now suggested by the Claimant. The Claimant acknowledged at the time that payment was to be processed under the contractual payment provisions by requesting payment in IPC 17 on 15 January 2007. The Engineer certified the Outstanding Amount in IPC 18 on 19 March 2007 and thus it was only due for payment on 14 May 2007.

26. The Claimant did not issue a Sub-Clause 16.1 notice of entitlement to suspend on the basis of the Outstanding Amount, a condition precedent to any valid suspension. The purported notices relied upon as set out above cannot function as Sub-Clause 16.1 or 20.1 notices. They were written months before the Outstanding Amount was due, on 14 May 2007. *Obrascon* is not binding. Under Tanzania law, specifically Regulation 118(3), contractual notice provisions (both Sub-Clauses 16.1 and 20.1) must be construed strictly.

27. Furthermore, no Sub-Clause 20.1 notice was issued. The letters relied on by the Claimant of 6 and 19 February 2007 cannot be considered as either Sub-Clause 16.1 or Sub-Clause 20.1 notices. The Claimant also failed to comply with the particularisation requirements.

28. In any event, the claimed delay was not caused by late payment of IPC 15 or the Outstanding Amount. At the time, the Claimant's subcontractor Estim was executing major works and was obliged to supply its own fuel. There is no evidence that the timing of the Claimant's receipt of the Outstanding Amount affected Estim's ability to advance the works. The Claimant did spend money and do work during this period but chose to progress non-critical works.

29. Once the Claimant started to remobilise, it only started to remobilise slowly, causing delay. Under Tanzanian law (Regulation 123(3)) the Employer was released from its payment obligations until the Claimant had

achieved full mobilisation and made good any delay caused due to the slow remobilisation.

## Second Suspension

### Overview

30. The Second Suspension relates to the alleged late payment of IPCs 19, 20, 20A and 23. In outline, the Claimant avers that:

   a. A Sub-Clause 16.1 notice was given in relation to IPC 19 on 22 August 2007 **[G3/189/1217]**. The Claimant was therefore entitled to suspend on this basis from 12 September 2007. However, the Claimant did not exercise this right immediately and kept working.

   b. A Sub-Clause 16.1 notice was served in respect of IPC 20 on 6 November 2007 **[G3/230/1333]**.

   c. On 26 March 2008, the Claimant wrote to Tanroads asserting that its Sub-Clause 16.1 notice in respect of IPC 20 applied to IPC 20A **[G3/330/1569]**.

   d. A further Sub-Clause 16.1 notice in respect of IPC 20A was served on 16 April 2008 **[G3/349/1597]**.

   e. The Claimant eventually suspended on 19 April 2008.

   f. A Sub-Clause 16.1 notice for IPC 23 was given on 21 April 2008 **[G3/356/1613]**.

   g. On 29 May 2008, IPC 19 was paid in full. **[G4/393/1715]**. However the Claimant's entitlement to suspend continued as a result of the non-payment of IPCs 20, 20A and 23.

### Respondents' principal submissions

31. The Respondents contend that:

a. The only IPCs of relevance to this suspension are IPCs 20A and 23. IPC 19 was paid in full and IPC 20 was withdrawn and so neither could found a Sub-Clause 16.1 suspension.

- By 2 November 2007, all but USD 182,000 had been paid on IPC 19.

- When the Contractor received payments totalling nearly USD 8 million on 16 January, 23 January 20 February and 26 February 2008, it allocated the entire sums to IPCs 21 and 22, although those were not due for weeks. The exercise of discretion under s 60 of the Law of Contracts Act must be used reasonably

- Therefore when the Claimant suspended on 19 April 2008, nearly eight months after its Sub-Clause 16.1 notice for IPC 19, any outstanding balance was *de minimis* and could not justify the suspension.

b. Furthermore, the Claimant never purported to suspend on the basis of IPC 19. The Claimant announced the Second Suspension by its letter of 18 April 2008 **[G3/353/1609]** referring only to IPC 20 and the Sub-Clause 16.1 notice given in respect of IPC 20. It did not invoke IPC 19 as a basis for the suspension. On 20 September 2008 when the Claimant submitted its particularised claim in respect of the Second Suspension **[G4/463/1927]** IPCs 20, 20A and 23 are listed but not IPC 19.

c. The Sub-Clause 16.1 notices upon which the Claimant relies in relation to IPC20A and IPC 23 were not effective until 21 days after they were given. Accordingly, the earliest the Claimant could have reduced the rate of progress or suspended the Works was 7 May 2008 (and 14 May 2008 for IPC 23). Any suspension prior to this time was in breach of contract.

d. The Sub-Clause 16.1 notice that was issued in respect of IPC 19 cannot be left open for 10 months as the Claimant alleges. Sub-Clause 16.1 notices cannot reasonably be construed to give a perpetual right to suspend.

e. Irrespective of the issues on Sub-Clause 16.1 notices, the claim must fail as no Sub-Clause 20.1 notice was given in respect of the Second Suspension within the required time. Additionally, particularisation of the claim was not given until 20 September 2008.

f. In any event, on a proper analysis of the balance of payments made, no monies were due to the Claimant during the period 19 April 2008 to 12 July 2008, as set out in the Respondents' Schedule of Balance of Payments Against Revised IPCs at Appendix A to the SoDC.

g. As a matter of Tanzanian law, the Respondents were under no obligation to make payments to the Claimant due to its alleged failure to recover the delay to progress caused by its purported slow remobilisation of work following the previous suspension in 2007.

Claimant's principal submissions

32. The Claimant submits that:

a. Despite the part payments, a sum of USD 182,000 remained outstanding on IPC 19 until the 29 May 2008 and the Claimant was therefore entitled to suspend work on 19 April 2008. There is no *de minimis* restriction on the Claimant's right to suspend under Sub-Clause 16.1.

b. The Respondents never questioned the Claimant's reliance on its Sub-Clause 16.1 notice for IPC 20 in relation to IPC 20A or its right to suspend. By their conduct, the Respondents have waived their rights or are estopped from contending the contrary. The Respondents have not shown that there was any agreement made that there should be a further 56 days for the payment of IPC 20.

c. The Respondents' reliance on the table in Appendix A is misplaced. Appendix D to the Reply records the actual, contemporaneous payment situation with regard to certified amounts, with allocation of sums received from the Respondents by the Claimant taking into account any intimation from the Respondents as to how the sums should be attributed.

113

d. The Claimant states that Sub-Clause 20.1 notices were given as set out in the table below:

| | IPC | 20.1 Notice |
|---|---|---|
| e. In any event, the Respondent, the Re | 19 | • Letter dated 18 April 2008 [G3/357/1614]<br>• Minutes of Progress Meeting 52 on 8 May 2008 [A2/13/5]<br>• Letter dated 14 May 2008 [G3/371/1636]<br>• Minutes of the meeting on 23 May 2008 [G3/387/1702]<br>• Alternatively, the Sub-Clause 16.1 notice of 22 August 2007 [G3/189/1217] was also a notice under Sub-Clause 20.1 |
| | 20 | • Letter dated 1 May 2008 [G3/361/1621]<br>• Minutes of Progress Meeting 52 on 8 May 2008 [A2/13/5-6]<br>• Letter of 14 May 2008 [G3/371/1636]<br>• Minutes of the meeting on 23 May 2008 [G3/387/1702]<br>• Further or alternatively, the Sub-Clause 16.1 notice dated 6 November 2007 [G3/230/1333] was also a notice under Sub-Clause 20.1 |
| | 20A | • Letter of 1 May 2008 [G3/361/1621]<br>• Letter of 9 May 2008 [G3/367/1629]<br>• Alternatively, Sub-Clause 16.1 notice dated 6 November 2007 [G3/230/1333] was also a notice under Sub-Clause 20.1 |
| | 23 | • Letter of 24 May 2008 [G3/390/1711] |

s cannot rely on any alleged failure to notify the claim under Sub-Clause 20.1 to their advantage by virtue of the prevention principle – *Gaymark Investments Pty Ltd v Walter Construction Group Ltd* [1999] NTSC 143 **[F1/1.1/1]**. Furthermore, the notice provisions do not apply to the Claimant's claims for breach of contract.

f. The failure to particularise within the time limits prescribed by Sub-Clause 20.1 is not a condition precedent and therefore not fatal to the Claimant's claim.

**Third Suspension**

Claimant's principal submissions

33. The Claimant contends that the Employer's breach of its payment obligations in respect of IPCs 24 and 25 caused the Claimant to suspend the Works in accordance with Sub-Clause 16.1 between 6 November 2008 and 11 March 2009, ultimately forcing the Claimant to terminate on that date.

34. IPC 24 was certified on 16 May 2008 in the amounts of TZS 2,182,176,813 and USD 6,209,459.41. Payment was due on 11 July 2008. It is accepted that on 5 August 2008, the Claimant submitted a Sub-Clause 16.1 notice, effective on 26 August 2008 **[G4/430/1836]**.

35. IPC 25 was certified on 18 August 2008 in the amounts of TZS 5,072,376,217.00 and USD 7,936,978.24. Payment was due on 13 October 2008.

36. The Employer subsequently made the following payments:

a. 2 September 2008: local currency element of IPC 24 (TZS 2,182,176,813) **[G4/447/1865]**;

b. 22 September 2008: USD 4 million, of which USD 3.49 million was allocated to IPC 24 **[G4/464/1929]**.

37. The Claimant avers that at this stage the following sums remained outstanding:

    a.  USD 2,719,809.57 on IPC 24;

    b.  The full amount on IPC 25.

38.  On 17 September 2008, the Claimant wrote to Tanroads affirming its entitlement to suspend the Works **[G4/455/1906]**.

39.  It is accepted that on 15 October 2008, the Claimant submitted a Sub-Clause 16.1 notice based on non-payment of IPC 25. In the same letter, the Claimant asserted that it would be entitled to terminate the Contract 120 days after IPC 24 was due, on 11 July 2008 **[G4/498/2005]**. The Employer responded that it was reviewing the prior payments made under the Addendum and asked the Claimant to withdraw its intention to suspend the works **[G4/523/2070]**.

40.  On 3 November 2008, the Claimant wrote to Tanroads stating that works would proceed at a reduced rate from that day forward, pursuant to the Sub-Clause 16.1 notice for IPC 24, and that suspension of the works for non-payment of IPC 25 would begin on 6 November 2008 **[G4/527/2084]**. The Claimant confirmed the suspension on 6 November 2008 **[G4/534/2096]**.

41.  On 2 December 2008, the Claimant issued a "Notice of Entitlement to Termination Pursuant to Sub-Clause 16.2" alleging various grounds including that payment for IPC 24 was 144 days late, the Engineer had not certified IPC 26 within the required time, as well as that the Employer had refused to issue Taking Over Certificates and had interfered with the Engineer's determination of claims **[G4/559/2142]**. The Claimant stayed on site until mid-March, at which point it alleges that it terminated the Contract on 11 March 2009 **[G5/645/2325]**.

Respondents' Principal Submissions

42.  The Respondents accept that the Claimant notified the suspension under Sub-Clause 16.1 and gave a Sub-Clause 20.1 notice for the additional time and money now sought. However, they contend that:

a. They are discharged from liability as a result of the Claimant's failure to particularise the claim until submission of its Final Account on 26 June 2009 **[A3/1.1/109]**.

b. In any event, no monies were due to the Claimant during the period of suspension from 6 November 2008 to 11 March 2009 due to the invalidity of prior amounts paid previously under the Addendum, as set out in the Respondents' Schedule of Balance of Payments Against Revised IPCs at Appendix A. The Claimant had been substantially overpaid and therefore was not owed the monies covered by IPCs 24 and 25 and could not suspend. Under Sub-Clause 20.6, the Tribunal is entitled to open up, review and revise any IPC.

c. On 15 December 2008, Tanroads informed the Claimant that the Contract was at an end and instructed the Claimant to vacate the Site. That the Claimant decided to wait until 11 March 2009 until it commenced demobilizing is a matter for its own account, and cannot found an entitlement to additional time and money. Even if the Claimant is correct about anything else in relation to the final suspension, the maximum Extension of Time that could be sustained is 40 calendar days: 6 November 2008 to 15 December 2008 inclusive.

d. As set out above, the Employer was entitled to refuse to authorize further payments to the Contractor given that the Contractor had not yet recovered the unexcused delay to the schedule, nor remedied the other shortcomings notified to it pursuant to Regulation 123(3).

43. The Claimant accepts that particularisation was provided on 26 June 2009 however failure to particularise within 42 days is not a bar to the Claimant's right to claim. The only sanction for failure to particularise is that contained in the final paragraph of Sub-Clause 20.1, which states that if the Contractor fails to comply, any extension or additional payment will take account of the extent (if any) to which the failure has caused prejudice to the Employer. No prejudice has been demonstrated by the Respondents.

117

44.    Even if the Tribunal were to find that the sums certified in IPCs 24 and 25 were not in fact due to the Claimant, the fact remains that they were certified but not paid. This cannot defeat the Claimant's claim.

**Analysis and Conclusions of the Tribunal**

45.    The first issue which the Tribunal must consider is whether in respect of each suspension an appropriate notice was given by the Claimant under Sub-Clause 16.1.

46.    Although helpful in relation to the Claimant's consequentially asserted rights to relief from liquidated damages and costs, an analysis of compliance with the notice provisions of Sub-Clause 20.1 does not assist in determining whether the notice requirements of Sub-Clause 16.1 have been satisfied (save perhaps insofar as it is alleged that notice is given under Sub-Clause 20.1 constituted valid notices under Sub-Clause 16.1).

47.    It is therefore necessary to extract from the Parties' submissions their respective contentions in respect of compliance with Sub-Clause 16.1. It is helpful to do so in relation to each Suspension.

First Suspension

48.    On 14th August 2006 the Claimant gave a notice under Sub-Clause 16.1 **[G1/66/318]**. This notice related to IPC 15.

49.    Be that as it may, a very substantial portion of IPC 15 was in fact paid on 8 September 2006 **[G1/74/377]**, leaving an amount of approximately only USD 25,000 unpaid - an insignificant percentage of the amount which was the subject of the notice.

50.    The Claimant seeks to justify the First Suspension by referring not just to the fact that an insignificant percentage of IPC 15 remained unpaid, but that the Outstanding Amount (the sum of USD 10,602,746.36 allegedly owed to the Claimant as Price Escalation on the foreign currency component of IPCs 7 -16) which was allegedly due to be paid immediately following the MoU negotiations in early 2007 but was not in fact paid until 12 July 2007. The

118

Claimant argues that its letters of 6 February 2007 **[G2/123/860]** and 19 February 2007 **[G2/124/861]** and the Minute recorded at paragraph 4.5.0 of the meeting on 20 December 2006 **[G2/104/671]** constitute notices under Sub-Clause 16.1 for the purpose of paying the amounts alleged to be immediately payable under the MoU.

51. The Tribunal does not accept these submissions. A notice under Sub-Clause 16.1 needs in terms to warn the Employer that unless an amount specified is paid, rights to suspension and/or slowing down of work will be exercised by the Contractor. None of the material identified by the Claimant does this. Accordingly, the Tribunal has reached the view that the Outstanding Amount was not the subject of a Sub-Clause 16.1 notice.

52. In the Tribunal's view, in order for the First Suspension to be maintained after the payment of virtually all of the IPC 15 amount which was the subject of the 14 August 2006 notice, to ensure that the Respondents were aware that there was a small remaining sum still outstanding, it would have been necessary for a fresh (21 day) notice to have been given, setting out the amount then alleged to be unpaid and advising the Employer of its intention to suspend in accordance with Sub-Clause 16.1 if the amount specified is not paid within the period set out in the notice.

53. The Tribunal is not persuaded that there is any right to slow down or suspend work under the Contract other than in reliance upon the right to be found in Sub-Clause 16.1.

54. The Tribunal therefore finds that:

    a. As set out in paragraph 52 above, the Claimant was not entitled to maintain its suspension on the basis of the Sub-Clause 16.1 notice given on 14 August 2006 following the payment made by the Respondents on 8 September 2006. In the absence of further notice it is not commercially sensible for a suspension notice to be able to continue when after such a payment, a de minimis sum remains outstanding.

119

b. There is thus no significant period of time during which the Claimant was entitled to suspend or slow down the work given that the 21 day period specified in its notice of 14 August 2006 was overtaken virtually immediately by the substantial payment of almost all of the amount the subject of the notice on 8 September 2006.

c. The suspension cannot be justified on the basis of the non-payment of the "Outstanding Amount" which was not the subject of a Sub-Clause 16.1 notice.

55. Accordingly, the Tribunal finds that the Claimant was not entitled to slow down or suspend work for what is referred to as the First Suspension. It is thus unnecessary to consider the Respondents' arguments regarding the alleged non-compliance by the Claimant under Sub-Clause 20.1 in respect of periods of delay and costs relating to the First Suspension.

## Second Suspension

56. The Sub-Clause 16.1 notices relied upon by the Claimant to justify the Second Suspension were given on 22 August 2007 **[G3/189/1217]** for IPC 19, 6 November 2007 **[G3/230/1333]** for IPC 20 and 16 April 2008 **[G3/349/1597]** for IPC 20A; and 21 April 2008 in respect of IPC 23 **[G3/356/1613]**. The period of suspension or reduction in the rate of work commenced on 19 April 2008.

57. In the Tribunal's view a variety of issues arise in connection with this Second Suspension claim.

58. The first is that the Tribunal does not consider that notice of intention to suspend under Sub-Clause 16.1 remains alive indefinitely. If not acted upon within a reasonable period of time, and assuming that the amount the subject of the notice remains outstanding, it is necessary in the Tribunal's view for there to be a fresh notice enabling or alerting the Employer to the Contractor's intention to suspend.

59. The position here is more complicated because the notices given in 2007 were in respect of the non-payment of IPCs 19 and 20. The 16 April 2008 notice was given in relation to IPC 20A (which replaced IPC 20). The 21 April 2008 notice was given in respect of IPC 23.

60. Thus although in the Sub-Clause 16.1 notice of 16 April 2008 **[G3/349/1597]** the Contractor placed reliance upon the Sub-Clause 16.1 notice of 6 November 2007, the position with respect to the Contractor's assertion regarding rights arising from non-payment had changed in the period between 6 November 2007 and 16 April 2008.

61. In the Tribunal's view, the notices given in August and November 2007 cannot be relied upon by the Claimant to justify the suspension or slow down commencing on 19 April 2008, which is the subject of the Claim, as the periods between the dates of the notices and 19 April 2008 are beyond the reasonable period of time within which the suspension should commence in the absence of a further notice.

62. Furthermore, it is obvious from the facts stated in paragraph 56 above that the suspension commenced before the notice of 21 April 2008 and within the notice period of 21 days required by clause Sub-Clause 16.1 following the notice of 16 April 2008. If this occurs, in the Tribunal's view, the suspension does not then become valid once the notice period of 21 days has expired. The reason for this is that Sub-Clause 16.1 provides that the Contractor may suspend after giving not less than 21 days' notice. By commencing suspension before the 21 day notice period has expired the Contractor is in breach of Contract (invalidating the suspension) and this is not rectified by the 21 day notice period subsequently expiring while the work is still suspended.

63. The Tribunal is therefore of the view that compliance with the requirements of Sub-Clause 16.1 was not satisfied for the purposes of the Second Suspension or slow down.

Third Suspension

64.    The position in relation to the Third Suspension is different.

65.    So far as the giving of the period of notice required by Sub-Clause 16.1 is concerned, the Claimant took a different course of action to that taken in respect of the two previous claims for suspension or slow down of work:

    a.  A Sub-Clause 16.1 notice was given in respect of IPC 24 on 5 August 2008 **[G4/430/1836]**.

    b.  The Claimant's letter of 17 September 2008 **[G4/455/1906]** reactivates the notice of 5 August 2008 and expressly refers to Sub-Clause 16.1.

    c.  A Sub-Clause 16.1 notice is given in relation to IPC 25 on 15 October 2008 **[G4/498/2005]** which also reactivates the notices in respect of IPC 24 of 5 August 2008 and 17 September 2008.

    d.  By the letter of 3 November 2008 **[G4/527/2084]** further referring to and reactivating the notice of 5 August 2008, a suspension was advised commencing that day. This letter also referred to the separate notice that had been issued on 15 October 2008 in relation to IPC 25 indicating that when its due period had lapsed, a suspension based on that notice would begin on 6 November 2008.

66.    In these circumstances, the Tribunal need not be concerned about the expiry of long periods of time between notification under Sub-Clause 16.1 and the suspension or slow down of work. Thus from a formal notice requirement perspective, this claim complies with Sub-Clause 16.1.

67.    This being the case, the issue arises as to whether the claim for payment (the subject of the notice) was one which could validly be made by the Claimant for the purpose of exercising a right of suspension or slow down of work.

68.    In this regard, the starting point is that the amounts which were the subject of the notices were amounts certified by the Engineer, the payment of which was resisted by the Employer on the basis that amounts previously certified and paid by the Employer should not have been paid. In particular,

the Employer was asserting that the amounts for Additional Design costs and pre-Addendum disruption costs which were the subject of the Addendum should not have been paid.

69. The Tribunal has found in this Award that these amounts were properly payable by the Employer under the Addendum.

70. However, this was at the time of suspension a matter in dispute between the Parties. The entitlement to suspend or slow down under Sub-Clause 16.1 arises in respect of a breach by the Employer of Sub-Clause 14.7 regarding payment, requiring payment within the time specified of amounts certified. In the Tribunal's view, irrespective of the conclusion it has now reached that the Employer's objections to payment were without legal foundation, the amount certified was payable and the Employer was in breach of its obligation under Sub-Clause 14.7 in not making that payment.

71. Accordingly, the Tribunal concludes that the Contractor was entitled to suspend or slow down the work in respect of the Third Suspension and now turns to consider in relation to the Contractors' claims in respect of this Suspension, whether the other defences raised by the Respondents should disentitle the Contractor to recovery.

72. In respect of the Third Suspension, the Respondents concede that there has been adequate formal notice under Sub-Clause 16.1 and adequate notice of intention to claim under Sub-Clause 20.1. **[A3/1.1/109]**

73. The Respondents say however that the Claimant has failed to provide the particulars of claim required by Sub-Clause 20.1 within the time specified in that Sub-Clause. They assert that the requirement for the provision of particulars is a condition precedent to the right to recover amounts the subject of validly given notices of claim under Sub-Clause 20.1. In its Partial Award, the Tribunal found that notice of intention to claim under Sub-Clause 20.1 is a condition precedent to the right to claim but did not find that the provision of the particulars required was a condition precedent

123

to the right to recover amounts the subject of valid notices of intention to claim under the Sub-Clause.

74.    Indeed, any such conclusion would fly in the face of the last paragraph of Sub-Clause 20.1 which provides:

*"If the Contractor fails to comply with this or another Sub-Clause in relation to any claim, any extension of time and/or additional payment shall take account of the extent (if any) to which the failure has prevented or prejudiced proper investigation of the claim, unless the claim is excluded under the second paragraph of this Sub-Clause. "* **[E3/1/663]**

75.    It seems clear that the remedy for non-compliance with the time limits for provision of "*a fully detailed claim*" is to take into account in respect of that claim the extent (if any) to which the failure to comply has prejudiced the proper investigation of the claim.

76.    The only condition precedent to be found in the clause (as determined by the Tribunal) is the requirement for notice in the second paragraph of the Sub-Clause.

Did the Claimant fail to provide a fully detailed claim in accordance with Sub-Clause 20 and, if so, has it prejudiced the proper investigation of Claim 22?

77.    The Respondents contend that Claim 22 in relation to the Third Suspension was not particularised until June 2009 **[A3/1.1/109]** which is when the Final Account was submitted.

78.    Sub-Clause 20.1 requires the Contractor to submit "*a fully detailed claim which includes full supporting particulars of the basis of the claim and the extension of time and/or the additional payment claimed*" within 42 days after the Contractor became aware or should have been aware of the event or circumstance giving rise to the claim.  Paragraph 1230 of the Standard Specification also sets out requirements in relation to records to be kept in relation to claims.

124

79.    In the Tribunal's view the period of 42 days would have commenced at the latest on or about 3 November 2008 when the Contractor served notice that a suspension was to commence **[G4/527/2084]**. Consequently the Contractor did not comply with the 42 day notice period.

80.    The Third Suspension culminated in termination of the Contract on 11 March 2009, as the Tribunal has found. Prior to this date, the Contractor served a notice of its entitlement to terminate on 2 December 2008 **[G4/559/2142]**. Following this notice there were meetings between the Parties and a disagreement between them as to the effect of the Contractor's notice. The Parties' respective positions are set out at Section VIII. It is the Tribunal's view that the delay in submitting the particularised claim for the Third Suspension has not "*prevented or prejudiced proper investigation of the claim*" by the Respondents for the following reasons:

   a. The basis for the Third Suspension was non payment by the Respondents of certain IPCs. The Respondents were fully aware of this and also knew that the solution would have been to pay such IPCs as required by the Contract.

   b. The Respondents also knew that a suspension would result in delay to completion of the Works by the period of any such suspension plus a remobilisation period.

   c. The Respondents chose in December 2008 to treat the Contract as terminated (wrongfully) and the Tribunal has found that the Contract was terminated on 11 March 2009 when the Contractor accepted the Respondents' conduct as repudiatory (see Section 8).

   d. These circumstances in December 2008 overlapped with the period of 42 days under Sub-Clause 20.1 for particularising the claim in respect of the Third Suspension and effectively superseded this requirement because:

   •   In the context of a purported wrongful termination of the Contract by the Respondents in December 2008 (followed by actual termination of the Contract in March 2009) the Respondents' contention that

125

consideration of the Third Suspension claim was prevented or prejudiced is not sustainable.

- In the context of the various steps leading to termination of the Contract it was reasonable for the Contractor to include the particularisation of Claim 22 in the Final Account in June 2009.

- In addition, the Respondents have not demonstrated that they were prejudiced by this particularisation and the experts have on consideration of the evidence and records agreed that there is at least 118 days of critical delay arising from the Third Suspension.

81. Accordingly the Claimant is entitled to an extension of time for the Third Suspension and to recover prolongation costs arising therefrom, which are addressed in Sections VI and VII.

# SECTION V: OTHER DELAY AND DISRUPTION CLAIMS (CEMENT, CHOLERA, EMERGENCY REPAIR WORKS, RAINFALL, WATERLOGGED GROUND)

**Overview**

1. In this Section the Tribunal addresses the claims for delay and disruption arising from the cement shortage; cholera outbreak; emergency repair works; rainfall; and waterlogged ground.

**Cement Shortage (Claim 7)**

Background

2. The Claimant alleges that there was a national shortage of cement in Tanzania in the second half of November and December 2007 caused by the introduction of import tariffs by the Government of Tanzania. It was not until the imposition by the Government of restrictions on the export of cement that supplies improved in late December 2007 **[C1/1/36.]** Further knock on delays occurred to the Claimant's works in February 2008 due to shoulder repairs which the Claimant alleges were required as a result of the earthworks being left exposed in late 2007 due to the cement shortages.

3. The Claimant therefore seeks:

   a. An extension of time of 42.5 days for Section 3 and 46.5 days for Section 4 (Claim 7) pursuant to Sub-Clause 8.4(d) and Sub-Clause 8.4(e); and/or

   b. An extension of time and cost pursuant to Sub-Clause 19.4; and/or

   c. Damages for breach of paragraph 6.3 of the MoU.

Summary of Parties' Principal Submissions

4. The Respondents contend that:

   a. The Claimant failed to notify and particularise its claim in accordance with Sub-Clause 20.1 and Sub-Clause 19.2. The Claimant knew of

127

actual delays resulting from the cement shortage by 5 September 2007, therefore any notices served by the Claimant were out of time.

b. There was no shortage of cement during the relevant period. The issue was simply one of increased price.

c. The shortage of cement was the Claimant's risk under the Contract. The cement shortage was not unforeseeable, caused by government actions or a Force Majeure event. The Claimant could have avoided or overcome the shortage by paying the higher market prices or sourcing cement from abroad. A Tanzanian court observed in *Chapakazi Building Contractor v Parokia Ya Kiwanja Cha Ndege* [1983] TLR 252 **[F3/3.3/6]** that the shortage of building materials in Tanzania is a "notorious fact."

d. The Claimant's cement manufacturer, Tanga, had factory problems unrelated to market conditions. This was the cause of the cement-delivery shortages and unrelated to either government action or market forces.

5. The Claimant submits that:

a. The Claimant first gave notice under Sub-Clause 20.1 on 8 October 2007 **[G3/212/1273]**. Alternatively, Mr Sakamoto only became aware this was not a passing shortage around the beginning of November 2007, after which he gave notice on 15 November 2007 **[G3/217/1282]**. In any event, the time period for giving notice only starts when the Contractor actually incurs critical delay – *Obrascon Huarte Lain SA v Her Majesty's Attorney General for Gibraltar* [2014] EWHC 1028 TCC **[F2/2.24/1]**.

b. Furthermore, the Respondents are estopped and/or have waived their right to argue that valid notices were not served.

c. Whether or not the shortage was attributable to the manufacturer's problems does not affect the Claimant's entitlement because this

manufacturer was only one of three manufacturers of cement in Tanzania. This cannot explain the overriding national shortage of cement that existed.

d. There was a real shortage of cement amongst all suppliers in Tanzania, the issue was not simply an issue of an increase in prices. No cement was available from neighbouring countries due to high demand. The importation of bulk quantities from further afield would not have been a practicable solution as due to the sophisticated quality control required for the C1/C2 sub-base layers, it was critical to keep the cement as fresh as possible.

e. The shortage of cement was unforeseeable. The statement relied upon in the *Chapakazi* case is at its very highest a finding of fact restricted to that specific case. After 1986 there was a liberalization of the economy and easing of import restrictions, together with the opening of two further cement plants, increasing the general availability of cement in Tanzania.

**Analysis and Conclusions of the Tribunal**

6. In considering this claim, the Tribunal has taken into account that the inability of the Claimant to obtain adequate supplies of cement was caused by a number of factors. One of these factors was the inability for a period of the cement manufacturer (Tanga) from whom the Contractor's supplier (Highland Estates Limited) obtained its supplies of cement to produce for the Claimant adequate quantities of 42.5N cement due to a problem with the manufacturer's clinker machine.

7. This position is established by a letter from Tanga to the Claimant dated 28 November 2007 **[G3/248/1375]**. In-cross examination Mr Sakamoto admitted that Tanga cement was having substantial difficulty producing 42.5N cement from late November until mid-December, a period which overlapped with periods of the delay claimed by the Claimant in respect of the shortage of cement **[T6/87/22 - T6/88/8]**; **[T6/89/23 - T6/90/14]**.

8. It is of course for the Claimant to establish its claim.

9. A shortage of cement due to the manufacturer's kiln difficulties (albeit due initially to a power shortage) does not in the Tribunal's view constitute either an event which satisfies the requirements of Sub-Clause 8.4(d) or (e), or the definition of Force Majeure in Sub-Clause 19.4 because the manufacturer's kiln difficulties are a risk for which the Claimant is responsible under the Contract.

10. Accordingly, where at least a substantial cause of the cement shortage arose from the manufacturer's plant break down, the Tribunal is unable to conclude what if any contribution to the shortage of cement was made by Tanzanian government policy regarding the introduction of import tariffs.

11. Accordingly, this Claim 7 fails as to its merits and the Claimant is not entitled to an extension of time in relation to Section 3 or Section 4, or to prolongation costs or disruption costs. This conclusion means that the Tribunal does not need to consider the Respondents' arguments regarding the Claimant's failure to provide adequate notice of this claim.

## Cholera (Claim 8)

Background

12. In December 2007 a cholera outbreak occurred in Chukuyu, the area of the Claimant's main camp. On 5 December 2007, the Claimant wrote to the Engineer stating that in light of the outbreak the Works would be suspended and it considered this outbreak to be a Force Majeure event [G3/253/1384]. On 14 December 2007 the Claimant gave notice pursuant to Sub-Clause 19.2 of its claim for an extension of time and costs [G3/264/1403]. Particulars were submitted on 6 August 2008 [G4/432/1838]. The claim was later re-submitted as Claim 8A on 14 October 2008.

13. On 17 December 2008 the Engineer awarded a 7 day extension in respect of the cholera claim but without any additional cost [G4/582/2188]. The Claimant disagreed with this determination on 2 January 2009 and served a

notice of intention to refer the same to the DAB on 5 February 2009 **[G4/623/2279]**.

14. The Claimant now seeks disruption costs in respect of the cholera outbreak. Although the Engineer awarded an extension of time the Claimant now seeks only disruption costs. The causes of delay upon which the Claimant relies for an extension of time for Section 3 and 4 of the work are stated at paragraphs 4.4 and 4.7 of the CCS. The cholera outbreak is not included. At paragraph 6.1, CCS the Claimant states that the causes relied upon for the disruption costs claim are the same as for the extension of time and prolongation costs claims with one addition – the outbreak of cholera in December 2007.

15. The cholera outbreak is not included in the Claimant's List of Issues at item 39, Appendix A, CCS, as an event justifying an extension of time, but it is included at item 12(c) in the list of issues as an event in respect of an extension of time for Section 4 and the Works.

16. Consequently, the Tribunal considers that the Claimant's position is as stated in the CCS and that only one day's extension of time for Section 4 is sought for Claim 8 in respect of the emergency repairs.

## Summary of Parties' Principal Submissions

17. The Respondents contend that:

   a. The Claimant lost any entitlement to claim additional time or money as it failed to particularise the claim until 6 August 2008.

   b. The circumstances of the cholera outbreak do not justify relief in that the delay suffered was due to the Claimant's failure to provide shading and concreting around the food vendors, temporary toilets and clean water and appropriate catering facilities for its workforce. The risk of a personnel shortage due to cholera was not unforeseeable and the Claimant could have mitigated or entirely avoided the problem by providing clean food and water for its workers, as required by the Contract.

18. The Claimant submits that:

    a. No prejudice has been caused to the Respondents as a result of any delay in particularisation, which is denied. In the alternative the Respondents have waived alternatively are estopped from arguing that the late provision of particulars is a bar to the Claimant's claim.

    b. The Respondents are incorrect to suggest that the Claimant was somehow responsible for the delay caused by the cholera outbreak. In relation to the local villages, the Claimant was under no obligation to provide public health services unless instructed by the District Medical Officer. As to the facilities on site, the Claimant did provide sufficient and hygienic on-site catering facilities for its workforce. It also provided toilets and clean water.

**Analysis and Conclusions of the Tribunal**

19. In the Tribunal's view the Respondents' submissions are not persuasive. To suggest that the Claimant should have foreseen an outbreak of cholera is in the Tribunal's view unreasonable as are the criticisms which the Respondents make of the Claimant's response to the cholera outbreak.

20. Further, any delay in particularisation of the claim has not been established by the Respondents to have caused prejudice as required by Sub-Clause 20.1. Contrary to the Respondents' submissions, a claim under Sub-Clause 20.1 does not fail for lack of timely particularisation. It is for the Respondents to establish prejudice as a consequence of any late particularisation.

21. In the Tribunal's view the Claimant is entitled in principle to recover its direct costs on the basis that the cholera outbreak constitutes an event of Force Majeure. Accordingly the Tribunal finds that the Claimant is entitled to recover TZH 10,282,899; USD1,330 and JPY 234, 478 in respect of the direct costs in relation to the cholera outbreak.

22. The Tribunal is not however satisfied that the circumstances surrounding the cholera outbreak establish any breach by the Respondents of paragraph 6.3 of the MoU as alleged by the Claimant.

## Emergency Repairs (Claim 8)

Background

23. On 10 December 2007, Mr Mrema of the Employer wrote to the Engineer noting that due to rain, a section of the Manyoni-Issuna road (forming part of another contract) had deteriorated and required him to instruct the Claimant to carry out the necessary repairs **[G3/256/1389]**. It was agreed on 13 December 2007 that the works were to be paid on a dayworks basis and were urgent **[G3/261/1398]**.

24. The Claimant carried out the emergency repair works between 16 December 2007 and 1 January 2008. Dayworks records were submitted on 22 January 2008 **[G3/290/1451]**.

25. Shortly before 6 August 2008, the Claimant submitted particulars of Claim 8 (which included both the claim for cholera and emergency repairs) **[G4/432/1838]**. The Employer responded on 29 September 2008 stating that whilst it accepted that the Claimant was entitled to an extension of time as a result of the cholera, no extension was due for the emergency repairs on the basis that they were unrelated to the Contract **[G4/469/1942]**.

26. The Claimant therefore claims:

    a. An extension of time of one day (Claim 8) pursuant to Sub-Clause 8.4(a); and/or

    b. An adjustment to the Contract price pursuant to Sub-Clause 13.3; and/or

    c. Damages for breach of paragraph 6.3 of the MoU.

Summary of Parties' Principal Submissions

133

27. The Respondents aver that:

   a. The Claimant has lost any entitlement to claim any additional time and money as a result of its failure to particularise its claim until 6 August 2008.

   b. In any event, Ms McLaughlin and Mr Richards are in agreement that the emergency repairs caused no critical delay to Section 3 and only one day of delay to Section 4. **[D3/3.1/12-13]**

28. The Claimant contends that:

   a. No prejudice has been caused to the Respondents as a result of any delay in particularisation, which is denied. In the alternative the Respondents have waived or alternatively are estopped from arguing that the late provision of particulars is a bar to the Claimant's claim.

   b. The experts agree that one day of critical delay was caused to Section 4 for the repair works to the Manyoni-Issuna road.


**Analysis and Conclusions of Tribunal**

29. The Respondents' arguments in opposition to this claim are without merit. The emergency repairs were undertaken at the specific direction of the Employer, who agreed that the Contractor would be reimbursed on a dayworks basis for this work. To suggest as the Respondents now do that a lack of timely particularisation of this claim should be allowed to defeat it lacks merit. No prejudice as a result of the alleged late particularisation has been established by the Respondents. The delay experts agree that this event caused one day of critical delay to Section 4 in December 2007 **[CCS/Appendix F; D3/3.1/13]**.

30. Accordingly the Tribunal finds that the Claimant is entitled to an extension of time of one day for Section 4 and to recover the costs of TZS 72,258,670 being the cost of the execution of this requested work and prolongation costs. This day of delay as a result of the emergency repairs is concurrent with the period of delay for which an extension of time was agreed in the Addendum

134

(30 September 2006 to 29 September 2008). Consequently the prolongation costs cannot be recovered twice. This issue is addressed in Section VII.

**Rainfall**

Background

31. The Claimant avers that it suffered delays in early 2008 as a result of exceptional rainfall in Sections 3 and 4 and consequently seeks an extension of time pursuant to Sub-Clause 8.4(c).

Summary of Parties' Principal Submissions

32. The Respondents contend that:

   a. The rain was not exceptionally adverse. Mr Sakamoto admitted on cross examination **[T6/106/22]** that he had never claimed that the rain was exceptional. The delay due to rain in 2008 was not unique – the Claimant's own reports show that delay from rain in the rainy season was a recurrent issue, year after year **[P2/15/4]; [P2/21/6]; [P2/18/2]**. Mr Richards has no first-hand experience of working in Tanzania and did not undertake a comparison of the rainfall in 2008 to previous recorded weather.

   b. The Claimant has lost any entitlement to claim as (i) notice of the claim was never given - Mr Sakamoto accepted in cross-examination that no written Sub-Clause 20.1 notice was ever given **[T6/107/18]**; (ii) particularisation was not provided until 2013, at the time of the arbitration.

33. The Claimant submits that:

   a. Notice was given pursuant to Sub-Clause 20.1 at the monthly site progress meetings with the Engineer in January-April 2008 **[A2/9/4]; [A2/10/4]; [A2/11/4]; [A2/12/5]; [A2/9/4]; [A2/10/4]; [A2/11/4];**

[A2125]. Any delay in particularisation does not bar the Claimant's entitlement to claim.

b. The rain was exceptionally adverse. The Engineer recorded this himself in his March Report to the Employer [H2/1.57/4]. Historical data on rainfall is informative but not definitive. Mr Richards' experience that it is exceptional for work to be stopped for a whole day by rain in this part of Tanzania is therefore more relevant to the assessment [T8/118/10]; [T10/36/19].

c. The Claimant is entitled to an extension of time of 10 days for Section 3 and 24 days for Section 4.

**Analysis and conclusions of the Tribunal**

34. The Tribunal is not satisfied that the weather conditions experienced by the Claimant and the subject of this claim constitute exceptionally adverse rain. The evidence of Mr Sakamoto, suggests the opposite is the case.

35. The only evidence in support of this claim is that of Mr Richards who, despite his experience contracting in Africa did not in the Tribunal's view provide reliable evidence enabling the Tribunal to conclude that the rainfall experienced was in anyway unique or exceptional.

36. Accordingly the Claimant's claim fails and it is not necessary for the Tribunal to address the Respondents' submissions as to lack of notice under Sub-Clause 20.1.

**Waterlogged Ground (Claim 20)**

Background

37. The Claimant undertook works in relation to the waterlogged ground between 20 September 2008 and 23 October 2008. A notice of claim was issued on 8 November 2008 with particulars on 26 June 2009 as part of the Final Account [G5/669/2451]. To date the Engineer has not made an evaluation of this claim.

136

38. The Claimant accordingly seeks:

    a.  An extension of time of one day for Section 4 pursuant to Sub-Clause 8.4(a); and/or

    b.  An adjustment to the contract price pursuant to Sub-Clause 13.3; and/or

    c.  An extension of time and cost pursuant to Sub-Clause 4.12; and/or

    d.  Damages for breach of paragraph 6.3 of the MoU.

Summary of Parties' Principal Submissions

39. The Respondents submit that:

    a.  The Claimant has failed to notify and particularise the claim within the time required by Sub-Clause 20.1. The Claimant knew or should have known of the nature of the situation and the scope of the required works by 20 September 2008 at the latest, after the Engineer had approved the Claimant's method statement and it had commenced works. The Claimant therefore was required to give a Sub-Clause 20.1 notice by 18 October 2008. In any event, particularisation was not provided until 26 June 2009.

    b.  The work to treat the waterlogged ground was not a Variation because it was the Claimant's responsibility to put forward a design that was appropriate for the actual conditions on site. What Mr Sakamoto seeks to class as "variation instructions" were actually the Resident Engineer performing the routine task of approving activities proposed by the Contractor pursuant to Sub-Clause 4.9 [E3/1/618]. The Contract required the Claimant to submit a method statement for approval prior to carrying out works on site which it did on 18 September 2008 and there was no change in the Employer's Requirements.

    c.  The situation is not one that was unforeseeable and entitling the Claimant to relief under Sub-Clause 4.12. The Resident Engineer described the watery stretch as "relatively small" and stated that "many

137

more such holes" were encountered and dealt with by Estim when it took over as contractor, without complaint **[C8/2/6]**. Mr Ntensibe was not cross-examined on this point at the hearing.

40. The Claimant contends that:

a. The works were carried out between 20 September 2008 and 23 October 2008. On completion, the Claimant was able to assess the delay caused as a result and put in its notice on 8 November 2008. The notice was therefore given within 28 days of the Claimant appreciating that the Works were or would be delayed. Any delay in particularisation has caused no prejudice and does not bar the Claimant's entitlement to claim under Sub-Clause 20.1. The Claimant further relies on its arguments as to waiver and estoppel.

b. The works did amount to a Variation - there was no requirement in the Employer's Requirements for the Contractor to carry out the ground improvement and drainage work that the Claimant was instructed to carry out and it was only required under the Contract to carry out what was specified in those Requirements.

c. The problem with the waterlogged section was unforeseeable as there had been no rainfall in the area, it was not prone to flooding and the site visits and inspections undertaken by the Claimant had not revealed any issues.

**Analysis and Conclusions of the Tribunal**

41. The Tribunal is satisfied on the evidence of Mr Sakamoto that the physical conditions encountered because of the waterlogged ground the subject of this claim were unforeseeable conditions entitling the Claimant to relief under Sub-Clause 4.12. Mr Sakamoto's evidence is that the waterlogged ground was encountered during a dry time of year and that there was nothing in the hydrological investigation to suggest that a problem might be encountered. **[C1/1/52]**

138

42. Further, the Tribunal accepts the Claimant's submissions that notice of intention to claim under Sub-Clause 20.1 was given within the requisite period, when measured from the date of completion of the Work which was carried out up to 23 October 2008. The notice of intention to claim was provided on 8 November 2008 and therefore was within 28 days of the Claimant becoming aware of the delay.

43. The Tribunal does not accept the Respondents' submissions regarding the Claimant being disentitled to make this claim for delayed particularisation. Delayed particularisation does not bar the Contractor's entitlement to recover under Sub-Clause 20.1 and no prejudice arising from the alleged late particularisation has been established by the Respondents.

44. The delay experts agree that this event caused critical delay of one day in October 2008 **[CCS/Appendix F; D3/3.1/14]**.

45. Accordingly the Claimant is entitled to an extension of time of one day for Section 4 and its Costs pursuant to Sub-Clause 4.12 of TZS 40,348,543; USD 28,378; JPY 4,193,472.

## SECTION VI: EXTENSIONS OF TIME AND LIQUIDATED DAMAGES

## The Claimant's entitlement to extensions of time in relation to the Suspension claims

### The First and Second Suspensions (Claims 6 and 13)

1. The Tribunal has found that Claim 6 in respect of the First Suspension for 97 days extension of time to the Section 3 completion date of 30 April 2008 and for an extension of time of 86 days to the Section 4 completion date of 29 September 2008 fails for lack of a valid notice under Sub-Clause 16.1.

2. The Tribunal has found that Claim 13 in respect of the Second Suspension for an extension of time of 67 days to the Section 3 completion date and an extension of time of 75 days to the Section 4 completion date fails for lack of a valid notice under Sub-Clause 16.1.

3. Accordingly, the Claimant has no entitlement to extensions of time, prolongation costs or disruption costs in respect of Sections 3 and 4 arising from the First and Second Suspensions.

### The Third Suspension (Claim 22)

4. The Tribunal has found that Claim 22 in respect of the Third Suspension in respect of an extension of time of 118 or 128 days to Section 4 is valid.

5. The delay experts are agreed that, depending upon which of their respective methodologies is adopted, the critical delay to Section 4 resulting from the Third Suspension is 118 or 126 days **[Joint Statement, Appendix B; D3/3.1/14].**

6. Ms MacLaughlin finds 126 days of critical delay by a count of the calendar days from the date of suspension (6 November 2008) to the date of termination (11 March 2009). Mr Richards uses the same approach but deducts eight days which he includes in Claim 7 (Cement Shortage). In Claim 7 Mr Richards allows 22.5 days delay in December 2007, which includes eight days' delay being the knock-on effect of the Cement Shortage in December 2008. The Tribunal have found in Section V that Claim 7 fails on its merits.

140

7. The difference between 118 and 126 days arises as a result of Mr Richards' delay analysis methodology. In the context of an extension of time resulting from a suspension the Tribunal considers that it is preferable to calculate the effect of a suspension by reference to the actual calendar days for which the work was suspended. Clearly suspension would have been the critical cause of delay at the time as no work was being carried out during the suspension period.

8. Accordingly the Tribunal finds that the Claimant is entitled to an extension of time to Section 4 of the work and for the whole of the work of 126 days for the period from 6 November 2008 to 11 March 2009 which is the date the Contract was terminated.

**The Claimant's entitlement to other extensions of time**

Section 2

9. Section 2 of the Road was completed on time on 23 December 2007 **[G3/271/1417; CCS/42]** so there are no issues for the Tribunal to address.

Section 3

10. At paragraph 4.4 of the CCS the Claimant summarises its claim for an extension of time of 216.5 days in respect of Section 3 of the works for the following events:

   a. First Suspension (Claim 6);

   b. Cement Shortage (Claim 7);

   c. Exceptionally adverse rain;

   d. Second Suspension (Claim 13)

11. The Tribunal has dismissed these events as entitling the Claimant to any extension of time for completion of Section 3.

12. The completion date for Section 3 was agreed in the Addendum as 30 April 2008 **[G2/130/917; CCS/41.]**.

141

13. Section 3 of the Road was opened to the public on 1 November 2008 **[G4/519/2059]** 184 days late. Under the Contract as amended by the Addendum this constituted taking over of the section by the Respondents.

## Section 4 and the Works

14. The completion date for Section 4 and the whole of the work was agreed in the Addendum as 29 September 2008.

15. At paragraph 4.7 of the CCS the Claimant summarises its claim for an extension of time of 351.5 days for the following events:

    a. First Suspension (Claim 6);

    b. Cement Shortage (Claim 7);

    c. Emergency repairs to Manyoni – Issuna Road (Claim 8);

    d. Exceptionally adverse rain;

    e. Second Suspension (Claim 13);

    f. Waterlogged ground (Claim 20);

    g. Third Suspension (Claim 22)

16. The Tribunal has found in the Claimant's favour in respect of:

    Claim 8        Extension of time of 1 day

    Claim 20       Extension of time of 1 day

    Claim 22       Extension of time of 126 days

17. The Tribunal has dismissed the other claims.

18. Consequently the Claimant is entitled to an extension of time of 128 days for completion of Section 4 and for the whole of the work. This extension of time partially covers the period from 29 September 2008 (the date for completion of Section 4 and the whole of the work) to 11 March 2009 (the date of termination of the Contract).

**The Respondents' entitlement to liquidated damages in respect of Section 3; Section 4; and the whole of the Works**

19. As set out above, there was a delay of 184 days by the Claimant in completing Section 3.

20. In relation to Section 4 there were delays for which the Claimant was responsible but the Contract was terminated on 11 March 2007 when the Claimant accepted the Respondents' repudiation of the Contract, as found by the Tribunal in Section 8 (Termination).

Provisions of the Contract and the Addendum relating to Liquidated Damages

21. Under the original Contract, there was one period of 1278 days for completion of the work from the date of commencement and pursuant to Sub-Clause 10.1 of the Conditions of Particular Application [E2/6/272] undefined sections of the work of less than 20 km could be taken over. Under Sub-Clause 10.2 of the Conditions of Particular Application [E2/6/272] use of the Road by the public was expressly stated not to constitute taking over by the Employer.

22. The Appendix to Tender of the Contract defined delay damages, i.e., liquidated damages, as *"Zero Point One Five Percent (0.15%) per day of the Contract Price on value of works not taken over in the currency proportions in which the Contract Price is payable."* [E2/5/257] but there is no allocation of delay damages by reference to defined or any sections of work.

23. In the Addendum the Parties agreed four defined Sections with dates for completion of each. Sub-Clauses 10.1 and 10.2 of the Conditions of Particular Application were removed from the Contract so that the Sub-Clauses 10.1 and 10.2 reverted to the standard FIDIC wording. By Sub-Clause (viii) of the Addendum [E5/2/1311] the Parties agreed that use of the Road by the public would constitute taking over by the Employer, in the following manner: *"Sub-Clause 10 on Employer's Taking Over, the "minor outstanding work" may include, but not be limited to, clearing away materials outside the actual road surface and ancillary works including marker posts, guardrails, road signs, road markings, a weighbridge and landscaping. The procedure for Taking-*

143

144

*Over may be backdated for Section 1, which is confirmed as being completed by 30th November 2006. The Employer's use of a Section is deemed to commence when used by vehicles of the general public."*

24. However, the provisions for delay damages were not amended to apply to the four Sections of the work defined in the Addendum so that the delay damages continued to apply only to the completion of the work as a whole. The date for this became the same as for Section 4 of the work by agreement by the Parties pursuant to the Addendum **[E5/2/1310]**.

25. Because the Parties did not in the Addendum amend the provisions for delay damages so that delay damages became applicable expressly to the Sections as well as the whole of the work, in the Tribunal's view there are no liquidated delay damages which can apply to Sections 3 or 4 in respect of the periods of delay for which the Contractor is responsible.

26. As far as the completion of the whole of the work is concerned as at the date of termination of the Contract (11 March 2009) the Contractor was responsible for some delay at that point. However the termination resulted from the repudiation of the Contract by the Respondents which had the effect of preventing the Contractor from completing the work, in circumstances where the work had been suspended justifiably by the Claimant since 6 November 2008, and in respect of which the Claimant is entitled to an extension of time (see Sections IV and VI).

27. The Tribunal concludes that in these circumstances the Respondents cannot recover liquidated delay damages for any delay by the Claimant in completing the whole of the work due to the Respondents' own default in repudiating the Contract, resulting in the termination on 11 March 2009. The Contractor was deprived wrongfully of the opportunity to complete the whole of the work at this point.

28. For completeness the Tribunal records that the Respondents did not produce any evidence of actual loss suffered by the Respondents.

144

## SECTION VII: PROLONGATION AND DISRUPTION COSTS

1. The issues to be addressed in respect of prolongation and disruption costs are set out in the List of Issues at item 12. The Parties adopt differing approaches to some of the questions to be addressed. The Tribunal prefers Konoike's approach to the specific questions to be addressed in relation to prolongation and disruption costs, but consider that these questions fall within the issue raised by the Respondents at item 12:

| NO. | ISSUE | KONOIKE'S COMMENTS |
|-----|-------|--------------------|
| 12. | What additional time and/or money (if any) is the Contractor entitled to in relation to prolongation and disruption of the Works allegedly caused by the following: | Not agreed as an issue. These should be separated into Konoike's entitlement to (i) extensions of time, (ii) prolongation costs and (iii) disruption costs (as below with new Issues 12A and 12B). In addition, Konoike's entitlement to extensions of time will need to be determined for the different Sections. The relevant issue on extension of time to be determined by the Tribunal is: What extensions of time (if any) is the Contractor entitled to in respect of: (i) Section 3 (for (a), (b), (e) & (f) below only); and (ii) Section 4 and the Works in relation to delay caused by each of the following: |

145

| | | |
|---|---|---|
| a. | The alleged late payment of IPC15 and the Outstanding Amount. | The first suspension (Claim 6). |
| b. | The short delivery of cement to the Site in November and December 2007. | The cement shortage (Claim 7). |
| c. | The cholera outbreak in December 2007. | Agreed (Claim 8). |
| d. | Emergency repair works to the Manyoni-Issuna Road | Agreed (Claim 8) |
| e. | Exceptionally adverse rain | Agreed. |
| f. | The alleged late payment of IPCs 19, 20, 20A and 23. | The second suspension (Claim 13). |
| g. | The treatment of waterlogged ground at km 115+600 | Agreed (Claim 20) |
| h. | The alleged late payment of IPCs 24 and 25. | The third suspension (Claim 22) |
| 12A. | | What additional money (if any) is the Contractor entitled to for prolongation caused by each of the following: |
| a. | | The first suspension (Claim 6) |
| b. | | The cement shortage (Claim 7) |
| c. | | The second suspension (Claim 13) |

| | | |
|---|---|---|
| d. | | The treatment of waterlogged ground at km. 115+600 (Claim 20) |
| e. | | The third suspension (Claim 22) |
| 12B. | | What additional money (if any) is the Contractor entitled to for disruption caused by each of the following: |
| a. | | The first suspension (Claim 6) |
| b. | | The cement shortage (Claim 7) |
| c. | | The cholera outbreak in December 2007 and the Emergency repair works to Manyoni-Issuna Road (Claim 8). The cholera outbreak is not included in the CCS Appendix A as justifying an extension of time. |
| d. | | The second suspension (Claim 13) |
| e. | | The third suspension (Claim 22) |

147

2. The Tribunal has addressed the issues relating to extensions of time in the Sections IV, V and VI of this Award. Accordingly the Tribunal now addresses the issues of prolongation and disruption costs.

**Prolongation Costs**

3. What additional money (if any) is the Contractor entitled to for prolongation for each of the following claims of the Claimant:

   a. the First Suspension (Claim 6);

   b. the cement shortage (Claim 7);

   c. the emergency repairs (Claim 8);

   d. the Second Suspension (Claim 13);

   e. the treatment of waterlogged ground (Claim 20);

   f. the Third Suspension (Claim 22).

4. The Tribunal has rejected Claims 6, 7 and 13 in Sections IV and V so the Claimant cannot recover prolongation costs in respect of these Claims. Before addressing Claims 8, 20 and 22 specifically the Tribunal will address the Parties' general submissions in relation to prolongation costs.

The Parties' general submissions on prolongation costs

5. At CCS/5.1 the Claimant submits that "Cost" is defined in Sub Clause 1.1.4.3 [**E5/3/1324**] as "*all expenditure reasonably incurred (or to be incurred) by the Contractor, whether on or off the Site, including overhead and similar charges but does not include profit.*"

6. At CCS/5.1 the Claimant submits that to the extent the works were delayed it is entitled to claim costs incurred as follows:

148

a. Sub-Clause 16.1: *"Cost plus a reasonable profit"* in respect of costs incurred as a result of suspension of the works or a reduced rate of working.

b. Sub-Clause 19.1: payment of "Cost" incurred as a result of Force Majeure.

c. Clause 13: an adjustment to the contract price in respect of Variations.

d. Sub-Clause 14.12: the payment of cost in respect of unforeseeable physical conditions.

7. The Respondents contend firstly that the Claimant did not incur any additional costs due to prolongation as at the date of termination **[A3/1.1/164; A3/1.1/8]** and the Respondents' quantum expert assesses the prolongation costs at nil on this basis at item 2 in the first joint report **[D3/3.4/4]**. The Respondents' case is that the Claimant was not on site for longer than it would have been but for the delays.

8. In response the Claimant submits that it was entitled as at the date of termination of 11 March 2009 to 351.5 days' extension of time to Section 4 and so it would not have completed until 15 September 2009.

9. Secondly the Respondents contend that prolongation is to be valued on the basis of a monthly amount agreed in the Addendum **[RCS 131 – 142]**.

10. The Claimant's response to this contention is that the lump sum paid to the Claimant for the cost of time related preliminaries incurred over the 24 month extension of time agreed in the Addendum did not take into account prolongation of production or overhead equipment, labour or fuel. The Claimant submits that the Claimant's true entitlement is to be paid the Cost that it incurred as a result of prolongation plus profit.

## Analysis and conclusions of the Tribunal in relation to the general submissions on prolongation costs

11. In the Tribunal's view the Respondents first submission that the Claimant did not incur any additional costs due to prolongation as at the termination of the

149

Contract is simply incorrect as a matter of analysis. In the context of the third suspension which commenced on 6 November 2008 and ended on 11 March 2009 (the date of termination) the work was not complete at that date and but for the termination which the Tribunal have found was the fault of the Respondents the Claimant would have continued working until completion of the work. In the Tribunal's view it cannot be correct as a matter of analysis to contend that delay for which the Respondents are responsible and which occurs prior to the date of termination does not attract prolongation costs if recoverable under the Contract. Put another way prior to the date of termination the Contractor was entitled to suspend the Contract under its terms which also entitled the Contractor to recover prolongation costs in respect of the period of delay resulting from the suspension.

12. The Tribunal has used the third suspension for the purpose of the analysis but similar arguments apply in respect of the other claims such as Claim 20 for water logged ground which the Tribunal has found to constitute unforeseeable physical conditions and to Claim 8 where the emergency repairs are to be treated as Variations.

13. In relation to the Respondent's second contention that prolongation is to be valued on the basis of the monthly amount agreed in the Addendum as the "*Additional Indirect Cost*" the Claimant contends that it can be seen from the Addendum that no account was taken of prolongation of production or overhead equipment labour or fuel.

14. Even if the Claimant's submission is correct, the first question to be considered, in the Tribunal's view, is why the compensation agreed in the Addendum for the 24 month extension of time agreed in the Addendum should apply in respect of the claims for prolongation costs arising as a result of events occurring subsequently to the Addendum.

15. The Addendum itself provides that the Adjusted Contract Price includes "costs due to Extension of Time for Completion up to Km 127". Addendum No 1[**E5/2/1313**] at clause v) provides that these costs are TZS 9,908,094,816.00.

16. The MoU **[E5/3/1319]** which is Appendix 1 to the Addendum, provides at clause 6.1 that *"The Parties have agreed that the Extension of time shall be compensated under time related preliminary and general costs."*

17. The *"Bills for the Final Approved her Designs"* are contained in Appendix 3 to the Addendum and *"Bill 1 General"* contains the item *"Additional Indirect Cost"* of TZS 9,908,094,816 for 24 months at a monthly rate of TZS 412,837,284.

18. In the Tribunal's view there is nothing in the Addendum and the attached documents which suggests that the agreed monthly figure for the Additional Indirect Cost is to apply to the calculation of prolongation costs to which the Claimant may become entitled in respect of events occurring after the date of the Addendum. The figure for Additional Indirect Cost was agreed following negotiations between the Parties as the compensation for time related preliminary and general costs in relation to the agreed extension of time of 731 days for events occurring prior to the date of the Addendum. The Addendum represents a settlement by the Parties of the disputes described therein and was not expressed to have any application to further disputes in the future.

19. Accordingly the Tribunal finds that there is no agreement between the Parties in the Addendum or otherwise that the monthly amount for Additional Indirect Cost stated in the Addendum is to be applied to the calculation of prolongation costs claimed in this arbitration by the Claimant. The amount of the Additional Indirect Cost operates as a full and final settlement agreed between the Parties in respect of prolongation costs related to the extension of time of 731 days agreed in the Addendum.

## Calculation of Prolongation Costs

20. The starting point for calculating prolongation costs under the Contract is the definition of Cost which is set out above. In the Tribunal's view the Claimant is entitled to recover Cost as defined in clause 1.1.4.3. Consequently profit is excluded except in respect of Cost arising as a result of a suspension or reduced rate of working pursuant to Sub -Clause 16.1.

21. Alternatively the Claimant submits it is entitled to recover its costs as a result of delays caused by breaches by the Respondents of Clause 6.3 of the MoU. This clause provides:

*"The Employer (and the Engineer on his behalf) has undertaken to henceforth, accord the Contractor every support and assistance to ensure smooth implementation of the Contract, early completion of the project, reduction of the extended Time for Completion and the cost of the Project."*

22. The MoU forms part of the Addendum which provides at Clause xiii that the other terms and conditions are to remain as set out in the Contract. In addition the Addendum provides that it forms part of the Contract and that its content is to prevail over the relevant provisions contained in the Contract wherever there is a contradiction between the Contract and the Addendum.

23. In the Tribunal's view Clause 6.3 of the MoU supplements the provisions of the Contract but there is no contradiction between Clause 6.3 and the relevant provisions of the Contract pursuant to which the Contractor claims prolongation cost. The Tribunal concludes that prolongation costs are to be recovered pursuant to the relevant provisions of the Contract agreed between the Parties for this purpose in respect of those claims which the Tribunal has accepted.

24. The Tribunal now turns to consider the issues between the experts in relation to the calculation of prolongation costs. In order to establish a daily rate of prolongation cost for each month of the Project the experts have considered nine heads of cost [**D6/16/2**] and their respective positions are set out in Appendix H to the CCS which is an updated version of Exhibit C 11. The heads of cost are:

    a.  owned equipment ownership costs;

    b.  hired equipment costs;

    c.  Claimant owned overhead equipment operation costs;

    d.  hired equipment overhead operation costs (agreed);

e.  overhead equipment fuel (agreed);

f.  overhead equipment operatives (agreed);

g.  equipment sundry costs;

h.  overhead labour costs (agreed);

i.  site expenses (yen element agreed).

## Owned Equipment ownership Costs

25. The experts primary positions are reflected in Exhibit C 10:



26. Exhibit C10 was produced by Mr Richards and agreed in principle by Mr Kyte **[T13/56-58]**. Mr Richards contends that maintenance spending on heavy machinery falls into two categories. The first is normal maintenance spending and the second is investment or capital maintenance. The saw tooth line in exhibit C10 reflects Mr Richard's position and the fact that there must have been some investment or capital spending on a machine because it is operating beyond its original economic life. Consequently the rate of depreciation will be steeper than calculated using a straight line depreciation from purchase to sale which is reflected in the green line in exhibit C10 and is the method used by Mr Kyte who accepted that the saw tooth line on C10 is closer to reality than his own method shown by the green line **[T13/58/1-13]**. Mr Kyte agreed that if investment spending is known it should be taken into account **[T13/48-50]**.

27. Only the total amount spent on all maintenance and repair is known. Separation of normal maintenance costs and investment maintenance is not possible; and the spending on each machine is not known. The agreed information in relation to the owned equipment is set out in exhibit C 11.

28. Mr Kyte has utilised the known sale prices of the equipment whereas Mr Richards has used a residual value to assess the rate of depreciation taking account of capital spending and investment spending. The difficulty with Mr Richards approach is that he has assumed as new purchase prices from the 2001 Japanese Green Book and economic lives from the Caterpillar Handbook and calculated a depreciation rate.

29. Mr Kyte, on the other hand prefers to use a fact-based approach but the only relevant known fact is the sale price.

30. The Tribunal is not attracted to either approach. Mr Richards' approach is over theoretical in its use of the Japanese Green Book and the Caterpillar Handbook particularly where the equipment purchased by the Claimant was mostly second-hand and at least a third of the items were more than five years

154

old when the Claimant commenced work in 2004.   In addition it is not possible to be certain that investment maintenance took place although it is likely given that much of the equipment was second-hand.

31. Mr Kyte's approach is to calculate ownership costs on a straight line depreciation basis using the agreed purchase and sale prices and actual length of, the Claimant's ownership.  This takes no account at all of any maintenance spending on the production equipment [**T13/62-64**]. In addition Mr Kyte has only included equipment that was reported in the monthly progress reports as idle during periods of prolongation [**D5/5.8/173**]. The Tribunal accepts the Claimant submission, supported by Mr Richards, that whether equipment is working or not during a period of critical delay it would be held on site for longer than it would have but for the delay and that the additional ownership costs are attributable to the period of critical delay. It is also clear that there are errors in Mr Kyte figures for idle plant due to a lack of an idle time column in some monthly progress minutes.

32. Accordingly, the Tribunal is not satisfied with Mr Richards' primary assessment or with Mr Kyte's assessment although it recognises that both experts have attempted to address the issue of depreciation of owned equipment against the background where much information is missing.

33. The Tribunal prefers Mr Richards' alternative approach in which he continues to use the project records of actual costs spent on maintenance but in which he uses actual purchase and actual sale information as used by Mr Kyte. The Tribunal considers that this approach addresses the depreciation of owned equipment in the most balanced way utilising actual information in so far as it is available.   The Tribunal is also satisfied that it is appropriate to include freight charges, finance costs and a 5.26% uplift for petty theft and vandalism for the reasons which are summarised at paragraphs 5.27 (v), (vi) and (viii) of the CCS.

34. The Claimant submits that this alternative approach does not sufficiently represent the ownership costs incurred by the Claimant because it takes no account of the restoration in value of the equipment due to capital spending on

155

investment maintenance. However in the Tribunal's view because there is no actual information in relation to investment maintenance the alternative approach of Mr Richards is preferable to his primary approach where his depreciation depends upon the Japanese Green Book and the Caterpillar Handbook which the Tribunal consider were not designed to be applied in the circumstances of this case. It is also the Tribunal's conclusion that Mr Richards' alternative approach is preferable to Mr Kyte's approach for the reasons set out above.

Hired Equipment Costs

35. The Parties' experts have agreed the applicable daily rates **[D6/5.3/38]** but Mr Kyte utilized the same approach to identifying idle plant which the Tribunal has found is not appropriate in relation to owned equipment.

36. In cross examination Mr Richards was challenged on certain invoices as having included costs on days for which the Claimant was not being charged **[T13/11-22]**. This was the first time this issue had been raised as Mr Kyte had previously agreed the hired plant rates .Since the Hearing Mr Richards has reviewed the invoices and prepared an alternative assessment of hired plant prolongation costs **[Appendix J and paragraph 5.42 CCS]**. The Tribunal would have adopted Mr Richards' primary assessment but in the light of the cross examination on these invoices has now decided to adopt the alternative assessment of Mr Richards on the basis that it produces a more accurately calculated figure.

Owned Equipment Operation Costs

37. These costs represent the cost of operating owned equipment which is engaged in overhead activities. The experts agree that this is appropriate and the costs represent cost of normal maintenance.

38. Mr Richards has utilised for his primary assessment of normal maintenance costs the same method that he used for his primary assessment of ownership costs. The Tribunal has rejected this approach. However Mr Richards' alternative approach is an assessment of nil [T**12/20**].

39. Mr Kyte has assessed the costs on the basis of actual maintenance costs and overhead equipment ownership costs utilising a backward rolling average which reduces the monthly maintenance cost amounts because of the fact that the contract was terminated.

40. Notwithstanding this criticism of Mr Kyte's approach by the Claimant as the experts agree that equipment operation costs in respect of overhead activities should be included in prolongation costs the Tribunal adopts Mr Kyte's assessment

Equipment Sundry Costs

41. As the Tribunal have adopted Mr Richards' alternative assessment in respect of Owned Equipment Ownership Costs there is nothing to add in respect of this item because the Equipment sundry Costs are included in that alternative assessment [**CCS/5.49**].

Site Expenses

42. This item relates to the Claimant's costs in running the site and the Project. The time related element of these costs has been audited by Mr Richards and agreed by Mr Kyte as figures.  However Mr Kyte does not accept that all the figures in Mr Richards audit are prolongation costs. The difference between the experts is small and the Tribunal accepts Mr Richards' explanation of why the costs in his audit should be included in the prolongation costs at paragraph 7.11 of his Side Report [**D6/15/52**].

**The Tribunal's Findings as to the Quantum of Prolongation Costs in respect of Claims 8, 20 and 22**

43. Claim  Period

| | |
|---|---|
| Claim 8 (emergency repairs) | 1 day in December 2007 |
| Claim 20 (waterlogged ground) | 1 day in October 2008 |
| Claim 22 (Third Suspension) | 126 days split as follows |
| | 25 days in November 2008 |

31 days in December 2008

31 days in January 2009

28 days in February 2009

11 days in March 2009

126 days

The table below reflects the Arbitral Tribunal's findings set out above in relation to equipment costs.

**Richards Alternative Valuation**

| Month | Kuvolke Equipment Ownership Costs | Hired Equipment Costs | Kuvolke Equipment Overhead Operation Costs | Hired Equipment Overhead Operation Costs | Overhead Equipment Fuel | Overhead Equipment Operatives | Equipment Sundry Costs | | | Labour Costs | | | Site Expenses | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11.3.1 | 11.3.2p | 11.4a | 11.4a | 11.5a | 11.6.2a | 11.1.1a | 11.1.1a | 11.1.1a | 11.1.1a | 11.1.1a | 11.1.1a | 11.1.1a | 11.1.1a | 11.1.1a |
| | Yen | US$ | Yen | US$ | TZS | Yen | Yen | US$ | TZS | Yen | US$ | TZS | Yen | US$ | TZS |
| Apr-07 | ¥1,698,606 | $17,823.57 | ¥34,318 | $96.64 | TZS 3,978,914 | ¥51,692 | ¥ - | $ - | TZS - | ¥414,043 | $452.62 | TZS 3,295,188 | ¥11,672 | $349.34 | TZS 2,498,556 |
| May-07 | ¥1,619,896 | $17,923.57 | ¥14,141 | $6.83 | TZS 3,823,960 | ¥27,395 | ¥ - | $ - | TZS 63,486 | ¥404,327 | $438.02 | TZS 3,383,452 | ¥11,971 | $665.39 | TZS 2,324,486 |
| Jun-07 | ¥1,642,743 | $17,766.71 | ¥82,524 | $239.44 | TZS 3,112,542 | ¥4,615 | ¥ - | $ - | TZS 12,144 | ¥437,695 | $544.42 | TZS 3,514,088 | ¥3,450 | $645.77 | TZS 2,407,053 |
| Jul-07 | ¥1,615,459 | $18,059.57 | ¥121,146 | $189.26 | TZS 4,067,265 | ¥14,442 | ¥ - | $ - | TZS 5,430 | ¥425,505 | $526.86 | TZS 3,287,826 | ¥5,896 | $780.91 | TZS 2,192,213 |
| Aug-07 | ¥1,598,980 | $21,420.82 | ¥168,085 | $478.56 | TZS 4,496,983 | ¥22,481 | ¥ - | $ - | TZS 194 | ¥425,607 | $526.86 | TZS 3,307,101 | ¥8,454 | $1,076.26 | TZS 2,427,509 |
| Sep-07 | ¥1,651,107 | $23,209.82 | ¥218,981 | $1,299.43 | TZS 7,696,233 | ¥59,538 | ¥ - | $ - | TZS 51,139 | ¥479,027 | $544.42 | TZS 3,217,016 | ¥6,730 | $608.13 | TZS 2,079,885 |
| Oct-07 | ¥1,626,931 | $24,036.82 | ¥170,571 | $753.11 | TZS 5,418,944 | ¥25,906 | ¥ - | $ - | TZS - | ¥449,715 | $526.86 | TZS 3,223,590 | ¥50,568 | $754.03 | TZS 1,526,381 |
| Nov-07 | ¥1,656,343 | $26,765.57 | ¥64,359 | $509.06 | TZS 5,361,346 | ¥23,538 | ¥ - | $ - | TZS 13,162 | ¥441,094 | $544.42 | TZS 3,337,426 | ¥14,650 | $560.83 | TZS 2,166,989 |
| Dec-07 | ¥1,631,118 | $26,519.35 | ¥102,597 | $428.97 | TZS 5,862,634 | ¥39,603 | ¥ - | $ - | TZS 18,652 | ¥431,682 | $507.57 | TZS 3,481,848 | ¥31,344 | $1,140.79 | TZS 1,487,360 |
| Jan-08 | ¥1,606,210 | $26,680.35 | ¥183,736 | $1,258.39 | TZS 6,768,667 | ¥67,593 | ¥ - | $ - | TZS 34,624 | ¥421,027 | $262.80 | TZS 4,788,433 | ¥46,735 | $487.87 | TZS 1,860,423 |
| Feb-08 | ¥1,631,065 | $26,285.35 | ¥162,999 | $764.41 | TZS 7,234,715 | ¥93,263 | ¥ - | $ - | TZS 46,988 | ¥453,254 | $280.93 | TZS 4,935,110 | ¥16,248 | $316.31 | TZS 2,001,786 |
| Mar-08 | ¥1,561,509 | $26,983.35 | ¥121,661 | $796.72 | TZS 5,493,441 | ¥14,739 | ¥ - | $ - | TZS 20,565 | ¥443,108 | $262.80 | TZS 4,676,778 | ¥34,737 | $450.55 | TZS 1,883,856 |
| Apr-08 | ¥1,555,259 | $28,764.35 | ¥107,564 | $913.96 | TZS 6,779,323 | ¥50,615 | ¥ - | $ - | TZS - | ¥459,990 | $271.56 | TZS 5,473,590 | ¥37,689 | $509.53 | TZS 1,756,468 |
| May-08 | ¥1,505,614 | $29,980.21 | ¥ - | $28.67 | TZS 3,630,278 | ¥21,588 | ¥ - | $ - | TZS 50,426 | ¥361,576 | $262.80 | TZS 4,749,182 | ¥42,632 | $111.42 | TZS 1,457,264 |
| Jun-08 | ¥1,511,171 | $28,884.21 | ¥24,076 | $18.58 | TZS 3,929,795 | ¥11,231 | ¥ - | $ - | TZS 60,301 | ¥325,336 | $394.93 | TZS 4,218,061 | ¥3,546 | $1,608.43 | TZS 1,625,941 |
| Jul-08 | ¥1,494,237 | $29,365.21 | ¥127,572 | $873.64 | TZS 8,583,546 | ¥37,519 | ¥ - | $ - | TZS 57,215 | ¥361,478 | $389.51 | TZS 4,513,720 | ¥26,206 | $313.88 | TZS 1,878,193 |
| Aug-08 | ¥1,472,031 | $35,216.21 | ¥122,952 | $1,047.65 | TZS 8,582,303 | ¥35,583 | ¥ - | $ - | TZS 10,645 | ¥374,121 | $389.51 | TZS 4,886,621 | ¥48,961 | $1,243.88 | TZS 2,319,208 |
| Sep-08 | ¥1,455,183 | $36,010.21 | ¥113,558 | $1,088.89 | TZS 8,316,717 | ¥16,923 | ¥ - | $ - | TZS 94,922 | ¥375,980 | $402.49 | TZS 5,131,546 | ¥46,181 | $540.74 | TZS 2,210,182 |
| Oct-08 | ¥1,435,001 | $36,523.21 | ¥98,779 | $883.43 | TZS 6,309,712 | ¥9,677 | ¥ - | $ - | TZS - | ¥376,714 | $389.51 | TZS 5,551,838 | ¥36,516 | $480.12 | TZS 1,915,638 |
| Nov-08 | ¥1,454,305 | $33,370.34 | ¥46,552 | $117.83 | TZS 5,124,109 | ¥51,231 | ¥ - | $ - | TZS 13,667 | ¥393,268 | $404.03 | TZS 4,653,122 | ¥43,435 | $271.37 | TZS 1,792,693 |
| Dec-08 | ¥1,465,206 | $26,378.34 | ¥ - | $31.49 | TZS 3,768,662 | ¥55,533 | ¥ - | $ - | TZS 66,786 | ¥357,549 | $488.16 | TZS 4,571,212 | ¥41,268 | $719.06 | TZS 1,587,624 |
| Jan-09 | ¥1,450,213 | $26,249.16 | ¥ - | $ - | TZS 3,733,848 | ¥76,079 | ¥ - | $ - | TZS 8,684 | ¥336,237 | $ - | TZS 3,851,429 | ¥33,970 | $486.85 | TZS 1,254,386 |
| Feb-09 | ¥1,505,103 | $6,402.82 | ¥ - | $ - | TZS 2,306,075 | ¥30,989 | ¥ - | $ - | TZS 82,113 | ¥355,549 | $ - | TZS 3,887,135 | ¥49,292 | $526.71 | TZS 1,974,333 |
| Mar-09 | ¥1,441,518 | $6,402.82 | ¥ - | $20.77 | TZS 2,821,132 | ¥39,603 | ¥ - | $ - | TZS 24,132 | ¥107,638 | $ - | TZS 3,444,013 | ¥3,707 | $476.84 | TZS 1,246,821 |

44. The Tribunal finds that the Claimant is entitled to prolongation cost of:

    a.  Claim 8 (Emergency Repairs):       TZS 351,293

                                                                 USD 286

|                                       |                 |
|---------------------------------------|-----------------|
|                                       | JPY 68,710      |
| b.  Claim 20 (Waterlogged Ground):    | TZS 444,738     |
|                                       | USD 635         |
|                                       | JPY 60,388      |
| c.  Claim 22 (Third Suspension):      | TZS 39,638,528  |
|                                       | USD 12,511      |
|                                       | JPY 7,827,373   |

45. The period of delay for Claim 8 is one day in December 2007. This period falls within the period of 30 September 2006 to 29 September 2008 for which an extension of time was agreed in the Addendum. The Addendum also recorded prolongation costs for this period of TZS 9.9 billion or TZS 13,572.73 per day.

46. At 3/117/CCS the Claimant accepts that there should be a deduction of TZS 13,572,73 per day from the prolongation costs agreed in the Addendum for any day of extension of time granted by the Tribunal which overlaps with the period of 30 September 2006 to 29 September 2008. Accordingly the Tribunal finds that the amount of TZS 9,908,094,816 found by the Tribunal to be recoverable by the Claimant pursuant to the Addendum for prolongation costs is to be reduced by the amount of TZS 13,572.73.

47. The extensions of time granted by the Tribunal for claims 20 and 22 are for periods which fell outside the period of 30 September 2006 to 29 September 2008 agreed in the Addendum.

48. The Tribunal now addresses the issue of disruption costs.

**Disruption Costs**

49. The Claimant submits [**CCS/6.1; 6.3**] that it is entitled to disruption costs for the same events that it relies upon to recover extensions of time and

159

prolongation costs with the addition of the cholera outbreak (Claim 8) as a Force Majeure event. Accordingly given the Tribunal's earlier findings on the basis of this submission, the claim for disruption costs applies to claims 8, 20 (waterlogged ground) and 22 (third suspension). However it is questionable whether the Claimant's submission is correct.

50. Claim 22 is referred to by the Claimant at item 12B of the List of Issues as being a cause of disruption. It is not referred to in section 6/CCS as being a cause of disruption where the last period of disruption referred to ends at November 2008. Claim 22 does not fall within the disruption events listed at item 43 of the Claimant's list of issues appearing at Appendix A/CCS. It is logical that the Third Suspension which is the subject of Claim 22 did not cause disruption. The work was suspended on 6 November 2008 and never restarted because the Contract was terminated on 11 March 2009. Accordingly although the Claimant is entitled to prolongation costs in respect of the Third Suspension disruption would only have occurred if the work had restarted. Accordingly the Tribunal concludes that in any event Claim 22 would not result in recovery of disruption costs.

51. In relation to Claim 20 this is not referred to by the Claimant at Section 6/CCS dealing with disruption nor is it referred by the Claimant at item 12B of the List of Issues. Accordingly the Tribunal concludes that disruption in relation to Claim 20 is not recoverable.

52. Accordingly given the foregoing and the Tribunal's earlier findings the only claim in respect of which the Tribunal needs to consider the entitlement to disruption costs is Claim 8.

53. The claims for disruption costs are made by the Claimant pursuant to the same contract provisions as for prolongation costs and alternatively as damages for breach of clause 6.3 of the MoU.

54. The Claimant asks the Tribunal to assess appropriate compensation in respect of disruption costs using, as an aid, the assistance of the analysis is carried out by Mr Richards and Ms MacLaughlin on the basis of fuel use. The Claimant

recognises that the figures resulting from these analyses are of questionable value at least when considered over the short term and, secondly, the difficulty of finding appropriate measured miles to be the benchmark.

55. There are two issues in relation to Ms MacLaughlin's analysis which the Tribunal needs to address. The first is that she has excluded the 55 borrow pits from her analysis. The Tribunal considers this to be incorrect as the borrow pits were an integral part of the works and the rate of fill progress is capable of having an impact on the rest of the works **[D5/5.7/23;T10/103 AND 107]**.

56. Secondly Ms MacLaughlin in addition to using the measured mile approach which is largely objective (although the selection of the measured mile can involve subjective issues) has made assessments of the extent to which individual items of equipment within the overall measured mile pools of equipment were affected. There are not sufficient records to support such an approach **[D5/5.2/15]** which means that it is subjective. Such a subjective approach in addition to the existing difficulties with assessing appropriate measured miles leads the Tribunal to consider that this qualitative assessment should not be adopted.

Claim 8

57. Claim 8 is addressed by the Claimant at paragraphs 6.20-6.27 of the CCS **[S3/1/162 – S3/1/163]** and by the Respondents at paragraphs 94 – 114 of Appendix 3 of the RCS **[S4/1/237 – S4/1/247]**.

The Cholera Outbreak

58. The Tribunal have found that the cholera outbreak constitutes an event of Force Majeure and the Tribunal further finds that the Claimant is entitled to recover its disruption costs under Sub-Clause 19.4 of USD 11,354,740.25 applying the disruption percentages established below by the Tribunal in addition to its direct costs via Variation 9.8 of TZS 10,282,899; USD 1,330; JPY 234,478.

Emergency Repairs

59. The Tribunal have found that the emergency repairs are to be compensated as a variation pursuant to Clause 13. The Claimant is entitled to its costs of TZS 72,258,670 plus disruption costs of USD 11,354,740.25 applying the disruption percentages established below by the Tribunal.

## Disruption cost percentages in December 2007

60. The Parties' submissions on the calculation of disruption costs are addressed in their closing submissions at paragraphs 6.4-6.8 CCS and paragraphs 171-177, Chapter 4, RCS.

61. The Tribunal is required to determine a percentage to be applied to the base cost in respect of disruption for December 2007 in respect of the cholera outbreak and the emergency repairs forming Claim 8.

62. The Respondents effectively submit that the evidence provided by the delay and disruption experts is not capable of quantifying actual disruption and that there were significant deficiencies in Mr Richards' evidence in particular. The Claimant and both experts accepted that it was difficult to find appropriate measured miles but that in the case of the Claimant it is suggested that the experts' exercises are of some value to guide the Tribunal in assessing either an overall disruption percentage or disruption percentages for the periods that it considers relevant.

63. The Tribunal is of the view that it is possible to assess a percentage for disruption costs in December 2007 reflecting the experts' views in relation to the earthworks and CI/C2.

64. In respect of the earthworks in December 2007, Mr Richards has assessed a disruption percentage of 62% and Ms MacLaughlin has assessed a percentage of 42%. Given the difficulties with making the percentage assessments the Tribunal concludes that it is fair and reasonable to assess a disruption percentage for earthworks of 52% reflecting the range between the experts.

65. In respect of C1/C2 in December 2007 Mr Richards assesses disruption costs ranging from 40% to 100% and Ms MacLaughlin assesses the range as 47% to 100%. Given the lowest percentage is that of Mr Richards at 40% the Tribunal concludes that it would be fair and reasonable to apply a percentage of 70% for C1/C2 in December 2007 reflecting Mr Richards' range which produces a lower disruption percentage than if the percentage is based upon Ms MacLaughlin's range.

## SECTION VIII: TERMINATION

### Overview

1.  In this Section, the Tribunal addresses the dispute over which party validly terminated the Contract. Both the Contractor and the Employer claim to have terminated the Contract and to be entitled to recover damages as a result.

    a.  The Respondents aver that the Contract terminated on 16 December 2008, either (i) automatically due to the passage of 14 days from the Contractor's 16.2 notice; or (ii) by acceptance of the Claimant's repudiatory breach.

    b.  The Claimant contends that it correctly terminated the Contract on 11 March 2009 either (i) in accordance with Sub-Clause 16.2; or (ii) by accepting the Respondents' repudiatory breaches.

2.  The Tribunal will address as a preliminary matter the issue of the correct procedure for termination of the Contract under Sub-Clause 16.2; followed by an analysis of the validity of the Employer's alleged termination and that of the Claimant.

### The Correct Procedure for Termination under Sub-Clause 16.2

#### Background

3.  Sub-Clause 16.2 of the Contract provides for a notice to be served before termination as follows:

    *"The Contractor shall be entitled to terminate the Contract if:*

    *...in any of these events or circumstances, the Contractor may, upon giving 14 days' notice to the Employer, terminate the Contract..."* **[E3/1/654]**

4.  The Claimant served a notice under Sub-Clause 16.2 on Tanroads on 2 December 2008 **[G4/559/2142]** which stated:

    *"Dear Sir*

164

*Re: DESIGN & CONSTRUCTION OF DODOMA – MANYONI ROAD*

*SUB: NOTICE OF ENTITLEMENT TO TERMINATE PURSUANT TO SUB-CLAUSE 16.2*

*As of today's date, we have still not received payment of the outstanding sum due under IPC-24 of US$ 2,719,809.75. Payment of the full amount of IPC-24 was due under the Contract by 11th July 2008. This payment is accordingly now 144 days late.*

*The Engineer has also failed to issue IPC-26 within 56 days, or alternatively within 70 days (taking into account the extended period for certification of IPC-26 of 42 days agreed between us and the Engineer), after receiving our Statement and supporting documents on 13th September 2008 under cover of our letter ref. KIG/DMP/BV/2441 dated 13th September 2008.*

*In addition, the Employer has substantially failed to perform his obligations under the Contract as a result of (but not limited to) the following:*

*(i)* *The Employer's persistent late payment of amounts due under Interim Payment Certificates, which payments are frequently only made significantly later than the required period of 56 days from the Engineer's certification.*

*(ii)* *The Employer's interference with the Engineer's duty to certify fairly IPC-26 and/or the Employer's wrongful instruction to the Engineer for the 'immediate correction' under the last paragraph of Sub-Clause 14.6 of amounts previously certified for disruption and price escalation on this amount.*

*(iii)* *The Employer's unreasonable withholding of approval of the Engineer's determination that we are entitled to an extension of Time for Completion in respect of our Claim No. 6 – Time Extension and Associated Costs.*

165

(iv)     *The Employer's interference with the Engineer's duty to make a fair determination of our claims, particularly in respect of Claim No. 6 – Time Extension and Associated Costs, Claims No. 7 – Shortage of Cement and Claim No. 8 – (i) Cholera Epidemic and (ii) Emergency Repair Work at Manyoni – Issuna Road.*

(v)      *The Employer's unreasonable withholding of approval for the Engineer to issue a Taking-Over Certificate under Clause 10 of the contract in respect of Sections 1, 2 and 3 and/or the Employer's Interference with the Engineer's duty to issue such Taking-Over Certificates.*

(vi)     *Generally, the Employer's failure to comply with the terms of Addendum No. 1 to Contract dated 14th March 2007.*

*Accordingly and without prejudice to our rights generally under the Contract or otherwise, we hereby give you notice pursuant to Sub-Clause 16.2 that we have now acquired an entitlement to terminate the Contract under Sub-Clauses 16.2(b), 16.2(c) and/or 16.2(d) of the Conditions of Contract following a period of no less than 14 days from your receipt of this letter as a result of the events and/or circumstances listed above.*

*We are presently considering our position.*

*Yours faithfully*

*KONOIKE CONSTRUCTION CO. LTD."*

5.     Thereafter, the Parties disputed the effect of the notice.

6.  By letter dated 4 December 2008 **[G4/560/2145]** the MoID wrote to both Mr Mrema of Tanroads and the Claimant stating that it had been advised on the notice to terminate and due to the importance of the project had arranged a meeting between the Contractor and Employer to discuss the way forward.

7.  The minutes of this meeting on 5 December 2008 **[G4/561/2147]** note that the Employer stated that under the conditions of contract once the 14 days of the notice expire the contract is automatically terminated.

8.  The Claimant's letter of 12 December 2008 **[G4/567/2156]** states that the service of the notice of entitlement to terminate means that it is entitled to terminate the contract after 14 days and not that the contract is automatically terminated. It further states that the Claimant's openness to participation in amicable settlement cannot be construed as a waiver of its entitlement to terminate.

9.  On 15 December 2008, the Employer wrote to the Claimant acknowledging receipt of the notice and contending that the Claimant was required after 14 days to proceed as per Sub-Clause 16.3 to cease further work, hand-over plant and materials for which it had received payment and remove all other goods from the site **[G4/571/2164 and G4/576/2179]**.

10. This letter was followed by a further letter from the Employer on 16 December 2008 which stated that the notice of termination would take effect from that day's date in accordance with Sub-Clause 16.2 **[G4/577/2180]**.

11. By a further letter of 16 December 2008 the Respondents restated that there is no such thing as a notice of entitlement to terminate **[G4/579/2183]**.

12. The Claimant responded on 16 December 2008 pointing out that the notice was a notice of entitlement to terminate and not a notice of termination **[G4/578/2182]**.

13. The Employer replied on the same day, contending that any notice under Sub-Clause 16.2 was a notice of termination **[G4/579/2183]**.

167

14. The Claimant wrote to Tanroads on 17 December 2008 noting that there had been a repudiatory breach by Tanroads in appointing another contractor **[G4/583/2189]**. The letter stated, in part:

*"Dear Sir*

*RE: DESIGN AND CONSTRUCTION OF DODOMA – MANYONI ROAD*

*SUB: NOTICE OF ENTITLEMENT TO TERMINATE PURSUANT TO SUB-CLAUSE 16.2*

*We refer to your letters ref: TRD/CE/GEN/07/Vol. 1/018 and ref: TRD/CE/GEN/07/Vol. 1/019, both dated 16th December 2008, and to our letter ref: KIG/DMP/TANRD/041 also dated 16th December 2008.*

*We restate our position as regards our notice of entitlement to terminate the Contract as set out in our letter ref: KIG/DMP/TANRD/041 dated 16th December 2008. The service of this notice has given us the contractual right to terminate after 14 days from this notice.   This notice does not automatically trigger termination of the Contract after the passing of this 14-day period.*

*We will respond in due course to your comments in your letter ref: TRD/CE/GEN/07/Vol. 1/018 dated 16th December 2008.   We nevertheless maintain that we were entitled to serve our notice of entitlement to terminate the Contract on 2nd December 2008 and, pursuant to this notice, we remain entitled to terminate the Contract under Sub-Clause 16.2 after 14 days from this notice (i.e. on or after 17th December 2008).  Such entitlement is strictly reserved.*

*In any event, we note that you state that our 'notice of termination' took effect from 16th December 2008.  However, the 14-day period from the service of our notice of entitlement to terminate had not yet passed on that date. We further note that you took the final steps to award the contract to another contractor on 15th December 2008 for*

168

*the completion of the Works.   Such actions by the Employer were clearly premature and demonstrate that you have wrongly treated the Contract as terminated.   This amounts to a repudiatory breach on the part of the Employer and we expressly reserve our rights in this respect..."*

15.   During three days of meetings on 22, 23 and 24 December 2008, Mr Mrema alleged that the Contract had already expired and there was no contract to discuss **[G4/592/2216]**.

The Parties' Principal Submissions

16.   The Claimant contends that the Respondents wrongfully treated the Contract as automatically terminated from 16 December 2008 on the basis of the Claimant's service of the Sub-Clause 16.2 notice on 2 December 2008. It contends that the Employer's position in respect of the notice was plainly wrong: Sub-Clause 16.2 provides that a Contractor <u>may</u> upon giving 14 days' notice terminate the Contract. Thus, the service of a notice does not result in automatic termination of the Contract on the expiry of 14 days. It gives rise to an entitlement such that the Contractor may elect whether to terminate or to continue with the Works. The Claimant points to the fact that in the *Obrascon* decision, termination was effected well after the 14 day period **[F2/2.24/186]**.

17.   As to the Respondents' 'sword of Damocles' argument (meaning that there would be an open ended threat of termination hanging over the Respondents if the Claimant's argument is correct), this ignores the factual realities of what happened following service of the notice. In particular, the Claimant was asked to and did enter into negotiations with the MoID to try to resolve the issues between them. It continued to make clear that it was reluctant to bring the Contract to an end and wanted to engage with the Respondents in order to resolve the issues and complete the Project. However, by letter dated 5 March 2009 **[G5/640/2310]** the Employer wrote to the Claimant advising that they had entered into a replacement contract with Estim on 27 February 2009, and requesting the Claimant to leave the site immediately.

169

Therefore once it became clear to the Claimant that these negotiations could not succeed, it terminated the Contract.

18. The Respondents state that the Claimant was not permitted under the Contract to serve a notice of "entitlement" to terminate. Either the relevant letter was a Sub-Clause 16.2 notice in which case termination would follow automatically, or it was not, in which case it had no legal effect and the Claimant's later termination, purportedly on the basis of that notice would have been invalid as well.

19. The Respondents point to the difference of language in Sub-Clause 16.1 and Sub-Clause 16.2. Sub-Clause 16.1 refers to "after" while Sub-Clause 16.2 refers to "upon". The use of those different words is informative of when the Contractor has to elect to take an action that must occur. The use of "after" in Sub-Clause 16.1 implies that the Contractor must elect to suspend or not suspend after the 14 days' notice: it gives 14 days' notice and at the end of those 14 days it has to decide what to do. However in Sub-Clause 16.2 the use of the word "upon" implies that the Contractor first decides/elects whether to terminate or not. If it has decided that it is going to terminate it then gives notice, initiating at that point an unstoppable countdown to automatic termination 14 days later, unless the Parties mutually agree to stop the clock [T15/51/8 – T15/52/23].

20. The Respondents refer to an excerpt from the FIDIC contracts guide in relation to Sub-Clause16.2: *"If the contractor believes that the employer's failure of performance is sufficiently serious to merit termination…the contractor should take legal advice before giving notice…A notice of termination that is subsequently decided to be unjustified would constitute a breach of contract by the contractor."* Also: *"If the contractor gives notice and then wishes to withdraw it, the parties may agree that the notice shall be of no effect and that the contract is not terminated."* [F8/14/1]

21. The Respondents also contend that their position is not disavowed by the authors of *"FIDIC Contracts: Law and Practice"* who do not come down firmly on one side or the other [T15/54/24 – T15/54/19].

**Analysis and conclusions of the Tribunal**

22. The Tribunal does not accept the Respondents' contentions regarding the interpretation of Sub-Clause 16.2.

23. In the Tribunal's view a notice given by a Contractor advising of an intention to terminate as a result of the occurrence of the events set out in that clause is not self-executing and does not automatically bring the Contract to an end at the conclusion of the period of 14 days (or other specified period) after the giving of a notice of intention under the clause.

24. To accept the interpretation advanced by the Respondents it would be necessary to conclude that the provisions of Sub-Clause 16.2 did not envisage an opportunity for the Employer to remedy the breaches specified in a notice given by the Contractor under that clause. Such an opportunity for the Employer to remedy alleged breaches the subject of a notice is in the Tribunal's view a necessary and logical step in the process of addressing the dispute arising from alleged breach.

25. It is logical and sensible to interpret the sub-clause as enabling there to be a response by the Employer to a notice by a Contractor and consideration by the Contractor of any such response. It can be asked in aid of this view why any period after the notice contemplated by Sub-Clause 16.2 needed to be provided for, if the effect of the notice was to effect automatic termination at the end of the period specified. In the Tribunal's view if this sub-clause was intended to allow for a self-executing termination notice to be given, effective after the period of time of 14 days (or longer) referred to in the sub-clause, there would be no need to provide for any period of time after which the notice would be effective. Termination clauses providing for a right to terminate for default upon occurrence of an event are not uncommon. Thus the period of time to be allowed for after which termination may then occur must in the Tribunal's view have been intended to allow for a response by the Employer and consideration of that response by the Contractor before then proceeding to exercise the right created by the giving of the notice.

26. In the Tribunal's view it is not sensible to conclude that the only option for the Contractor is to withdraw the notice within the period specified in it. It is a more common sense and commercial interpretation to regard the sub-clause as requiring a further notice of termination after the expiry of the specified period subject of course to the threat of termination not being able to be held over the head of the Employer indefinitely. For how long the option to terminate remains available will depend on the subsequent dealings between the Parties, subject to it being lost if the Contractor acts in a manner inconsistent with the preservation of an option to terminate.

27. Indeed it can be seen from the letter written by the Permanent Secretary of the MoID to the Contractor upon receipt of the Contractor's notice under Sub-Clause 16.2 **[G4/560/2145]** that this senior government officer viewed the notice in this light. This letter called for meetings between the Employer and the Contractor "*to discuss the current situation of the Project and deliberate on the way forward*". Meetings were then held.

28. Indeed one sees a willingness on behalf of the MoID to continue a dialogue to seek a solution to the issues between it and the Contractor in Mr Chambo's letter to the Contractor of 15 December 2008 **[G4/570/2163]** in which it is said:

> "*Despite the clarifications you have offered, the Ministry would like to convene a meeting between the contractor's top management and the Ministry.    The main objective of the meeting is to resolve the differences which have arisen including payment of interim certificates No. 24, 25 and 26*"

29. The interpretation of Sub-Clause 16.2 for which the Respondents contend was the one adopted by Mr Mrema, Chief Executive of Tanroads, without the benefit of legal advice **[T14/180/7 – 21]** and despite the warning of the Employer's Engineer that this interpretation of the Contract was open to question **[S3/1.1/1]**.

172

173

30. The submissions of the Respondents are necessary because of the firmness with which Mr Mrema nailed his colours to the mast of his interpretation of Sub-Clause 16.2.

31. It was in the view of the Tribunal a misconceived interpretation of the sub-clause.

32. The Tribunal has therefore concluded that the notice given by the Contractor under Sub-Clause 16.2 did not of itself, at the end of the 14 day period specified result in termination the Contract at the instance of the Contractor.

**The Respondents' Purported Termination**

Background

33. In addition to the alleged automatic termination of the Contract on the expiry of 14 days from the date of the Contractor's Sub-Clause 16.2 notice, the Respondents further contend that the Claimant's conduct in November and December 2008 amounted to an abandonment of the Works and a repudiatory breach of the Contract. As a result, Tanroads was justified in considering the Contract to be at an end in December 2008 and communicated this acceptance to the Claimant.

34. The Claimant denies that it was in repudiatory breach and further denies that the Respondents ever communicated acceptance of the repudiatory breach now alleged.

The Parties' Principal Submissions

35. In support of their contention, the Respondents allege that the Claimant:

   a. Suspended the Works on 6 November 2008 **[G4/534/2096]** and concurrently on 24 November 2008 **[G4/555/2136]**.

   b. Announced at Site Meeting No 58 on 13 November 2008 that it would not resume work even if Tanroads immediately paid all certified sums **[A2/19/6]**.

173

**174**

c. Repeated its repudiation during a meeting with the Permanent Secretary of the MoID on 5 December 2008 **[G4/561/2146]**.

d. On 2 December 2008, sent a termination notice under Sub-Clause 16.2 **[G4/559/2142-2143]**.

36. The Claimant's behaviour amounted to an abandonment of the Works and left Tanroads and the MoID in no doubt that the Claimant did not intend to resume performance of its obligations. This entitled Tanroads to terminate the Contract pursuant to Sub-Clause 15.2 or by reason of the Claimant's repudiation.

37. On 15 December 2008, Tanroads informed the Claimant that the Contract was at an end and asked it to vacate the Site and put the necessary safety measures in place **[G4/571/2164 and G4/576/2179]** thereby accepting its repudiation. On the same day, the Engineer sent the Claimant a list of works that it was obliged to complete following the termination to protect lives and property and the safety of the Works. The Respondents deny that acceptance of repudiation has to be explicit **[T14/184/20 – 22]**.

38. The Respondents contend that whether repudiation has occurred is a factual question based on words and conduct, seen through the eyes of a reasonable person. It is a matter of context. The Claimant made statements that it would continue to suspend the Works even if it received payment of IPCs 24 and 25 and such statements, in the context of the rest of the Claimant's conduct over the second half of 2008, were reasonably understood by Tanroads as a refusal by the Claimant to perform its contractual obligations. The Respondents deny that the Claimant's conduct was only anticipatory conduct – they rely on the fact that the Claimant stated it would not resume work, proceeded to give a Sub-Clause 16.2 notice, and then started to demobilise **[T14/187/13-15]**.

39. The Respondents deny that the Claimant's conduct post 15 December 2008 is irrelevant. In a situation where the Claimant has attempted to explain ex post facto that its prior conduct was non-repudiatory, inconsistencies

between these explanations and the Claimant's post-termination conduct are informative as to the situation at the time that Tanroads brought the Contract to an end. The evidence shows that after its repudiation, the Claimant abandoned the Works and refused to resume its duties save upon the granting of terms onerous to the Employer and having no basis in the Contract.

40. The Claimant submits that the Respondents' case on termination is an attempt to re-write history. The evidence demonstrates that the Respondents at the time did not purport to accept any repudiatory breach by the Claimant and had no basis to do so but instead proceeded on the basis that the Claimant had terminated the Contract on 16 December 2008 under Sub-Clause 16.2 by reason of its Notice of Entitlement to Terminate.

41. The Claimant denies that it was in repudiatory breach of contract. For the reasons summarised in Section IV it was fully entitled to suspend when it did on the basis of the non-payment of IPCs 24 and 25.

42. As to the statements purportedly made on 13 November 2008 and 5 December 2008, the Claimant's position is that:

    a. It made no such statement at the meeting on 13 November 2008;

    b. It was entitled to make the statement it made on 5 December 2008.

43. Regarding the meeting of 13 November 2008, paragraph 58.7.2 of the Minutes incorrectly records that the Claimant stated that it would not recommence the Works if IPCs 24 and 25 were paid because of the non-certification of IPC 26. Instead, the Minutes in fact record the position as at 6 December 2008, being the date upon which the Minutes were issued by the Resident Engineer. The reason why the Claimant did not pick up the mistake, before the Respondents sought to rely on it for the first time in the SoDC, is that the Minutes were issued on 6 December 2008, three and a half weeks after the Site Progress Meeting. Mr Sakamoto was not on Site, but in Dar es Salaam at the time. The Minutes were signed off by Mr Maruyama whose English is not such that he would have identified the mistake.

175

44. In the alternative, it is denied that the wrongful exercise of a contractual right to suspend the Works would evince an intention to abandon the Contract and/or is capable of amounting to a repudiatory breach of contract as a matter of law.

45. As to the meeting on 5 December 2008, it is agreed that the Respondents asked the Claimant whether it would recommence works if all outstanding sums apart from IPC 26 were paid and the Claimant said it would not. This was because the Claimant would have been entitled to suspend and had suspended the Works by reason of the Respondents' wrongful interference with the certification of IPC 26.

46. In sum, the Claimant avers that it is plain that it neither abandoned the Contract nor was in repudiatory breach of the same. At the time of the so-called abandonment, the Claimant made clear on numerous occasions that it was reluctant to bring the Contract to an end and wanted to engage with the Respondents in order to resolve the issues and complete the Project. For example, in its letters of 6 November 2008 **[G4/536/2098] [G4/537/2100] [G4/538/2102] [G4/539/2104]** and its letter of 12 December 2008 **[G4/567/2156]**.

47. Furthermore, the Claimant's conduct after 15 December 2008 cannot be used to justify the alleged termination. The purported termination was either valid as at 15 December 2008 or it was not. Later events cannot make an invalid termination valid. In any event, the Claimant's conduct after 15 December 2008 did not demonstrate that it had no intention of performing its obligations under the Contract and recommencing the Works as alleged by the Respondents.

48. Rather than accepting the Claimant's purported repudiation as they contend, in fact the Respondents were erroneously proceeding on the basis that the Claimant had terminated the Contract in accordance with Sub-Clause 16.2. This was confirmed by the Respondents in the meeting on 5 December 2008 **[G4/561/2146]**. Tanroads maintained their erroneous position in this regard in numerous letters to the Claimant throughout 2009 and in January and

176

February      2009      **[G4/602/2248]**      **[G4/613/2264]**      **[G4/622/2278]**
**[G4/624/2280] [G4/627/2285]**.

49.   Further, the Respondents' purported acceptance of a repudiatory breach by
      letter of 15 December 2008 **[G4/571/2164]** cannot credibly be read as an
      acceptance of repudiatory breach. The letter is simply seeking to say that
      termination on 14 days is automatic and the Claimant must follow Sub-
      Clause 16.3. Under Tanzanian law, the common law concept of repudiatory
      breach is found in section 39 of the Law of Contract Act. The acceptance of
      the breach must be unequivocal and must be communicated to the party in
      repudiatory breach. The acceptance of repudiation is only complete when it
      comes to the knowledge of the person to whom it is made **[T15/31/1-14]**.

50.   Alternatively, even if the matters relied on by the Respondents amounted to
      a repudiatory breach of contract by the Claimant, the Respondents affirmed
      the Contract by virtue of the discussions, meetings and correspondence that
      occurred subsequently.

## Analysis and conclusions of the Tribunal

51.   The Tribunal does not agree with the Respondents' submissions that an
      acceptance of repudiation does not need to be express. In the absence of any
      authority for this proposition it seems to the Tribunal to be quite inconsistent
      with the necessity for Parties to a contract to know with clarity the position
      of the other Party regarding the continued existence of the contract.

52.   Mr Mrema's letter of 15 December 2008 cannot on any view be regarded as
      an express acceptance of any alleged repudiation **[G4/571/2164]**. It is the
      assertion by Mr Mrema of his misconceived interpretation of sub-clause
      16.2 and the consequent request for the Contractor to proceed "*as per Sub-
      Clause 16.3 of the GCC.*"

53.   The Respondents' submission that it accepted any alleged repudiation of the
      Contractor thus cannot be sustained.

54.  It is therefore unnecessary to consider whether the Contractor had engaged in conduct which could be interpreted as repudiatory as submitted by the Respondents.

55.  Although not needing to decide this question the Tribunal does not think that the conduct of the Contractor can be characterised as repudiatory.   The assertion by the Contractor of entitlement to be paid and its continuation of what the Tribunal has held to be a valid period for suspension is not conduct which in the Tribunal's view can be properly characterised as repudiatory.

## The Claimant's Purported Termination

Background

56.  On 5 March 2009, the Employer wrote to the Claimant stating that it had entered into a contract with Estim on 27 February 2009, engaging Estim to complete the Works and requesting the Claimant to leave the Site immediately **[G5/640/2310]**. In response, the Claimant wrote to the Employer on 11 March 2009 **[G5/645/2325]** giving notice of its election to terminate the Contract under Sub-Clause 16.2 with immediate effect and, in the alternative accepting the Employer's actions as a repudiatory breach of the Contract.

57.  The Claimant contends that it was entitled to terminate either by virtue of Sub-Clause 16.2 or in accepting the Respondents' repudiatory breaches and bringing the Contract to an end by operation of law.

58.  The Respondents contend that the Claimant's arguments on termination are merely academic as the Contract had already been validly terminated by Tanroads in December 2008. In any event, the Claimant would not have been substantively entitled to terminate the Contract when it purported to do so in March 2009.

The Claimant's Principal Submissions

59. The Claimant contends that it correctly terminated the Contract on 11 March 2009 either:

    a. In accordance with Sub-Clause 16.2 of the Contract as a result of the Respondents' failure to pay IPCs 24 and 25; alternatively

    b. By accepting the Respondents' repudiatory breaches and bringing the Contract to an end by operation of law. The Claimant relies on the grounds set out at Section 10 of the SoC [**A1/1.1/309**], including in particular the Respondents':

- Wrongful interference with the Engineer's performance of his duties, including (i) requiring him not to certify IPCs 26 and 27; (ii) interfering with his determination of the Claimant's claims for extensions of time and additional payment; (iii) preventing him from issuing Taking-Over Certificates in respect of Sections 1, 2 and 3.

- Persistent failure to pay certified sums either when they fell due or at all.

- Wrongful treatment of the Contract as terminated from 16 December 2008, appointment of a replacement contractor and ejection of the Claimant from the site.

Wrongful interference with the Engineer's performance of his duties

60. The Claimant contends that the Respondents were in repudiatory breach of contract by wrongfully interfering with the Engineer's performance of his duties. In particular, by:

    a. Requiring him not to certify IPCs 26 and 27;

    b. Interfering with his determination of the Claimant's claims for extensions of time and additional payment;

    c. Preventing him from issuing Taking-Over Certificates in respect of Sections 1, 2 and 3.

61. First, the Claimant alleges that under Sub-Clause 16.2(b) and (d), the Claimant was entitled to terminate the Contract if:

   a. The Engineer failed within 56 days of receiving a Statement and supporting documents to issue the relevant IPC;

   b. The Employer substantially failed to perform his obligations under the Contract.

62. The Engineer failed to certify IPCs 26 or 27 on time or at all because the Employer insisted that the Engineer deduct the sums previously certified in respect of Pre-Addendum Disruption and Price Escalation and made clear that it would not approve any certificates if the Engineer failed to comply **[G4/453/1904]**. Under Sub-Clause 3.5 the Engineer must make a fair determination whereas, in fact, the correspondence makes clear that deductions were made because the Employer insisted upon them and not because the Engineer formed an independent view **[G4/515/2052]**. Thus, any determination made cannot be said to be a fair determination of the Engineer **[G4/531/2089]**.

63. In any event, Sub-Clause 14.6 does not confer authority on the Employer to insist that the Engineer deduct sums which he considered were properly due and had certified accordingly. Furthermore, the FIDIC Contracts Guide within its commentary on this Sub-Clause makes clear that an Employer is bound by a Certificate and should not deduct against it but should submit a claim in accordance with Sub-Clause 2.5 if he considers himself entitled to do so.

64. In light of the above, Tanroads wrongly interfered with the Engineer in the exercise of his duties, alternatively the Engineer wrongly failed to issue IPCs 26 and 27. As a result, the Claimant was entitled to terminate the Contract pursuant to Sub-Clause 16.2(b) and 16.2(d) and by operation of law.

65. Second, the Claimant contends that the Employer's failure to approve the Engineer's proposed extensions of time without proper explanation and

justification was unreasonable and/or amounted to interference with the Engineer in the carrying out of his duties. They rely on the following:

a. Under Sub-Clause 3.1, the Engineer was obliged to obtain approval from the Employer before determining any extension of time **[E2/6/268]**.

b. By virtue of Sub-Clause 1.3 of the Contract, the Employer's approval was not to be unreasonably withheld **[E3/1/608]**.

c. Under Paragraph 6.3 of Appendix 1 to the Addendum, the Employer undertook to give the Claimant every support and assistance to ensure smooth implementation of the Contract.

d. Pursuant to implied terms of the Contract, the Employer would not interfere with the Engineer when carrying out his duties and exercising his authority.

e. Under Sub-Clause 16.2(d), the Claimant was entitled to terminate the Contract if the Employer substantially failed to perform his obligations under the Contract **[E3/1/654]**.

66. In respect of Claims 6, 7, 8, 12 and 13 the Engineer sought the approval of the Employer both in respect of the Claimant's claims for extensions of time and additional payment. This was so despite the fact that the Employer had no contractual right to grant or withhold approval in respect of the Claimant's applications for additional payment.

67. Tanroads unreasonably withheld approval in respect of those determinations contrary to Sub-Clauses 3.1 and 1.3 and/or the implied terms of the Contract and/or paragraph 6.3 of Appendix 1 to the Addendum. This amounted to a substantial failure to perform its obligations under the Contract, entitling the Claimant to terminate pursuant to Sub-Clause 16.2(d) and by operation of law.

68. Third, the Claimant submits that the Respondents wrongfully interfered with the Engineer's issuance of Taking-Over Certificates.

69. Under paragraph (iii) of the Addendum, the Parties agreed sectional completion in respect of the four sections of the road **[E5/2/1310]**. Additionally, the procedure for taking over of sections was relaxed under paragraphs (vii) and (viii) of the Addendum such that completion of a section was deemed to have occurred when the road was used by vehicles of the general public **[E5/2/1310]**.

70. Pursuant to Sub-Clause 3.1 as amended, the Engineer was obliged to obtain approval from the Employer before issuing a Taking Over Certificate **[E3/1/613]**. Under Sub-Clause 1.3 this approval was not to be unreasonably withheld **[E3/1/608]**. Under Sub-Clause 16.2(d), the Claimant was entitled to terminate the Contract if the Employer substantially failed to perform his obligations under the Contract **[E3/1/654]**.

71. By paragraph (viii) of the Addendum, Section 1 was agreed to have been completed on 30 November 2006 **[E5/2/1311]**. This was opened to traffic on 31 October 2006. Sections 2 and 3 were opened to traffic on 23 December 2008 **[G3/276/1423]** and 1 November 2008 **[G4/519/2059]** respectively, as recorded in the contemporaneous correspondence at the time. These dates were unchallenged by the Respondents at the hearing.

72. Tanroads refused to agree that any of the Sections had been completed and to date no Taking Over Certificates have been issued in respect of Sections 1-3 despite the fact that all three sections have been in use for many years.

73. The Employer's behaviour amounted to a substantial failure to perform its obligations under the Contract which entitled the Claimant to terminate the Contract pursuant to Sub-Clause 16.2(d) and by operation of law **[E3/1/654]**.

Persistent failure to pay sums due

74. The Claimant alleges that it was entitled to terminate the Contract under Sub-Clause 16.2(d) if:

    a. It did not receive the amount due under an IPC within 120 days after the expiry of the 56 day period referred to in Sub-Clause 14.7;

    b. The Employer substantially failed to perform his obligations under the Contract.

75. The Claimant's position on persistent late payments is summarised in the following table:

| IPC No. | Certified | Payment Due | Full Payment Received | Days Late |
|---------|-----------|-------------|-----------------------|-----------|
| 18 | 19 March 2007 | 10 January, alternatively 30 January, alternatively 13 May 2007 | 12 July 2007 | 183, alternatively 161, alternatively 59 |
| 19 | 26 June 2007 | 22 August 2007 | 29 May 2008 | 282 |
| 20 | 7 September 2007 | 2 November 2007 | Re-issued | See 20A |
| 20A | 19 February 2008 | 19 February 2008 | 16 September 2008 | 210 |
| 23 | 23 February 2008 | 19 April 2008 | 22 September 2008 | 156 |

183

76.    The Claimant contends that even if it is ultimately determined that the Claimant has been paid in excess of the sums found to be due and payable on a re-determination of the value of the Works, this cannot amount to a defence to a failure to pay certified sums as and when they fell due for payment. This is because under Sub-Clause 14.7, the Employer "*shall pay*" to the Contractor the amount certified – it is bound by the certification. If the Employer considers that it has a claim against the Contractor, a mechanism is provided under Sub-Clause 2.5 whereby he must give the Contractor notice and particulars of that claim. If the Engineer determines pursuant to Sub-Clause 3.5 that the Employer has a valid claim and is entitled to payment then the amount can be deducted from the next interim certificate issued after the determination has been made. The Employer is only entitled to set off against or make deduction from an amount certified or to otherwise claim in accordance with this procedure.

77.    As a result of the persistent failure to pay the sums due, the Claimant was therefore entitled to terminate the Contract under Sub-Clause 16.2(d) and by operation of law.

Wrongfully treating the Contract as terminated from 16 December 2008

78.    As set out above, the Claimant contends that the Respondents wrongfully treated the Contract as terminated from 16 December 2008.    The Respondents' actions amounted to:

   a.   A denial of the Claimant's right of access to and possession of all parts of the site in breach of Sub-Clause 2.1; and

   b.   A failure to accord the Claimant every support and assistance to ensure the smooth implementation of the Contract in breach of paragraph 6.3 of Appendix 1 to the Addendum.

79.    The Claimant was thereby entitled to terminate the Contract under Sub-Clause 16.2(d) or by operation of law.

The Respondents' Principal Submissions

80.   The Respondents contend that the grounds upon which the Claimant purportedly terminated the Contract are artificial, given that the Contract had already been validly terminated by Tanroads in December 2008. In any event, for the reasons set out below, the Claimant would not have been substantively entitled to terminate the Contract even if it had not already been terminated.

Allegations of wrongful interference with Engineer's performance of his duties.

81.   The Respondents deny the Claimant's allegations of wrongful interference with the Engineer's performance of his duties.

82.   In respect of the certification of IPCs 26 and 27, the Claimant was notified on 5 November 2008 that removing the sums claimed – but not substantiated – for Disruption and Price Escalation from the amount sought in IPC 26 resulted in a negative figure, in respect of which no IPC was possible. Further, making the equivalent adjustment to the sums claimed for IPC 27 resulted in a figure less than the minimum for a Payment Certificate, as notified to the Claimant on 20 December 2008.

83.   Under Sub-Clause 14.6 the Engineer is not bound to issue an IPC if the amount that would otherwise be certified is less than the amount stated in the Appendix to Tender, which is 2.5% of the Contract Price. This was not met with respect to either IPC 26 or IPC 27 once the incorrectly certified items had been removed. The Engineer was therefore correct to remove the sums claimed for reasons discussed summarised in Section 3. There is no dispute that the result of removing them was that the otherwise payable items in IPC 26 were completely offset, and those in IPC 27 offset to such an extent that left the balance below the minimum for which the Engineer could have issued an IPC. The Claimant therefore had no right to terminate the Construction Contract because of the Engineer's purported "failure."

84.   As to the allegations of interference with the Engineer's determination of the Claimant's claims for extensions of time and additional payment, the Respondents aver that Sub-Clause 3.1 of the Contract explicitly limits the

185

Engineer's authority to make certain determinations. The Engineer must obtain the Employer's approval before making the determinations that are enumerated in that Sub-Clause. The Engineer sought such approval when he was contractually required to do so and did not seek it when he was not. The Employer exercised its right to grant or withhold approval when the Contract gave it that right and did not purport to withhold approval when its approval was not required.

85. In particular, Sub-Clause 3.1(c) provides that the Employer's approval is required before the Engineer may determine an Extension of Time. If the Contractor claims time-dependent costs that depend on an Extension of Time, those costs are also effectively subject to the Employer's approval.

86. As to the issuance of Taking Over Certificates – this is one of the determinations for which the Engineer must obtain the Employer's approval pursuant to Sub-Clause 3.1, in particular Sub-Clause 3.1(f). There can therefore be no claim in respect of purported interference given the express limitation of the Engineer's authority.

87. In any event, the Engineer's decisions not to issue Taking Over Certificates were substantively correct. Sub-Clause 10.1 states that the Employer shall take over the Works or a Section thereof when two conditions are met: (i) the Contractor has completed the Works or Section in accordance with the Contract, except for minor work and defects that will not substantially affect the use of the Works or Section (Substantial Completion); and (ii) a Taking Over Certificate has been issued, or is deemed to have been issued in accordance with that Sub-Clause. In determining whether the Contractor has achieved Substantial Completion, the Engineer refers to the Employer's Requirements.

88. The Engineer declined the Contractor's requests for Taking Over Certificates in respect of Sections 1, 2 and 3 as Substantial Completion had not been achieved. The Claimant was thus never denied any Taking Over Certificate to which it was entitled. It applied repeatedly when it had not completed the Works that were necessary to achieve Substantial

186

187

Completion. When it was about to receive Taking Over Certificates for Section 2 and part of Section 1, it stopped working and repudiated the Contract. Furthermore, there was nothing improper in the process by which the Engineer reached his correct determinations regarding the Contractor's applications for Taking Over Certificates.

89. As to the Claimant's argument that under Sub-Clause 10.2 a part of the Works is deemed to have been taken over if the Employer uses that part, paragraph (viii) of the Addendum adds a gloss to Sub-Clause 10.2 in specifying that *"the Employer's use of a Section is deemed to commence when used by vehicles of the general public."* This gloss cannot reasonably be construed to apply any time that a member of the public, without authorization, used a vehicle on even an unpaved and clearly incomplete part of the road. That would be commercially unreasonable and contrary to public policy. To take advantage of the gloss provided by paragraph (viii) of the Addendum, the Claimant must at least show that the Employer agreed to permit the general public to use the Works (or a Section thereof).

90. In respect of Section 1, the Claimant argues that the parties agreed in paragraph (viii) of the Addendum that the Section had already been substantially completed and the Claimant was entitled to a Taking Over Certificate. Paragraph (viii) provides that *"the procedure for Taking Over may be backdated for Section 1, which is confirmed as being completed by 30th November 2006."* The Respondents submit that the most sensible reading of the passage is that the Engineer may backdate the Taking Over Certificate for Section 1. However the use of the word 'may' is telling. The Engineer retained discretion whether to backdate the Taking Over Certificate for Section 1 or not. The Parties did not agree that the Engineer *shall* issue such a certificate, or that the certificate would be deemed to have been issued on 30 November 2006. The second part of the sentence is a representation by the Claimant that it had achieved Substantial Completion of Section 1 on 30 November 2006. The effect of paragraph (viii) was therefore that the Engineer was to assess whether the Contractor had achieved Substantial Completion of Section 1 by the date it claimed to have

187

done so, 30 November 2006, and if so, to issue a Taking Over Certificate for Section 1 bearing that date. The Addendum did not dictate automatic taking over of Section 1.

Allegations of failure to pay certified sums

91. The Respondents repeat that the Claimant had been paid more than in full when it purported to terminate in March 2009 and relies on Appendix A in the SoDC.

Treatment of the Contract as terminated from 16 December 2008

92. The Respondents deny this ground for the reasons set out above. They aver that the Employer correctly and appropriately terminated the contract on 16 December 2008 and therefore the Claimant's arguments are misconceived.

93. In any event, even if the Respondents were in repudiatory breach, which is denied, the Claimant would not have had a right to terminate. In order to terminate for another party's repudiatory breach, a contractual party must be willing and able to perform the contract itself. As set out above, the Claimant abandoned the Works and averred on multiple occasions that it was not prepared to perform the Contract. It therefore had no right to terminate when it purported to do so.

**Analysis and conclusions of the Tribunal**

94. The Contractor's primary case regarding its alleged entitlement to terminate is that it was entitled to do so pursuant to Sub-Clause 16.2 on the basis of the notice dated 2 December 2008.

95. The Tribunal has some difficulty with this submission given the time that elapsed between the date of that notice, or more particularly the expiration of the 14 day period mentioned in that notice, and the Contractor's Notice of Termination dated 11 March 2009.

96. There is an issue with respect to the period within which an actual Notice of Termination can be given by a contractor under sub-clause 16.2 after the

giving of a notice of intention to terminate and expiry of the period specified in that notice.

97.   The Tribunal accepts the Respondents' submission that a sword of Damocles cannot be indefinitely held over the head of an Employer. There must come a time at which a notice of intention to terminate ceases to be effective for the purpose of an election to terminate.

98.   The Contractor sought to preserve the right to actually terminate in correspondence the last of which is dated 12 February 2009 **[G4/625/2281]**.

99.   There is however such force in the Contractor's argument that the Employer repudiated the Contract and that that repudiation was accepted by the Claimant, that the Tribunal prefers to base its reasons upon this ground of termination.

100.  Under Tanzanian law whether repudiation has taken place is a matter of fact. The actions of the Employer in the engaging of another contractor to undertake the work reserved to the Contractor under the Contract, and in excluding the Contractor from the site, constitute, in the Tribunal's view, conduct consistent only with an intention by the Employer no longer to be bound by the Contract amounting to a repudiation of the Contract. This occurred on the 5th March 2009 and the Contractor accepted that repudiation by letter dated 11 March 2009 **[G5/645/2325]**.

101.  This acceptance of the Employer's repudiation of the Contract is done so expressly, albeit as an alternative basis to the Contractor's asserted right to terminate the Contract under sub-clause 16.2.

102.  The Tribunal, having reached the view that the Respondent's' interpretation of sub-clause 16.2 is incorrect, find as a consequence that the Respondents had no right to engage another contractor to execute the work and to exclude the Claimant from the site and find that the Claimant was entitled to accept such a repudiation and terminate the Contract.   This conduct by the Respondents was of course expressly based upon its view that the Contract

189

**190**

had been terminated by the Claimant pursuant to its notice under sub-clause 16.2 dated 2 December 2008.

## Termination for Convenience

Overview and summary of Parties' submissions

103. The Respondents contend that when assessing the Claimant's claims on termination, the Tribunal must give effect to the legal principle that the losses flowing from termination will be assessed on the assumption that but for the termination, the defaulting party would have performed the contract in the least onerous way possible. They rely on a number of cases set out at footnote 160 of the Rejoinder [A5/1.1/56].

104. They further contend that there is no requirement to prove the Contractor would have terminated the Contract, it is just an assumption that is applied in order to avoid over-compensating. In any event, it is clear from Mr Mrema's letter of 15 December 2008 [G4/571/2164] that Tanroads was going to terminate for convenience if they were wrong on acceptance of repudiation [T14/188/15 – T14/189/3]. Consequently, they aver that the Tribunal would have to assess the losses flowing from the termination assuming that the Employer would have exercised the contractual right to terminate for convenience on 28 days' notice pursuant to Sub-Clause 15.5. Such losses do not include loss of profit or other loss or damages sustained by the Contractor as a result of the assumed termination for convenience.

105. The Claimant submits that this argument is wrong in law and fact. The case relied on of *Golden Strait Corporation v Nippon* [2007] UKHL 12 is distinguishable from the present facts because it was shown there that the contract would have come to an end at a particular date that lay in the future viewed from the date of breach. The argument was not about whether the contract would have been terminated at this date in 2003 but about whether the law permitted consideration of that later fact. The Respondents have neither pleaded nor produced any evidence that they would actually have terminated for convenience at any date.

106. Sub-Clause 15.5 specifically provides that the Employer shall not terminate the Contract under that Sub-Clause in order to execute the works himself or to arrange for the works to be executed by another contract or [T15/28/11-22]. It is therefore wholly unrealistic to suppose that the Employer would have exercised such a right. The general principle should therefore apply that damages should be assessed as at the date of breach and so far as money can do it, to place the Claimant in the same situation, with respect to damages, as if the Contract had been performed.

**Analysis and Conclusions of the Tribunal**

107. The Tribunal does not agree with the Respondents' submissions that the Contractor's right to general damages arising from the Respondents' repudiation of the Contract is limited to what could be recovered had the Respondents exercised their right to terminate the Contract for convenience under Sub-Clause 15.5.

108. The authorities referred to by the Respondents deal with assumptions to be made with respect to the basis upon which damages will be assessed. The cases concern periods of time for which it can be anticipated loss will continue and other assumptions regarding the conduct of the Parties.

109. The cases are not consistent with the propositions advanced by the Respondents. In particular, the cases are not authority for the proposition that where there has been a wrongful termination the compensation to be paid is on the basis of a termination for convenience, particularly where no purported termination for convenience has even been contemplated or exercised.

110. Put simply for there to be a limitation upon general damages arising from a provision of the Contract it would need to be expressed. Indeed the contract does contain a limitation of liability in Sub-Clause 17.6 of the General Conditions.

111. Contrary to the Respondents' submissions the letter of 15 December 2008 from Mr Mrema does not, in the Tribunal's view, suggest that the

191

Respondents were going to terminate for convenience. In fact, there is no evidence to suggest that this Contract would have been terminated for convenience as an inevitable consequence of the repudiation of it by the Respondents.

112. Another complete answer to the proposition advanced by the Respondents is that the works remaining at the date that the Claimant was removed from the site were completed by another contractor. This is a scenario expressly prohibited by Sub-Clause 15.5.

113. Accordingly the Claimant's entitlement to general damages falls to be assessed by reference to general principles unlimited by what may have been recoverable by it had it been terminated for convenience by the Respondents under Sub-Clause 15.5.

192

## SECTION IX - CLAIMS ARISING FROM TERMINATION

1. The Contractor makes a number of claims in relation to termination separate to the claims for damages.

2. As a preliminary matter, the Tribunal addresses the Parties' arguments on loss of profits and overheads.

### Loss of Profits and Overheads

3. In respect of each item of loss claimed by the Claimant by reason of the termination of the Contract, the Claimant claims an uplift for (i) overheads at 5.52% and (ii) profit at 5%. They aver that this reflects what the Parties agreed in the Appendix to Tender as reasonable profit for the purposes of Sub-Clause 10.3. The Respondents dispute the figure for profit, and the experts have therefore stated in their Second Joint Report their figures for the termination claims inclusive of an uplift of 5.52% for overheads but net of profit.

Parties' submissions

4. The Respondents contend that 5% profit should only apply to Variations under Sub-Clause 13.3 of the Contract and in respect of the termination claims profit should be limited to 1.2%. Mr Kyte states in his First Side Report dated 19 November 2014 **[D5/5.8/11]** that he has had sight of the internal Konoike records submitted to their bank at the outset of the Project which show that Konoike itself anticipated only 1.2% profit margin on the project. They rely on "Report of New Contract Signed" **[S2/1.1/1] ["Report"]** and aver that during cross examination M Sakamoto confirmed that Konoike was expecting a profit margin of 1.2% **[T4/197/1]**. The Respondents also contend that other documents, such as the site status for weekly meeting documents, refer to the expected 1.2% profit margin **[P2/21/2]; [P2/15/2]; [P2/15/3]; [P2/15/4]**.

5. The Claimant contends that this point is being taken at a very late stage by the Respondents, the 1.2% is of little guidance and the agreements that were made as to the reasonable 5% profit should stand. Mr Sakamoto's statement in cross examination must be placed in the context of the entirety of his evidence on

the Report. Mr Sakamoto qualified his answers at the outset by explaining that the Report was an internal document prepared by Konoike's head office, rather than the site team and it was not a type of document he was familiar with [**T4/193/11**]. It was prepared in 2003, four years before he joined the Project. He was therefore unable to explain the Report with any knowledge as to what it was intended to record, what it actually recorded and how it is to be interpreted. The Report was not put to any other Konoike witnesses. In the circumstances, the Claimant contends that very little weight should be given to his answers, particularly in light of Ms Prior's analysis in respect of the inconsistencies which are present in the Report.

6. Ms Prior recognises that if the purported costs as stated in the Report are taken away from the Lump Sum Contract Price, the apparent conclusion is that these figures show an estimated profit of 1.2%. However, there are contradictions in the report – page 7 in particular contains figures which suggest that the Claimant anticipated a profit of 7% on the Project [**S2/1.17**]. There are two separate figures recorded in the Report as the Project Costs and no explanation as to how these figures are reconciled.

7. The Claimant further relies on:

   a. Ms Prior's assessment that 5% is the level of profit she would expect a contractor to anticipate on such a project and in her experience is reasonable [**D6/2/11**].

   b. The agreement between the Parties in the Contract of 5% as reasonable profit for the purposes of Sub-Clause 13.3 (Variations) [**E2/5/257**].

   c. The Respondents' acceptance of 5% profit on the billed and measured works in the SoD **A3/1.1/183**].

   d. Mr Kyte's agreement in the First Joint Report with Ms Prior that 5% profit on the billed and measured works is reasonable.

194

e. Paragraph 39 of Ms Prior's third report dated 24 December 2014 **[D6/2/11]** in which she points out the benefits of a cash positive Cashflow.

8. The Respondents argue in response that Mr Sakamoto did not mention during cross examination that he was unfamiliar with the Report, his confirmation of the profit margin was unequivocal. Further, the Claimant has been more than happy to have Mr Sakamoto address in detail a number of other topics that preceded his physical presence on the site.

**Analysis and conclusions of the Tribunal**

9. In relation to the uplift of 5.52% for overheads there is no dispute between the Parties and the Tribunal find that the Claimant is entitled to recover 5.52% for overheads.

10. In relation to the uplift for profit the Claimant contends that it is entitled to 5 % uplift. The Respondents agree that an uplift of 5% for profit applies to Variations under Sub-Clause 13.3 and the Tribunal agrees that this is the case.

11. Otherwise the Respondents dispute an uplift of 5 % for profit and now allege that the uplift should be no more than 1.2% based upon the Report and Mr Sakamoto's evidence in cross examination .This was not the Respondents' position at an earlier stage. The Respondents accepted 5% profit  on billed and measured work was reasonable **[SOD; A3/1.1/183]** and Mr Kyte agreed in Joint Statement of 17 December 2014 **[D6/1/1]** that 5% is a reasonable profit on billed and measured work.

12. Notwithstanding this, in cross examination on the Report Mr Sakamoto agreed on the basis of this document that the profit margin on the Contract Price was 1.2% **[T4/192-197]**. This document is an internal report prepared by Konoike head office (not the site office) and before M Sakamoto became Project Manager. By its own terms it is described as a report submitted for Konoike's bank.

195

13. The Claimant submits that little weight should be put upon the Report and Mr Sakamoto's evidence in the context of the points summarised at paragraph [3] above and in particular the inconsistencies in the Report which have been highlighted by Ms Prior and summarised above.

14. In the Tribunal's view there are two difficulties with the Claimant's submissions. First, the Report, notwithstanding the inconsistencies is the only direct documentary evidence at the time the Contract was entered into of the anticipated profit margin. Secondly the Claimant's submissions understate the importance of Mr Sakamoto's evidence and his position. Mr Sakamoto was appointed Project Manager in 2007 and has been responsible not only for the conduct of the Contract but also the conduct of this arbitration on behalf of Konoike. In cross examination his responses were clear and repeated on the issue of the profit margin referred to in the Report. The relevant part of the cross examination is set below [**T4/192-197**]:

> "24　Q. To double check all of this and to round it off, I would
>
> 25　　like to look at one more document which is under tab B5
>
> 　　　　192
>
> 1　　of your binder. This one does have a reference number
>
> 2　　because it came out of Mr Okada's witness statement.
>
> 3　A. Correct.
>
> 4　Q. Then we translated it into English, together with our
>
> 5　　opening submissions, and the reference is {S2/1.1/1}.
>
> 6　　　It is under your tab B5. What I would like to do,
>
> 7　　if we start on the very first page, it is largely in
>
> 8　　Japanese but we see at the top it says "Report of new
>
> 9　　contract signed."
>
> 10　A. Correct.
>
> 11　Q. Do you recognise this as being a form of report that

12     *Konoike submitted to its banks?*

13     *A.  Correct.  To the banks?*

14     *Q.  To the banks.*

15     *A.  This is an internal document I think.*

16     *Q.  Okay.  Are you saying that you don't think this would*

17        *have gone to the bank?*

18     *A.  I think so.  Actually I'm not sure about that.  I do not*

19        *think so.*

20     *Q.  You don't think so, but you don't know.*

21     *A.  This is still internal document, I believe.*

22     *Q.  We will just check it briefly against what Mr Okada says*

23        *to be sure because it comes out of his witness*

24        *statement.*

25        *(Pause).*


### 193


1      *Maybe we should just turn it up.  Can we put up on*

2      *the screen {C5/3/5}.  This is Mr Okada's witness*

3      *statement.  If you just look at 7.1 and 7.2.  We see him*

4      *describing the document that we are looking at now.*

5      *What he says is the "main Japanese bank" and which bank*

6      *would that be, Mr Sakamoto?*

7      *A.  Correct, yes.  I think this is Mitsui Sumitomo --*

8      *Q.  SMBC?*

9      *A.  SMBC.  Yes.*

10     *Q.  It says that they queried it and:*

11        *"Following the award of the contract ... I prepared*

12        *the document entitled "Report of New Contract*

13     *Signed"..."*

14         *We were assuming that that meant it went to the*

15     *bank, but you can tell me if you have any recollection*

16     *in that regard?*

17  *A.  No.  This type of document is prepared in the*

18     *international -- in the -- in Japan, not at the site.*

19  *Q.  Of course not.*

20  *A.  That's why I don't know the details.*

21  *Q.  I think we can -- I'm sorry --*

22  *A.  But if Mr Okada said he said, probably --*

23  *Q.  Well, just turn the page.  We will go down to the very*

24     *next page. {C5/3/6}.  I should have pointed this to you*

25     *before, to the bottom of 7.2 and we see in the last*

*194*

1     *sentence he says:*

2         *"This report was presented to Konoike's bank in*

3     *May 2003."*

4  *A.  Okay.*

5  *Q.  So that is what we are looking at here, okay?*

6  *A.  Okay.*

7  *Q.  I'm afraid we have to turn to the English, if you don't*

8     *mind.  We translated it.  If you flip through in your*

9     *binder a number of Japanese pages, you come to*

10    *{S2/1.1/9} which is the translation.*

11  *A.  Okay.*

12  *Q.  If we look at this first page of this document that*

13     *apparently, according to Mr Okada, went to the banks.*

14     *If you look on page 1 where it says "Contract Amount".*

198

15    *We have the same contract value in yen that we have seen*

16    *several times now, right? The 6.136.*

17  *MR CHRISTIE: Sorry, I am not --*

18  *A. Yes, correct.*

19  *MR CHRISTIE: We are on 1/9?*

20  *MR KING: We are on {S2/1.1/9}. The first page of the*

21    *English translation and as we go from the left we see*

22    *"Jurisdiction", "Project Name" and then we get to*

23    *"Contract Amount". We see Konoike --*

24  *MR CHRISTIE: That's where I'm lost. (Pause) Sorry. Yes,*

25    *got it.*

*195*

1  *MR KING: I was just asking Mr Sakamoto to confirm that that*

2    *is the same contract amount in yen that we have seen*

3    *a few times now in the documents. Right Mr Sakamoto?*

4  *A. Yes, it is correct.*

5  *Q. Now, if we turn to the second page of the document*

6    *{S2/1.1/10}. In the second column you see it is*

7    *entitled "Project Costs", right?*

8  *A. Correct.*

9  *Q. We see the same amount in yen that we saw in the other*

10    *document called "Motivation Cost", remember that?*

11  *A. I remember that.*

12  *Q. Again we see confirmation that the ratio of those two is*

13    *98.8%?*

14  *A. Correct.*

15  *Q. Equating to an expected profit margin of 1.2% on the*

16     *contract, right?*

17   A.  *Correct.*

18   Q.  *So let's see if we can summarise what we have seen so*

19     *far. I'm going try and summarise, Mr Sakamoto, not on*

20     *this document, but just generally what we have been*

21     *discussing for the last hour or so and I will ask you to*

22     *agree with me if you can.*

23       *For reasons of its own, Konoike did its accounting*

24     *for the project in yen; correct?*

25   A.  *Yes, correct.*

*196*

1   Q.  *And financed the project in yen; correct?*

2   A.  *Correct.*

3   Q.  *At the very beginning of the project Konoike was*

4     *expecting a profit margin of only 1.2%; correct?*

5   A.  *Correct.*

6   Q.  *And that was only if Konoike's motivation costs or*

7     *initial project budget was not understated; correct?*

8     *Was not too low. (Question translated).*

9   A.  *Simply, this contract (inaudible) divide net to costs.*

10     *This difference is 1.2%, is expected profit. I think?*

11   Q.  *Yes. My question was just, had the initial budget of*

12     *6065 turned out to be understated, the profit margin*

13     *would have been even less; correct?*

14   A.  *What is the meaning of "understated"?*

15   Q.  *Too low. (Question translated).*

16   A.  *So "other" means, if this net cost is properly made. we*

> *17    could expect 1.2% profit?  Am I correct?*
>
> *18   Q.  Aha, and if it turned out that that initial budget was*
>
> *19    too low, you would have made less than 1.2% profit,*
>
> *20    correct? (Question translated)*
>
> *21   A.  Yes, (inaudible) correct.*
>
> *22   Q.  Over the course of the project we saw the dollar*
>
> *23    devalued against the yen by about 20%, correct?*
>
> *24   A.  You are talking about April 2003 and --*
>
> *25   Q.  June 2009."*

15. In the Tribunal's view this evidence of Mr Sakamoto is to be given full weight by the Tribunal on the basis that Mr Sakamoto agreed more than once that the Report indicated a profit margin of 1.2% and that as Project Manager and the person responsible for the arbitration he would be aware of the likely profit margin even though he was not Project Manager at the time the Report was prepared.

16. In addition there are site status for weekly meeting documents that refer to an expected 1.2% profit margin and which are referred to above **[P2/21/2; P2/15/2; P2/15/3; P2/15/4]**.

17. The Tribunal concludes that the Report. Mr Sakamoto's evidence and the site status documents outweigh the other evidence and find that the applicable uplift for profit is 1.2%.

**Analysis and conclusions of the Tribunal on claims arising from termination**

18. For the sake of convenience, the Tribunal sets out its analysis of these claims in the Schedule below.

## SCHEDULE OF CLAIMS ARISING FROM TERMINATION

| Claim | Response | Tribunal's finding |
|---|---|---|
| **Additional insurance premiums** - policies were already in place until 31 March / 1 April 2009 with termination on 11 March 2008.<br><br>Agreed costs of TZS 14,218,293 | Costs already incurred - sunk costs not caused by the termination **[S4/1/294]**. | Not recoverable as not caused by or a consequence of termination. |
| **Safety works** -- Engineer directed works in December after termination by the Employer.<br><br>Agreed costs of TZS 499,154; JPY 95,453 | Potentially recoverable under 19.6 **[S4/1/295]**. | The Claimant is entitled to TZS 499,154 and JPY 95,543 plus 1.2% uplift for profit totalling TZS 505,144 and JPY 96,690. |
| **Services provided to Engineer** – security guards, telephones, vehicles, plus manpower for Engineer's offices | Potentially recoverable under 19.6 **[S4/1/295]**. | Notified then incurred so recoverable at agreed amount. The Claimant is entitled to TZS 4,586,139 plus 1.2% uplift for profit |

| | | |
|---|---|---|
| provided for 7 days after 11 March 09.<br><br>Agreed costs of TZS 4,586,139. | | totalling TZS 4,641,173. |
| **Repair costs of Engineer's vehicle (withdrawn)** | Withdrawn. | Withdrawn. |
| **Claimant's costs and expenses from 11 March 2009 to 30 June 2009 -** incurred in preparing final account, but also termination costs and value of work done, together with office and general running costs claimed as part of costs of termination. | Do not fall within 19.6 but may under 16.4(c). Some incurred in any event, therefore not due to termination. Also general running costs **[S4/1/296]**. | Recoverable as a result of termination at the costs detailed in 7.86.4 of the CCS. The Claimant is entitled to the sums set out therein which are inclusive of the 20% reduction set out in paragraph 7.83.5 of the CCS plus 1.2% uplift for profit totalling TZS 243,606,189; USD 69,028; and JPY 37,472,773. |
| **Claimant's costs and expenses post 30 June 2009 –** preparing final account and office and general running costs. | Part of Final Account so costs are recovered in any event. Over claimed for period involved **[S4/1/298]**. | Not allowed as not incurred as a result of termination. |

| | | |
|---|---|---|
| **Loss of profits and overheads on the balance of works the Claimant did not execute as a result of terminating the Contract** | Not entitled – the Claimant would have made a loss if it completed the Works. | The Arbitral Tribunal have found that the Contract was wrongfully terminated by the Respondents. Accordingly the Claimant is entitled to receive loss of profit at 1.2% and overheads at 5% on the balance of works not executed.<br><br>The Claimant is awarded TZS 428,431,533 and USD 993,957. |
| **Materials left on site –** materials sold to Estim (some at a profit). Difference between sale price and original costs of purchasing claimed | Not accepted. Contractor made more losses than if it had completed the Works. Costs also already incurred so not a loss on termination **[S4/1/300]**. | Allowed as consequence of termination as assessed and evidenced by Ms Prior in her presentation (Page 39, Tab 2 of Exhibit $(13 - X1/20/130)$. The Claimant is entitled to JPY 12,152,046 and must give credit in the amount of TZS 20,694,102; USD 20,846. |
| **Borrow pit preparation work –** borrow pits constructed and costs incurred but not yet utilised in full due to termination. 69% | No reliable substantiation provided, although recoverable under 19.6(c). Can only claim bulldozers during preparatory work at pit | Recoverable but on the basis it is only for those bulldozers identified as doing preparatory work at the borrow pits as detailed by Mr Kyte **[D5/5.8/109]** |

| preparation costs unrecovered claimed. | [S4/1/301]. | at paragraph 456. The Claimant is entitled to TZS 7,817,662 and JPY 121,051 plus 1.2% uplift for profit totalling TZS 7,911,474; and JPY 122,504. |
|---|---|---|
| **Water supply facilities** – facilities constructed for last section of road which was not built by the Claimant due to termination therefore not recovered through measured works on last section of road. 26% unrecovered claimed. | Recoverable under 19.6(c) but estimate not substantiated and not clear. Cost spread over all bill items [S4/1/303]. | In the absence of evidence from the Respondents regarding the proportion of this item which was incomplete at termination the claim is allowed. The DR Alternative Rates apply. The Claimant is entitled to TZS 189,174,768; JPY 890,685 and must give credit for USD 27,930; plus 1.2% uplift for profit totalling TZS 198,633,506 and JPY 935,936 and must give credit for USD 26,576. |
| **Quarry preparation works** – a quarry was built at Suranda with costs recovered through measured concrete work. Due to termination 18% | Recoverable under 19.6 but not substantiated and only 12% not 18% [S4/1/303 – 304]. | In the absence of evidence from the Respondents regarding the proportion of this item which was incomplete at termination the claim is allowed. The |

205

| | | |
|---|---|---|
| unrecovered through measured works. | | DR Alternative Plant Rates apply. The Claimant is entitled to TZS 22,427,287; USD 6,139; JPY 452,947 plus 1.2% uplift for profit totalling TZS 22,696,414; USD 6,213; and JPY 458,383. |
| **Construction of temporary diversion road** - a temporary gravel diversion road was built for km110 to the end of the road but unrecovered through measured works due to termination. 73% of cost unrecovered. | Recoverable under 19.6 but no substantiation of estimate and may have already been recovered in full. Cost to remove diversion not deducted [S4/1/304]. | In the absence of evidence from the Respondents regarding the proportion of this item which was incomplete at termination, claim is allowed with deduction for the cost to remove the diversion. The DR Alternative Plant Rates apply. The Claimant is entitled to TZS 52,858,711; USD 4,045; JPY 1,114,829 plus 1.2% uplift for profit totalling TZS 53,493,015; USD 4,094; and JPY 1,128,207. |
| **Demobilisation and removal of plant and equipment** – costs claimed for demobilisation of plant and equipment post | Recoverable under 19.6 [S4/1/305]. | Allowed as damages consequent on termination. The Claimant is entitled to TZS 40,256,206 plus USD 39,158 plus JPY 792,503 plus 1.2% uplift for profit |

| | | totalling TZS 40,739,281; USD 39,628; and JPY 802,013. |
|---|---|---|
| termination | | |
| **Demobilisation and removal of temporary facilities** – costs of demobilisation and removal after termination. | Recoverable under 19(6) **[S4/1/305-306]** | Allowed as damages consequent on termination. The Claimant is entitled to TZS 105,402,108 plus USD 307, plus JPY 1,220,877 plus 1.2% uplift for profit totalling TZS 106.666,934; USD 311; and JPY 1,235,528. |
| **Stand down of plant and equipment to 30 June 2009** – costs of labour, plant and equipment following termination for storage at Zuzu until plant sold. | Costs recoverable are for removal not stand down of plant, especially not as long as claimed. Stand down would occur on completion. Failure to mitigate by hiring out **[S4/1/306 – S4/1/307].** | Allowed from termination on 11 March 2009 to demobilization to the Zuzu storage yard and at the same plant rates as determined elsewhere as detailed in **[D6/1/10].** The Claimant is entitled to TZS 4,414,500; USD 37,354; JPY 12.325.993 plus 1.2% uplift for profit totalling TZS 4,467,474; USD 37,802; and JPY 12,473,905. |
| **Security guards** – security guards for protection of residences, | Recoverable under 19.6(d) for reasonable period pending removal. | Allowed at a cost of TZS 48,237,624 for security guards from 11 March to |

| | | |
|---|---|---|
| temporary camps and facilities, plant and equipment during demobilization | Would incur if completed the works after demobilization [S4/1/307]. | 30 April 2009 as per Prior and Kyte 2nd Joint Report on Quantum [D6/1/10] plus 1.2% uplift for profit totalling TZS 48,816,475. |
| **Repatriation of ex-pat staff** - costs incurred in repatriating staff. USD 19,374 agreed. | Plant demobilised in April so not needed after that. Recoverable under 19.6(e) but not as damages [S4/1/308]. | Recoverable as damages as a consequence of termination. The Claimant is entitled to USD 19,374 plus 1.2% uplift for profit totalling USD 19,606. |
| **Legal and consultant costs** – costs of fees incurred in relation to early termination | Not recoverable under 19.6. Incurred before termination [S4/1/308-309]. | Not recoverable as a consequence of termination |
| **Management costs and expenses** - senior management staff from Japan and Tanzania from November 2008 to February 2009 on early termination. | Not recoverable under 19.6 as not incurred as a result of termination [S4/1/309]. | Not recoverable as a consequence of termination. |

19. Accordingly, the Claimant is entitled to the following total amounts in respect of the claims arising out of termination:

    a. TZS 1,139,914,510;

    b. USD 1,123,217;

    c. JPY 66,877,983.

## SECTION X: THE FINAL ACCOUNT: the Claimant's claim for outstanding sums for the measured works

### Introduction

1. The Claimant seeks reimbursement for measured works arising from those aspects of its Final Account that were rejected by the Engineer's assessment of 10 February 2010.

2. A preliminary point raised by the Respondents is that the Contractor did not give a notice of claim in respect of its dissatisfaction with the Engineer's determinations on the Claimant's Final Account within the 21 days specified by the first paragraph of Sub-Clause 20.1.

3. It is therefore necessary to consider whether the first paragraph Sub-Clause 20.1 applies as asserted by the Respondents.

### Application of Sub-Clause 20.1

4. The Tribunal is of the view that Sub-Clause 20.1 does not apply. The first paragraph of Sub-Clause 20.1 relates to claims for additional payment *"under any Clause of these Conditions..."* and requires the Contractor to give notice to the Engineer describing the event or circumstance giving rise to the claim. The Sub-Clause is intended to alert the Employer to events or circumstances giving rise to the assertion by the Contractor of a right to additional payment. The whole purpose of the Sub-Clause is to enable the Parties to be aware of matters in respect of which additional payment is to be claimed by the Contractor to enable the investigation and management of such claims.

5. Under Clause 14 the Contractor is required to first submit a Statement at Completion (Sub-Clause 14.10) and then a Final Statement (Sub-Clause 14.11). Both these statements are submitted to the Engineer. Clause 14 provides a self-contained regime for dealing with the final account issues and the issue of a Final Payment Certificate.

6.     The Contractor's Final Statement deals with matters of which the Employer and Contractor were well aware: the measurement of the works, performed by the Contractor under the supervision of the Employer's Engineer. The dissatisfaction of the Claimant with the Engineer's assessment of the matters of which all Parties were aware does not easily fall within the description of an event or circumstance pursuant to which the Contractor is intending to claim additional payment.

7.     In the Tribunal's view the submission of the Statement at Completion and/or the submission of the Final Statement do not constitute an event or circumstance giving rise to a claim.

8.     Accordingly the Tribunal finds that Sub-Clause 20.1 does not apply in relation to the submission of the Statement at Completion and/or the Final Statement under Clause 14.   It follows that the Engineer's assessment of the Final Account of 10 February 2010 is not binding on the Parties or the Tribunal.

9.     The Tribunal therefore turns to a consideration of the Bill items which are the subject of this claim.

**Original design costs**

10.    Given the reduction by the Engineer in its assessment of the Contractor's final claim of 30%, on the basis that the Contractor did not demobilise any plant or temporary facilities, the issue has arisen as to whether original design should be the subject of this reduction given that it would have been complete at the time of termination.

11.    The Claimant argues that Bill Item 13.01 includes not only establishment and demolition but also the Claimant's allowance for design services for the original lump sum work.

12.    In support of its position, the Claimant refers to its Tender in which the Claimant listed the proposed prices for the elements of the Works in eight separate sections. The proposed price of the design for the original scope of the Works was set out in Item 7 "Design of the Works" at TZS 1,835,343.34

**[E1/6/109]**. In the original B1 Bills the agreed prices for the elements of the Works were combined into six separate sections **[E5/9/1331]** rather than eight. Bill item 1 "General" combined the prices set out in the Claimant's tender at Items 1(a), (b) and (c) and Item 7. The breakdown of Bill item 1 "General" clearly establishes the inclusion of the original scope of the Works in item 13.01. The revised figures for item 13.01 in the B2 Bills of Quantities (B2 Bills) attached to the Addendum included the original design scope costs of TZS 1,813,008,129. Items 1 and 2 of the revised item 13.01 totalled TZS 17,218,601,677 which is the same rate set out in the B1 Bills.

13. In its application for payment, the Claimant separated the BQ sum for Establishment and Demolition into (i) a sum for Establishment and Demolition; and (ii) a further sum for the Original Design fee. This was accepted by Mr Ntensibe on behalf of the Engineer **[S3/1/95]**. The sums certified and paid subsequently represented 100% of the Original Design Fee and 70% of the Establishment and Demolition. However, at the time of issuing his assessment of the Claimant's Final Account claim in February 2010, the Resident Engineer added the Establishment and Demolition and Design Fees together and applied a 70% valuation to both, thereby reducing the Claimant's valuation of the Design Fee by 30%.

14. The Respondents say that the Claimant has provided no documentary evidence showing the original design costs were included in item 13.01 but instead has relied on its own documents which the Respondents say are at odds with what appears in the wording of the Bill item. Neither the B1 Bills nor the B2 Bills contain a line item referring to original design costs **[E5/5/1330] [E551339]**.

15. After careful consideration of the Parties' submissions, the Tribunal is satisfied that Bill item 13.01 does include the allowance for original design as contended for by the Claimant.

16. As a consequence of the agreement between the quantum experts, the amount to be certified is TZS 3,123,032.804 (being inclusive of 100% of the original design fee which is TZS 1,813,008,129).

**Additional design costs**

17.   This refers to the dispute regarding the Claimant's entitlement to TZS 1,813,008,129.00 for additional design costs arising from the Addendum. The Tribunal has found in Section III that the Contractor is entitled to this amount.

**Additional Indirect Cost**

18.   This issue relates to a reduction to be made in respect of the prolongation costs agreed in the Addendum where any extension of time awarded by the Tribunal falls within the period of 30 September 2006 to 29 September 2008 being the extension of time that was agreed in the Addendum. This is addressed in Section VII relating to the entitlement of the Claimant to payment for prolongation costs.

**Gravel (crushed stone) bedding for Structures**

19.   This dispute relates to whether the Claimant is entitled to be paid in addition to the rate for pipe culverts, bridges and box culverts, for the gravel bedding for those structures.

20.   In the Contractor's revised bill of quantities, submitted at the time of the Addendum, referred to as the B2 bills of quantities, the following appears in paragraph 2218 which deals with compensation for concrete pipe culverts: *"the bid rates shall include full compensation for providing, testing, loading, transporting and unloading the culverts, for providing and placing the fine-grained material, where required..."* **[E4/3/984]**

21.   In relation to gravel bedding for bridge and box culverts, it appears clear from bill item 61.08 **[E4/8/1140]** that gravel bedding for these is included in this bill item. Accordingly, the Tribunal concludes that the Contractor is not entitled to additional measurement and compensation for the gravel bedding for structures as claimed.

**Clearing and grubbing**

22.     This item is agreed with the Claimant entitled to recover the amount of TZS 406,549,114.

**Excavation to spoil**

23.     Konoike's case is contained in paragraph 7.36 and at Appendix 7.1, paragraphs 28 -38 of the SOC and paragraphs 7.34-7.41 of the Reply; and in paragraphs 3.130-3.137 of the CCS.

24.     The Respondents' case is contained in paragraphs 425-428 of the SODC; paragraphs 106-107 of the Rejoinder; and paragraphs 21-27 of Appendix 2, RCS.

25.     Bill no 3 item 36.01(a) relates to common excavation to spoil. The Parties agree that the applicable rate is TZS 1994/m3 and the issue to be decided by the Tribunal is whether this item of the Bills is to be interpreted to apply to all material that may be excavated and deposited in any manner and not only to material taken to spoil.

26.     Having considered the Parties' submissions and in particular, Standard Specification 3610 which provides that common excavation to spoil shall be measured based on "*the cubic metre of material removed as specified to be spoiled on the instruction of the engineer*" the Tribunal have decided that this item only applies to material taken to spoil on the instructions of the Engineer and that the amount in respect of which payment is to be made under this item is for 305.7 m³ at the applicable rate of TZS 1994/m3.

27.     In fact in the Final Account the Resident Engineer certified 261,020.46 cubic metres which for the purposes of payment entitlement is pursuant to the Tribunal's decision to be reduced to 305.6 m³.

28.     Secondly the Respondents contend that the instruction for the removal of 305.7 m³ was in relation to the waterlogged ground and that if the latter claim is paid the Claimant should only be compensated for the removal of that

material under one of the Bill items to avoid double counting. The Tribunal agrees with this submission and since the cost of excavating the amount of 305.7 cubic metres on the instructions of the engineer is already included in the valuation of the waterlogged ground the Tribunal finds that no further compensation is due for this item.

## Road Signs

29.     This claim relates to a deduction in relation to 55 road signs which had been installed in Sections 1 and 2 (in the case of Section 1, before 30 November 2006 and in the case of Section 2, before 28 December 2007) but then stolen from the site before termination of the Contract in March 2009.

30.     Initially the Contract provided in the Standard Specification at Clause 5407 that the Contractor shall protect the completed road signs against damage until they have been finally accepted by the Employer and that he shall maintain the road signs until the Performance Certificate has been issued.

31.     In addition, initially under the original Contract (before the Addendum) Sub-Clauses 10.1 and 10.2 of the Condition of Particular Application (amending the standard FIDIC Sub-Clause 10.1) stated that takeover as a result of use or sectional completion could not occur.

32.     The original FIDIC contract provisions had provided that at Clause 10.1 that *"If the Works are divided into Sections, the Contractor may similarly apply for a Taking-Over Certificate for each Section."* Clause 10.2 stated that *"The Employer shall not use any part of the Works (other than as a temporary measure which is either specified in the Contract or agreed by both Parties) unless and until the Engineer has issued a Taking-Over Certificate for this part. However, if the Employer does use any part of the Works before the Taking-Over Certificate is issued: (a) the part which is used shall be deemed to have been taken over as from the date on which it is used; (b) the Contractor shall cease to be liable for the case of such part as from this date, when responsibility shall pass to the Employer, and (c) if requested by the*

215

*Contractor, the Engineer shall issue a Taking-Over Certificate for this part."*
**[E3/1/636]**

33. Pursuant to the Addendum it was agreed that there would be sectional completion. One of the main justifications for this was that the Contractor wished to be alleviated from care of the Works in respect of those sections which were already in public use or about to be. The Contractor's Minimum Position Paper notes that *"Sections and Defects Liability Period: As stated above, the Contract has no defined Sections, thus no Completion Dates for the sections and hence no Defect's Liability Period. Without these, the ending of the Contract cannot be properly effected."* **[G2/101/529]**

34. As a consequence, it was agreed pursuant to paragraphs v and vii of the Addendum that the original standard FIDIC Sub-Clauses 10.1 and 10.2 of the General Conditions would be reinstituted. Sub-Clause 10.2 provides that on take-over, care of the works passes to the Employer.

35. The consequence of this amendment was that the Contractor was relieved of continued care of the Works, including of the 55 road signs once taking over of any section occurred.

36. The takeover of Section 1 had occurred on 30 March 2006 (as agreed by the Parties in the Addendum) and the takeover of Section 2 occurred on 23 December 2007. The Tribunal finds that the Claimant is entitled to recover TZS 22,157,703 in respect of this claim.

**Thermoplastic road markings**

37. This bill item 55.03 relates to painting of road markings in the section of the road between Km 2.5 and Km 23.6. This section of the road is the subject of a counter claim as it is alleged by the Respondents that in light of undulations in this section, remedial works are required.

38. The Tribunal has rejected this counterclaim in respect of undulations in the Road for the reasons set out later in the Award, at Section XV.

39.     The position is however that the provision of the road markings was essential for road safety. The road markings were installed by the Contractor and in the Tribunal's view the Contractor should be paid for the execution of this work. The Tribunal notes in passing that the Road has been in continuous use since it opened which supports the Contractor's contention that the provision of the Road markings was both necessary and essential for the operation of the Road. Accordingly the Claimant is entitled to recover TZS 304,154,766.

**Topsoiling median strip**

40.     The dispute in this matter relates to the alleged inadequacy of the top soil provided by the Contractor for the first 2.5km of the Road.

41.     Although the amount claimed by the Contractor of TZS 1,690,095 was originally certified by the Engineer in IPC 25 that was subsequently reversed when the allegations of inadequacy of the topsoil were made.

42.     In Mr Ntensibe's first witness statement at paragraphs 49 and 50 he says that he deducted the amount because the topsoil was not in his opinion in accordance with specification and was incapable of sustaining the growth of grass. In the Tribunal's view, more cogent evidence is necessary to establish the inadequacy of the topsoil, given that the work was originally certified for payment and then reaffirmed in a number of certificates over a considerable period of time.

43.     The certification was only reversed at the time of the final certificate. The Tribunal notes that there could be a number of reasons why the median strip did not sustain grass in the period 2007 – early 2010 other than the inherent quality of the topsoil and thus is dissatisfied with the evidence provided as to its inadequacy. After considering Mr Ntensibe's evidence and exhibits referred to the Tribunal is not satisfied that the works were inadequate.

44.     Accordingly the Tribunal finds that the Claimant is entitled to recover the amount of TZS 1,690,095.

**Railway crossing**

45. This claim is similar to the road signs claim above. It relates to broken panels in Section 2 discovered after handing over of Section 2 on 23 December 2007.

46. There is a related aspect of incomplete filling which the Contractor has made an allowance for.

47. As a result, the only issue for determination is whether the Claimant continued to have responsibility for care of the panels after sectional takeover of section 2.

48. As with the road signs, the consequence of the reintroduction in the Addendum of Clause 10.2 of the Conditions of Contract in its original FIDIC form was to provide that care of the works after takeover is the responsibility of the Employer.

49. As a result, the Tribunal finds that the sum of TZS 10,621,376 is recoverable by the Claimant.

## Concrete class 30

50. The experts are agreed on this issue and the Claimant is entitled to recover TZS 260,229,612.

## Renovation work at the RE office in Dodoma, temporary accommodation and telephone costs for the Engineer's office in Chikuyu

51. The Tribunal also notes that the Konoike comments on the Respondents' List of Issues notes in relation to these three items at item 10(o to q) that: "*There is no issue between the parties other than the...contention that Konoike is bound by the RE's assessment of 10 February 2010. Subject to the Tribunal's determination of that issue the parties agree the amount to be certified.*"

52. In relation to these three Final Account items at Tab 2 page 17 RCS under the heading "Agreed Variations" the Respondents confirm that these three items are agreed as variations and as to quantum subject to a submission that the Claimant is bound by the Resident Engineer's assessment of 10 February 2010. The Tribunal has ruled above in this Section that the assessment is not

218

binding. Consequently, there is agreement between the Parties that these items are Variations and quantum is also agreed as set out at tab 2 page 17 RCS.

53. Accordingly the Tribunal finds that the Claimant is entitled to recover the following amounts:

| | | |
|---|---|---|
| a. | Renovation work: | TZS 9,248,370. |
| b. | Temporary accommodation: | TZS 9,144,000. |
| c. | Telephone costs: | TZS 3,779,391. |

**Engineer's laptop**

54. This claim arises from Sub-Clause 19.1 of the Employer's Requirements **[E2/7/313]** requiring the provision of two laptops for the Engineer which were provided. Subsequently, a Variation was issued for a further laptop to be provided to the Engineer which was also supplied.

55. In response to the claim for payment of this Variation the Respondents contend that one of the originally supplied laptops was deficient or unreliable and therefore the Variation was to supply a replacement.

56. However the Variation itself did not specify that this was the basis for the further laptop and this contention appears to be a belated justification for not paying for the Variation.

57. In the absence of any evidence substantiating this was the reason for the Variation and the provision of the further laptop the Tribunal is not persuaded that the cost of the Variation is unrecoverable. Accordingly this claim of TZS 1,423,464 is allowed in accordance with the Variation Order which was issued on the basis that the additional laptop was to be further and additional to these required under the Specification.

**Excess materials purchased or produced by the Contractor prior to termination**

58.    At item 14(9) the Respondents raise the issue of losses incurred by the Claimant in relation to excess materials purchased or produced by the Contractor prior to termination. The difficulty with this issue is that the works were finished by Estim who purchased materials left on site by the Claimant. There is no way of knowing whether there were excess materials purchased by the Claimant prior to termination as the Claimant might have executed the works in a different manner to Estim. Given that the termination of the Contract was wrongful and Estim purchased the materials left on site the Tribunal finds that no adjustment is to be made in respect of materials on site at termination in respect of losses alleged in relation to excess materials purchased or produced by the Contractor prior to termination.

## Claim for slow working

59.    The Claimant claims for slow working costs between 21 June and 6 November 2008 which is the period between the end of the Second Suspension and the beginning of the Third Suspension.

60.    The Claimant's case is contained in paragraph 7.36 and appendix 7.1 paragraphs 91-93 of the SOC; paragraphs 7.81 - 7.84 of the Reply; and in paragraphs 3.197-3.200, CCS.

61.    The Respondents case is contained in paragraphs 453-454 of the Reply and in paragraphs 68-70 of Appendix 2 RCS.

62.    The Claimant claims direct costs incurred due to a lack of finance hampering progress as a result of the continuing late payment of IPCs 20A and 23 and additionally as a result of late payment of IPCs 24 and 25. The Claimant had insufficient funds to pay for its contracted supplier of diesel fuel and was forced to seek alternative sources of fuel at an additional cost. Secondly the Claimant was unable to pay for ordered bitumen supplies and the consignment was sold to other customers resulting in the costs of testing being wasted.

63.    In the Tribunal's view this claim fails for the following reasons:

a. Sub Clause 16.1 of the contract gives the Contractor the right to suspend the work or reduce the rate of work if the Employer fails to pay an IPC provided the Contractor gives not less than 21 days' notice. Prior to the period of slow working the Second Suspension took place and following the period of slow working the Third Suspension took place. The Tribunal has found that the Second Suspension was not valid because of lack of appropriate notice but that the Third Suspension was valid.

b. If the Claimant had wished to reduce the rate of working during the period between 21 June and 6 November 2008 it should have given 21 days' notice of its intention to reduce the rate of working during this period. It did not do so.

c. Secondly the Claimant is responsible for financing its own work and is not entitled to claim the costs of the slow working as a breach of contract for non-payment of a certificate when it has failed to operate the relevant provisions of the Contract that would have provided relief.

d. Thirdly the Claimant has not established that the failure to pay its contracted supplier of diesel fuel resulted from non-payment of any IPC in circumstances where it was able to source fuel from local stations in Dodoma Town. Similarly in relation to the bitumen testing the Claimant ordered y6t which it was then unable to pay for as a result of lack of finance which the Claimant has not shown to be attributable to the non-payment of any IPC.

## SECTION XI: THE CLAIMANT'S DAMAGES CLAIMS

1. In this Section, the Tribunal considers the Claimant's damages claims in relation to (i) performance security; (ii) currency devaluation; (iii) loss of opportunity; (iv) costs of DAB and amicable settlement; which are in addition to the claims made directly under the provisions of the Contract. The Tribunal first addresses the availability of damages as an alternative to claims made under the terms of the Contract.

**Availability of damages**

Parties' submissions

2. The Claimant makes these damages claims in addition to the claims made directly under the Contract. The Respondents aver that this is not possible as a matter of Tanzanian Law: where the Claimant has elected to proceed under the Construction Contract or common law, then the Contractor – by operation of common law election – is held to that path.

3. The Claimant denies that it is put to an election between its entitlement to terminate under Sub-Clause 16.2 of the Contract and to terminate for repudiatory breach at common law. Rights may accrue under the common law and rights may accrue under the Contract. To the extent that they do, they are independent rights and both may be exercised, subject to the qualification that there cannot be double recovery. If there are inconsistent remedies then an election may be required, but the Respondents have acknowledged at footnote 128 of the Rejoinder [A5/1.1/46] that no election is necessary in cases where the remedies under and for breach of contract do not differ: *Stocznia v Gearbulk* [2009] EWCA Civ 75 [F4/4.24/1]. They do not differ materially in the instant case. Termination under Sub-Clause 16.2 entitled the Claimant to the remedies provided under that clause, namely: (i) return of the performance security; (ii) payment in accordance with Sub-Clause 19.6; (iii) loss of profit and other loss and damage suffered as a result of the termination. Following acceptance of a repudiatory breach the Claimant was entitled to be put back in the position it would have been in had the contract been performed and so

would have been entitled to all of the matters provided for under Sub-Clause 16.2.

4. The Respondents aver that even if Tanroads was in repudiatory breach, the law provides that damages are to be calculated based on the least onerous legitimate action available to the defaulting party at the time of breach. Therefore damages would be assessed assuming that Tanroads had exercised its contractual right to terminate for convenience under Sub-Clause 15.5, with compensation limited to the payment provided for thereunder. In the case of a Sub-Clause 15.5 termination for convenience, payment is to be made in accordance with Sub-Clause 19.6. Assuming termination for convenience, the Contractor's potential recovery is limited to any categories of claim under Sub-Clause 19.6 that it has adequately proven. The Contractor's remaining claims are costs incurred, on the Contractor's theory, as a *consequence* of termination, and not in *expectation* of completing the Works or recoverable under any other provision of Sub-Clause 19.6. Therefore, even if the Contract was validly terminated by the Contractor, which is denied, the bulk of its claims on termination would still fail.

5. The Claimant denies the Respondents' suggestion that damages on termination should be assessed on the basis that, but for the termination, the defaulting party would have performed the contract in the least onerous way possible. The argument is based on the fact that because the Respondents had the benefit of a termination for convenience clause in the contract, damages would have been assessed on the basis that the Respondents would have exercised that right.

6. However, the Claimant maintains this is incorrect as (i) the Respondents cannot have the benefit of Sub-Clause 15.5 as they arranged for the Works to be executed by another contractor – Estim, which is not permitted by the clause; and (ii) in any event, the general principle is that damages are assessed at the date of breach.

**Analysis and conclusions of the Tribunal**

223

7. There are two issues to be decided in connection with the availability of damages.

8. The first is whether in the event that the Respondents are in repudiatory breach in relation to termination of the Contract as the Tribunal has decided, any damages are to be calculated on the basis of the least onerous legitimate action available to the Respondents at the time of breach .The Tribunal has already decided in Section XIII that the damages recoverable by the Claimant are not limited to the damages recoverable as if the Respondents had terminated the Contract for convenience under Sub- Clause 15.5.

9. The second issue is whether the Claimant is put to an election between its entitlement to terminate under Clause 16.2 of the Contract or to terminate for repudiatory breach at common law .The Tribunal has decided in Section XIII that the Contract was validly terminated in March 2009 by the Claimant for repudiatory breach by the Respondents.

10. In the Tribunal's view the right to recover damages for repudiatory breach and to recover under the Contract provisions relating to termination arise independently and no election is required where the remedies under the Contract and for repudiatory breach are similar as is the case in this instance. The Respondents accepted this to be the case in footnote 128 of the Rejoinder [A5.1.1/46]. The Tribunal, having found that the Contract was validly terminated on the basis of the Respondents' repudiatory conduct find that the Claimant is entitled to recover damages. The compensation recoverable by the Claimant in relation to Termination is addressed in Section IX and the remaining damages claims are addressed below.

**Performance Security**

Parties' submissions

11. The Claimant's claim in respect of Performance Security is set out at Section 11 of the Amended SoC. In summary, there are three heads of loss claimed:

a. First, the Claimant seeks the cost of maintaining the Performance Security at a value higher than it was contractually obliged to do from 1 November 2006 to termination on 11 March 2009. Under paragraph vi of the Addendum, the Performance Security was to be reduced as the Works were completed as follows: "...the Amount of the Performance Security shall be reduced by amounts equal to the value of Sections as and when the Sections are being Taken Over in accordance with Sub-Clause 10." It is the Claimant's case that the Employer failed to take over Sections 1 – 3 of the Works when they were obliged to in accordance with Sub-Clauses 10.1 and 10.2 as amended by the Addendum, which prevented the Performance Security from being reduced. These sections were in use by the general public and therefore deemed taken over under the Addendum. The Claimant avers that this was not challenged by the Respondents during the hearing.

b. Second, the cost of maintaining the Performance Security from 12 March 2009 to its expiry. In accordance with Sub-Clause 16.4(a) of the Contract, the Employer is obliged to return the Performance Security to the Claimant promptly. The Employer failed to do this despite the Claimant requesting such in its letter of 11 March 2009 [G5/645/2325]. The Claimant had to maintain the Performance Security up to its expiry and is entitled to recover the costs of doing so. The Performance Security was for TZS 1,299,960,087.60 and USD 4,073,613.75 initially expiring on 26 November 2009 but subsequently extended to 29 September 2011 [11.3.3, Amended SoC].

c. Third, the cost of preventing the Employer from making a claim under the Performance Security following termination of the Contract. The Employer threatened to call the Performance Security following termination and gave the Claimant no option but to take action to prevent the call. Accordingly, on the advice of counsel it took the following steps: (i) requested return of the Performance Security; (ii) commenced arbitration proceedings seeking return of the Performance

225

Security; (iii) commenced and conducted proceedings in the High Court of Tanzania seeking conservatory measures. The Claimant therefore seeks its costs incurred as a consequence of the Employer's breaches and an indemnity in accordance with Sub-Clause 4.2. As to the Respondents' res judicata argument, the Claimant avers that in both Arbitration and Court proceedings, the Respondents succeeded on procedural grounds and the Claimant's substantive case was not addressed. In any event, the Claimant is not seeking to re-open anything, it is seeking damages for breach of contract and/or the enforcement of a contractual indemnity, which is a different cause of action.

12. The Respondents reject the Claimant's claims:

    a. As to the claim for maintaining performance security at a higher value, their position is that since no sections of the Road were actually taken over by the Employer, and since the Contractor improperly repudiated the Contract, the Employer was under no obligation either to reduce the amount of Performance Security or return it in part or in whole to the Contractor. Starting in May 2007, the Contractor made numerous requests to the Engineer to issue Taking-Over Certificates to Sections 1, 2 and 3 of the Road. Each time the Engineer declined because the Contractor had not, pursuant to Sub-Clause 10.1 of the Contract, substantially completed these sections at the time of its requests. In October 2008, both Employer and Engineer agreed that the Contractor could be issued Taking-Over Certificates for Sections 1 and 2 of the Road, excluding the undulating portion in Section 1. The Contractor, however, improperly repudiated the Contract in December 2008

    b. In relation to the claim for maintaining the performance security past 11 March 2009, the Respondents aver that the Contractor's notice of termination was invalid. Accordingly, the Employer was under no obligation to return the Performance Security. On the Respondents' primary case, the Contract was terminated in December 2008,

following the Contractor's repudiation. In that instance, the Respondents were entitled to retain the Performance Security until such time that the works were completed.

c. In response to the claim for protecting the Performance Security, the Respondents' position is that the Claimant breached the Contract when it filed for arbitration with the ICC without first referring the dispute to the DAB as required by the Contract. The Employer prevailed in the arbitration proceedings and was awarded costs for the arbitration, which the Claimant has failed to pay. The Claimant may not attack the prior tribunal's award or the High Court's decision by repackaging its rejected costs claim as a claim for contractual damages. The decisions of the previous tribunal and High Court are *res judicata* between the Parties such that neither party can seek to re-litigate those costs awards before this Tribunal.

13. Further, the Respondents note that My Kyte made a number of observations and had certain reservations about the poor state of the underlying substantiation provided by the Contractor to support its claim, which should be taken into account in any valuation the Tribunal performs [**D5/5.8/151-156**].

**Analysis and conclusion of Tribunal**

14. In relation to the claim for maintaining the Performance Security at a higher value than the Claimant was obliged to do the Tribunal concludes that under paragraph vi of the Addendum the Parties agreed expressly that the amount of the Performance Security would be reduced by amounts equal to 10 percent of the value of Sections taken over.

Claim for maintaining the Performance Security at a higher value to 11 March 2009

15. The Parties agreed in the Addendum that use by the general public of a section would constitute a deemed takeover of the relevant section.

16. Section 1 was wholly in use by the general public by 31 October 2006 [**11.5.2, Amended SoC**]. The Addendum was executed on 14 March 2007.

17. Accordingly for the purposes of this issue, the Tribunal finds that Section 1 is deemed to be taken over following the execution of the Addendum, with effect from 15 March 2007 and that the Performance Security should have been reduced to TZS 982,055,301.54 and USD 3,404,756.32 [**Appendix 1.1; Amended SoC**].

18. Section 2 was in use by the general public on 28 December 2007 [**11.6.4, Amended SoC**]. Accordingly, for the purposes of this issue, the Tribunal finds that Section 2 is deemed to be taken over with effect from 28 December 2007 and that the Performance Security should have been reduced to TZS 659,818,405.73 and USD 2,287,570.66 [**Appendix 11.2, Amended SoC**].

19. Section 3 was in use by the general public from 1 November 2008 [**11.2.4, Amended SoC**] and for the purposes of this issue, the Performance Security should have been reduced to TZS 260,858,439.47 and USD 904,388.40 [**Appendix 11.3, Amended SoC**].

20. Accordingly the Tribunal accepts the Claimant's submission that the Performance Security was maintained at a higher value than contractually required from 14 March 2007 (the date of the Addendum) to 11 March 2009 (the date of valid termination as found by the Tribunal) and finds that the Claimant is entitled to recover the cost of this as damages for breach of the Contract.

21. The particulars of the cost incurred are set out at paragraph 11.12.7 and in Appendices 11.4 and 11.5 of the Amended SoC. The Tribunal accepts the categories of cost claimed for the Bond Fee, the insurance premium and the Valuation Fees, but not the Nominal Fee. The latter consists of rent paid by the Claimant to Highland Estates Ltd, a subcontractor, for allowing its premises in Dar es Salaam to be used as security for the Performance Security. The Tribunal does not consider that this arrangement represents a proper cost of maintaining the Performance Security.

22. Accordingly the Tribunal finds that the Claimant is entitled to recover TZS 25,888,889 and USD 39,523 for this head of claim.

Claim for maintaining the Performance Security from 12 March 2009

23. In relation to the cost of maintaining the Performance Security from 11 March 2009 to the date of expiry of the Performance Security as the Tribunal has found that the Claimant validly accepted the Respondents' repudiatory conduct as terminating the Contract on this date and the Employer did not return the Performance Security as requested in the Claimant's letter of 11 March 2009 **[G5/645/2325]** as it should have done, the Tribunal finds that the Claimant is entitled to recover this cost.

24. Accordingly the Claimant is entitled to recover the sums of TZS 121,056,060 and USD 443,903 as set out in Appendices 11.6 and 11.7, Amended SoC. Those sums are agreed by the Quantum Experts as figures.

Claim for costs of preventing a call on the Performance Security

25. In relation to the claim to recover, as damages, the costs incurred by the Claimant in taking conservatory measures to prevent the Respondents from making a call under the Performance Security following termination of the Contract, the Tribunal finds that this claim fails. The Claimant commenced both arbitration proceedings and proceedings in the High Court of Tanzania for these conservative measures. The Claimant failed in both sets of proceedings and costs were awarded to the Respondents. Whatever the reasons for the decisions in the arbitration proceedings and the High Court (and irrespective of the question of whether the Tribunal in this arbitration has jurisdiction to award, as damages, costs arising in another arbitration) the Tribunal considers that the Claimant is not entitled to recover damages in respect of the costs incurred in taking conservatory measures where the Claimant has failed in the proceedings. If the Claimant had been successful in the proceedings it would, no doubt, have been awarded its costs but the costs now being claimed following the failure of the proceedings cannot be considered as being damages flowing from the wrongful termination of the

Contract. The issue of the unpaid award of costs in the arbitration proceedings in favour of the Respondents is addressed in Section 13.

26. Finally at RCS/Appendix 5/4 the Respondents rely on certain observations by Mr Kyte in his First Side Report **[D5/5.8/151-156]** about the "*poor state of the underlying substantiation provided by the Contractor to support its claim*". However in the Second Joint Report **[D6/1/11]** Mr Kyte agreed figures as figures with Ms Prior in relation to the value of the claims and the Tribunal sees no need to depart from these agreements.

**Currency devaluation**

Parties' submissions

27. The Claimant seeks an award in Japanese Yen being the currency in which it felt the loss and relies on s73(1) of the Tanzanian Law of Contracts Act. Devaluation is a recoverable as a head of loss under Tanzanian Law – *Zuberi Augustino v Anciet Mugabe* [1992] TLR 137 **[F2/2.14]**.

28. It avers that although the currencies of payment under the Contract were TZS and USD, the Claimant had to finance the project in JPY as this was the currency available to it from its Japanese banks. Only an award in Japanese Yen or in other currencies plus compensation for the devaluation of the other currencies against Japanese Yen will compensate the Claimant for the deteriorating exchange rates.

29. The Respondents contend that entitling the Claimant to recover for the depreciation of contractual currencies as against the Yen has no legal basis and would lead to inequitable results. The Claimant would retain the upside benefit when the contractual currencies appreciate against the Yen, without having to accept the downside risk when those same currencies depreciate. There is no indication in the Contract that the Employer agreed to bear this risk. To the contrary, the Parties had agreed a contractual exchange rate.

30. The Claimant's position finds no support in either English or Tanzanian Law. The law does not countenance the recovery of foreign exchange losses. First,

the claim is wholly speculative, and falls outside the scope of the type of damages that are recoverable under the Tanzanian Law of Contract Act s73 (1) which only permits the recovery of damages "*which the parties knew, when they made the contract, to be likely to result from the breach of it.*" Further, compensation is not to be given for "*any remote and direct loss or damage sustained by reason of the breach.*" Second, in the *Texaco Melbourne* case, the court found that once the appropriate currency for paying damages has been determined "*no account is taken of fluctuations in the relevant currency as against other currencies between the date of breach and the date of judgment.*" Third, the Contractor voluntarily bore the risk that the value of the contractual currencies vis-à-vis the yen could fluctuate over time. Prior to submitting its bid, the Contractor was free to select the convertible foreign currency it wished, which Mr Sakamoto admitted could have been Japanese Yen **[T4/168/21-25]**. Mr Koizumi also acknowledged that he understood that the choice of currencies exposed the Contractor to foreign exchange risks **[T4/85/12-15]**.

31. The Respondents state that case law provides that an award of damages should be made in the currency in which the Parties have agreed payments should be made. The currency in which a claimant felt its loss is a fall-back position to be used if – and only if – there is no such agreement. Here, the Parties chose US dollars and Tanzanian shillings as the currencies of account and payment for all transactions arising under the Contract. Accordingly, the proper currencies for any award of damages are the contractual currencies.

32. The Respondents also point out that if the Claimant succeeded on both the financing charges claim and the devaluation claim, this would amount to double recovery. Theoretically, the Contractor would receive financing charges at the contractual rates of interest during the period of delayed payment, on top of the principal. Therefore, when assessing the Contractor's actual loss for the purpose of calculating damages, it would be improper merely to compare the difference between the Yen that the Contractor could have purchased had its various claims for additional payment been paid at the time they were made, and the Yen that it will be able to buy when the

Respondents pay the hypothetical award in this Arbitration. That approach improperly disregards the interest payable on the principal amounts. Instead, the comparison would have to be made between (i) the Yen that the Contractor could have purchased (principal), plus the interest that is payable on the principal and (ii) the Yen that the Contractor will be able to purchase, when the award is paid. They contend that adjusting for this duplication would eradicate the devaluation claim in its entirety.

**Analysis and conclusions of Tribunal**

33. The Claimant is seeking an award in Japanese Yen as the currency in which it felt the loss or in other currencies plus compensation for the devaluation of the other currencies against the Yen .this claim ignores the reality of the position under the Contract and the basis on which the Claimant chose to tender.

34. Prior to submitting its tender the Claimant was free to select the convertible foreign currency that it wished to have .In fact the foreign currency chosen was US Dollars notwithstanding that the Claimant knew it had to finance the Project in Yen as this was the currency available to it from its banks. Mr Sakamoto accepted in evidence that the foreign currency selected could have been Yen **[T4/168/21-25]**.

35. Despite this the Claimant did not hedge the currency risk **[T4/81/23-25 – T4/82/1-2]** and Mr Koizumi accepted that he understood the Claimant was exposed to foreign exchange risks **[T4/85/12-15]**.

36. In the Tribunal's view the Claimant knowingly undertook the foreign exchange risk after selecting US Dollars as the foreign currency for the Contract alongside TZS and did nothing to protect itself from the risk of fluctuations in the exchange rate. Accordingly the Tribunal finds that the Claimant is not entitled to compensation for the devaluation of other currencies against the Yen.

**Loss of opportunity**

Parties' submissions

232

233

37. The Claimant avers that Konoike's financial difficulties caused by the Respondents' breaches of contract affected its ability to bid for and win new work. Its case on loss of opportunity is set out at Section 13 of the Amended SoC. It had identified three projects where it could not submit a bid because of its financial difficulties and lost the chance to submit tenders for and win these three contracts. Tender 1 was for a joint tender for the sub-contract for the construction of two pre-stressed concrete tanks forming part of a jetty development and LNG received terminal project in Thailand. Tender 2 was a tender for Phase 3 of a Hydropower project in Kenya. Tender 3 was for the Fly Over Project in Mongolia. The Claimant avers that its banks, in particular SMBC, advised the Claimant not to submit the tenders and it had no option but to follow this advice. In 2006, SMBC and Konoike agreed a Framework according to which Konoike would not engage in a further large international project until one year after the Dodoma issue has been resolved. In the meantime, Konoike should concentrate only on going for Grant Aid Projects. Konoike could not persuade SMBC to allow it to tender for Tenders 1 -3 and for that reason it did not submit these tenders. Konoike claims loss of profit in the sum of J.Yen 838,610,983 alternatively tender expenses in the sum of J. Yen 6,682,378.

38. Sub-Clause 17.6 of the Contract provides a limitation of liability provision stating that: *"Neither Party shall be liable to the other Party for loss of use of any Works, loss of profit, loss of any contract or for any indirect or consequential loss or damage which may be suffered by the other party in connection with the Contract, other than under Sub-Clause 16.4 and Sub-Clause 17.1."* The Claimant points to the final paragraph which states *"This Sub-Clause shall not limit liability in any case of fraud, deliberate default or reckless misconduct by the defaulting Party."* It is the Claimant's case that the Respondents' breaches which resulted in the Claimant being unable to tender for Tenders 1 – 3 amount to both deliberate default and reckless misconduct of the Respondents so that the limitation does not apply.

39. The Respondents contend that the lost opportunity claim is speculative in the extreme. It rests entirely on the testimony of Mr Yamashita, who has admitted

233

that Konoike never actually tendered for any of the three projects **[T7/74/1-7]**. In fact, the weight of the evidence is that the Claimant's decisions not to pursue these Tenders were based on quite unrelated business considerations, including the Claimant's inability to prepare a reliably lower bid, competition from other construction companies, and the Claimant's own poor track record in the countries where these projects were located. The Claimant has abjectly failed to prove either causation or damages with respect of any of the three Tenders. It cannot show that (i) but for a specific breach of contract by the Employer, it would have submitted the bids; and (ii) there was a substantial chance, not merely a speculative chance – that it would have won them.

40. Additionally, with respect to at least Tenders 2 and 3, the Respondents state that a broader point should be made on the issue of causation, which is that the Claimant's decision making appears to have hinged largely on the "advice" of a single bank which the Claimant treats as binding, rather than the Claimant's own appreciation of its business circumstances. If so, the Respondents contend that the Claimant's unwillingness or inability to seek other sources of project finance is a more prominent cause of any decision not to bid than supposed cash flow problems on any particular project.

41. In relation to the Claimant's argument on the limitation clause, the Respondents aver that there was no such wilful misconduct or deliberate default. How that could even be alleged as of October or December 2007, when Tenders 1 and 2 would have taken place, is in the Respondents' submission incomprehensible.

42. Furthermore, in the event that the Tribunal were to accept all or some of the Claimant's case on lost opportunities, the Respondents aver that the Claimant's estimates are over-optimistic and clearly ignore the realities of its past projects.

**Analysis and conclusions of the Tribunal**

43. The Tribunal have concluded that the loss of opportunity claims in respect of the three projects must be dismissed on the grounds that the Claimant has

234

235

failed to prove causation  or that damage was suffered .In all three projects the proposed tenders were not even submitted.

Tender 1

44. Tender 1 involved a tender to 1HI for a subcontract for two concrete LNG tanks for the PTT LNG Terminal in Thailand. It is clear from the minutes of a meeting on 27 October 2007 **[C2/1.11/3]** of the Claimant's Screening Committee setting out the reasons for not proceeding with the tender and form Mr Yamashita's evidence that the problems with the this Project were not given as a reason for not proceeding **[T7/82/5-19].**

45. The Claim in respect of Tender 1 fails for this reason alone.

Tender 2

46. This tender involved a bid to construct phase 3 of the Sondu/Miriu Hydropower Project in Kenya. Although the Claimant contends that they did not proceed with this tender and that their bank (SMBC) advised them not to because of the problems on this Project it was apparent from Mr Yamashita's evidence that losses incurred by the Claimant on previous phases of the Kenyan project of 1.8 billion yen were a factor influencing the position **[T7/90/10-17; T7/92/19-93/6].**

47. Secondly Mr Yamashita told the Kenya Ministry of Energy, the Japan Bank for International Cooperation and the Japanese Ambassador to Kenya that the Claimant was not proceeding with its tender because of high costs and security problems **[T7/99/4-9].** My Yamashita said in evidence that he had no alternative but to say this in order to protect the Claimant's business reputation on Kenya **[T7/96/19-23]** although the overriding reason not to proceed was the problems on this Project.

48. Given the foregoing the Tribunal has no hesitation in dismissing the claim for lost opportunity in respect of Tender 2.

Tender 3

49. Tender 3 was a joint tender for the construction of a Railway Flyover in Mongolia. Mr Yamashita accepted in evidence [T7/112/17-21] that the contemporaneous documentation did not refer to this Project as being a reason not to proceed with a project in a country where the Claimant had previous negative experience. Instead Mr Yamashita relied upon an undocumented telephone call from SMBC on 10 July 2009 instructing the Claimant not to proceed due to the Claimant's cash flow problems.

50. The evidence in the Tribunal's view is insufficient to establish causation in respect of Tender 3 and this claim for lost opportunity is dismissed.

51. Although it is not necessary to address further submissions in the case of all three tenders the Claimant submits through Mr Yamashita that they had a 100% chance of winning each tender. The reality is that none of the tenders were submitted and in any competitive tendering situation in other countries no bidder has a 100 % chance of success. In the case of each of these tenders there are specific reasons submitted by the Respondents as to why the chance of success could not have been 100 %. Given the decision of the tribunal on the basis of causation it is not necessary to address these specific submission although many of them are cogent in the Tribunal's view.

52. Finally Sub-Clause 17.6 of the Subcontract excludes loss of profit and contract claims unless the Claimant is able to establish fraud, deliberate default or reckless conduct by the Respondents. Given the Tribunal's findings on the merits it is not necessary to decide whether Sub-Clause 17.6 is applicable.

## Costs of the DAB proceedings and amicable settlement procedures

### Parties' submissions

53. The Claimant states that as a consequence of the Respondents' breaches, it referred the disputes to a DAB. There were two Referrals for two adjudications – DAB1 and DAB2 and the adjudicator failed to give a decision in either. The Claimant avers that the Respondents served a Defence which failed to address the majority of the issues in DAB1 and failed to serve a Defence at all in DAB2. Thereafter, amicable settlement talks were conducted

by the Parties. The Claimant accordingly seeks recovery of JPY 215,959,867 in respect of the DAB Proceedings; and JPY 60,448,403 in respect of the amicable settlement talks.

54. The Claimant contends that the Respondents' conduct in refusing to perform their obligations under the Contract and refusing to agree to allow these disputes to be determined in arbitration without first going through the DAB and Amicable Settlement processes in circumstances where it was obvious that these disputes simply were not suitable for these processes is such that Konoike is entitled to recover such costs as damages and/or compensation for breach of the Contract and/or as costs. Further, the costs incurred would not have been incurred had the Respondents not committed their breaches of contract which are the subject of this Arbitration. Further again, the Parties conferred jurisdiction on the DAB to determine costs in DAB 1 by seeking payment of such in their submissions. Sub-Clause 20.6 of the Contract provides that any dispute in respect of which the DAB's decision has not become final and binding shall be finally settled by international arbitration. The DAB failed to reach a decision including in respect of the costs claims and the Tribunal has jurisdiction over this matter. In relation to DAB 2, the Claimant sought its costs in those proceedings in its Referral and accordingly in accordance with Sub-Clause 20.6 it is a dispute upon which the DAB failed to give a decision and it is submitted that it is a dispute which the Tribunal must decide.

55. The Respondents' primary position is that the costs incurred in the DAB proceedings and the subsequent settlement talks are unrecoverable by either party. The costs were incurred by both Parties as a result of the operation of the contractual dispute resolution mechanism, as mandated by Sub-Clauses 20.2 to 20.4 of the Contract. There is no allegation that the Employer breached Sub-Clauses 20.2 to 20.4 of the Contract, and there are no grounds upon which such allegations could be founded. The Respondents' primary position is consistent with prevailing principles in international arbitration. While the ICC rules expressly empower the Tribunal to allocate the costs associated with

arbitral proceedings, there are no provisions permitting the allocation of costs of pre-arbitration settlement mechanisms.

56. In any event, it was the Claimant, not the Respondents, who caused unnecessary burdens during the DAB process. While the DAB was intended as an efficient dispute resolution mechanism, the Claimant served up vast and complicated submissions.   The Claimant refused to cooperate with the Respondents' attempt to streamline the dispute by narrowing the issues, which led to the DAB's cancellation of the hearing and the expiry of its jurisdiction.

57. In the alternative, if the Tribunal determines that the costs of these type are in principle recoverable, then the Claimant should be ordered to pay the Respondents' DAB and settlement negotiations costs.

58. In the further alternative, if the Tribunal were to award the Claimant costs in respect of the DABs and settlement discussions, the claim for management time should be rejected, and the overall award should not exceed the corresponding sums expended by the Respondents.

**Analysis and conclusions of Tribunal**

59. Both DAB1 and DAB 2 and the amicable discussions took place as a result of the requirements of the dispute resolution provisions contained in Sub-Clauses 20.2 to 20.4 of the Contract. These provisions require these steps to take place before this arbitration could commence but in the case of the discussions the requirement is that a period has to expire for this purpose rather than that discussions have to take place.

60. No decision was given by the adjudicator in either DAB as the time limit for giving such a decision expired .Both Parties claim their costs incurred in both the DABs and for the discussions although the Respondents primary position is that these costs are not recoverable by either Party.

61. The Tribunal agrees with the Respondents' primary case for the following reasons:

a. Sub-Clauses 20.2 to 20.4 do not make any provision for the recovery of costs in respect of DAB proceedings or in respect of amicable discussions.

b. In respect of any DAB proceedings, although such proceedings are a precondition to commencing an arbitration they are separate proceedings conducted by a separate tribunal, in this case a sole adjudicator. There was no final decision by the adjudicator on the merits of the issues and no decision in relation to costs incurred by either Party.

c. In relation to amicable discussions although a precondition to arbitration this is simply a sensible step to require the Parties to take in an attempt to explore whether arbitration can be avoided. The process is not formal and in the Tribunal's view costs would only be recoverable if the Parties agreed to this as part of an overall; or partial settlement resulting from the discussions.

d. Article 37 of the ICC Rules empowers the Tribunal to allocate costs relating to the arbitration proceedings but contains no provisions allowing the award of costs relating to pre- arbitration settlement mechanisms.

62. For the foregoing reasons the Tribunal finds that neither Party is entitled to recover its costs in relation to DAB1, DAB2 or the amicable discussions which took place as part of the dispute resolution process before the commencement of this arbitration.

## SECTION XII: THE CLAIMANT'S CLAIMS FOR VAT; FINANCING; INTEREST

1. In this Section, the Tribunal considers the Claimant's claims for VAT, financing costs and interest.

**VAT**

Parties' submissions

2. The Claimant avers that it is entitled to recover VAT and/or an indemnity for the same on the sums found due to it by the Tribunal. It seeks (i) payment of VAT at 20% on all sums claimed in the arbitration; and (ii) an indemnity from the Respondents in the event that the Tanzanian Revenue Authority seeks to recover VAT in excess of that paid to the Contractor for the Project, or impose interest, fines, penalties or other charges or sums on the Claimant in respect of the Project.

3. The Claimant submits that it is clear that the Respondents have frequently failed to pay sums due and payable to the Claimant when due or at all. The Claimant is claiming those sums in this arbitration and is entitled to recover VAT on the sums due to it by the Tribunal. VAT is a cost to the consumer (the Respondents), not the supplier (the Claimant).

4. Further, Ms Karume in closing submissions pointed out that it is for the Tanzanian Revenue Authority to interpret the Value Added Tax Act to determine whether or not VAT was due. Therefore there is a risk, if the Claimant is not provided with an indemnity, that the Tanzanian Revenue Authority could ask for VAT and on appeal the Court of Appeal could decide that VAT is due. **[T14/102/5-25]**. Ms Karume was asked by the Tribunal whether it was correct that the prima facie position was that damages do not attract VAT, but it was open to a court to rule otherwise. She confirmed this was correct **[T14/103/1-6]**.

5. The Respondents deny that the Claimant is entitled to be paid VAT at 20% on all sums claimed in the arbitration. The rate of VAT in force in Tanzania since

1 July 2009 has only been 18%. Further, the Claimant has failed to demonstrate that the sums claimed in the Arbitration constitute "taxable supply" for the purposes of the VAT Act. The only possible claim put forward by the Claimant that constitutes "taxable supply" is the claim for additional payment in relation to the value of work done as at termination – i.e. the additional quantities certified in the Final Account Assessment.    The remaining claims do not relate to the Claimant providing goods and services. On the contrary, they are damages claims that relate to the Claimant actively not providing goods or services to the Employer during periods of suspension and as a consequence of termination.

6. In relation to the indemnity sought, the Respondents aver that the Tribunal has no jurisdiction to make an order as to the purely hypothetical potential future actions of the Tanzanian Revenue Authority. They would not be actions under this Contract, but rather actions in implementing the VAT Act. Such disputes do not fall within the scope of the arbitration agreement pursuant to which this Tribunal has been appointed.

7. Further, the Contractor is effectively requesting immunity from the Tanzanian VAT regime. Such relief is not within a contractual tribunal's authority to give. To the extent that the Contractor subsequently comes into dispute with the Tanzanian Revenue Authority, its remedy lies elsewhere.

**Analysis and conclusions of the Tribunal**

8. The Claimant is claiming VAT at 20% on all sums claimed in the arbitration. The Respondents say the VAT rate applicable in Tanzania since 1 July 2009 is 18% and may not be recoverable on all sums claimed in the arbitration.  Ms Karume for the Claimant submitted that the Tanzanian Revenue Authority will interpret the VAT Act to decide whether VAT is due on any sums claimed in this arbitration.

9. On the basis of the foregoing and lack of evidence as to the applicability of VAT to any sums awarded the Tribunal is not in a position to decide what if any VAT may be due on sums received by the Claimant.

10. However the Contract is governed by Tanzanian law and the services were supplied in Tanzania. Accordingly it is possible that the Tanzanian Revenue Authority may decide that VAT is due on some or all of the sums awarded to the Claimant in this arbitration. In the Tribunal's view it is appropriate that if such a liability arises  the Claimant is entitled to be reimbursed  by the Respondents and that  the Respondents as Tanzanian Government bodies should have no objection to the imposition (if any) of VAT by another government body in relation to this Contract.

11. Accordingly the Tribunal finds that the Claimant is entitled to and shall have an indemnity from the Respondents in respect of any amount of VAT which the Tanzanian Revenue Authority  seeks to recover  on sums awarded in this arbitration (in excess of any VAT so far paid to the Claimant) and in respect of any interest, fines, penalties and/or any other charges that may be imposed on the Claimant in relation to VAT in respect of the Contract or Project provided that any such interest, fines, penalties or other changes do not arise, in whole or in part from any fault on the part of the Claimant. The indemnity shall be in respect of the final amount of VAT that is applicable after all appeals under the Tanzanian legal system have been exhausted.

12. The Respondents contend that the Tribunal does not have the jurisdiction to make an order for an indemnity and secondly that the Claimant is effectively requesting immunity from the Tanzanian VAT regime.

13. The Tribunal does not agree with either of these submissions. Firstly the Claimant's request for an indemnity is not a request for such immunity. It is a request to be protected in the event that the Tanzanian Revenue Authority decides that under Tanzanian law the sums paid by the Employer to the Contractor are subject to VAT. This is a contract for the supply of goods and services in Tanzania and if VAT is applicable thereto the Tribunal considers it to be reasonable for the Claimant to recover this from the Respondents who are benefitting from the Contract.

14. Secondly if VAT is applicable to sums due to the Claimant under the Contract or this arbitration pursuant to the Contract the liability for such VAT clearly

242

243

arises under the Contract in respect of whatever sum is decided to be applicable by the Tanzanian Revenue Authority.

**Financing costs and interest**

<u>Parties' submissions</u>

15. The Claimant claims financing charges, alternatively interest on the sums found due to it in the arbitration.

16. The Claimant's case on financing charges is set out at Section XIV for the amended SoC **[A1/1.1/430-436; and Appendix 4]**. The Claimant seeks financing charges in accordance with Sub-Clause 14.8 on all payments which the Employer allegedly failed to make in accordance with Sub-Clauses 14.7, the Payment Certificates under Sub-Clause 19.6 and/or Sub-Clause 16.4.

17. The Claimant seeks financing charges in respect of:

    a. The Outstanding Amount;

    b. IPCs 19, 20A and 23;

    c. Balance of payments due for billed and measured work completed including adjustments for Price Escalation;

    d. Prolongation and disruption payable on claims 6, 7, 8, 13, 20 and 22;

    e. Entitlement arising upon termination;

    f. Claims 10 and 12.

18. In the alternative, the Claimant claims interest pursuant to Section 49 of the Arbitration Act 1996.

19. The Respondents aver that the Claimant should not receive financing charges because the Employer did not make payments late. Furthermore, given the Claimant's claim for currency devaluation, the Respondents infer that any sums that the Claimant received denominated in Shillings and Dollars would purportedly have been transferred to Yen immediately had they been paid on the same day as the Claimant says payments were due. Any interest thereon

should therefore be limited to the interest rates in Japan. The Claimant has not put into evidence its actual cost of financing but assuming that the Claimant was borrowing at the short term prime lending rate for principle banks, then the appropriate rate would be 1.475% which has been fixed since January 2013.

**Analysis and conclusions of Tribunal**

20. In the Tribunal's view it is not possible to calculate what the financing charges would be pursuant to Sub-Clause 14.8.As the Respondents submit there is little evidence of Konoike's actual cost of financing although it is reasonably clear that the Contract was financed by Konoike's bank in Yen. Secondly the dates from which such financing charges would be calculated on the sums awarded in respect of the categories of cost set out above are difficult to calculate with any reasonable accuracy on the evidence available.

21. However it is the Tribunal's view that the Claimant is entitled to some compensation for the loss of use of the sums of money which the Tribunal has found are due to the Claimant. Accordingly the Tribunal finds that the Claimant is entitled to recover simple interest pursuant to Section 49 of the Arbitration Act 1996 on the following basis:

   a. Interest on sums due under the Addendum shall be payable from 14 April 2007 which is 30 days after the date of the Addendum until the date of payment of such sums. Where a sum has not been paid the interest continues until 31 December 2015.Interest has been calculated at the Bank of Tanzania rates from 2007 plus 1.005 %. The Claimant is accordingly entitled to TZS 1,787,741,126 and USD 6,198,045..

   b. In respect of all other sums awarded in this arbitration it is not possible to ascertain with any accuracy the specific dates on which such sums became due. The Tribunal have found that the Contract was correctly treated by the Claimant as wrongfully repudiated by the Respondents in March 2009. The Claimant commenced this arbitration in July 2012 approximately three years after the termination and approximately 3

years prior to the date of this award.  The Tribunal concludes that it is fair to award interest on all sums awarded (other than the sums referred to in the preceding paragraph) from the date of 4 July 2012 to the date of this Award,using the date of 31 December 2015 for this purpose..

22. The rates of interest from 4 July 2012 to 31 December 2015 shall be:

a.  For US Dollars, 1.005% above base for 2012, 2013, 2014 and 2015 which is:

| | |
|---|---|
| 2012 | 1.013% |
| 2013 | 0.683% |
| 2014 | 0.561% |
| 2015 | 0.792% |

b.  For Tanzanian Shillings, 1.005% above base for 2012, 2013, 2014 and 2015 which is:

| | |
|---|---|
| 2012 | 13.005% |
| 2013 | 13.672% |
| 2014 | 17.005% |
| 2015 | 17.005% |

c.  For Japanese Yen, 1.005% above base for 2012, 2013, 2014 and 2015 which is:

| | |
|---|---|
| 2012 | 1.305% |
| 2013 | 1.305% |
| 2014 | 1.305% |
| 2015 | 1.305% |

23. Accordingly the Claimant is entitled to interest of:

    a.   TZS        6,007,136,955;

    b.   USD      800,624

    c.   JPY       3,613,226.

up to 31 December 2015.

24. In addition the Tribunal  finds that the Claimant is entitled to recover interest of:

    a.   TZS 5,172,428.40;

    b.   USD 682.04;

    c.   JPY 2,833.90;

per day from 1 January 2016 to the date of payment of the principle sums due under this award. These daily amounts are calculated on all principle sums awarded to the Claimant ,other than costs.

## SECTION XIII: COUNTERCLAIMS

1. The Respondents make a number of counterclaims in these proceedings with which the Tribunal will now deal.

**Revisions to IPCs**

2. This counterclaim must fail in view of the Tribunal's findings regarding the enforceability of the Addendum. Secondly, in relation to the items at paragraphs 175(f) and 175(g) the Tribunal does not consider that it is necessary or appropriate to make any adjustment to the IPCs referred to therein.

**Liquidated damages**

3. In the light of the Tribunal's findings in Section VI regarding the unenforceability of liquidated damages for sectional completion and for completion of the whole of the Works, the Respondents' claim for liquidated damages must fail. In the Tribunal's view, as set out in Section VI, the liquidated damages provision for completion of the whole of the Works cannot be enforced where the Contractor had been prevented from completing by wrongful termination.

**Defective works**

Defective box culvert

4. The Respondents claim the amount of TZS 16,512,045.68 and USD 8,422.36 (including VAT). The cracking to this box culvert arose from settlement and the Claimant admits that if it had been obliged to complete the work it would have been required pursuant to Sub-Clause 11.1 to rectify the cracking.

5. The Claimant argues that it has been discharged from the obligations for rectification of the cracking from the date of termination of the Contract as it

was not the intention of the Parties in the event of wrongful termination by the Employer for the Contractor to have any obligation with respect to completion of outstanding works and remedying defects.

6. It seems however to the Tribunal that a calculation of the damages to which a wrongfully terminated Contractor is entitled must take into account the cost to the Contractor of rectifying the defective work carried out before the termination of the Contract at its cost if no termination had occurred.

7. The position is however complicated by the fact that the Tribunal does not have evidence of what it would have cost the Contractor to remedy this defective work. The Counterclaim is for the actual costs incurred by the Respondents in having this work carried out by a replacement Contractor. The amount of this claim is not in the Tribunal's view the proper amount which should be taken into account against the wrongfully terminated Contractor. There are also issues raised regarding the extent of the remedial work in addition to its cost.

8. Accordingly the Tribunal does not accept that the Respondents are entitled to the amounts claimed and disallows this counterclaim.

### Reinstatement of open gravel pits and clean-up of excess materials

9. This Counterclaim relates to the completion of work still to be executed by the Contractor rather than to defective work for which the Contractor was responsible. Characterised thus, it is not an amount which can be recovered by the Respondents from the wrongfully terminated Contractor. This Counterclaim is dismissed.

### Undulating section of Road

10. There is a dispute between the Parties as to how this section of Road came to be in the state in which it presently exists, and a dispute as to whether, if the state of the road is the responsibility of the Contractor, being properly

characterised as defective work, any amount can be recovered by the Respondents given the expert evidence regarding the appropriate rectification.

11. The first issue concerns the insistence by the Engineer upon the final trimming and finishing of the CRR base course layer being undertaken by a paver only and without the use of a grader as desired by the Contractor.

12. The Tribunal accepts the evidence of Mr Penfold **[D4/4.1/13 – D4/4.1/14; D5/5.5/4 – D5/5.5/7; T11/23/15 – T11/32/5]** that any undulations to this section of the Road were a consequence of the working method instructed by the Engineer against the Contractor's wishes and that, following a comparison of the undulating section of the Road with an adjacent section, this was the only cause of any irregularities created.

13. The Tribunal is also cognisant of the fact that the new Resident Engineer after December 2005 immediately rescinded the prohibition which prevented the Contractor from using a grader on the final CRR surface and that as a result there have been no irregularities from the 23Km+ point onwards.

14. The section of the Road in question has been in use by the public for some 9 years now without remedial works and the experts are in agreement **[D4/4.2/4 – D4/4.2/5; T11/20/22 – T11/20/24; T11/22/7 – T11/22/11; T11/42/14 – T11/42/22]** that the durability of this section of the Road has not been affected or compromised.

15. In that respect it is important to note that only some 8% of the undulating section is outside the specified tolerance for surface regularity and that there are no signs of early failure of the undulating section of the Road, despite the fact that it is now nearly past 50% of its design life.

16. It was accepted by both the experts **[D4/4.2/8 – D4/4.2/9; D5/5.5/9 – D5/5.5/10; D5/5.9/10; T11/34/13 – T11/34/17; T11/58/19 – T11/63/4]** that as the Road is performing as expected and that only 8% of the Road has any issue with regard to ride quality, the work and the risks involved in disturbing

the pavement by remedial work are not justified. Neither of the experts recommend the carrying out of the works at this time and suggest the Employer should continue to monitor the Road. Dr Busch, the Respondents' expert, stated in cross-examination:

*"MR THOMAS: Yes. Just to be clear, the works that you have costed in your report, you do not recommend carrying those out now?*

*A. No I don't. I would require benefit/cost analysis, where the risks also of doing these patches was taken into account."* **[T11/62/24 – T11/63/4]**

17. The Respondents' expert accepted that it might be advisable for the Employer to wait and see what eventuated and possibly apply a 2 inch asphalt concrete overlay in due course to the entire length of the undulating section when more routine and comprehensive maintenance was undertaken.

18. In the Tribunal's view, in the circumstances set out above the counter claim must fail.

Bleeding of bitumen

19. The Respondents claim costs in respect of the surface dressing of the Road between (1) Ch. 83+700 and Ch. 84+000 and (2) Ch. 78+000 to Ch. 78+600 which they contend is out of specification in that the surface dressing contained bleeded and fatted areas. However the experts are both agreed that no rectification works are required in respect of the bleeding of bitumen at this section. Although it is not entirely clear from the Respondents' closings whether this counterclaim is pursued, in these circumstances the Tribunal considers that this counterclaim must fail.

**Costs of DAB proceedings and settlement negotiations**

20. This issue is addressed in Section XII and the counterclaim fails.

250

**Deduction of Costs awarded against the Claimant in the First Arbitration**

21. The Claimant commenced a previous arbitration (**"First Arbitration"**) under the Contract in connection with the Performance Security provided under the Contract.

22. It is not necessary for the Tribunal to consider the issues which arose in the First Arbitration. As set out at paragraphs 1- 10 of the Respondents' Application for Determination of Preliminary Issues dated 10 April 2013 (**"Preliminary Issues Application"**), the Tribunal in the First Arbitration declined jurisdiction and in its final award dated 23 November 2010, awarded costs to the Respondents in the following currencies:

    (a) EUR 271,258;

    (b) USD 136,016.60;

    (c) GBP 1,504.02;

    (d) TZS 4,780,194.30.

23. The Claimant has not paid this award of costs in the First Arbitration but accepts that the Claimant will pay by credit in this arbitration. At the hearing of the Preliminary issues Application [**T2/58/10-20**] Mr Thomas QC for the Claimant stated:

    *"So we accept that when it comes to your final award in this arbitration in the quantum section there will be a line which, if there is money in our favour there will be a line with a sum in brackets of the costs award in the first arbitration.*

*We accept that that will be so, whether our claim for the costs of that arbitration arising from a breach of contract succeeds or fails. So if we get all of our costs back or some of our costs back as damages for breach of contract or we get none of them back we will still have to credit the amount of those costs."*

24. Accordingly the Tribunal finds that the costs awarded in the First Arbitration, set out above plus interest from 10 December 2010 to 31 December 2015 and thereafter in a daily amount until the date payment are to be deducted from the sums awarded in this arbitration to the Claimant.

25. For the purpose of calculating interest the Tribunal have selected the date of 10 December 2010 as the date from which interest is to run because this is the date proposed by the Respondents as the date by which it proposed to the Claimant that the costs under the final award in the First Arbitration should be paid as set out at paragraph 11 of the preliminary Issues Application. The interest from 10 December 2010 to 31 December 2015 and the daily amount thereafter to the date of payment of each of the principal sums is:

| Currency | Interest to 31 October 2015 | Daily amount |
|----------|------------------------------|--------------|
| USD | 6,862 | 2,.95 |
| GBP | 164 | 0.06 |
| TZS | 3,379,909 | 2,227.05 |
| EUR | 25,694 | 9.07 |

252

26. The sums awarded to the Claimant in this arbitration are calculated in the currencies of TZS, USD and JPY. As set out in Section XVI Summary of Decisions the net sums awarded to the Claimant in TZS and USD include a deduction of the TZS and USD costs (including interest to 31 December 2015) of the First Arbitration.

27. In relation to the EUR and GBP costs of the First Arbitration the Tribunal finds and directs that these sums plus interest due thereon are to be converted to TZS and USD in the proportions specified in the Contract at the exchange rates prevailing on the date of payment of the TZS and USD sums awarded to the Claimant in this Award and deducted therefrom prior to payment.

## SECTION XIV – COSTS

### Applicable legal principles

1. The allocation of costs by the Tribunal is governed by the relevant provisions of the ICC Rules.

2. Article 37(1) of the ICC Rules provides that:

   *"The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration."*

3. Article 37(4) of the ICC Rules provides:

   *"The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties."*

4. Article 37(5) of the ICC Rules provides:

   *"In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner."*

5. The Claimant has also referred to various provisions of the English Arbitration Act 1996. The Tribunal accepts the Respondents' submission that since no

provisions of that Act conflict with the costs provisions of the ICC Rules, the ICC Rules apply to the determination of costs.

6. The parties are agreed that the general principle is that costs follow the event. The parties also agree that the application of this general principle is based on an assessment of the parties' "relative success" in the arbitration. However, the parties disagree on how the Tribunal should measure relative success.

7. The Claimant submits that relative success should be assessed on whether the Tribunal decides that the Claimant's termination was valid and/or that the Claimant is entitled to payment of further sums over and above what it has been paid so far. It submits that in either or both of these situations it should be considered to be the successful party.

8. The Respondents submit that relative success should be determined by:

   a. A comparison of any sums awarded to the Claimant against the amount claimed by the Claimant; and

   b. The Parties' success on certain discrete claims or issues.

**Relative success in the arbitration**

9. The Tribunal finds that in this arbitration, the critical issues that have largely determined the Award were whether the Claimant was entitled to terminate the Contract and whether it was entitled to any further payments in particular arising from the Addendum especially on Price Escalation. The Claimant was successful on these issues. In addition the Respondents have not succeeded on their counterclaims, other than to the extent the costs of the previous arbitration have been deducted as a line item from the amount awarded to the

255

Claimant. This issue occupied little time and does not impact on the assessment of relative success.

10. While the Tribunal does not necessarily accept the Claimant's submission that any financial recovery should entitle them to costs, the Claimant has succeeded to a substantial financial extent. Again, the Claimant has succeeded on the key issue of termination. The Claimant has also been successful on the counterclaims which were of significant value.

11. It follows that the Tribunal finds that the Claimant had relative success in the arbitration and the starting point is that it is entitled to costs.

**Efficient and cost-effective manner of proceeding**

12. Article 37(5) of the ICC Rules expressly provides that the Tribunal may take into account the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.

13. Both parties submit that the other has failed to conduct the arbitration in an efficient and cost effective manner.

14. The Tribunal's view is that both parties have at times complicated the conduct of the arbitration. However, the Tribunal finds that the conduct of each of the parties does not justify any change from the costs to be awarded to the Claimant on a costs follow the event approach.

256

**Costs of various preliminary issues**

15. The Tribunal has considered whether the costs of any preliminary issues should be assessed separately.

16. The Tribunal has considered the various preliminary issues referred to by each of the parties. It finds that none of the issues justify being dealt with separately nor justify a separate costs award.

17. Although the Respondents were successful on the interim award ultimately this did not have any real impact on the scope of the arbitration or on the Award.

18. Similarly although the Claimant says that it should get costs in any event in relation to the objection to Mr Schwartz; the Respondents' unsuccessful application for interim relief; the Respondents' failure to comply with the timetable; and the Respondents' changing position and pursuit of unmeritorious arguments, the Tribunal finds that these issues do not justify being dealt with separately.

**Jurisdiction to award costs of DAB proceeding/amicable settlement**

19. Both parties claim as costs, costs incurred in relation to the DAB proceedings and settlement discussions. For the Respondents, this claim is in the

257

alternative because its primary position is that these costs are not recoverable in principle as they are not costs of this arbitration.

20. The Claimant submits that these costs should be recovered as the work done for the DAB proceedings and settlement discussions was necessary for and not duplicated in the arbitration.

21. The Tribunal finds that it is empowered to allocate only the costs of this arbitration. The costs of separate previous processes cannot be claimed as costs in this arbitration, and any claim for these costs is disallowed.

22. The calculation of the Claimant's costs of the DAB and amicable settlement which have been disallowed, are those set out in the table at paragraph 3.19 of the Claimant's costs submissions. These calculations do not appear to be challenged by the Respondents and the figures have been agreed between the parties' experts: see joint statement of Ms Prior and Mr Kyte dated 17 December 2014.

**Whether any settlement offers impact on the award of costs**

23. The Claimant has referred to various offers made by it during the settlement discussions. The Tribunal does not consider it necessary to determine the admissibility of these offers as in any event these offers were higher than the amount awarded to the Claimant and were not express offers relevant to costs.

24. The Tribunal has considered the two without prejudice save as to costs offers made by the Respondents:

a. Offer of 16 September 2011 corrected on 3 October 2011: the parties disagree as to whether this was an offer capable of acceptance and on what the amount of the offer was. However, on either party's contention of the amount the offer was well below the amount awarded to the Claimant.

b. Offer of 19 January 2015: the Tribunal finds that this offer was made too late to have any real impact on the assessment of costs and in any event this offer was less than the amount awarded to the Claimant.

25. It follows that the Tribunal finds that there are no relevant settlement offers that impact on the Tribunal's assessment of costs.

**Assessment of costs claimed by Claimant**

26. While the Tribunal has found that the Claimant is entitled to costs, and accepts that it had the burden of proof for its claims, its costs must be reasonable to be recoverable.

27. The Respondents have submitted that a comparison of the amounts spent by the Parties shows that the costs claimed by the Claimant are excessive. The Tribunal considers that it is relevant to take the costs incurred by the Respondents into account as a comparative factor but the simple fact that costs incurred by the Claimant may be higher than those of the Respondents does not mean that the Claimant's costs are excessive.

28. The Tribunal finds that the Claimant is entitled to its costs as claimed, subject to:

259

    a.  Costs in relation to the DAB proceeding/settlement discussions, which are disallowed;

    b.  A deduction for the "Internal Party Staff costs", which are disallowed (addressed in further detail below); and

    c.  Specific deductions on some categories of costs, as detailed below.

29. Each of the categories of costs claimed by the Claimant will be dealt with in turn.

## Solicitor's fees

30. The Claimant has incurred solicitor's fees of GBP 4,678,893.75, as set out in schedule 2 to its costs submissions.

31. Adequate breakdown of these fees has been given and the fees claimed are substantiated.

32. The Tribunal disallows any fees relating to the DAB proceedings/settlement discussions but otherwise allows the claim for solicitor's fees. The amount for Beale & Company fees and disbursements for the DAB was GBP 946,949.13, with no fees for the amicable settlement (see paragraph 3.19 of the Claimant's costs submissions). Deducting this amount means an award for solicitor's fees of GBP 3,731,944.60.

## Solicitor's disbursements

33. The Claimant has incurred solicitor's disbursements of GBP 490,244.50, as set out in Schedule 2 to its costs submissions.

260

34. Adequate breakdown of the disbursements has been given and the disbursements claimed are substantiated.

35. The Tribunal disallows any disbursements relating to the DAB proceedings/settlement discussions but otherwise allows the claim for disbursements. Because disbursements for the DAB proceedings were included in the DAB costs deducted from solicitor's fees above, they are not separately deducted here. This means the award for disbursements is GBP 490,244.50.

36. Since the filing of costs submissions, the Claimant has incurred further costs in relation to the provision of the electronic hearing bundle. These costs have been substantiated and are allowed at the amount claimed of GBP 12,060.

Counsel fees

37. The Claimant has incurred counsel fees of GBP 1,422,258.78 and USD 133,256.70, as set out in Schedule 3 to its costs submissions.

38. Adequate breakdown of these fees has been given and the fees claimed are substantiated.

39. The Tribunal disallows any fees relating to the DAB proceedings/settlement discussions but otherwise allows the claim for counsel fees. The schedule of DAB/amicable settlement costs at paragraph 3.19 of the Claimant's costs submissions shows counsel fees and expenses of USD 34,250 and GBP 19,280.37 for the DAB and no counsel fees and expenses for the amicable

261

settlement. Deducting these amounts from the amount claimed means an award of USD 99,006.70 and GBP 1,402,978.40 for counsel fees.

ICC/Tribunal expenses

40. The Claimant has currently incurred an advance on ICC costs of USD 627,500, as set out in Schedule 4 to its costs submissions.

41. The Respondents have submitted that an inflated claim by the Claimant has meant that the ICC costs and expenses have been higher than necessary. However, the Tribunal finds that as the Claimant has succeeded on the key issue of termination and has had substantial financial success, it is entitled to recover its share of the costs of the arbitration fixed by the Court.

42. At its session of 17 December 2015, the ICC Court has fixed the costs of the arbitration at USD 1,068,440. Accordingly, the Claimant is entitled to recover from the Respondents 50% of the costs of the arbitration which is USD 534,220.

Expert fees

43. The Claimant has incurred expert fees of GBP 2,282,259.63, as set out in Schedule 5 to its costs submissions.

44. The Claimant has incurred fees and expenses of GBP 1,400,603.38 for its expert Mr David Richards. The Tribunal finds that Mr Richards's fees are high, and that given his views changed during the course of the arbitration, allows these fees with a 20% reduction, ie an award of GBP 1,120,482.60.

262

45. The Claimant has incurred fees and expenses of GBP 70,949.63 for its expert Mr Nigel Penfold. The Tribunal allows these fees.

46. The Claimant has incurred fees and expenses of GBP 390,188.77 for its expert Mr Tim Tapper. Mr Tapper was originally instructed by the Claimant however dispensed with and Ms Prior was instructed. In these circumstances the Tribunal disallows the claim for Mr Tapper's fees.

47. The Claimant has incurred fees and expenses of GBP 420,517.85 for its expert Ms Joanne Prior, not including the work required by Ms Prior from February 2015. The Tribunal allows these fees.

48. From the expert costs must also be deducted expert fees for the DAB of GBP 32,194.30. This means an award for expert fees of GBP 1,579,755.70.

Costs directly paid by party

49. The Claimant has incurred costs directly paid by party of GBP 350,129.55, USD 146,294.56, JPY 22,380,759.50 and TZS 954,276.82, as set out in Schedule 6 to its costs submissions.

50. The Tribunal has found that costs for the DAB and amicable settlement are not recoverable in this arbitration. The schedule of DAB/amicable settlement costs at paragraph 3.19 of the Claimant's costs submissions shows the following for costs paid directly by party:

*DAB*

a. Consultant fees and expenses: USD 63,220, JPY 4,659,041 and GBP 50,252.86.

b. Costs of business trips: TZS 276, 412 and USD 23,778.

c. DAB fees: USD 8,000.

*Amicable settlement*

d. Consultant fees and expenses: JPY 2,160,467 and GBP 97,074.41.

e. Costs of business trips: USD 9,860.

51. Deducting these amounts from the amount claimed for costs paid directly by party means an award of:

GBP 202,802.28;

USD 41,436.56;

JPY 15,561,251; and

TZS 677,864.82.

Fact witnesses costs

52. The Claimant has incurred fact witnesses costs of GBP 24,238.75, USD 1,090.96 and JPY 983,147, as set out in Schedule 7 to its costs submissions.

53. The Tribunal notes that the Claimant's claims for lost opportunity for which there were a number of Japanese witnesses were unsuccessful. Because of this

the Tribunal allows the fact witnesses costs with a 10% reduction. Costs of fact witnesses relating to the DAB proceedings (GBP 6,323.96) are also disallowed. This means that for fact witnesses:

GBP 24,238.75 – 6,323.96 with 10% reduction = GBP 16,123.31;

USD 1,090.96 with 10% reduction = USD981.86; and

JPY 983,147 with 10% reduction = JPY 884,832.30.

<u>Internal party staff costs</u>

54. The Claimant has incurred internal party staff costs of USD 547,543, JPY 214,682,872 and TZS 740,090,201, as set out in Schedule 8 to its costs submissions.

55. These are essentially management costs and some relate to the DAB/amicable settlement. The Tribunal finds that none of these costs are allowable as a category of costs and disallows this claim.

**Award of costs**

56. The Tribunal finds that the Claimant is entitled to the following costs:

Solicitor's fees: GBP 3,731,944.60.

Solicitor's disbursements: GBP 490,244.50 and GBP 12,060.

Counsel fees: GBP 1,402,978.40 and USD 99,006.70.

ICC/Tribunal expenses: USD 534,220.00

Expert fees: GBP 1,579,755.70.

Costs directly paid by party: GBP 202,802.28, USD 41,436.56, JPY 15,561,251 and TZS 677,864.82.

Fact witness costs: GBP 16,123.31, USD 981.86 and JPY 884,832.30.

## SECTION XV:  SUMMARY OF DECISIONS

1. For the reasons set out above, the following is a summary of the Tribunal's decisions in this Arbitration

## SECTION III: THE ADDENDUM CLAIMS

**Price Escalation**

2. The Respondents have failed to demonstrate that approval of the Addendum by a Tender Board was not granted. Accordingly, pursuant to paragraph 1.0(i) of the Addendum (and also stated in the Deed of Settlement), the Claimant is entitled to be paid Price Escalation in US Dollars on the foreign currency element of the Adjusted Contract Price from the date of the Addendum.

3. Under the original Contract after the expiry of the first 18 months of the contract period the Claimant is entitled to payment of Price Escalation in Tanzanian shillings on both the local currency and the foreign currency elements of the Accepted Contract Amount. The Pre-Bid Minutes do not alter this finding.

4. The fact that the Claimant did not insert a figure in the foreign currency column of the Schedule does not alter this finding.

5. The figure of TZS 1.5 billion inserted in the Schedule is a provisional sum and does not operate as a cap on the amount of Price Escalation payable under the

original Contract in Tanzanian shillings on both the local and foreign currency elements of the Accepted Contract Amount,

6. The agreement in respect of Price Escalation in the Addendum does not result in an unreasonable windfall to the Claimant.

7. The Addendum is not void on the basis of mutual mistake of fact.

8. Accordingly, pursuant to the Addendum, the Claimant is entitled to the sum of TZS 3,825,541,246.28 and USD 9,167,298.07 for Price Escalation

**Pre-Addendum Disruption Costs**

9. The Parties agreed a liquidated sum of TZS 10 billion in respect of the Pre-Addendum Disruption costs and that no further substantiation is required. This was paid to the Claimant in IPC 19 and was not subsequently deducted.

10. The Claimant is entitled to TZS 593,370,920 and USD 5,630,448.83 for Price Escalation on Pre-Addendum Disruption.

**Additional Design Costs**

11. The Claimant is entitled to recover TZS 1,813,008,129.00 for Additional Design Costs without further substantiation of this figure. This sum was paid in IPC 19 and was not subsequently deducted.

**SECTION IV: THE SUSPENSIONS CLAIMS**

12. The Claimant was not entitled to slow down or suspend work for the First Suspension.

13. The Claimant was not entitled to slow down or suspend work for the Second Suspension.

14. The Claimant was entitled to suspend or slow down work for the Third Suspension and accordingly is entitled to an extension of time and prolongation costs arising therefrom.

## SECTION V: OTHER DELAY AND DISRUPTION CLAIMS

### Cement (Claim 7)

15. The claim in relation to cement fails as to its merits and the Claimant is not entitled to an extension of time in relation to Section 3 or Section 4, or to prolongation costs or disruption costs.

### Cholera (Claim 8)

16. The Claimant is entitled in principle to recover its direct costs on the basis that the cholera outbreak constitutes an event of Force Majeure. Accordingly the Tribunal finds that the Claimant is entitled to recover TZS 10,282,899; USD 1,330 and JPY 234,478 in respect of the direct costs in relation to the cholera outbreak.

17. The Tribunal is not however satisfied that the circumstances surrounding the cholera outbreak establish any breach by the Respondents of paragraph 6.3 of the MoU as alleged by the Claimant.

### Emergency repairs (Claim 8)

18. The Claimant is entitled to an extension of time of one day for Section 4 and to recover the costs of TZS 72,258,670 being the cost of the execution of this requested work and prolongation costs. This day of delay as a result of the emergency repairs is concurrent with the period of delay for which an extension of time was agreed in the Addendum (30 September 2006 to 29 September 2008). Consequently the prolongation costs cannot be recovered twice.

**Rainfall**

19. The Tribunal is not satisfied that the weather conditions experienced by the Claimant and the subject of this claim constitute exceptionally adverse rain. Accordingly the Claimant's claim fails.

**Waterlogged Ground (Claim 20)**

20. The Claimant is entitled to an extension of time of one day for Section 4 and its Costs pursuant to Sub-Clause 4.12 of TZS 40,348,543; USD 28,378; JPY 4,193,472.

**SECTION VI: EXTENSIONS OF TIME AND LIQUIDATED DAMAGES**

**Extensions of time**

21. The Claimant has no entitlement to extensions of time, prolongation costs or disruption costs in respect of Sections 3 and 4 arising from the First and Second Suspensions.

22. The Claimant is entitled to an extension of time to Section 4 of the work and for the whole of the work of 126 days for the period from 6 November 2008 to 11 March 2009 which is the date the Contract was terminated.

23. The Claimant is entitled to an extension of time of 1 day in respect of Claim 8 (Emergency repairs to Manyoni-Issuna Road; and Claim 20 (waterlogged ground).

**Liquidated Damages**

24. The Respondents cannot recover liquidated delay damages in respect of Sections 3 and 4. The contract provisions relating to liquidated delay damages

were not amended in the Addendum so that liquidated delay damages applied to sections rather than to the whole of the work.

25. The Respondents cannot recover liquidated delay damages for any delay by the Claimant in completing the whole of the work due to the Respondents' own default in repudiating the Contract, resulting in the termination on 11 March 2009. The Contractor was deprived wrongfully of the opportunity to complete the whole of the work at this point.

## SECTION VII: PROLONGATION AND DISRUPTION COSTS

26. There is no agreement between the Parties in the Addendum or otherwise that the monthly amount for Additional Indirect Cost stated in the Addendum is to be applied to the calculation of prolongation costs claimed in this arbitration by the Claimant. The amount of the Additional Indirect Cost operates as a full and final settlement agreed between the Parties in respect of prolongation costs related to the extension of time of 731 days agreed in the Addendum

27. Clause 6.3 of the MoU supplements the provisions of the Contract but there is no contradiction between Clause 6.3 and the relevant provisions of the Contract pursuant to which the Contractor claims prolongation cost.    The Tribunal concludes that prolongation costs are to be recovered pursuant to the relevant provisions of the Contract agreed between the Parties for this purpose in respect of those claims which the Tribunal has accepted.

28. The Claimant is entitled to prolongation costs of:

| Claim 8 (Emergency Repairs): | TZS 351,293 |
| | USD 286 |
| | JPY 68,710 |
| Claim 20 (Waterlogged Ground): | TZS 444,738 |

270

|                              |                |
|------------------------------|----------------|
|                              | USD 635        |
|                              | JPY 60,388     |
| Claim 22 (Third Suspension): | TZS 39,638,528 |
|                              | USD 12,511     |
|                              | JPY 7,827,373  |

29. The amount of TZS 9,908,094,816 found by the Tribunal to be recoverable by the Claimant pursuant to the Addendum for prolongation costs is to be reduced by the amount of TZS 13,572.73.

30. The Claimant is entitled to disruption costs of:

| | |
|---|---|
| Emergency Repairs: | USD 11,354,740.25 |
| Cholera: | USD 11,354,740.25 |

## SECTION VIII: TERMINATION

31. The Tribunal, having reached the view that the Respondents' interpretation of Sub-Clause 16.2 is incorrect, find as a consequence that the Respondents had no right to engage another contractor to execute the work and to exclude the Claimant from the site. Accordingly, the Claimant was entitled to accept such a repudiation and terminate the Contract.

32. The Claimant's right to general damages arising from the Respondents' repudiation of the Contract is not limited to what could be recovered had the Respondents exercised their right to terminate the Contract for convenience under Sub-Clause 15.5.

33. The Claimant's entitlement to general damages falls to be assessed by reference to general principles unlimited by what may have been recoverable by it had it been terminated for convenience by the Respondents under Sub-Clause 15.5.

## SECTION IX: CLAIMS ARISING FROM TERMINATION

34. The applicable uplift for loss of profit is 1.2%.

35. The claim in respect of additional insurance premiums fails.

36. The claim in respect of safety works is allowed. The Claimant is entitled to TZS 505,144 and JPY 96,690.

37. The claim in respect of services provided to the Engineer is allowed. The Claimant is entitled to TZS 4,641,173.

38. The claim in respect of repair costs of the Engineer's vehicle has been withdrawn.

39. The claim in respect of costs and expenses from 11 March 2009 to 30 June 2009 is allowed. The Claimant is entitled to TZS 243,606,189; USD 69,028; and JPY 37,472,773.

40. The claim in respect of costs and expenses post 30 June 2009 fails.

41. The claim in respect of loss of profits and overheads on the balance of works the Claimant did not execute as a result of terminating the Contract is allowed. The Claimant is entitled to TZS 428,431, 533 and USD 993,957.

42. The claim in respect of materials left on site is allowed. The Claimant is entitled to JPY 12,152,046 and must give credit in the amount of TZS 20,694,102; USD 20,846.

43. The claim in respect of borrow pit preparation work is allowed in part. The Claimant is entitled to TZS 7,911,474; and JPY 122,504.

44. The claim in respect of water supply facilities is allowed. The Claimant is entitled TZS 198,633,506 and JPY 935,936 and must give credit for USD 26,576.

45. The claim in respect of quarry preparation work is allowed. The Claimant is entitled to TZS 22,696,414; USD 6,213; and JPY 458,383.

46. The claim in respect of the construction of temporary diversion road is allowed. The Claimant is entitled to TZS 53,493,015; USD 4,094; and JPY 1,128,207.

47. The claim in respect of the demobilisation and removal of plant and equipment is allowed. The Claimant is entitled to TZS 40,739,281; USD 39,628; and JPY 802,013.

48. The claim in respect of the demobilisation and removal of temporary facilities is allowed. The Claimant is entitled to TZS 106,666,934; USD 311; and JPY 1,235,528.

49. The claim in respect of the stand down of plant and equipment to 30 June 2009 is allowed in part. The Claimant is entitled to TZS 4,467,474; USD 37,802; and JPY 12,473,905.

50. The claim in respect of security guards is allowed. The Claimant is entitled to TZS 48,816,475.

51. The claim in respect of the repatriation of ex-pat staff is allowed. The Claimant is entitled to USD 19,606.

52. The claim in respect of legal and consultant fees fails.

53. The claim in respect of management costs and expenses fails.

273

54. Accordingly, the Claimant is entitled to the following total amounts in respect of the claims arising out of termination:

TZS 1,139,914,510

USD 1,123,217

JPY 66,877,983

## SECTION X: THE FINAL ACCOUNT

55. Sub-Clause 20.1 does not apply in relation to the submission of the Statement at Completion and/or the Final Statement under Clause 14. Accordingly, the Engineer's assessment of the Final Account of 10 February 2010 is not binding on the Parties or the Tribunal.

56. Bill item 13.01 includes the allowance for original design costs. The Claimant is entitled to TZS 1,813,008,129.

57. The claim in respect of additional design costs is allowed. As set out above, the Claimant is entitled to TZS 1,813,008,129.

58. The claim in respect of additional indirect costs is addressed in Section VII above.

59. The claim in respect of gravel (crushed stone) bedding for structures fails.

60. The claim in respect of clearing and grubbing is agreed. The Claimant is entitled to TZS 406,549,114.

61. The claim in respect of excavation to spoil fails.

62. The claim in respect of road signs is allowed. The Claimant is entitled to TZS 22,157,703.

63. The claim in respect of thermoplastic road markings is allowed. The Claimant is entitled to TZS 304,154,766.

64. The claim in respect of topsoiling median strip is allowed. The Claimant is entitled to TZS 1,690,095.

65. The claim in respect of the railway crossing is allowed. The Claimant is entitled to TZS 10,621,376.

66. The claim in respect of concrete class 30 is allowed. The Claimant is entitled to TZS 260,229,612.

67. The claim in respect of renovation work at the RE office in Dodoma is allowed. The Claimant is entitled to TZS 9,248,370.

68. The claim in respect of temporary accommodation at the Chikuyu camp is allowed. The Claimant is entitled to TZS 9,144,000.

69. The claim in respect of telephone costs for the Engineer's office in Chikuyu is allowed. The Claimant is entitled to TZS 3,779,391.

70. The claim in respect of the Engineer's laptop is allowed. The Claimant is entitled to TZS 1,423,464.

71. The claim in respect of excess materials purchased or produced prior to termination fails.

72. The claim in respect of slow working costs between 21 June and 6 November 2008 fails.

### SECTION XI: THE CLAIMANT'S DAMAGES CLAIMS

73. The right to recover damages for repudiatory breach and to recover under the Contract provisions relating to termination arise independently and no election is required.

74. The Claimant is entitled to recover the cost of maintaining the Performance Security at a higher value than contractually required from 14 March 2007 to 11 March 2009 as damages for breach of contract. The Tribunal accepts the categories of cost claimed for the Bond Fee, the insurance premium and the Valuation Fees, but not the Nominal Fee. Accordingly, the Claimant is entitled to recover TZS 25,888,889 and USD 39,523.

75. The Claimant is entitled to recover the cost of maintaining the Performance Security from 12 March 2009 to the date of expiry of the Performance Security. Accordingly, the Claimant is entitled to recover the sums of TZS 121,056,060 and USD 443,903.

76. The claim in relation to the costs incurred in preventing the Employer from making a call under the Performance Security fails.

77. The claim for currency devaluation fails.

78. The claims for loss of opportunity fail.

79. The claim for the costs of the DAB proceedings and amicable settlement procedures fails.

## SECTION XII – THE CLAIMANT'S CLAIMS FOR VAT; FINANCING AND INTEREST

80. The Claimant is entitled to an indemnity from the Respondents in respect of any amount of VAT which the Tanzanian Revenue Authority seeks to recover on sums awarded in this arbitration (in excess of any VAT so far paid to the Claimant) and in respect of any interest, fines, penalties and/or other charges

that may be imposed on the Claimant in relation to VAT in respect of the Contract or Project provided that any such interest, fines, penalties or other charges do not arise, in whole or in part from any fault on the part of the Claimant. The indemnity shall be in respect of the final amount of VAT that is applicable after all appeals under the Tanzanian legal system have been exhausted.

81. The Claimant is entitled to recover simple interest pursuant to Section 49 of the Arbitration Act 1996 on the following basis:

   a. Interest on sums due under the Addendum shall be payable from 14 April 2007 which is 30 days after the date of the Addendum until the date of payment of such sums. Where a sum has not been paid the interest continues until 31 October 2015. The Claimant is accordingly entitled to TZS 1,787,741,126 and USD 6,198,045.

   b. In respect of all other sums awarded in this arbitration, from 4 July 2012 to 31 December 2015 in the amounts of:

   | | |
   |---|---|
   | TZS | 6,007,136,955; |
   | USD | 800,624; |
   | JPY | 3,613,226.. |

82. In addition the Tribunal finds that the Claimant is entitled to recover interest of:

   TZS 5,172,428.40;

   USD 682.04;

   JPY 2,833.90.

per day from 1 January 2016 to the date of payment of the principle sums due under this award. These sums for daily interest are calculated after deducting the amounts of daily interest in TZH and USD to which the Respondents are entitled in respect of the amounts awarded for the costs of the First Arbitration and which are set out below at Section XIII, paragraph 90 . **The deduction of the amounts of interest in GBP and EUR are addressed in Section XVI , paragraph 4.**

## SECTION XIII: COUNTERCLAIMS

83. The claim for revisions to IPCs fails.

84. The claim for liquidated damages fails.

85. The claim in respect of the defective box culvert fails.

86. The claim in respect of open gravel pits and clean-up of excess materials fails.

87. The claim in respect of the undulating section of the Road fails.

88. The claim in respect of the bleeding of bitumen fails.

89. The claim in respect of the costs of the DAB proceedings and settlement negotiations fails.

90. The costs awarded in the First Arbitration set out above (EUR 271,258; USD 136,016.60; GBP 1,504.02; TZS 4,780,194.30) plus interest from 10 December 2010 to 31 December 2015 and thereafter in a daily amount until the date of payment (as set out in the table below): are to be deducted from the sums awarded in this arbitration to the Claimant.

| Currency | Interest to 31 December 2015 | Daily amount |
|---|---|---|
| USD | 6,682.40 | 2.95 |
| GBP | 160.27 | 0.06 |
| TZS | 3,244,059 | 2,227.05 |
| EUR | 25,140.93 | 9.07 |

## SECTION XIV: COSTS

91. The Tribunal finds that the Claimant is entitled to the following costs:

Solicitor's fees: GBP 3,731,944.60.

Solicitor's disbursements: GBP 490,244.50 and GBP 12,060.

Counsel fees: GBP 1,402,978.40 and USD 99,006.70.

ICC/Tribunal expenses: USD 534,220.00

Expert fees: GBP 1,579,755.70.

Costs directly paid by party: GBP 202,802.28, USD 41,436.56, JPY 15,561,251 and TZS 677,864.82.

Fact witness costs: GBP 16,123.31, USD 981.86 and JPY 884,832.30.

92. The effect of the foregoing decisions and findings of the Arbitral Tribunal (excluding the award of costs set out above) is set out in the table below.

| Claim | Tribunal's Finding | | | | |
|---|---|---|---|---|---|
| | Tsh | $ | Jpn Yen | GBE | € |
| Agreed Measured Works | 54,700,521,473 | | | | |
| BQ Items | 24,525,341,007 | | | | |
| Variations | 146,485,337 | 29,717 | 4,437,950 | | |
| Price Escalation | 4,418,912,166 | 14,797,747 | | | |
| Termination Costs | 1,139,914,510 | 1,123,217 | 66,877,983 | | |
| Other Issues | 146,944,949 | 483,426 | - | | |
| Prolongation | 40,434,553 | 13,432 | 7,956,471 | | |
| Disruption | 22,709,483 | 1,006 | - | | |
| Previous Arbitration Costs | - 4,780,194 | 195,017 | - | 1,504 - | 271,258 |
| Counterclaim | - | - | - | | |
| Total Sum Awarded Excluding Interest | 85,137,083,293 | 16,312,528 | 79,262,404 - | 1,504 - | 271,258 |
| | | | | | |
| Payment Ratio of Tanzanian Shillings to Foreign Currency | 23,615,801,329 | 78,389,253 | 79,262,404 - | 1,504 - | 271,258 |
| Less Amounts Paid | - 12,708,778,462 | 46,820,981 | | | |
| Net Sum Awarded Excluding Interest | 11,107,022,867 | 31,568,271 | 79,262,404 - | 1,504 - | 271,258 |
| | | | | | |
| Interest on Sums Awarded from 4 July 2012 to 31 December 2015 | 6,007,186,955 | 890,624 | 3,613,226 | | |
| Interest on Addendum sums from 14 April 2007 to 31 December 2015 | 1,787,741,126 | 6,198,045 | | | |
| Interest on Previous Arbitration Costs Awarded to Respondent to 31 December 2015 | - 3,379,909 | 6,862 | - | 164 - | 25,694 |
| Interest on Net Sum Awarded | 7,791,498,173 | 6,991,807 | 3,613,226 - | 164 - | 25,694 |
| | | | | | |
| Net Sum Including Interest | 18,898,521,040 | 38,560,078 | 82,875,629 - | 1,668 - | 296,952 |

Daily Interest from 31 December 2015 to date of payment

| | |
|---|---|
| Tsh | 5,172,428.40 |
| US$ | 682.04 |
| JPY | 2,833.90 |
| GBE - | 0.06 |
| € - | 3.07 |

Konoike is entitled to an indemnity from TANROADS in relation to VAT charged by the Tanzanian Revenue Authority in excess of that paid to Konoike for this Project. Konoike is entitled to an indemnity from TANROADS in the event that the Tanzanian Revenue Authority imposes interest, fines, penalties or other charges or sums on Konoike in relation to the Project.

## SECTION XVI: FINAL AWARD

1. For the foregoing reasons, the Arbitral Tribunal awards and declares as follows in respect of the Claims of the Claimant and the Counterclaims of the Respondents as set forth in their respective pleadings and submissions.

2. The Decisions and Findings of the Arbitral Tribunal in relation to each Claim and each Counterclaim are set out in the preceding Section XV: Summary of Decisions.

3. As a consequence of such Decisions and Findings the Respondents shall pay to the Claimant the following net sums as set out in the table at Section XV paragraph 92 (including net interest to 31 December 2015)less the TZS and USD sums calculated pursuant to paragraph 4 below:

   (a) the sums of :

   TZS 18,898,521,040

   USD 38,560,078

   JPY 82,875,629

   J

   (b) interest of the following daily amounts from 1 January 2016 to the date of payment of the principle sums of:

   TZS 5,172,428.40

   USD 682.04

   JPY 2833.90

281

4. At the date of payment of the sums set out in paragraph 3 above the Respondents shall convert the following sums(which include interest to 31 December 2015) into TZS and USD at the Contract TZS:USD ratio at the rates of exchange prevailing on the date of payment and deduct such converted amounts from the total of the foregoing TZS and USD sums:

   (a) GBP 1,668

      EUROS 296,942

   (b) interest on GBP 1,504 and EUR 271,258 sums from 1 January 2016 to the date of payment of the principle sums at daily amounts of GBP 0.06 and EUROS 9.07.

5. The Respondents shall indemnify the Claimant in respect of any final amount of VAT, after all appeals under the Tanzanian legal system have been exhausted, which the Tanzanian Revenue Authority seeks to recover on sums awarded in this arbitration in excess of any VAT which the Claimant has so far paid in respect of the Project or the Contract.

6. The Respondents shall indemnify the Claimant in respect of any interest, fines, penalties and/or other charges that may be imposed on the Claimant in relation to VAT on the Project or Contract, provided that any such interest, fines, penalties or other charges do not arise in whole or in part from any fault on the part of the Claimant.

7. In respect of the costs of the arbitration the Respondents shall pay to the Claimant :

   (a) Claimant's costs of :

TZS 677,864.82

USD 141,425.12

JPY 1,6446,083.30

GBP 7,435,908.79


(b) ICC costs of USD 534,220.00


Place of Arbitration: London, United Kingdom

DATED: 10th February 2016


John Bellhouse                Professor Douglas Jones AO                Graeme Christie


President